No.  25-9548

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

PAWNEE NATION OF OKLAHOMA,
*Petitioner,*

v.

LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency
Administrator, and U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*

_____

Petition for Review of May 12, 2025 Order by the
U.S. Environmental Protection Agency

_____

**PETITIONER'S OPENING BRIEF**

_____

Michael S. Freeman
Rachael Jaffe
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
Phone: (303) 996-9615
Facsimile: (720) 550-5757
mfreeman@earthjustice.org
rjaffe@earthjustice.org

*Attorneys for Petitioner Pawnee Nation of Oklahoma*

October 14, 2025

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..............................................................1

ISSUES PRESENTED FOR REVIEW ......................................................3

STATEMENT OF THE CASE....................................................................3

   A.  Federal Environmental Regulation on Indian Lands.......................................4

   B.  Insertion of the SAFETEA Rider Into a 2005 Transportation Bill................6

   C.  Expiration of SAFETEA in 2009 .................................................10

   D.  McGirt v. Oklahoma .......................................................11

   E.  Oklahoma's SAFETEA Request and EPA's 2020 Decision .........................13

   F.  EPA's January 2025 and May 2025 Decisions .............................................17

SUMMARY OF ARGUMENT....................................................................20

ARGUMENT ...........................................................................................22

I.    STANDARD OF REVIEW................................................................22

II.   THE SAFETEA RIDER EXPIRED LONG BEFORE OKLAHOMA
       SUBMITTED ITS REQUEST UNDER THAT LAW. ..................................23

   A.  The SAFETEA Rider Expired Along With the Time-Limited Spending
       Bill to Which It Was Attached. ....................................................23

   B.  The Indian Law Canon of Construction, and Respect for Tribal
       Sovereignty, Require Treating the SAFETEA Rider As Expired.................29

   C.  The SAFETEA Rider Should Not Be Interpreted as an Implied Partial
       Repeal of Multiple Environmental Statutes. .................................................32

   D.  The Circumstances Surrounding Enactment of the SAFETEA Rider
       Show Why It Should be Deemed to Have Expired. ......................................35

III.  EVEN IF THE SAFETEA RIDER HAD NOT EXPIRED, THE MAY
       2025 ORDER SHOULD BE SET ASIDE BECAUSE EPA HAD
       AUTHORITY TO IMPOSE CONDITIONS WHEN APPROVING
       OKLAHOMA'S REQUEST. .......................................................37

   A.   The Plain Language of the SAFETEA Rider Allowed EPA to Impose the Engagement Condition. ...........................................................37

   B.   Case Law Recognizes EPA's Authority to Apply Conditions When Approving a SAFETEA Rider Request..........................................39

   C.   EPA Had Authority Independent of the SAFETEA Rider to Impose Conditions When Approving Oklahoma's Request.....................................40

IV.   EPA IGNORED THE PLAIN LANGUAGE OF THE SAFETEA RIDER WHEN IT APPROVED OKLAHOMA'S REQUEST WITHOUT ADDRESSING WHETHER THE STATE WAS COMPLYING WITH THE LAW IN ADMINISTERING THE AFFECTED PROGRAMS. ...........................................................44

   A.   EPA Misread the Text of the Rider ............................................45

   B.   EPA's Failure to Assess Oklahoma's Compliance With the Law Was Prejudicial ......................................................................47

      1.   Clean Air Act Compliance Issues...............................................47

      2.   Safe Drinking Water Act Underground Injection Well Problems .............48

      3.   TSCA Lead-Based Paint Programs .........................................50

CONCLUSION .........................................................................52

STATEMENT REGARDING ORAL ARGUMENT ...........................................52

ADDENDUM:

   SAFETEA Rider, Pub. Law 109-59 § 10211, 119 Stat. 1144, 1937

   January 13, 2025 EPA SAFETEA Order

   May 12, 2025 EPA SAFETEA Order

   EPA Office of Inspector General Report No. 25-E-0042 (July 16, 2025)

   Declaration of Monty Matlock

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

<u>3484, Inc. v. Nat'l Labor Rels. Brd.</u>,
   137 F.4th 1093 (10th Cir. 2025) .......................................................22

<u>All. for the Wild Rockies v. Salazar</u>,
   800 F. Supp. 2d 1123 (D. Mont. 2011) ..............................................36

<u>Atl. Fish Spotters Ass'n v. Evans</u>,
   321 F.3d 220 (1st Cir. 2003) .................................................24, 26, 27

<u>Auburn Housing Auth. v. Martinez</u>,
   277 F.3d 138 (2d Cir. 2002) ...........................................27, 29, 34, 35

<u>Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin</u>,
   961 F.2d 269 (D.C. Cir. 1992) .......................................23, 24, 25, 26

<u>Ctr. for Biological Diversity v. EPA</u>,
   861 F.3d 174 (D.C. Cir. 2017) ............................................................2

<u>Env't Def. Ctr. v. Babbitt</u>,
   73 F.3d 867 (9th Cir. 1995) ..............................................................34

<u>Epic Sys. Corp. v. Lewis</u>,
   584 U.S. 497 (2018) ..........................................................................33

<u>Hays Medical Ctr. v. Azar</u>,
   956 F.3d 1247 (10th Cir. 2020) .........................................................22

<u>Herrera v. Wyoming</u>,
   587 U.S. 329 (2019) ..........................................................................29

<u>HRI, Inc. v. EPA</u>,
   198 F.3d 1224 (10th Cir. 2000) .........................................................31

<u>Lamonica v. Safe Hurricane Shutters, Inc.</u>,
   711 F.3d 1299 (11th Cir. 2013) .....................................................32, 33

<u>Loper Bright Enters. v. Raimondo</u>,
   603 U.S. 369 (2024) ..........................................................................22

Maine Comty. Health Options v. United States,
  590 U.S. 296 (2020)....................................................................................32, 34

McGirt v. Oklahoma,
  591 U.S. 894 (2020)....................................................................................11, 12

Michigan v. Bay Mills Indian Cmty.,
  572 U.S. 782 (2014)............................................................................................30

Modoc Lassen Indian Housing Auth. v. U.S. Dep't of Housing and
  Urban Dev.,
  881 F.3d 1181 (10th Cir. 2017) .........................................................................43

Montana v. Blackfeet Tribe of Indians,
  471 U.S. 759 (1985)............................................................................................30

Natl' Labor Rels. Brd. v. Pueblo of San Juan,
  276 F.3d 1186 (10th Cir. 2002) ...............................................22, 29, 32, 38, 39

Oklahoma Dep't of Env't Quality v. EPA,
  740 F.3d 185 (D.C. Cir. 2014)....................................................3, 19, 21, 39, 40

Phillips Petroleum Co. v. EPA,
  803 F.2d 545 (10th Cir. 1986) .............................................................................5

Pub. Serv. Co. of N.M. v. Barboan,
  857 F.3d 1101 (10th Cir. 2017) ...............................................22, 29, 38, 39, 46

New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,
  565 F.3d 683 (10th Cir. 2009) ...........................................................................43

Ruckelshaus v. Monsanto Co.,
  467 U.S. 986 (1984)......................................................................................32, 33

Russello v. United States,
  464 U.S. 16 (1983)........................................................................................27, 29

Santa Clara Pueblo v. Martinez,
  436 U.S. 49 (1978)..............................................................................................29

Smithsforks Grazing Ass'n v. Salazar,
  564 F.3d 1210 (10th Cir. 2009) .........................................................................24

iv

Soul Quest Church of Mother Earth, Inc. v. Att'y Gen.,
 92 F.4th 953 (11th Cir. 2023) ...................................................................2

Sunnyside Coal Co. v. Director,
 112 F.4th 902 (10th Cir. 2024) ...............................................................22

Tennessee Valley Auth. v. Hill,
 437 U.S. 153 (1978)..................................................................................32

Tin Cup, LLC v. U.S. Army Corps of Eng'rs,
 904 F.3d 1068 (9th Cir. 2018) .................................................25, 26, 28

TRW Inc. v. Andrews,
 534 U.S. 19 (2001)....................................................................................45

United States v. Husted,
 545 F.3d 1240 (10th Cir. 2008) ..............................................................46

United States v. Wilson,
 503 U.S. 329 (1992)..................................................................................46

Wash. Dep't of Ecology v. EPA,
 752 F.2d 1465 (9th Cir. 1985) ............................................................5, 31

Wisconsin v. EPA,
 266 F.3d 741 (7th Cir. 2001) ..................................................................31

**Statutes**

5 U.S.C. § 702 ...............................................................................................1

33 U.S.C. § 1342(d)(1)................................................................................42

33 U.S.C. § 1369(b) .....................................................................................2

33 U.S.C. § 1377(e) ...................................................................................33

42 U.S.C. § 300j-7 .......................................................................................2

42 U.S.C. § 300j-11(b)...............................................................................33

42 U.S.C. § 6976(b) .....................................................................................2

42 U.S.C. § 7601(d) ...................................................................................33

v

42 U.S.C. § 7607(b)(1) ........................................................................ 2

42 U.S.C. § 7661d ...............................................................................42

46 U.S.C. § 13102 ...............................................................................28

46 U.S.C. § 13104(a) ...........................................................................28

46 U.S.C. § 13106 ...............................................................................28

49 U.S.C. § 30106 ...............................................................................28

Pub. L. No. 109-59, 119 Stat. 1144
    (Aug. 10, 2005) ..................................... 1, 6, 7, 21, 25, 27, 28, 44, 45

Pub. L. No. 111-68, 123 Stat. 2023 (Oct. 1, 2009) ...............................10

Pub. L. No. 112-141, 126 Stat. 405 (July 6, 2012) ...............................11

Pub. L. No. 114-94, 129 Stat. 1312 (Dec. 4, 2015) ..............................11

## Other Authorities

40 C.F.R. § 70.8(a)-(c) ........................................................................42

40 C.F.R. § 123.43(d) ..........................................................................42

40 C.F.R. § 123.44(d)(3) ......................................................................42

40 C.F.R. § 123.62(a) ...........................................................................41

40 C.F.R. § 239.12 ...............................................................................41

151 Cong. Rec. S9398-01 (July 29, 2005) .............................................9

H.R. Conf. Rep. 109-23 (July 28, 2005) .................................................8

Kimberly Chen, Toward Tribal Sovereignty: Env't Regul. in
    Oklahoma after McGirt, 121 Colum. L. Rev. F. 95 (2021) ............. 10, 16, 30, 31

EPA Office of Inspector General, Evaluation of the EPA's Oversight
    of Authorized State Lead-Based Paint Programs, Report No. 25-E-
    0042 ................................................................................................51

Neal E. Devins, Regulation of Government Agencies Through
   Limitation Riders, 1987 Duke L.J. 456 (1987)....................................................35

Newton et al., Cohen's Handbook of Federal Indian Law
   (2012 ed.) ...................................................................5, 22, 29, 30, 43

Office of the General Counsel, U.S. General Accounting Office,
   Principles of Federal Appropriations Law (4th ed. 2016)..................................25

The Hon. John Edward Porter, House of Representatives, Comptroller
   Gen., B-271412, 1996 WL 335238 (June 13, 1996) ...........................................25

Keith S. Porter, Good Alls. Make Good Neighbors: The Case for
   Tribal-State-Federal Watershed P'ships, 16 Cornell J. L. & Pub.
   Pol'y 495 (2007) .................................................................................................10

Peter Raven-Hansen & William C. Banks, Pulling the Purse Strings of
   the Commander in Chief, 80 Va. L. Rev. 833 (1994) ................................. 23-24

Security Clearances at DOE, Comptroller Gen.,
   B-248926, 1992 WL 130552 (May 29, 1992)....................................................24

Will Tress, Lost Laws: What We Can't Find in the United States
   Code, 40 Golden Gate U. L. Rev. 129 (2010) ...............................................28, 35

Sandra Beth Zellmer, Sacrificing Legislative Integrity at the Altar of
   Appropriations Riders: A Constitutional Crisis, 21 Harv. Envtl. L.
   Rev. 457 (1997) .......................................................................................... 35-36

**Related Case**

Pawnee Nation of Oklahoma v. Zeldin, No. 20-9635 (10th Cir.), petition dismissed
August 28, 2025

## **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | Environmental Protection Agency |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| ODEQ | Oklahoma Department of Environmental Quality |
| OIPA | Oklahoma Independent Petroleum Association |
| RCRA | Resource Conservation and Recovery Act |
| SAFETEA (or SAFETEA-LU) | Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users |
| SDWA | Safe Drinking Water Act |
| TAS | Treatment as a State |
| TSCA | Toxic Substances Control Act |
| UIC | Underground Injection Control |

## JURISDICTIONAL STATEMENT

The Pawnee Nation of Oklahoma brings this petition to seek review under Fed. R. App. P. 15 of a May 12, 2025 Order by Environmental Protection Agency (EPA) Administrator Lee Zeldin (the May 2025 Order), Admin. Record at AR0001132 (included in Addendum).[1]  The May 2025 Order granted a request by the State of Oklahoma under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005 (the SAFETEA Rider), Pub. Law 109-59, 119 Stat. 1144, 1937 (Aug. 10, 2025), to take over administration of more than two dozen federal environmental programs in Indian country.  EPA asserted authority to issue the order under the SAFETEA Rider, which provided for the EPA Administrator to issue such orders.[2]

The Administrative Procedure Act (APA), 5 U.S.C. § 702, provides for the Pawnee Nation to seek judicial review of the May 2025 Order.  The May 2025 Order was a final order by EPA because it resolved Oklahoma's request to administer the environmental programs in question.

This Court has jurisdiction over the Pawnee Nation's petition because many of the statutory programs affected by the May 2025 Order provide that challenges to EPA decisions must be brought in the Court of Appeals, including the appeals

---

[1] References to the administrative record are cited in this brief as "ARXXXX."
[2] EPA did not have authority to issue such an order, however, because the SAFETEA Rider had expired years earlier.  <u>See</u> pp. 23-37, <u>infra</u>.

1

court for the circuit in which Petitioner resides.  See 33 U.S.C. § 1369(b) (Clean

Water Act); 42 U.S.C. § 300j-7 (Safe Drinking Water Act (SDWA)); 42 U.S.C.

§ 6976(b) (Resource Conservation and Recovery Act (RCRA)); 42 U.S.C.

§ 7607(b)(1) (Clean Air Act).[3]  The Pawnee Nation is located in the Tenth Circuit.

The shortest statutory deadline for filing such a petition is under SDWA,

which allows 45 days after the final agency action being challenged.  42 U.S.C.

§ 300j-7(a)(2).  This petition is timely because it was filed on June 18, 2025, within

45 days after issuance of the May 2025 Order.

The Pawnee Nation has standing to bring this case because EPA's May 2025

Order eliminated a requirement that Oklahoma engage with the Pawnee

government when taking actions under the affected environmental programs.  Pp.

19-20, infra.  That engagement requirement served to mitigate the impact of the

SAFETEA Rider on the Pawnee Nation.  It also helped protect the air, water, and

health of the Pawnee Nation and its members by "ensur[ing] that the Tribes' input

and environmental priorities are considered in the State's decision-making

---

[3] While some of the programs affected by the May 2025 Order do not require
exclusive review in the appeals court, jurisdiction is proper in this Court because
the changes to those programs are part of the same EPA Order.  See Ctr. for
Biological Diversity v. EPA, 861 F.3d 174, 179 (D.C. Cir. 2017) (holding that
because Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) challenge to
EPA decision must be brought in appeals court, Endangered Species Act claim
against same decision must also be filed there); Soul Quest Church of Mother
Earth, Inc. v. Att'y Gen., 92 F.4th 953, 971-72 (11th Cir. 2023) (same).

2

processes." Pp. 17-18, <u>infra</u>.  By eliminating the engagement requirement, the May 2025 Order caused an injury to the Pawnee Nation that this Court can redress. <u>See</u> Decl. of Monty Matlock (included in Addendum).

## <u>ISSUES PRESENTED FOR REVIEW</u>

1.    Did the SAFETEA Rider expire prior to 2025, thus eliminating the basis for EPA's approval of Oklahoma's request to administer federal environmental programs on Indian lands?

2.    Did EPA err when it asserted in the May 2025 Order that the SAFETEA Rider "reserves no authority for EPA to impose additional requirements" or conditions when approving Oklahoma's request, despite the ruling in <u>Oklahoma Dep't of Env't Quality v. EPA</u>, 740 F.3d 185 (D.C. Cir. 2014) (<u>ODEQ</u>), and EPA's own prior interpretation, both of which recognized that EPA does have such authority?

3.    Did EPA err by approving Oklahoma's SAFETEA request without determining that Oklahoma's administration of the affected programs complies with relevant federal environmental laws, where the SAFETEA Rider expressly required such a determination?

## <u>STATEMENT OF THE CASE</u>

The May 2025 Order challenged in this case allowed the State of Oklahoma to take over administration of more than two dozen federal environmental

3

regulatory programs on Indian lands in the state.  EPA's order invoked a legislative rider (the SAFETEA Rider) that had been inserted into an unrelated transportation spending bill twenty years earlier, and which applied only in Oklahoma.  In doing so, EPA failed to recognize that the Rider had expired.  EPA also declined to impose conditions on the SAFETEA approval that would mitigate its impact on the Pawnee Nation and other tribes and failed to make a determination—required by the SAFETEA Rider—that Oklahoma's existing administration of those programs was in compliance with the law.

### A.    Federal Environmental Regulation on Indian Lands

Many federal environmental laws allow EPA to delegate administration of environmental regulatory programs to states, under certain conditions and subject to ongoing EPA oversight.  Over the years, Oklahoma has been approved to administer at least twenty-six of those programs under six federal environmental laws, including the Clean Air Act, Clean Water Act, SDWA, Toxic Substances Control Act (TSCA), and other statutes.  Jan. 13, 2025 EPA SAFETEA decision at 23-24 (the January 2025 Order), AR0000923 (included in Addendum).

Those delegations, however, typically do not extend to Indian lands. Instead, EPA (rather than states) administers federal environmental laws on Indian lands absent an "express grant of jurisdiction from Congress" allowing a state to

regulate there.[4]  This is because "[i]nherent state authority within Indian country is

severely limited," Newton et al., Cohen's Handbook of Federal Indian Law (2012

ed.) (Cohen) § 10.02[1] at 789, and the federal government has a trust duty to

tribes "as a guarantor of Indian rights against state encroachment." Wash. Dep't of

Ecology v. EPA, 752 F.2d 1465, 1470 (9th Cir. 1985) (affirming EPA denial of

request by state to administer RCRA on Indian lands); see also Phillips Petroleum

Co. v. EPA, 803 F.2d 545, 546, 552 (10th Cir. 1986) (affirming EPA authority to

issue SDWA regulations on Indian lands and noting that state lacks authority

there); January 2025 Order at 2, 7.

 Several federal environmental laws also allow Indian tribes to apply for

"treatment as a state" status (TAS), under which EPA delegates administration of

the environmental program to the tribe on the tribe's jurisdictional lands.  See

Cohen § 10.02[1] at 790-91; AR0000002 (1984 EPA Policy) (stating EPA policy to

recognize "tribal governments as the primary parties for" environmental regulation

on their lands).  In Oklahoma, the only tribes to have approved TAS programs are

_____

[4] AR0000001, Env't Prot. Agency, EPA Policy for the Admin. of Env't Programs on Indian Reservations (Nov. 8, 1984) at 2 (1984 EPA Policy); see also Env't Prot. Agency, EPA Policy for the Admin. of Env't Programs on Indian Reservations, https://www.epa.gov/tribal/epa-policy-administration-environmental-programs-indian-reservations-epa-indian-policy (last visited October 7, 2025) (stating that 1984 EPA Policy "remains the cornerstone for EPA's Indian program").

the Pawnee Nation (which obtained approval in 2004 for certain Clean Water Act

programs) and the Cherokee Nation (which obtained TAS approval in 2001 for a

TSCA lead abatement program).[5]  Thus, prior to 2020, EPA implemented most

environmental programs on Indian lands in Oklahoma.  January 2025 Order at 3.

**B.     Insertion of the SAFETEA Rider Into a 2005 Transportation Bill**

In 2005, a legislative rider was included in an unrelated transportation

spending bill known as the Safe, Accountable, Flexible, Efficient Transportation

Equity Act of 2005: A Legacy for Users, Pub. Law 109-59, 119 Stat. 1144

(SAFETEA or SAFETEA-LU).  SAFETEA was a spending bill that addressed

transportation funding for a five-year period covering fiscal years 2005 to 2009.[6]

---

[5] January 2025 Order at 3; EPA TAS approval of Cherokee program (Oct. 15, 2001), https://www.cherokee.org/media/dvahper1/31900epaapprovalofprogram.pdf; EPA TAS approval of Pawnee program (Nov. 4, 2004), https://www.epa.gov/sites/default/files/2015-07/documents/pawnee_nation_approval_and_maps.pdf.

[6] See, e.g., AR0000162 (EPA noting that SAFETEA was a "a transportation appropriations bill"); SAFETEA Section 1101(a)(1)-(21), 119 Stat. at 1153–56 (authorizing specific sums to be appropriated for various Federal-aid highway programs for fiscal years 2005 to 2009); Section 1114(e)(2), 119 Stat. at 1174–75 (providing appropriations for particular bridge activities for fiscal years 2005 to 2009); Section 2001(a), 119 Stat. at 1519–20 (authorizing appropriations for highway safety and other related programs for fiscal years 2005 to 2009); Section 4101(a), 119 Stat. at 1714 (similar for Motor Carrier Safety programs); Section 5101(a), 119 Stat. at 1779 (similar for research and other programs); Section 7125, 119 Stat. at 1908–09 (authorizing and providing appropriations related to hazardous materials preparedness for fiscal years 2005 to 2008); Sections 10113, 10118, 119 Stat. at 1927-1929 (distributing appropriations for conservation project grants for fiscal years 2006-2009).

The SAFETEA Rider altered the normal statutory framework in Oklahoma by allowing Oklahoma to seek EPA approval to administer environmental programs on Indian lands in that state. The SAFETEA Rider applied only to Oklahoma, and stated:

SEC. 10211. ENVIRONMENTAL PROGRAMS.

(a) OKLAHOMA.—Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency (referred to in this section as the "Administrator") determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.

SAFETEA Section 10211(a), 119 Stat. at 1937.[7]

---

[7] Subsection (b) of the SAFETEA Rider also gave Oklahoma an effective veto over applications by tribes seeking TAS status, stating:

(b) TREATMENT AS STATE.—Notwithstanding any other provision of law, the Administrator may treat an Indian tribe in the State of Oklahoma as a State under a law administered by the Administrator only if— (1) the Indian tribe meets requirements under the law to be treated as a State; and (2) the Indian tribe and the agency of the State of Oklahoma with federally delegated program authority enter into a cooperative agreement, subject to review and approval of the Administrator after notice and opportunity for public hearing, under which the Indian tribe and that State agree to treatment of the Indian tribe as a State and to jointly plan [and] administer program requirements.

Id. § 10211(b).

The Rider was inserted into the SAFETEA bill shortly before its passage by
Oklahoma Senator James Inhofe.[8]  The Rider had not been included in earlier
versions of the SAFETEA bill, and it bypassed consideration by the Senate Indian
Affairs Committee.[9]  The Rider first appeared in the House-Senate conference
report, which was released at 6:59 pm on July 28, 2005.[10]  Less than 24 hours later,
both the House and Senate approved the full 836-page SAFETEA bill on July 29,
2005.[11]

There is no legislative history explaining the intent or scope of the
SAFETEA Rider.  The only apparent mention of the Rider in the legislative history
involved comments by Senator John McCain of Arizona, who spoke from the
Senate floor shortly before the SAFETEA bill was approved.  Senator McCain

---

[8] AR0000989 (citing Tony Thornton, Indian leaders hear complaints about
legislation, The Oklahoman (Nov. 2, 2005)
https://www.oklahoman.com/article/2918130/indian-leaders-hear-complaints-
about-legislation (hereinafter Thornton (2005))).

[9] AR0000898; AR0000989 (citing Travis Snell, Tribal officials angry over
transportation bill, Cherokee Phoenix (May 3, 2006)
https://www.cherokeephoenix.org/Article/index/1417 (hereinafter Snell (2006))).

[10] See H.R. Conf. Rep. 109-23 (July 28, 2005); Congress.gov, H.R.3 - SAFETEA-
LU, All Actions: H.R. 3 — 109th Congress (2005-2006),
https://www.congress.gov/bill/109th-congress/house-bill/3/all-actions?s=1&r=1
(last visited October 7, 2025) (SAFETEA-LU Timeline) (noting HR Conf. Rep.
109-23 filed at 6:59 pm on July 28).

[11] SAFETEA-LU Timeline (House passage at 11:37 am on July 29); U.S. Senate,
Roll Call Vote 109th Congress – 1st Session,
https://www.senate.gov/legislative/LIS/roll_call_votes/vote1091/vote_109_1_0022
0.htm (last visited October 7, 2025) (Senate vote at 6:03 pm on July 29).

described the Rider as "egregious" and noted that it had not been considered by the

Indian Affairs Committee:

> Mr. McCAIN.
>
> Mr. President, this is a remarkable piece of work. I want to . . . take a few minutes to talk about some of the interesting and egregious and remarkable aspects of this bill.
>
> ***
>
> [It] [e]xpands the authority of the State of Oklahoma in environmental matters to extend over 'Indian country' within that State.
>
> I don't know what that costs. But what in the world is it doing on a highway bill?
>
> Requires for Treatment as a State under EPA regulations, an Indian Tribe in Oklahoma, and the State of Oklahoma, must enter a cooperative agreement to jointly plan and administer program requirements.
>
> What is that all about? No one has ever brought it to my attention as chairman of the Indian Affairs Committee.

151 Cong. Rec. S9398-01, 2005 WL 1797579 (July 29, 2005).

News reports published once the Rider became public after SAFETEA's

passage suggest that Senator Inhofe had inserted the Rider into the bill at the

urging of the Oklahoma Independent Petroleum Association (OIPA).[12]  The Rider

---

[12] AR0000989; Snell (2006) (tribal leader stating the Rider was "[a]ttached at the OIPA's urging"); Thornton (2005) (stating "[t]he only people who knew about it were Senator Inhofe and the Oklahoma Independent Petroleum Association").

9

came a few months after the EPA had granted the Pawnee Nation Treatment as a State to administer certain Clean Water Act programs over OIPA's objections.[13]

The SAFETEA Rider apparently passed without any notice to EPA or Oklahoma tribes.[14]  One Oklahoma tribal leader stated at the time that the Rider "was really a midnight rider . . . [i]t avoided all the process of good policy and legislative development."[15]

### C.    Expiration of SAFETEA in 2009

While the Rider did not include an express sunset date, most of the SAFETEA statute expired in 2009.  After 2009, Congress had to pass multiple short-term extension acts to continue funding for transportation projects past fiscal year 2009.[16]  See, e.g., News Release, U.S. Dep't of Transp., $48.8 Billion In Highway Funds Now Available To States Annual Apportionment, Restored Dollars Will Enable States To Make Longer-term Plans, DOT 73-10, 2010 WL 1584919

---

[13] AR0000898 n.5; Keith S. Porter, Good Alls. Make Good Neighbors: The Case for Tribal-State-Federal Watershed P'ships, 16 Cornell J. L. & Pub. Pol'y 495, 529–30 (2007); Kimberly Chen, Toward Tribal Sovereignty: Env't Regul. in Oklahoma after McGirt, 121 Colum. L. Rev. F. 95, 102-03 (2021).

[14] See Porter, 16 Cornell J. L. & Pub. Pol'y at 530 ("Senator Inhofe did not inform EPA, any tribes, or the governor of Oklahoma that he was going to include this provision in the transportation legislation; only the Oklahoma Independent Petroleum Association knew that the Senator was going to insert it.").

[15] AR0000989 (quoting Snell (2006)).

[16] See AR0000493; U.S. Dep't of Transp. Fed. Highway Admin., SAFETEA-LU Extension Acts, https://www.fhwa.dot.gov/safetealu/legis.htm (last visited October 7, 2025); see, e.g., Legislative Branch Appropriations Act, 2010 § 157, 111 Pub. L. 68, 123 Stat. 2023, 2050 (Oct. 1, 2009).

(Apr. 21, 2010) ("SAFETEA-LU expired September 30, 2009, and since then, Congress has passed a series of small, short-term funding extensions . . ."); U.S. Dep't of Transp., <u>FY 2012 Appropriations</u>, 2012 WL 362703 (FTRAN-FTAGC) (Jan. 20, 2012) ("Ever since [SAFETEA-LU] expired on Sept. 30, 2009, Congress has passed a series of short term extensions").

Once these extensions expired, Congress replaced SAFETEA with another transportation funding law, the Moving Ahead for Progress in the 21st Century Act (MAP-21), Pub. L. No. 112-141, 126 Stat. 405 (July 6, 2012). MAP-21 was also time-limited and was later replaced by the Fixing America's Surface Transportation Act (FAST Act), Pub. L. No. 114-94, 129 Stat. 1312 (Dec. 4, 2015). Unlike the 2005 SAFETEA statute, MAP-21 and the FAST Act did not include language comparable to the SAFETEA Rider.

For years after SAFETEA's expiration, Oklahoma never sought to use the Rider to take over environmental programs on Indian lands. That changed in July 2020.

### D.    <u>McGirt v. Oklahoma</u>

On July 9, 2020, the United States Supreme Court held in <u>McGirt v. Oklahoma</u> that lands guaranteed by treaty to the Muscogee (Creek) Nation in Oklahoma remain Indian country for purposes of the Major Crimes Act rather than being under Oklahoma state criminal jurisdiction. 591 U.S. 894, 899-937 (2020).

11

In holding that these lands remain Indian country, the Supreme Court noted that they had been guaranteed to the Muscogee Nation by treaty and held that the Muscogee Reservation has not been disestablished.  Id. at 902-24.

This decision affected a substantial area of northeastern Oklahoma where the state had for many years been exercising jurisdiction to prosecute crimes. Oklahoma argued that there would be "potentially transformative" consequences from upholding the Muscogee's treaty rights.  Id. at 932 (quotation omitted). Oklahoma expressed "fears that perhaps as much as half its land . . . could wind up within Indian country" if other tribes also sought to vindicate their treaty rights. Id.

The Supreme Court rejected Oklahoma's objections about "significant consequences," holding that such concerns were not a license to disregard the law. Id. at 935. The Court stated: "[M]any of the arguments before us today follow a sadly familiar pattern. Yes, promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye. We reject that thinking." Id. at 937.  The Court observed: "[I]t is unclear why pessimism should rule the day.  With the passage of time, Oklahoma and its Tribes have proven they can work successfully together as partners."  Id. at 936-37.  The court noted, for example, that "[a]lready, the State has negotiated hundreds of intergovernmental agreements with tribes." Id. at 937.

### E.    Oklahoma's SAFETEA Request and EPA's 2020 Decision

Oklahoma did not follow the Supreme Court's admonition to work collaboratively with tribes. Instead, less than two weeks after the <u>McGirt</u> decision, the Governor of Oklahoma on July 22, 2020 submitted a request to EPA under the SAFETEA Rider asking the agency to grant Oklahoma authority to administer all EPA-approved environmental programs in "areas of the State that are in Indian Country." AR000052.

Oklahoma's request covered at least twenty-six different programs under six federal statutes: the Resource Conservation and Recovery Act (RCRA), the Safe Drinking Water Act (SDWA), the Clean Air Act, the Clean Water Act, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), and the Toxic Substances Control Act (TSCA). AR000052-55; AR0001140 n.11.

Oklahoma's request sought to nullify the impact of <u>McGirt</u> by "reestablish[ing] the status quo regarding the scope of the State's programs as they had been administered prior to the <u>McGirt</u> decision." May 2025 Order, App. A at 2; <u>see also</u> AR0000052 (July 22, 2020 letter from Okla. Gov. Kevin Stitt) (describing Indian lands covered by request as "[c]onsistent with the extent to which the State of Oklahoma implemented environmental programs throughout the State prior to the U.S. Supreme Court's recent decision in <u>McGirt v. Oklahoma</u>").

EPA did not inform the Pawnee Nation and many other Oklahoma tribes of Oklahoma's request for more than a month, until August 25, 2020. When they were notified, Oklahoma's request generated objections from numerous tribes. January 2025 Order at 4.[17] While there are thirty-eight Oklahoma tribes, and more than two dozen regulatory programs were at stake, EPA offered only three weeks—until September 15, 2020—for consultation with tribes. AR000070 (August 25, 2020 EPA Consultation and Coordination Timeline); January 2025 Order at 5, 7 (EPA later describing inadequacy of its 2020 consultation effort).

On October 1, 2020, EPA approved the State's SAFETEA request (the 2020 Decision) in a cursory letter to the Oklahoma governor. AR0000208-214. While it transferred authority over dozens of federal programs to Oklahoma, the approval letter was only seven pages long, with two of those pages devoted to listing the programs being transferred. Id.

EPA's 2020 Decision had a major impact on many Oklahoma tribes because it "fundamentally alter[ed] the sovereign relationship of the affected Tribes to the front-line regulator in broad areas of their Indian country land base." January 2025

---

[17] See, e.g., AR0000141-162 (EPA summary of tribal comments and noting written comments received from Choctaw Nation, Cherokee Nation, Muscogee (Creek) Nation, Seminole Nation, Osage Nation, Sac and Fox Nation, Quapaw Nation, Absentee-Shawnee Tribe, Citizen Potawatomi Nation, Delaware Nation, Fort Sill Apache Tribe, Iowa Tribe, Kaw Nation, Ponca Tribe, Pawnee Nation, and Wichita and Affiliate Tribes); AR0000104-140 (comment letters); see also AR0000215 (March 2021 letter to EPA Administrator from sixteen Oklahoma tribes).

Order at 11-12.  McGirt's recognition that the Muscogee Nation's reservation remains intact (and thus comprises Indian land) meant that, absent the SAFETEA decision, EPA rather than Oklahoma would have administered federal environmental programs on those lands.

That federal administration is significant because unlike Oklahoma, EPA has a trust obligation to the tribes, p. 43, infra, and engages in government-to-government consultation with tribes on federal actions that may affect them. January 2025 Order at 12; AR0000040-41 (EPA Consultation Policy).  Federal consultation is a defined process that goes well beyond accepting public comment, involving "a two-way, government-to-government exchange of information and dialogue" with the goal of achieving "consensus or a mutually desired outcome" with the affected tribe.  AR0000039-41.  By transferring administration to Oklahoma, EPA's 2020 SAFETEA Decision eliminated the basis for that consultation as part of environmental regulation in the state.  January 2025 Order at 12-13.

This change affected not only the Muscogee Nation (where administration of the environmental programs would otherwise have shifted from the State to EPA), but also the Pawnee Nation and numerous other Oklahoma tribes.  Because air and water pollution don't stop at political boundaries, environmental permitting decisions on the Muscogee Reservation affect the Pawnee Nation (whose

15

jurisdictional lands are adjacent to the Muscogee Nation).  AR0000351-354.  For

example, the Muscogee Reservation and Pawnee jurisdictional lands share the

same airshed, id., and numerous air pollution permits have been issued for sources

on the Muscogee Nation but very close to the Pawnee Nation.  Id.; see also

AR0000223-230 (Oklahoma comments providing maps of environmental permits

in Oklahoma).

     The loss of EPA administration affected the Pawnee Nation and other tribes

who have significant concerns with Oklahoma's approach to environmental

regulation.[18]  For example, EPA has identified "routine and/or widespread issues"

with Oklahoma's administration of certain Clean Air Act programs.  Pp. 47-48,

infra.  And mismanagement of Oklahoma's SDWA underground injection control

(UIC) program (which regulates disposal of oil and gas wastes by injecting them

underground) has been linked to numerous human-caused earthquakes.  In 2015,

Oklahoma even surpassed California as the most seismically active state in the

country because of the UIC-related earthquakes.  Pp. 48-50, infra.

---

[18] See AR0000547 (EPA noting that in meetings over SAFETEA, a "number of
tribes expressed concern that the State of Oklahoma would not adequately
implement the environmental programs or take enforcement actions in
cases of violations"); see, e.g., AR0000491, 835, 958, 1006-1012 (tribal
comments); Chen, 121 Colum. L. Rev. F. at 108-109 (describing concerns over
impacts of Oklahoma environmental regulation on Indian lands).

The Pawnee Nation filed a protective petition for review in this Court to preserve its rights to challenge EPA's 2020 Decision.  Case No. 20-9635.  After the 2021 change in presidential administration, EPA announced it would reconsider the 2020 Decision.  Following that proposal, EPA undertook "a lengthy period of review and reconsideration," May 2025 Order at 1, holding numerous meetings and discussions with Oklahoma tribes and the State, and multiple rounds of comment over a three-and-a-half-year period.  AR0000542-545, 948-951 (EPA summaries); January 2025 Order at 5-6.

During that process, the Pawnee Nation and other tribes urged EPA to withdraw the 2020 Decision and deny Oklahoma's SAFETEA request.  See, e.g., AR0000545-546 (EPA summary), 596-597, 807, 818-820, 986 (letters from tribes). On the other side, Oklahoma Governor Kevin Stitt submitted comments promising to file suit over "[a]ny attempt by EPA to alter the regulatory framework in Oklahoma," adding "Let me be clear: Oklahoma will pursue every available avenue to maintain its regulatory authority and safeguard its sovereignty, including litigation if necessary."  AR0000921.

## F.    EPA's January 2025 and May 2025 Decisions

On January 13, 2025, EPA withdrew its 2020 Decision and replaced it with a new decision approving Oklahoma's request (the January 2025 Order).  Unlike the 2020 Decision, EPA's January 2025 approval imposed a condition requiring

Oklahoma to engage with the Pawnee Nation and other affected tribes when administering the transferred environmental programs and to "ensure that the Tribes' input and environmental priorities are considered in the State's decision-making processes." January 2025 Order at 17.

The January 2025 Order reflected an attempted compromise by EPA: The agency approved Oklahoma's SAFETEA request, despite requests by the Pawnee Nation and other tribes that it be denied. EPA, however, sought to mitigate the impacts to tribes by adding a condition to its approval requiring Oklahoma to engage with tribes and "ensure a general baseline of opportunity for the [affected] Tribes to provide meaningful input into the State's regulatory activity in their areas." January 2025 Order at 14. EPA explained that the process required by the engagement condition "will not prove unduly burdensome, will help ensure that the views of the affected sovereign Tribes are appropriately incorporated into environmental decision making in their areas of Indian country, and will thereby avoid unnecessary potential conflicts and improve environmental regulation in the covered areas." Id. at 1-2.

That condition had been suggested by the Pawnee Nation and other tribes as an alternative if Oklahoma's SAFETEA request were not denied, AR0000820, 834, 838, 850, 872-75, and it established a process similar to the government-to-government consultation that EPA would have followed absent SAFETEA. EPA

18

explained "the State is replacing EPA as the front-line regulator" and the condition "establish[es] a similar consultative relationship between the State and Tribes as exists between EPA and the Tribes."  January 2025 Order at 7, 12-13.  The condition, EPA noted, was "narrowly tailored to provide procedural opportunities for Tribal input without disturbing the State's ultimate regulatory decision-making authority."  Id. at 7.

EPA observed that the text of the SAFETEA Rider "does not preclude such a condition," and that the engagement condition was "fundamentally consistent with key principles underlying the various [environmental] programs that regulatory decisions" should provide opportunities for participation, and be informed by, affected communities and tribes.  Id. at 6, 13.  EPA also pointed to the D.C. Circuit's decision in Oklahoma Dep't of Env't Quality v. EPA, 740 F.3d 185 (D.C. Cir. 2014) (ODEQ), noting that ruling "clearly contemplates the Agency's discretion to include reasonable conditions in a decision under SAFETEA." January 2025 Order at 6-7.

Following the change in presidential administration, EPA in May 2025 withdrew its January 2025 Order and issued a new decision approving Oklahoma's SAFETEA request but eliminating the tribal engagement requirement (the May 2025 Order).  EPA's May 2025 Order took the position that the engagement condition exceeded its legal authority under SAFETEA and thus EPA had "no

discretion but to withdraw" the January 2025 Order.  May 2025 Order at 1, App. A at 3.  Instead, EPA asserted that its approval was effectively a nondiscretionary ministerial decision leaving the agency no authority to include any conditions to protect tribal interests.  Id., App. A at 2-3.  The May 2025 Order, however, did not address (or even mention) the D.C. Circuit's contrary decision in ODEQ.

The Pawnee Nation timely filed this petition for review on June 18, 2025.

## SUMMARY OF ARGUMENT

First, EPA's May 2025 Order should be set aside as arbitrary and capricious and contrary to law because the SAFETEA Rider on which it is based has expired.  The Rider had no language reflecting an intent by Congress to make it permanent.  EPA's treatment of the Rider as permanent law disregarded the legal presumption that such riders are only temporary legislation, and the principle that statutes must be construed in favor of Indians.  It also treated the Rider as an implied partial repeal of multiple federal statutes, which is disfavored.

Second, even if the SAFETEA Rider had not expired, the May 2025 Order should be set aside because its elimination of the condition from EPA's January 2025 Order requiring Oklahoma to engage with affected tribes was arbitrary and capricious and contrary to law.  In the May 2025 Order, EPA took the position that the SAFETEA Rider left it no authority to impose any conditions when approving Oklahoma's request.  This position, which reversed the interpretation EPA had

articulated just four months earlier, has no support in the text of the Rider.  It also

ignored the D.C. Circuit decision in <u>ODEQ</u>, 740 F.3d at 190, recognizing that EPA

does have such authority, as well as other statutory and regulatory authorities

available to EPA.

Third, EPA's May 2025 Order also violated the plain language of the

SAFETEA Rider.  Before its expiration, the Rider provided that to approve

Oklahoma's request, EPA must determine both that: (a) EPA "approves the State to

administer the State program under the [federal environmental] law with respect

to" non-Indian lands, and (b) the Oklahoma program "meets applicable

requirements of the law."  SAFETEA Section 10211(a), 119 Stat. at 1937.  EPA

improperly conflated the two requirements and approved Oklahoma's SAFETEA

request without making the second finding.  This failure was prejudicial because

record evidence reflects substantial concerns with Oklahoma's administration of

several federal environmental programs.

For all these reasons, the Court should find that the SAFETEA Rider has

expired and set aside EPA's May 2025 Order as arbitrary and capricious and

contrary to law.

## <u>ARGUMENT</u>

## I.     STANDARD OF REVIEW

This Petition raises questions of law involving interpretation and expiration of the SAFETEA Rider, which are reviewed <u>de novo</u>.  <u>Sunnyside Coal Co. v. Director</u>, 112 F.4th 902, 910 (10th Cir. 2024).  In addressing those questions, EPA's interpretation of the SAFETEA Rider is not entitled to deference.  <u>Id.</u> (citing <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369 (2024)); <u>3484, Inc. v. Nat'l Labor Rels. Bd.</u>, 137 F.4th 1093, 1103-04 (10th Cir. 2025).

In addition, the established canon of Indian law requires that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  <u>Pub. Serv. Co. of N.M. v. Barboan</u>, 857 F.3d 1101, 1108 (10th Cir. 2017) (cleaned up); <u>Nat'l Labor Rels. Bd. v. Pueblo of San Juan</u>, 276 F.3d 1186, 1191 (10th Cir. 2002) (<u>NLRB</u>); Cohen § 2.02[1] at 113.

The Pawnee Nation also argues that EPA acted arbitrarily and capriciously in issuing the May 2025 Order.  That review under the APA looks "to the agency's contemporaneous explanation in light of the existing administrative record" but does "not consider the agency's 'post hoc rationalizations' for the action."  <u>Hays Medical Ctr. v. Azar</u>, 956 F.3d 1247, 1263 (10th Cir. 2020).  If the administrative record shows that EPA "relied on impermissible considerations or 'entirely failed to consider an important aspect of the problem,'" the May 2025 Order runs afoul of the APA.  <u>Id.</u>

## II.     THE SAFETEA RIDER EXPIRED LONG BEFORE OKLAHOMA SUBMITTED ITS REQUEST UNDER THAT LAW.

The May 2025 Order violated the law because the authority under which EPA granted Oklahoma's request has expired. SAFETEA was a time-limited spending act, most provisions of which applied only for fiscal years 2005 to 2009. EPA incorrectly treated the Rider as living on long after the expiration of the rest of the SAFETEA statute, despite any language reflecting an intent to make the Rider permanent. This approach disregarded the legal presumption that such riders are only temporary legislation, and the principle that statutes must be construed in favor of Indians. Barboan, 857 F.3d at 1108. It also treated the Rider as an implied partial repeal of multiple federal statutes, which is disfavored. EPA's failure to recognize the expiration of the SAFETEA Rider was arbitrary and capricious and contrary to law. See AR0000992, 1130 (issue raised before EPA).

### A. The SAFETEA Rider Expired Along With the Time-Limited Spending Bill to Which It Was Attached.

First, the text of the Rider provides no language reflecting an intent to make it permanent. There is a "very strong presumption" that if a rider in a time-limited spending act changes substantive law, it does so only for the fiscal years that the act is in effect. Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin, 961 F.2d 269, 273 (D.C. Cir. 1992) (appropriations rider); see, e.g., Peter Raven-Hansen & William C. Banks, Pulling the Purse Strings of the Commander in Chief, 80 Va. L.

Rev. 833, 876 (1994) (substantive provisions contained in single-year appropriation and authorization acts "are presumed effective only for the fiscal year"); Security Clearances at DOE, Comptroller Gen., B-248926, 1992 WL 130552, at *3 (May 29, 1992) ("A general rule regarding construction of annual authorization and appropriations acts is that, absent a clear expression of permanence, material contained therein—even material of general applicability—is effective only for one year.").

This presumption sets a "high" bar, Atl. Fish Spotters Ass'n v. Evans, 321 F.3d 220, 225 (1st Cir. 2003), that can only be overcome if "[the rider's] language clearly indicates that it is intended to be permanent." Martin, 961 F.2d at 274; see Atl. Fish Spotters Ass'n, 321 F.3d at 224 ("Congress may create permanent, substantive law through an appropriations bill only if it is clear about its intentions").

Because SAFETEA covered transportation spending for a time-limited period, pp. 6, 10-11, supra, the Rider and other policy provisions in that law are presumed temporary absent language reflecting an intent to make them permanent. The SAFETEA Rider includes no such language.

Nothing in the Rider "expressly stated that [it] would be permanent," Smithsforks Grazing Ass'n v. Salazar, 564 F.3d 1210, 1216 (10th Cir. 2009), or included "a clear statement of futurity" reflecting an intent to make it permanent.

24

Tin Cup, LLC v. U.S. Army Corps of Eng'rs, 904 F.3d 1068, 1073 (9th Cir.

2018).[19]  To the contrary, the Rider was phrased in the present tense.  See

SAFETEA Section 10211(a), 119 Stat. at 1937.  Further, there is no legislative

history reflecting a clear intent by Congress to make the Rider permanent.  Indeed,

there seems to be no material legislative history for the SAFETEA Rider at all.  Pp.

8-9, supra.

    EPA, however, took the meritless position that because the Rider had "no

explicit expiration date," it could not "reasonably be viewed as having expired."

AR0000524.  While the Rider is silent on an expiration date, that silence does not

indicate permanence.  Martin, 961 F.2d at 273-74 (rejecting argument that a rider

was permanent legislation because it had no expiration date).  Instead, courts look

to whether there is affirmative statutory language indicating "futurity," such as "to

apply in all years hereafter."  Id. at 274; Office of the General Counsel, U.S.

General Accounting Office, Principles of Federal Appropriations Law, 2-86 to 2-91

(4th ed. 2016).  Courts often find that "the absence of a clear statement of futurity"

---

[19] The words "[n]otwithstanding any other provision of law" are not words of
futurity and offer no indication as to the duration of the Rider.  See Martin, 961
F.2d at 274 (the term "notwithstanding any other provision of law" in a rider "goes
to the breadth of the amendment's effect, not its duration"); Comptroller General,
The Hon. John Edward Porter, House of Representatives, Comptroller Gen., B-
271412, 1996 WL 335238, at *1 (June 13, 1996).

in a rider is "dispositive" as to its temporary nature.  See, e.g., Tin Cup, LLC, 904
F.3d at 1075.

　　EPA also asserted that the presumption against permanence did not apply to
the Rider because while SAFETEA "contains certain appropriations provisions, the
statute is a broader authorization containing numerous substantive provisions."
AR0000524.  The Rider, EPA argued, was a "substantive provision of law" rather
than an appropriations measure and could "not reasonably be viewed as connected
to appropriations provisions" of the SAFETEA statute.  Id.  The presumption
against permanence, however, is not limited to appropriation provisions.  See pp.
23-24, supra (presumption applies to both appropriations and authorization acts).
Indeed, the presumption exists because using spending bills to "substantively
change existing law" is disfavored.  See Martin, 961 F.2d at 273; pp. 35-37, infra.
Courts frequently apply the presumption against permanence to policy riders that
are contained in unrelated spending bills.  See, e.g., Atl. Fish Spotters, 321 F.3d at
222-23 (rider banning use of "spotter" aircraft in commercial fishing operations
included in bill providing appropriations for District of Columbia government);
Martin, 961 F.2d at 273 (rider blocking implementation of Labor Department
prevailing wage regulations was attached to emergency appropriations bill to fund
military operations for Operation Desert Storm in Middle East).

But even if the Rider is evaluated without reference to the presumption against permanence, the normal principles of statutory construction point to its temporary nature.  See Atl. Fish Spotters, 321 F.3d at 223-24 (interpreting a rider with premise that "[s]tatutory interpretation begins—and sometimes ends—with the relevant statutory text").  When Congress intended the non-spending provisions of SAFETEA to remain in effect after 2009, it knew how to say so.  Unlike the Rider, multiple other SAFETEA provisions included terms of futurity making clear they would remain in effect after 2009.  See, e.g., SAFETEA Section 1114(f), 119 Stat. at 1175 (requiring annual bridge construction reports due "[n]ot later than 1 year after the date of enactment of this subsection, and annually thereafter"); Section 5201(h), 119 Stat. at 1785 (requiring biennial reports beginning in 2006, and "every second year thereafter," on future "highway, transit, and bridge needs" and the "backlog of current . . . needs").

The absence of any similar language in the SAFETEA Rider indicates Congress did not intend it to permanently change the law.  See Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up); Auburn Housing Auth. v. Martinez, 277 F.3d 138, 146-47 (2d Cir. 2002) (finding rider temporary where "Congress left

27

no doubt whatsoever that it intended [a different section of the appropriations bill] to apply beyond the fiscal year" covered by the bill, but "Congress[ ] fail[ed] to use such unequivocal language" in the rider); Tin Cup, LLC, 904 F.3d at 1073 (same).

Moreover, the Rider was not added to the U.S. Code or included in the Code notes, which further demonstrates its temporary nature. Temporary provisions are often not codified in the U.S. Code and do not appear in the Code notes. See Will Tress, Lost Laws: What We Can't Find in the United States Code, 40 Golden Gate U. L. Rev. 129, 130 (2010) ("Many enacted laws are left out of the Code entirely . . . because they are considered temporary."); id. at 164 ("[L]aws that are considered temporary, such as those included in appropriations acts, are left out of the Code entirely."). Here again, the Rider contrasts with certain other SAFETEA provisions that were added to the U.S. Code. See, e.g., SAFETEA Sections 10141-10143, 119 Stat. at 1931-32 (amending 46 U.S.C. §§ 13102(a), 13104(a), and 13106); Section 10208, 119 Stat. at 1935 (adding new provision at 49 U.S.C. § 30106).

By treating the Rider's silence as reflecting permanence, EPA flipped the principles of statutory construction on their head. When Congress intended certain provisions to live on beyond the rest of the SAFETEA law, it made that purpose clear by adding them to the U.S. Code or using other words of futurity. The different treatment of the SAFETEA Rider indicates Congress did not intend it to

28

permanently change the law.  See Russello, 464 U.S. at 23; Auburn Housing Auth., 277 F.3d at 146-47.

### B. The Indian Law Canon of Construction, and Respect for Tribal Sovereignty, Require Treating the SAFETEA Rider As Expired.

This conclusion is further reinforced by the principle that statutes must be construed in favor of Indians, "with ambiguous provisions interpreted to their benefit."  Barboan, 857 F.3d at 1108; Cohen § 2.02[1] at 113.  This principle has particular force where, as here, tribes' sovereign authority to regulate their own lands is at stake.  "Courts are consistently guided by the purpose of making federal law bear as lightly on Indian tribal prerogatives as the leeways of statutory interpretation allow."  NLRB, 276 F.3d at 1195 (cleaned up).  This Court has explained that courts should "tread lightly in the absence of clear indications of legislative intent," and will only "construe federal laws as working a divestment of tribal sovereignty . . . where Congress has made its intent clear that we do so."  Id., quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60 (1978).

These principles point to treating the SAFETEA Rider as temporary legislation.  "There must be clear evidence that Congress actually considered the conflict between" the Rider and tribal rights, and "chose to resolve that conflict by" permanently repealing parts of numerous federal environmental laws.  See Herrera v. Wyoming, 587 U.S. 329, 344-45 (2019) (cleaned up).  No such evidence exists.  While the Rider does not include an express sunset date, it was part of a

larger bill whose provisions expired in 2009 and there is no language or legislative history indicating that Congress intended the Rider to be permanent.  Under these circumstances, Congress should not be assumed to have enacted a permanent change to environmental law in Oklahoma without clearly saying so.  See Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 767-68 (1985) (declining to interpret statute in manner adverse to tribe where law was silent on the issue); Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 790-92 (2014) (narrowly construing statute that partially waived tribal sovereign immunity because "courts will not lightly assume that Congress in fact intends to undermine Indian self-government").

The impact of the SAFETEA Rider on tribal sovereignty underscores this conclusion.  Not only did the Rider let Oklahoma take over environmental regulation on Indian lands, but it also gave the State a veto over whether tribes could obtain TAS status from EPA.  P. 7, supra.  The ability to regulate for protection of air and water on their jurisdictional lands, and for the health of tribal members, is an important aspect of tribal self-determination and governance.  Tribes exercise that authority both as part of the inherent authority to govern their territory, and by exercising powers authorized by Congress.  See Cohen § 10.01[1] at 784; Chen, 121 Colum. L. Rev. F. at 97-98.

Courts have recognized, for example, that a tribe's interest in protection of water resources on its reservation can be "very important to [the tribe's] economic and physical existence" and even "essential to its survival." <u>Wisconsin v. EPA</u>, 266 F.3d 741, 750 (7th Cir. 2001) (affirming grant of Clean Water Act TAS authority to tribe); <u>see also</u> <u>Washington Dep't of Ecology</u>, 752 F.2d at 1470, 1472 (recognizing in RCRA context the "tribal interest in managing the reservation environment" and ensuring "that their reservations will [not] become 'dumping grounds' for off-reservation hazardous wastes"); <u>HRI, Inc. v. EPA</u>, 198 F.3d 1224, 1245-46 (10th Cir. 2000), reversed on other grounds, 608 F.3d 1131 (10th Cir. 2010) (en banc) (describing dispute over whether lands were Indian country for purposes of SDWA program regulating injection of uranium mining wastes into underground aquifer as affecting "core sovereignty interests of Indian tribes . . . in exercising civil . . . authority over tribal territory").

By letting Oklahoma regulate on Indian lands, and denying tribes the authority to regulate those lands themselves, the Rider directly impacted their sovereign interests. One tribal attorney described the Rider in 2005 as "the most scary, direct, take-the-gloves-off-and-go[-]for-the-jugular attack on tribal sovereignty I have ever seen." Chen, 121 Colum. L. Rev. F. at 104.

The Court should not interpret that attack on tribal sovereignty more broadly than its text clearly requires. There is no statutory language or legislative intent

reflecting an intent for the Rider to apply permanently, and that outcome should not be read into the law. As this Court has held, "silence [in a federal statute] does not work a divestiture of tribal power." NLRB, 276 F.3d at 1196.

### C. The SAFETEA Rider Should Not Be Interpreted as an Implied Partial Repeal of Multiple Environmental Statutes.

EPA's approach also should be rejected because treating the Rider as permanent would amount to an implied partial repeal of several federal environmental laws. Statutory repeals or amendments by implication are disfavored. Maine Cmty. Health Options v. United States, 590 U.S. 296, 306 (2020); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1017 (1984) (rejecting interpretation of law that "would amount to a partial repeal of" another statute). "Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one." Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1307 (11th Cir. 2013); see, e.g., Tennessee Valley Auth. v. Hill, 437 U.S. 153, 189-92 (1978) (declining to treat provision in appropriations bill as impliedly repealing Endangered Species Act requirements as they applied to particular project). Courts will not find such a repeal unless it is the "only reasonable interpretation" of the later Congressional act. Maine Cmty. Health Options, 590 U.S. at 316 (cleaned up).

As noted above, the SAFETEA Rider was not added to the U.S. Code. The Rider did, however, implicate several existing statutes governing tribes' ability to

obtain treatment as a state for environmental programs.  These laws all give EPA

the power to treat tribes as states under certain conditions—none of which requires

consent of the closest state.  See, e.g. 33 U.S.C. § 1377(e) (Clean Water Act);

42 U.S.C. § 300j-11(b) (SDWA); 42 U.S.C. § 7601(d) (Clean Air Act).  Treating

the Rider (and its Oklahoma veto over TAS applications from tribes) as permanent

would have the effect of repealing or sharply limiting EPA's statutory authority

under these statutes in Oklahoma, without any clear statement from Congress or

codification of that result in the U.S. Code.  See Epic Sys. Corp. v. Lewis, 584 U.S.

497, 510 (2018) (courts presume "that Congress will specifically address

preexisting law" when halting its application in later statute) (quotation omitted).

        Similarly, the Rider's language allowing Oklahoma to take over

environmental programs on Indian lands would substantially alter the balance of

regulatory authority created by various environmental statutes, which has been

maintained for decades.  See pp. 4-5, supra.  When it adopted those statutes,

Congress did not see fit to give states such authority over Indian lands, and the

Court should decline to find that this long-established system was permanently

restructured in Oklahoma by implication.  Ruckelshaus, 467 U.S. at 1017;

Lamonica, 711 F.3d at 1307.

        Rather than treating the SAFETEA Rider as impliedly repealing or

amending these existing environmental statutes, the Court should reconcile them

by recognizing the temporary duration of the Rider.  See <u>Maine Cmty. Health Options</u>, 590 U.S. at 316 (courts will not find implied repeal unless it is the only reasonable interpretation); <u>Auburn Housing Auth.</u>, 277 F.3d at 144-45, 150 (treating rider as only temporary in order to avoid repeal by implication of underlying statute); <u>Env't Def. Ctr. v. Babbitt</u>, 73 F.3d 867, 870 n.1, 870-72 (9th Cir. 1995) (rider in annual appropriations bill did not repeal requirement of Endangered Species Act but prevented agency from complying for period of appropriations bill).

The context in which Senator Inhofe acted is relevant here: Oklahoma tribes had first begun obtaining TAS authority in 2001 and 2004, shortly before the 2005 passage of the Rider.  <u>See</u> pp. 5-6, <u>supra</u>.  The Rider responded to these developments by suspending TAS approvals without the State's consent for fiscal years 2005-2009.  Congress also gave Oklahoma a five-year window to request authority to take over any environmental programs it wanted to administer on Indian lands.  That five-year period, however, did not require a permanent amendment of the underlying statutes to revoke EPA's normal authority in Oklahoma.  Instead, the five-year period gave the State an opportunity to work with the tribes and EPA to address any concerns.  The Rider should not be treated as permanent because it can be given effect without impliedly repealing parts of

the underlying environmental statutes.  <u>Auburn Housing Auth.</u>, 277 F.3d at 144-45,

150; <u>Env't Def. Ctr.</u>, 73 F.3d at 870-72.

### D. The Circumstances Surrounding Enactment of the SAFETEA Rider Show Why It Should be Deemed to Have Expired.

Finally, the opaque manner in which the Rider was adopted makes it

particularly important to treat it as temporary legislation.  While policy riders are

permitted in spending bills, there are strong reasons to disfavor them.  Those

reasons apply to the SAFETEA Rider.

Policymaking by rider occurs without the benefit of review by the

Congressional committee with appropriate subject expertise, and "does not allow

for sufficient study of the policy issues in question."  Neal E. Devins, <u>Regulation</u>

<u>of Government Agencies Through Limitation Riders</u>, 1987 Duke L. J. 456, 464-65

(1987).  This is common with environmental riders, which have "often [been] used

to reverse the effect of established legislation on an ad-hoc basis."  Tress, 40

Golden Gate U. L. Rev. at 141 & n.62.

Such riders also undermine public confidence in the law because they are

most often added on the application of one member or a small group and do not

reflect the will of Congress.  <u>Id.</u> at 141.  By avoiding public debate and decision

making, policy riders "circumvent[ ] the public will as expressed in those pre-

existing substantive laws" on environmental protection.  Sandra Beth Zellmer,

<u>Sacrificing Legislative Integrity at the Altar of Appropriations Riders: A</u>

Constitutional Crisis, 21 Harv. Envtl. L. Rev. 457, 510 (1997). As one court noted, "[p]olicy changes of questionable political viability . . . can be forced using insider tactics without debate by attaching riders to legislation that must be passed." All. for the Wild Rockies v. Salazar, 800 F. Supp. 2d 1123, 1125 (D. Mont. 2011). This tactic "transgresses the process envisioned by the Constitution by avoiding the very debate on issues of political importance said to provide legitimacy." Id.

The SAFETEA Rider embodies all these problems. The Rider was inserted by Senator Inhofe at the last minute without any opportunity for the full Congress to debate this significant policy change. In fact, the Rider blindsided the Senate Indian Affairs Committee that had expertise on the matter, as Senator McCain's comments reflected. See pp. 8-9, supra.

Nor did affected stakeholders—Oklahoma tribes and EPA—receive notice of the Rider and its significant infringement on the governmental rights of the tribes. P. 10, supra. A fundamental change was made to environmental protection law and tribal rights in Oklahoma without any opportunity for the public or Congress as a whole to consider it. This is exactly the kind of midnight rider that should be deemed temporary absent a clear indication of contrary Congressional intent. There was no such indication here.

In sum, the Rider expired prior to Oklahoma's 2020 SAFETEA request. The approval of that request was arbitrary and capricious and contrary to law because

EPA failed to apply: (a) the presumption that riders are not permanent, (b) the

principle that statutes must be construed in favor of Indians and tribal sovereignty,

and (c) the established rule that implied repeals or amendments are disfavored.

### III.   EVEN IF THE SAFETEA RIDER HAD NOT EXPIRED, THE MAY 2025 ORDER SHOULD BE SET ASIDE BECAUSE EPA HAD AUTHORITY TO IMPOSE CONDITIONS WHEN APPROVING OKLAHOMA'S REQUEST.

Even if the SAFETEA Rider had not expired, the May 2025 Order should be

set aside because its elimination of the engagement condition was arbitrary and

capricious and contrary to law.  According to EPA's May 2025 Order, the

SAFETEA Rider "imposes a nondiscretionary duty for EPA to approve a proper

request and reserves no authority for EPA to impose additional requirements or

otherwise constrain the State's administration of the subject environmental

regulatory programs."  May 2025 Order, App. A at 2.  This position, which

reversed the interpretation EPA had articulated just four months earlier in the

January 2025 Order, was meritless.  See AR0000998, 1130 (issue raised with

EPA).

### A. The Plain Language of the SAFETEA Rider Allowed EPA to Impose the Engagement Condition.

The plain language of the SAFETEA Rider provides no support for EPA's

new position.  Nothing in the statutory language precluded EPA from including

reasonable conditions on approval of a SAFETEA request.  January 2025 Order at

6 (EPA in January 2025 noting lack of any preclusive language).  In disclaiming

such authority, EPA pointed to two phrases in the Rider: (a) language that a

properly supported SAFETEA request shall be approved "notwithstanding any

other provision of law," and (b) that such approval will occur "without any further

demonstration of authority by the State."  May 2025 Order, App. A at 2-3.  This

language, however, addresses whether a SAFETEA request will be approved or

denied—not the separate question of whether EPA retains authority to include

reasonable terms to address tribal concerns when it approves Oklahoma's request.

The engagement condition, for example, does not rely on some "other

provision of law" to deny Oklahoma's request.  Nor does it require a "further

demonstration of authority" by Oklahoma prior to approval of its SAFETEA

request.  Instead, the condition directs that—having been granted authority to

implement programs on Indian lands—Oklahoma consider tribal concerns when

exercising that authority.

EPA's attempt to disclaim its authority not only misreads the text of the

SAFETEA Rider but also ignores the established principle that "statutes are to be

construed liberally in favor of the Indians," Barboan, 857 F.3d at 1108, and to

minimize infringements on tribal sovereignty, NLRB, 276 F.3d at 1195.  The text

of the SAFETEA Rider includes no language precluding EPA from including

reasonable conditions as part of an approval, January 2025 Order at 6, and the

38

Court should not read such a limitation into the law where it would harm the

sovereign interests of the Pawnee Nation and other tribes.  Barboan, 857 F.3d at

1108; NLRB, 276 F.3d at 1195.

### B. Case Law Recognizes EPA's Authority to Apply Conditions When Approving a SAFETEA Rider Request.

Remarkably, the May 2025 Order makes no mention the D.C. Circuit's

ODEQ ruling, where even the State of Oklahoma recognized that EPA could

impose conditions on approval of a SAFETEA request.  See May 2025 Order at 2-

3 (no discussion of ODEQ).  In ODEQ, Oklahoma challenged an EPA rule

implementing a Clean Air Act program on certain Indian lands. 740 F.3d at 187.

The State contended that it had legal authority for the program on those lands and

that the EPA rule "divested [Oklahoma] of regulatory authority over areas

otherwise within [its] purview."  Id. at 189.  EPA argued that Oklahoma lacked

standing because the SAFETEA Rider provided a mechanism by which the State

could "obtain regulatory authority over" the Indian lands in question and thus

avoid its alleged injury.  Id. at 190.

Oklahoma argued, and the D.C. Circuit agreed, that the SAFETEA Rider did

not eliminate the injury to the State because EPA "might attach a condition to its

approval of" a SAFETEA request.  Id.  The Court held that the "possibility of an

alternative remedy [under the SAFETEA Rider], of uncertain availability and

effect," did not preclude Oklahoma's standing.  Id.  ODEQ did not address the

specific conditions that might be adopted as part of a SAFETEA approval.  But its standing holding "clearly contemplates the Agency's discretion to include reasonable conditions under SAFETEA."  January 2025 Order at 6-7.  ODEQ cannot be reconciled with EPA's current position that the SAFETEA Rider imposes a blanket prohibition on any such conditions.[20]  EPA's disregard of this case law was arbitrary and capricious and contrary to law.

### C. EPA Had Authority Independent of the SAFETEA Rider to Impose Conditions When Approving Oklahoma's Request.

Moreover, the May 2025 Order ignored other sources of legal authority EPA has to impose conditions when approving a SAFETEA request.  When administration of an environmental program is delegated to a state, "EPA remains responsible and accountable . . . for progress toward meeting national environmental goals and for ensuring that federal statutes are adequately enforced."[21]  EPA has a broad range of oversight tools at its disposal, up to and including "taking back delegated responsibilities or reducing or cancelling grant

---

[20] The D.C. Circuit also noted that (in contrast to the agency's May 2025 Order), EPA did not claim that Oklahoma "would be entitled to approval without conditions for an application under the SAFETEA" Rider.  ODEQ, 740 F.3d at 190.

[21] Env't Prot. Agency, EPA Policy on Oversight of Delegated Environmental Programs at 1 (April 4, 1984) (EPA Oversight Policy), https://www.epa.gov/sites/default/files/2019-12/documents/epa_policy_on_oversight_of_delegated_environmental_programs_1984.pdf.

funds." EPA Oversight Policy at 10. EPA also is charged with regularly evaluating Oklahoma's programs, reviewing specific permits and regulatory actions by the State, and considering compliance and enforcement issues with State programs. January 2025 Order at 15.

EPA has acknowledged that its oversight powers were not eliminated by the SAFETEA Rider. May 2025 Order, App. A at 4 n.3 (EPA noting that regardless of the SAFETEA Rider, the agency's "ordinary statutory and regulatory authorities to oversee and review state programs will continue to apply as the programs are implemented going forward"). These tools gave EPA authority to include terms to mitigate the impact of the SAFETEA approval on affected tribes.

For example, EPA can require a revision to the terms of Oklahoma's previously approved Clean Water Act programs "when the controlling Federal or State statutory or regulatory authority is modified or supplemented." 40 C.F.R. § 123.62(a). EPA has similar authority to require changes in Oklahoma's RCRA solid waste disposal program: its regulations provide that "[a]pproved state permit programs may be modified for various reasons, such as changes in federal or state statutory or regulatory authority . . . . If the federal statutory or regulatory authorities that have significant implications for state permit programs change, approved states may be required to revise their permit programs." 40 C.F.R. § 239.12(a)-(b). An expansion of Oklahoma's authority under SAFETEA that

"fundamentally alters" environmental regulation in the state, clearly qualifies as a change in federal and state regulatory authority with significant implications for Oklahoma's permit programs.  January 2025 Order at 11-12.

In addition, EPA has the right to review and veto (known as "objecting to") Clean Water Act and Clean Air Act permits issued by Oklahoma.  See 33 U.S.C. § 1342(d)(1), (2) (Clean Water Act); 42 U.S.C. § 7661d(a), (b)(1); 40 C.F.R. § 70.8(a)-(c) (Clean Air Act).  As part of that process, EPA can allow potentially affected tribes additional comment and engagement opportunities and require Oklahoma to provide a wide variety of information and records relevant to compliance with the Clean Water Act and Clean Air Act.  40 C.F.R. §§ 123.43(d), 123.44(d)(3) (Clean Water Act); 40 C.F.R. § 70.8(c)(3)(ii) (Clean Air Act).[22]

These oversight powers provide EPA with authority to require additional engagement between Oklahoma and affected tribes and thus mitigate the impacts of the May 2025 Order.  Yet the May 2025 Order failed to consider applying its authority to retain the engagement condition EPA had previously adopted, or to impose other conditions to address tribal concerns about its SAFETEA approval.

---

[22] See also, Env't Prot. Agency, Model National Pollutant Discharge Elimination System (NPDES) Memorandum of Agreement at 14, https://www.epa.gov/sites/default/files/2013-08/documents/finalepastatemoa-attach2.pdf (state agrees that "upon request by EPA, the State will submit specific information and allow access to any files necessary for evaluating the State's administration of the [discharge permit] and pretreatment programs").

This was arbitrary and capricious and contrary to law.  See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 709-10 (10th Cir. 2009) (invalidating agency planning decision that was based on unduly narrow reading of agency's statutory mandate).

EPA's federal trust responsibility to Oklahoma tribes provided another source of authority.  The federal government has a "unique trust responsibility to protect and support Indian tribes and Indian people."  Modoc Lassen Indian Housing Auth. v. U.S. Dep't of Housing and Urban Dev., 881 F.3d 1181, 1194 (10th Cir. 2017) (internal quotation omitted).  In the "exercise of their trust responsibility, agencies are free to go beyond specific statutory requirements."  Cohen § 5.05[3][c] at 431.  EPA has long recognized that in keeping with that trust duty, the agency should "endeavor to protect the environmental interests of Indian Tribes when carrying out its responsibilities that may affect the reservations."  AR0000003 (1984 EPA Policy).  EPA policy also directs staff to "encourage early communication and cooperation among Tribes, States and local governments."  Id.

The engagement condition adopted in January 2025 reflected an exercise of EPA's trust duty to Oklahoma tribes.  Nothing in the SAFETEA Rider purported to excuse EPA from that trust duty, and it applied when EPA decided Oklahoma's request.  Id.  EPA's disregard of its trust duty in the May 2025 Order was arbitrary and capricious and contrary to law.  See New Mexico, 565 F.3d at 709-10.

43

In short, EPA never reconciled its May 2025 disclaimer of any authority to do more than just rubber-stamp Oklahoma's SAFETEA request with EPA's "ordinary statutory and regulatory" oversight authority, May 2025 Order, App. A at 4 n.3, and with the government's established trust responsibility to tribes. EPA was wrong on the law, and its position was arbitrary and capricious.

**IV.   EPA IGNORED THE PLAIN LANGUAGE OF THE SAFETEA RIDER WHEN IT APPROVED OKLAHOMA'S REQUEST WITHOUT ADDRESSING WHETHER THE STATE WAS COMPLYING WITH THE LAW IN ADMINISTERING THE AFFECTED PROGRAMS.**

EPA's May 2025 Order also violated the plain language of the SAFETEA Rider. Before its expiration, the Rider provided that to approve Oklahoma's request, EPA must determine both that: (a) EPA "approves the State to administer the State program under the [federal environmental] law with respect to" non-Indian lands, and (b) the Oklahoma program "meets applicable requirements of the law." SAFETEA Section 10211(a), 119 Stat. at 1937. EPA found the first requirement had been met because it had previously approved Oklahoma to administer on non-Indian lands the twenty-six programs covered by Oklahoma's request. But EPA failed to make the second finding, May 2025 Order, App. A at 4 n.3, despite the plain language of the Rider. See AR0000996-997, 1130 (issue raised before EPA).

## A.    EPA Misread the Text of the Rider.

Instead of evaluating whether Oklahoma's administration of the twenty-six programs "meets applicable requirements of the law," EPA asserted that if a state program previously met requirements "at the time the program was previously approved outside of Indian country," then no further determination regarding current compliance with the law was necessary.  May 2025 Order, App. A at 4 n.3.

This is contrary to the plain language of the Rider, which made the requirement that each Oklahoma program "meets applicable requirements of the law" an <u>additional and separate</u> requirement from EPA's approval of the program on non-Indian lands.  SAFETEA Section 10211(a), 119 Stat. at 1937.  By conflating the two requirements, EPA essentially rendered the second one superfluous and meaningless.  After all, if Oklahoma had not met the requirements of the law at the time the program was approved outside of Indian country, then EPA would not have approved the program for non-Indian lands in the first place.  <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotation marks and citation omitted).

EPA justified conflating the two requirements by pointing to the SAFETEA Rider language that "mandate[s] approval of the State's request . . .

45

[n]otwithstanding any other provision of law." May 2025 Order, App. A at 4 n.3. This is a non sequitur: the obstacle to approval of Oklahoma's request comes not from some "other provision of law," but from the text of the SAFETEA Rider itself. EPA cannot use the prefatory "notwithstanding" language to disregard a requirement imposed by the language of the Rider.

EPA's treatment of the SAFETEA Rider as requiring nothing more than a past program approval on non-Indian lands violates its plain language in another way: it ignores the verb tense used in the Rider. The Rider requires a showing that an Oklahoma program "meets applicable requirements of the law" in the present tense—not as something that occurred years earlier. By applying the wrong verb tense, the May 2025 Order effectively reads this requirement out of the statute. See United States v. Wilson, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes"); United States v. Husted, 545 F.3d 1240, 1243 (10th Cir. 2008) (same).

Moreover, EPA ignored the established principle that "statutes are to be construed liberally in favor of the Indians," Barboan, 857 F.3d at 1108. The SAFETEA Rider required that before handing over regulatory authority to Oklahoma for Indian lands, EPA must determine that the State's program is complying with the law on non-Indian lands. The agency ignored that clear textual direction and misconstrued the Rider to the disadvantage of the affected tribes.

46

**B.    EPA's Failure to Assess Oklahoma's Compliance With the Law Was Prejudicial.**

The failure to determine whether the Oklahoma programs meet applicable laws was prejudicial because record evidence indicates that the State has not been living up to its responsibilities under at least some of the delegated environmental programs.  EPA has identified significant concerns that highlight the necessity for a full evaluation of whether all twenty-six programs comply with legal requirements before the agency approved Oklahoma's SAFETEA request.

### 1.  Clean Air Act Compliance Issues

For example, a 2020 EPA review revealed "significant issues" and "routine and/or widespread performance issues" with Oklahoma's Clean Air Act programs.[23] EPA found "continu[ing]" problems with delays in ODEQ's reporting of high priority violations (HPVs) and addressing such violations. EPA also concluded that ODEQ's records "do not appear to fully satisfy the requirements of the case development and resolution timeline."[24]

---

[23] AR0000997; see also Env't Prot. Agency Region 6, Final Report: State Review Framework, Oklahoma, Clean Water Act and Clean Air Act Implementation in Federal Fiscal Year 2018 and Resource Conservation and Recovery Act Implementation in Federal Fiscal Year 2019 (EPA Review Report) at 3, 7-8 (June 22, 2020), https://www.epa.gov/sites/production/files/2020-08/documents/srf-rd4-rev-ok.pdf.

[24] EPA Review Report at 7, 30.

EPA classified these as "Area[s] for Improvement," meaning that "[s]ignificant issues are found. One or more metrics indicates routine and/or widespread performance issues related to quality, process, or policy. A recommendation for corrective action is issued which contains specific actions and schedule for completion. The EPA monitors implementation until completion."[25]

In addition, a 2019 EPA evaluation of Oklahoma's Clean Air Act operating permit program discusses a variety of ways in which the State is falling short.[26] For example, EPA raised several different concerns about whether Oklahoma permit documents comply with regulatory requirements. EPA also raised concerns about ODEQ's failure to comply with all public participation requirements when issuing operating permits.[27]

### 2. Safe Drinking Water Act Underground Injection Well Problems

There also are long-standing and well-documented issues with Oklahoma's administration of the underground injection control (UIC) well program. The SDWA UIC program regulates the permitting, construction and operation of

---

[25] AR0000997; EPA Review Report at 3.

[26] AR00000998; Env't Prot. Agency Region 6, Oklahoma Department of Environmental Quality Air Quality Division, Title V Operating Permit Program Evaluation (June 18, 2019), https://www.epa.gov/sites/production/files/2019-06/documents/2019_06_20_final_title_v_odeq_evaluation_report_with_transmittal_letter_and_summary_06202019.pdf.

[27] AR0000998.

injection wells used to store or dispose fluids underground.  UIC wells are commonly used to dispose of oil and gas wastes and other types of wastes.  When improperly constructed or operated, however, they can endanger aquifers that serve as underground sources of drinking water.  See Env't Prot. Agency, General Information About Injection Wells, https://www.epa.gov/uic/general-information-about-injection-wells#regulates.

Oklahoma's track record administering the UIC program for disposal of oil and gas wastes (known as Class II UIC wells) has not been good.  Under Oklahoma's administration, earthquakes linked to UIC wells proliferated for several years because the state allowed companies to pump enormous volumes of oil and gas wastewater into the wells at high pressures that destabilized the subsurface formations and caused a wave of seismic activity.  AR0001007. Between 2014-2017, Oklahoma surpassed California as the most seismically-active state in the country, with over 900 earthquakes in 2015 greater than magnitude 3.0.[28]

The wave of earthquakes directly impacted the Pawnee Nation: on September 3, 2016, the largest earthquake recorded in Oklahoma history

---

[28] U.S. Geological Survey, Oklahoma has had a surge of earthquakes since 2009. Are they due to fracking? (updated March 12, 2024), https://www.usgs.gov/faqs/oklahoma-has-had-a-surge-earthquakes-2009-are-they-due-fracking.

(magnitude 5.8) had its epicenter on the Pawnee Nation, causing significant damage to the Nation's administrative buildings, several of which were unusable for a period of time in late 2016 until repairs were completed. AR0001007. Many Pawnee tribal members' homes were also damaged by the earthquake. Id.

Another example occurred in June 2016, when saltwater spilled from a disposal facility located on Oklahoma state land. See AR0001007, 1017-20. The spill resulted in the discharge of 1,000-2,000 barrels of saltwater into an unnamed creek that flows through Pawnee Nation trust land. Id. at 1017-20. The Pawnee Nation responded to the incident, along with EPA, which was present and managed the incident and the clean-up. ODEQ was not present at the incident, even though the spill occurred from a facility located on state land. See id. The Pawnee Nation also has experienced several other incidents involving ODEQ's failure to enforce UIC requirements and respond to violations. AR0001007-08.

### 3. TSCA Lead-Based Paint Programs

With TSCA, the concerns involve not only the State, but also EPA itself. EPA's May 2025 Order allowed Oklahoma to administer two TSCA programs intended to reduce or eliminate lead-based paint hazards in homes and other facilities where children are present. May 2025 Order, App. B at 2. As with the other programs covered by the SAFETEA approval, EPA made no finding as to whether Oklahoma's lead-based paint programs comply with applicable laws.

50

A recent EPA Office of Inspector General report suggests that the agency has a blind spot with TSCA because EPA has not been "verifying that authorized state lead-based paint programs remain at least as protective of human health and the environment as" required by the law, or that "the programs provide adequate enforcement after initial program authorization."[29]  The Report concluded:

> EPA does not have sufficient information to verify that authorized state [lead-based paint (LBP)] programs remain protective of human health and the environment or to verify that the programs continue to provide adequate enforcement after initial authorization . . . . Since several LBP programs have been authorized for decades and the EPA has not conducted periodic adequacy evaluations, there is a risk that authorized state LBP programs are no longer able to demonstrate that all the programmatic and enforcement elements remain adequate.  Inadequate LBP programs may increase the risk of lead exposure to children.

EPA Lead-Based Paint Report at 12.  The findings by EPA's Inspector General show why full compliance with the SAFETEA Rider must be required before allowing Oklahoma to administer programs intended to protect children from lead-based paint on Indian lands.

As these examples illustrate, assessing the twenty-six environmental programs' performance is important not only as a prerequisite for approving Oklahoma's SAFETEA request, but also to protect the air, water and health of

---

[29] Env't Prot. Agency, <u>Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs</u>, Report No. 25-E-0042 at 3, 7-11 (July 16, 2025) (EPA Lead-Based Paint Report) (included in Addendum), <u>https://www.epaoig.gov/sites/default/files/reports/2025-07/_epaoig_20250716-25-e-0042_cert.pdf</u>.

tribal members.  Issuance of the May 2025 Order without finding that those programs meet applicable requirements of the law disregarded the plain language of the SAFETEA Rider.

## **CONCLUSION**

For the reasons stated above, the Court should find that the SAFETEA Rider has expired and set aside the May 2025 Order as arbitrary and capricious and contrary to law.

## **STATEMENT REGARDING ORAL ARGUMENT**

The Pawnee Nation believes that because of the importance of the issues presented, oral argument would assist the Court in resolving this petition.

Respectfully submitted this October 14, 2025.

*/s/ Michael S. Freeman*
Michael S. Freeman
Rachael Jaffe
EARTHJUSTICE
1125 17th Street, Suite 1010
Denver, CO 80202
Telephone: (303) 996-9615
Facsimile: (303) 623-8083
mfreeman@earthjustice.org
rjaffe@earthjustice.org

*Attorneys for Petitioner Pawnee Nation of Oklahoma*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X] this document contains 11,867 number of words, or

    [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14 point font size and Times New Roman style, or

    [ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: October 14, 2025       s/*Michael S. Freeman*
                          Michael S. Freeman
                          Earthjustice
                          1125 17th Street, Suite 1010
                          Denver, CO 80202
                          Phone: (303) 996-9615
                          Facsimile: (720) 550-5757
                          mfreeman@earthjustice.org

                          *Attorney for Petitioner Pawnee Nation of Oklahoma*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Power Shell Antivirus, AntiSpyware Signature Version 1.439.149.0, as of October 13, 2025, and according to the program are free of viruses.

/s/Michael S. Freeman
Michael S. Freeman

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2025, I served the foregoing

**PETITIONER'S OPENING BRIEF** with the Clerk of the Court for the United

States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF

system.

All participants in the case are registered CM/ECF users and will be served

by the appellate CM/ECF system.

*/s/Michael S. Freeman*
Michael S. Freeman

# ADDENDUM

**ADDENDUM INDEX**

| Document Description | Administrative Record Citation | Addendum Page Numbers |
|---|---|---|
| Section 10211 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005, Pub. Law 109-59, 199 Stat. 1144, 1937 (the SAFETEA Rider) | N/A | 000001-000002 |
| January 13, 2025 Environmental Protection Agency SAFETEA Decision (the January 2025 Order). | AR0000923-946 | 000003-000026 |
| May 12, 2025 Environmental Protection Agency SAFETEA Decision (the May 2025 Order). | AR0001132-1141 | 000027-000036 |
| EPA Office of Inspector General, Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs, Report No. 25-E-0042 (July 16, 2025) | N/A | 000037-000061 |
| Declaration of Monty Matlock | N/A | 000062-000075 |

PUBLIC LAW 109–59—AUG. 10, 2005

# SAFE, ACCOUNTABLE, FLEXIBLE, EFFICIENT TRANSPORTATION EQUITY ACT: A LEGACY FOR USERS

educational institutions that strive to develop and enhance technologies, including digital project simulation, that save money and time by using efficient methods of design, construction, and operation for transportation infrastructure projects.

(c) REPORT.—

(1) IN GENERAL.—Not later than one year after completion of the project described in subsection (a), the Secretary shall submit to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Environment and Public Works of the Senate a detailed report comparing the application of digital project simulation for such project to more traditional approaches to planning, design, and construction.

(2) PERFORMANCE MEASURES AND RECOMMENDATIONS.—The report shall also include—

(A) a description of the performance measures applied, including cost comparisons and length of construction; and

(B) recommendations, if any, for administrative or legislative action.

(d) DEFINITION.—For purposes of this section, the term "digital project simulation" means computer-assisted three-dimensional technology and digital lifecycle management.

**SEC. 10211. ENVIRONMENTAL PROGRAMS.**

(a) OKLAHOMA.—Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency (referred to in this section as the "Administrator") determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.

(b) TREATMENT AS STATE.—Notwithstanding any other provision of law, the Administrator may treat an Indian tribe in the State of Oklahoma as a State under a law administered by the Administrator only if—

(1) the Indian tribe meets requirements under the law to be treated as a State; and

(2) the Indian tribe and the agency of the State of Oklahoma with federally delegated program authority enter into a cooperative agreement, subject to review and approval of the Administrator after notice and opportunity for public hearing, under which the Indian tribe and that State agency agree to treatment of the Indian tribe as a State and to jointly plan administer program requirements.

**SEC. 10212. RESCISSION OF UNOBLIGATED BALANCES.**

(a) IN GENERAL.—On September 30, 2009, $8,543,000,000 of the unobligated balances of funds apportioned before such date to the States for the Interstate maintenance, national highway system, bridge, congestion mitigation and air quality improvement, surface transportation (other than the STP set-aside programs), metropolitan planning, minimum guarantee, Appalachian development highway system, recreational trails, safe routes to school,



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JAN 1 3 2025

OFFICE OF THE
ADMINISTRATOR

The Honorable J. Kevin Stitt
Governor of the State of Oklahoma
Oklahoma State Capitol
2300 North Lincoln Boulevard
Oklahoma City, Oklahoma 73105

**Re: State of Oklahoma Request Under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005**

Dear Governor Stitt:

This letter constitutes the United States Environmental Protection Agency's ("EPA" or "Agency") final decision, after reconsideration, on the State of Oklahoma's ("State") July 22, 2020, request to administer the State's environmental regulatory programs in certain areas of Indian country under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users. Pub. Law. 109-59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"). On December 22, 2021, the EPA provided notice proposing to withdraw and reconsider the October 1, 2020, decision ("October 2020 Decision") approving the Governor of Oklahoma's July 22, 2020, request ("December 2021 Proposal"). To avoid any disruption in program implementation during the reconsideration process, the State's program authority as provided in the October 2020 Decision has remained in place and unaffected pending EPA's final action on the December 2021 Proposal. EPA received and has carefully considered comments submitted by the State, by Indian Tribes located in Oklahoma, and by the public and has now concluded its reconsideration of the October 2020 Decision. After reconsideration, EPA is, as explained below, hereby withdrawing the October 2020 Decision and simultaneously replacing it with a new approval of the State's request that has been updated in two respects.

First, based on input from the State, EPA is clarifying that, consistent with the State's intent as articulated in the State's letter of December 4, 2024, this decision excludes all classes of wells from the State's approved Underground Injection Control ("UIC") program under the Safe Drinking Water Act ("SDWA") in Osage County, Oklahoma.

Second, the decision includes a condition designed to promote State engagement with Tribes during the State's administration of programs under this decision. We anticipate that this condition will not prove unduly burdensome, will help ensure that views of the affected sovereign Tribes are appropriately incorporated into environmental decision making in their areas of Indian country, and

**PETITIONER'S ADDENDUM 000003**

AR0000923

will thereby avoid unnecessary potential conflicts and improve environmental regulation in the covered areas.

By accompanying our withdrawal of the October 2020 Decision with a simultaneous revised approval of the State's request, EPA is ensuring that there is no gap in the State's program authority in the covered areas of Indian country. We look forward to working with the State's environmental agencies on program implementation as we all move forward together under the unique arrangement established by Section 10211(a) of SAFETEA.

## I.  Background

A.  Environmental Program Implementation prior to *McGirt*

As described in the December 2021 Proposal, many of the regulatory programs under the federal environmental statutes administered by EPA may be implemented by states and eligible Indian Tribes in the first instance, with EPA retaining oversight authority. For these programs, states and Tribes submit program applications to EPA, and EPA approves the programs where they meet applicable statutory and regulatory programmatic requirements. EPA retains oversight authority over many specific state/Tribal implementing activities and over the continuing sufficiency of a state's/Tribe's regulatory program.

Typically, EPA excludes Indian country[1] from its approvals of state environmental regulatory programs. In some cases, however, federal statutes provide one or more states with relevant jurisdiction in Indian country. In such instances, states may include areas of Indian country in their applications to EPA for environmental regulatory program approval, and where the applicant state demonstrates that federal law provides the state with sufficient jurisdiction, EPA has approved states to administer programs in the specified areas of Indian country. Indian Tribes may also apply to EPA for eligibility to administer regulatory programs and for program approval under federal environmental statutes administered by EPA. Generally, approved Tribal environmental programs would apply to areas that qualify as Indian country. In the absence of an approved Tribal or state program, EPA is generally authorized to administer environmental regulatory programs in Indian country.

---

[1] Section 10211 of SAFETEA does not define the term "Indian country." However, "Indian country" is defined under federal law at 18 U.S.C. § 1151 to mean (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. Although this definition is codified in the federal criminal code, it is also relevant for purposes of civil jurisdiction. *See, e.g., DeCoteau v. District County Court,* 420 U.S. 425, 427 n.2 (1975).

2

**PETITIONER'S ADDENDUM 000004**

Generally, prior to October 1, 2020, EPA's approvals of the State's environmental regulatory programs did not include Indian country located in the State. Currently, the Pawnee Nation of Oklahoma (Pawnee Nation) and the Cherokee Nation are the only Tribes in Oklahoma approved by EPA for eligibility to administer any regulatory programs under a statute administered by EPA – Pawnee Nation for the Clean Water Act Section 303(c) water quality standards and Section 401 certification programs, and Cherokee Nation for the Toxic Substances Control Act lead abatement program.[2] Prior to October 1, 2020, EPA thus retained authority to directly implement most environmental regulatory programs in most of the Indian country located in Oklahoma.

B.  *McGirt* and Subsequent Indian Reservation Adjudications

On June 9, 2020, the U.S. Supreme Court decided the case of *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020). In that decision, the Supreme Court held that The Muscogee (Creek) Nation's reservation in eastern Oklahoma had not been disestablished by Congress and remained Indian country under federal law. Prior to the *McGirt* decision, neither EPA nor the State had understood The Muscogee (Creek) Nation's original reservation boundaries to remain intact, and based on that misunderstanding the State had, as a practical matter, implemented environmental regulatory programs in much of the area that was held by the Supreme Court to be Indian country. However, because the State's programs were generally not approved to apply in Indian country, the State's program implementation was no longer appropriate following the Supreme Court's clarification regarding the Indian reservation status of the subject lands. Subsequent to the ruling in *McGirt*, several Oklahoma State court decisions have held that the reservations of other Tribes in Oklahoma had also never been disestablished and remained Indian country under federal law. In addition to The Muscogee (Creek) Nation, such Tribes currently include the Cherokee Nation, The Chickasaw Nation, The Choctaw Nation of Oklahoma, Miami Tribe of Oklahoma, Ottawa Tribe of Oklahoma, Peoria Tribe of Indians of Oklahoma, Quapaw Nation, The Seminole Nation of Oklahoma, and Wyandotte Nation.[3] Similar cases remain pending with

---

[2] The Pawnee Nation's and Cherokee Nation's eligibility to administer environmental programs is limited to these specific programs and covers only lands held in trust by the United States on behalf of the Tribes. EPA notes (as described further below) that Tribal trust lands, were, as a general matter, excluded from the State's request for program authority under SAFETEA.

[3] *See, e.g., Spears v. State*, 2021 OK CR 7, 485 P.3d 873, *cert. denied*, 142 S. Ct. 934 (2022) (Cherokee Nation Reservation); *Bosse v. State*, 2021 OK CR 30, 499 P.3d 771, *cert. denied*, 142 S. Ct. 1136 (2022) (Chickasaw Nation Reservation); *Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867, *cert. denied*, 142 S. Ct. 935 (2022) (Choctaw Nation Reservation); *Grayson v. State*, 2021 OK CR 8, 485 P.3d 250, *cert. denied*, 142 S. Ct. 934 (2022) (Seminole Nation Reservation); *State v. Lawhorn*, 2021 OK CR 37, 499 P.3d 777 (Quapaw Nation Reservation); *State v. Brester*, 2023 OK CR 10, 531 P.3d 125 (2023) (Ottawa, Peoria and Miami Reservations); *State v. Fuller*, 2024 OK CR 4, 547 P.3d 149 (2024) (Wyandotte Reservation).

3

**PETITIONER'S ADDENDUM 000005**

respect to additional Tribes, and additional areas may subsequently be adjudicated to retain reservation status under federal law.

C. Oklahoma's SAFETEA Request and EPA's October 2020 Decision

On July 22, 2020, the State submitted a letter to EPA requesting approval under Section 10211(a) of SAFETEA to administer in certain areas of Indian country the State's environmental regulatory programs that were previously approved by EPA outside of Indian country. Section 10211(a) of SAFETEA applies only to Oklahoma and provides:

SEC. 10211. ENVIRONMENTAL PROGRAMS.

(a) OKLAHOMA.—Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency (referred to in this section as the "Administrator") determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.

Pub. Law 109-59, 119 Stat. 1144, 1937.

The State's request under SAFETEA described the scope of Indian country areas that were intended by the State to be included within its requested program authority and expressly identified categories of Indian country that the State intended to exclude from its request. The State's request was not limited to any specific Tribe(s). Thus, the State's request included areas of Indian country within the formal reservations of all Tribes in Oklahoma – *i.e.*, all Tribes with formal reservations that, pursuant or subsequent to the ruling in *McGirt*, have been or will be adjudicated to remain intact. EPA's understanding is that the State's request was essentially intended to extend approval of the State's environmental regulatory programs into those areas of Indian country where, prior to *McGirt*, the State had, as a practical matter, implemented its programs; EPA's October 2020 Decision approved the geographic scope of the State's program authority as requested by the State.

Following receipt of the State's request, EPA convened expedited Tribal consultation meetings from August 25, 2020, to September 14, 2020. During and following those meetings EPA received numerous comments from Tribes opposing the State's request. Among other things, Tribal commenters expressed concerns regarding the impact of any approval of the State's request on Tribal sovereign interests in their Indian country lands, questioned the sufficiency of the State's prior administration of environmental regulatory programs in the affected areas of Indian country, and urged EPA to conduct

4

**PETITIONER'S ADDENDUM 000006**

AR0000926

additional review of the State's programs and consider appropriate oversight of those programs to address Tribal interests prior to any approval of the State's request under SAFETEA. Tribal commenters also expressed concern that the length of the Tribal consultation period (three weeks for 38 Tribes in Oklahoma and a wide range of covered environmental regulatory programs) was inadequate to allow for meaningful engagement regarding impacts of the State's request on Tribes.

On October 1, 2020, EPA's then-Administrator Andrew R. Wheeler approved the State's request. EPA's October 2020 Decision detailed the Agency's rationale at that time, as well as the programmatic and geographic scope of the approval. Among other things, EPA noted that the October 2020 Decision deviated from the geographic scope of the State's programs as administered prior to *McGirt* by approving the State to administer its SDWA UIC program (other than for Class II wells) in Osage County, whereas prior to *McGirt*, EPA had administered all classes of UIC wells in Osage County. The October 2020 Decision is the subject of a pending challenge in federal court. (*Pawnee Nation of Oklahoma v. Regan*, No. 20-9635 (10th Cir.)).

D.  Reconsideration of the October 2020 Decision and Additional Tribal Consultation

On January 20, 2021, President Biden issued Executive Order 13990 entitled "Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." 86 Fed. Reg. 7037 (Jan. 25, 2021). In relevant part, the Executive Order provided that agencies must review regulations, orders, guidance documents, and other similar actions adopted over the prior four years to determine whether they conflict with the national objectives stated therein. In accordance with the Executive Order and in response to input from Oklahoma Tribal Nations, EPA reviewed the Agency's October 2020 Decision and, consistent with the President's Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships (January 26, 2021), on June 30, 2021, the Administrator invited consultation with Indian Tribes in Oklahoma regarding the October 2020 Decision. Tribal consultation was intended to help EPA better understand the concerns expressed by Tribes regarding the decision and to consider appropriate measures to mitigate any adverse impacts on Tribes. EPA conducted consultation with Tribes from July 15 to October 31, 2021. During this period, EPA held two open consultation calls with Oklahoma Tribal Nations, with eighteen Tribes participating. In addition, EPA leadership held individual consultations with eight Tribes and received written comments from five Tribes.

On December 22, 2021, EPA provided notice proposing to withdraw and reconsider the Agency's October 2020 Decision ("December 2021 Proposal"). EPA provided interested parties and the public an opportunity to comment on the December 2021 Proposal and conducted consultation with Indian Tribes (in January 2022 and again in 2024) to ensure that the Agency's decision making was appropriately informed by Tribal views. To avoid any disruption in program implementation during the reconsideration process, the State's program authority as provided in the October 2020 Decision has remained in place and unaffected pending EPA's final action on the December 2021 Proposal.

**PETITIONER'S ADDENDUM 000007**

After the December 2021 Proposal, among other things, Tribes continued to express concerns regarding the State's existing administration of environmental regulatory programs in the covered areas of Indian country and the effects of State regulation on Tribal sovereign interests. Some Tribes questioned the adequacy of the October 2020 Decision under the terms of the applicable SAFETEA provision. Many Tribes expressed interest in opportunities for engagement with the State during program implementation to help ensure appropriate coordination and consideration of Tribal interests.

EPA has attempted to keep the State generally apprised of developments during the reconsideration process and directly reengaged with the State beginning in October 2024. EPA received comments from the State, by letter dated January 31, 2022, during the public comment period and also received a second letter from the State responding to EPA on two discrete issues on December 4, 2024. EPA has carefully considered comments submitted by the State, by Indian Tribes located in Oklahoma, and by the public. As stated above, the Agency has now completed its reconsideration process and is taking final action in connection with the December 2021 Proposal.

## II. Withdrawal of October 2020 Decision

Having reviewed all input received, for the reasons described herein EPA hereby finalizes withdrawal of the October 2020 Decision (and, as described in Section III below, replaces it with a new decision approving the State's request subject to the condition described in Section VI below).

A. Consideration Regarding Inclusion of State-Tribal Engagement Condition

EPA has reconsidered and is now revising our prior interpretation that Section 10211(a) of SAFETEA provides no discretion for the Agency to include in its approval a reasonable condition designed to promote efficient and effective coordination among sovereign entities with geographically overlapping environmental responsibilities in the affected areas. EPA is mindful of the statute's mandatory direction to approve a proper request by the State to extend the State's environmental regulatory programs into areas of Indian country, and EPA has done so here (see below at Section III). The Agency does not, however, interpret this requirement to foreclose the inclusion of a reasonable condition that is consistent with approval of the State's requested program authority in Indian country – *i.e.*, a condition that provides an appropriate process to ensure consideration of Tribal sovereign input in regulatory decision making in their areas of Indian country. The statute does not preclude such a condition, and EPA finds that providing a structured opportunity for State-Tribal engagement and Tribal input into the State's regulatory decision making is appropriate to help ensure that the same Tribal information is available to the State as would be available to EPA were the EPA directly administering programs in the areas of Indian country covered by this decision.

Such a condition is also supported by reasoning stated by the D.C. Circuit, the only court to have considered any aspect of the applicable SAFETEA authority. *See Oklahoma Department of Environmental Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014) (recognizing that EPA might interpret

6

AR0000928

SAFETEA to permit attachment of conditions to the State's program approval). Although the D.C. Circuit's consideration of SAFETEA arose in the context of its analysis of threshold questions of standing, the court clearly contemplates the Agency's discretion to include reasonable conditions in a decision under SAFETEA. The court's consideration of this issue was raised to EPA during the Agency's consultation with Indian Tribes prior to the October 2020 Decision. However, EPA did not address the court's recognition of EPA's discretion to consider potential conditions or otherwise respond to Tribal comments pointing the Agency to that aspect of the decision.

EPA views the condition described below as particularly relevant and reasonable in the situation presented here, where Oklahoma is broadly authorized to administer environmental regulatory programs across wide areas of multiple Tribes' reservations. In these circumstances, the State is replacing EPA as the front-line regulator and the authority to implement these programs necessarily transfers from EPA to the State in the covered areas of the Tribes' Indian country. The condition EPA is including in this decision is designed to establish a similar consultative relationship between the State and Tribes as exists between EPA and the Tribes and is narrowly tailored to provide procedural opportunities for Tribal input without disturbing the State's ultimate regulatory decision-making authority.

B.  The Need for Additional Tribal Consultation on EPA's SAFETEA Decision

EPA also recognizes that the abbreviated period the Agency offered in 2020 for consultation with affected Tribes in Oklahoma did not provide a sufficient opportunity for meaningful engagement and consideration of Tribal views, including Tribal views relating to a potential intergovernmental coordination process given the significance and broad scope of the decision. The circumstances surrounding Section 10211 of SAFETEA are atypical, and the authority provided therein to the State significantly alters the ordinary apportionment of environmental regulatory decision making and implementation in Indian country throughout the State of Oklahoma for purposes of programs under the statutes administered by EPA. As described above, EPA typically excludes Indian country from its approvals of state programs and thereby generally sets such areas aside for Tribal and federal program administration. EPA is aware of no federal statutory scheme similar to Section 10211(a) of SAFETEA that so summarily alters this arrangement across a full spectrum of regulatory programs without any explanation of congressional purpose or guidance to the administering federal agency in the statutory text or history. Based on our review of the October 2020 Decision, the Agency should have provided additional consideration to the unique circumstances presented by the SAFETEA provision and the State's request and should have allowed sufficient time for meaningful engagement with affected Tribes and consideration of mechanisms to promote coordination among the multiple sovereigns with interests in the administration of programs in the covered areas of Indian country.

Section 10211(a) of SAFETEA does not prescribe any particular process for EPA action on a request by the State; thus the Agency maintains discretion to develop an appropriate means to process and act on such a request. EPA finds that it would have been appropriate for the Agency to provide additional

7

time to ensure meaningful Tribal involvement and to develop protocols to promote coordination among the affected sovereigns and thereby minimize the potential for conflicts that could impede regulatory program administration in the covered areas. EPA's review of the four years of implementing the October 2020 Decision and completion of the reconsideration process have provided an opportunity to correct these deficiencies and improve EPA's decision making to the benefit of all affected entities. Withdrawal of the October 2020 Decision and replacement with a new, better-informed decision culminates these processes.

## C. Correction Regarding UIC Program in Osage County

As noted above, the October 2020 Decision approved the State to administer its UIC program (other than for Class II wells) in Osage County, Oklahoma. EPA noted at the time that this aspect of the approval exceeded the geographic scope of the State's UIC program as administered prior to *McGirt*. Prior to that decision, EPA had directly administered all classes of UIC permitting in Osage County. The State has clarified that EPA misunderstood its intent on this point. As the State has explained, it intended to exclude the UIC program in Osage County from its request for program authority in order to maintain – without expansion or restriction – the scope of that program as administered prior to the *McGirt* case. See Letter from Governor J. Kevin Stitt to EPA Administrator Michael S. Regan (December 4, 2024). Based on this clarification, EPA is withdrawing and revising the October 2020 Decision to match the intended scope of the State's request.

## D. Ensuring Continuity of Environmental Program Administration

The State expressed in its comments on the December 2021 Proposal that reconsideration of the prior decision should not disrupt the State's program administration in the covered areas of Indian country. EPA shares this concern. As noted above, and as expressly described in the December 2021 Proposal, the State's program authority has remained in place and was unaffected during the reconsideration process. Further, by simultaneously issuing a new decision approving the State's request, EPA is ensuring that there will be no gap in program coverage and that the State, regulated community, and Tribes can rely on a continuity of program administration in the affected areas of Indian country.

## III. Approval of the State's Request Under Section 10211(a) of SAFETEA

By this letter, EPA is also issuing a new decision approving the State's environmental regulatory program authority in the areas of Indian country requested by the State. As described below, the new elements of this decision are: 1) to exclude all classes of wells – as opposed to only Class II wells – in Osage County, Oklahoma from the State's approved SDWA UIC program authority, as requested by the State; and 2) to add a reasonable condition to help ensure that the views of affected Tribes will be considered in the State's program administration in Indian country. EPA also describes below certain program oversight commitments on the part of the Agency to further promote strong partnerships among the State, Tribes, and EPA as programs are administered by the State in Indian country.

8

**PETITIONER'S ADDENDUM 000010**

The Agency believes the basic outcome approving extension of the State's EPA-approved environmental regulatory programs into the requested areas of Indian country is consistent with the authority and requirements of SAFETEA. Although the Agency typically excludes Indian country from our approvals of state environmental regulatory programs, there are rare circumstances where a federal statute expressly provides for state program administration in Indian country. On its face, Section 10211(a) of SAFETEA provides for such program administration on the part of Oklahoma and requires that EPA approve a request from the State where the statute's elements are met – *i.e.*, where the request addresses (1) any regulatory program, (2) submitted by Oklahoma for approval by EPA under a law administered by EPA, where EPA has (3) determined that the program meets applicable requirements of the law, and (4) approved the program with respect to areas in the State that are not Indian country, and (5) the State requests to administer the program in areas of the State that are in Indian country. Because these circumstances are present here, EPA is approving the State's request and, as described in Section VI below, is including within this approval a condition to promote meaningful intergovernmental engagement with Tribes during the State's program administration.

## IV. Geographic Scope of Approval

EPA is making one change to the geographic scope of the October 2020 Decision. As explained above, the State has clarified that it did not intend to request SDWA UIC program authority in Osage County. EPA is thus revising the geographic scope of the State's UIC program as approved by the October 2020 Decision to exclude Osage County, Oklahoma for all classes of wells, as opposed to only Class II wells.[4] Otherwise, the geographic scope of this decision is identical to that of the October 2020 Decision. The State requested authority over Indian country throughout the State, but expressly excluded three categories of land over which the State had generally not administered regulatory programs prior to *McGirt*.[5] Therefore, consistent with the State's request, EPA's approval applies to Indian country

---

[4] As described in the October 2020 Decision, EPA had identified two instances where the decision deviated from the geographic scope of the State's programs as implemented prior to *McGirt*. The first was extension of the State's non-Class II UIC program into Osage County. That discrepancy is now being revised in today's decision. Second, consistent with the D.C. Circuit's decision in *Oklahoma Dept. of Environmental Quality v. EPA*, 740 F.3d 185 (D.C. Cir. 2014), the State's Clean Air Act State Implementation Plan ("SIP") applies on non-reservation areas of Indian country – most notably, Indian allotments – in the State. Prior to *McGirt*, the State had thus implemented its SIP on Indian allotments, including allotments that are now understood (per the Supreme Court's decision) to be located within the exterior boundaries of an Indian reservation. To the extent an allotment is located on an Indian reservation, it would be excluded from the D.C. Circuit's holding that SIPs apply on non-reservation areas of Indian country. The State's July 2020 request excludes Indian allotments, and thus does not request extension of Oklahoma's SIP onto such reservation allotments.

[5] Section 10211(a) of SAFETEA does not specify any required minimum geographic area of Indian country to be included in a request from Oklahoma. EPA interprets the provision as providing sufficient flexibility for the State

9

AR0000931

throughout the State, with the exception of and excluding all Indian country lands, including right-of-way running through the same, that:

(A) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. § 1151(c);

(B) Are held in trust by the United States on behalf of an individual Indian or Tribe; or

(C) Are owned in fee by a Tribe, if the Tribe –

(i) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party; and

(ii) never allotted the land to a member or citizen of the Tribe.

As noted above, EPA recognizes that the precise geographic areas covered by this decision may evolve to the extent additional reservations located within Oklahoma are adjudicated to remain intact. Because this approval applies to categories of Indian country, as opposed to specified parcels, the approval will automatically cover any areas of Indian country – other than the excluded categories – subsequently determined to exist in the State. Nothing in this decision is intended to change or address Tribal authority under Tribal law in the covered areas where Tribes are acting outside the scope of a program under a statute administered by EPA.

## V. Programmatic Scope of Approval

EPA is making one change to the programmatic scope of the October 2020 Decision. As explained above, the State has clarified that it did not intend to request SDWA UIC program authority in Osage County. EPA is thus revising the programmatic scope of the State's UIC program as approved by the October 2020 Decision to exclude all classes of wells, as opposed to only Class II wells – in Osage County, Oklahoma. Otherwise, the programmatic scope of this decision is identical to that of the October 2020 Decision. The State's July 2020 letter requests approval under SAFETEA with regard to all of the State's existing EPA-approved environmental regulatory programs[6] that are administered by the Oklahoma Department of Environmental Quality, the Oklahoma Department of Agriculture, Food and

---

to exclude certain areas of Indian country from its request and to mandate EPA approval of such a limited request so long as the basic criteria of the statute are met.

[6] Section 10211(a) of SAFETEA addresses only "regulatory program[s]" administered under federal environmental laws. The provision does not address funding provided under EPA grant programs. The provision also does not address any exercise of State regulatory authority outside the scope of a program approved by EPA under a federal environmental statute administered by EPA.

PETITIONER'S ADDENDUM 000012

AR0000932

Forestry, the Oklahoma Water Resources Board,[7] the Oklahoma Corporation Commission, and the Oklahoma Department of Labor. Consistent with the State's request, EPA is approving the State under SAFETEA to administer all environmental regulatory programs approved by EPA to apply outside of Indian country, including, but not limited to, the environmental regulatory programs identified in Appendix B to this decision. Each of the programs covered by this approval has been submitted to EPA — *i.e.,* they involve a submission by the State for EPA's consideration under a law administered by EPA — and approved by EPA as meeting applicable requirements of federal environmental law outside of Indian country. These programs thus satisfy the necessary criteria of SAFETEA Section 10211(a). To the extent EPA's prior approvals of these State programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by this approval under SAFETEA. Because each of the programs identified in Appendix B is now approved to include the requested areas of Indian country, any future revisions or amendments to these identified programs will similarly extend to the covered areas of Indian country without any further need for additional requests under SAFETEA.[8]

**VI. Condition on the Approval**

As described above, during reconsideration of the October 2020 Decision, EPA conducted extensive consultation with Indian Tribes. Although Tribes raised numerous issues considered by EPA, one consistent theme was that EPA should establish a process for the State to engage directly with Tribes and provide opportunities for input as a condition to approving the State to administer environmental programs within Indian country. EPA agrees that such a condition will promote the efficient and effective administration of environmental regulatory programs within the affected areas of Indian country. Therefore, as a condition of this approval, the State is required to follow the Tribal engagement process set forth below in Section VI.B with regard to the Tribes described below in Section VI.C.

   A.  Purpose and Background of the Tribal Engagement Process

As described above, the State's request to extend the reach of its environmental regulatory programs into certain areas of Indian country, and EPA's approval of that request under the terms of Section 10211(a) of SAFETEA, fundamentally alters the sovereign relationship of the affected Tribes to the

---

[7] EPA notes that as of November 2022, the State transferred administration of Clean Water Act Water Quality Standards from the Oklahoma Water Resources Board to the Oklahoma Department of Environmental Quality.

[8] However, should the State apply to EPA in the future for approval of any program that has not been previously approved outside of Indian country, the State would also need to submit a request under SAFETEA to the extent the State wishes to administer that program in any area of Indian country. This is consistent with the language of Section 10211(a), which contemplates that a request from Oklahoma to administer a program in Indian country will relate to a regulatory program that has already been submitted to EPA and approved by EPA to apply outside of Indian country.

front-line regulator in broad areas of their Indian country land base. In the absence of the State's request and EPA's approval, EPA would generally directly administer environmental regulatory programs under federal law in the covered areas of Indian country. As a federal agency, EPA has a sovereign government-to-government relationship with the Tribes which has important longstanding attributes under federal law and policy. As a critical element of that relationship, EPA routinely consults with federally recognized Tribes on Agency actions or decisions that affect Tribes and considers Tribal views prior to undertaking regulatory activity in Indian country, and in other areas where Agency actions or decisions may affect Tribes.

As demonstrated through longstanding efforts to establish and refine effective and enduring intergovernmental relationships, EPA's coordination and consultation with Indian Tribes honors and strengthens the Agency's government-to-government relationship with Tribes, ensures meaningful and timely opportunities for Tribal input, and promotes sound and well-informed Agency decision making for the protection of human health and the environment. Notwithstanding EPA's approval of the State's request under SAFETEA, the special EPA/Tribal relationship will continue to exist and will continue to inform EPA's oversight of the State's programs as administered in Indian country, and EPA will continue to consult with affected Tribes as part of that oversight.

However, because EPA will no longer be the front-line regulatory authority for the covered programs in the affected areas of Indian country, important and wide-ranging areas of environmental decision making will transfer to the State and will no longer fall within the scope of the EPA Consultation Policy. In these circumstances, program administration can be impacted by the loss of a regular, institutionalized process for cooperation and coordination among relevant interested sovereigns with unique knowledge, experiences, and priorities and with geographically overlapping responsibilities under their respective authorities for the protection of lands, resources, and communities in the covered areas. Although it is not possible to recreate the unique federal/Tribal government-to-government relationship at the State/Tribal level, EPA believes it is appropriate to establish a basic coordination process as part of this approval to reasonably approximate the Tribal engagement that would occur were EPA to remain the front-line regulator. During the consultation process conducted in connection with the December 2021 Proposal, EPA received input from several Tribes requesting that EPA include an appropriate process for State-Tribal engagement as a condition of any approval of the State's SAFETEA request. Among other things, some Tribes provided specific engagement protocols for EPA's consideration. EPA has determined that the protocols provided by Tribes, with some adjustments to help ensure functionality and reduce burden, serve to provide a process for the State to engage directly with Tribes and provide opportunities for Tribal input as Oklahoma exercises the authorities granted by this SAFETEA approval. Notably, as set forth in Section VI.D below, the protocols provide an opportunity for the State to modify the Tribal engagement process through separate written agreement(s) with one or more of the Tribes described in Section VI.C below.

By including this condition, the substitution of the State as the front-line regulator will not disturb the important opportunities for meaningful Tribal input and will ensure that the unique information and

12

views of the Tribes are appropriately obtained and considered as the State administers its regulatory programs. The goal of this process is to promote more effective program administration and minimize potential disputes in the covered areas of Indian country. The condition is intended to provide an orderly and accountable process for State-Tribal engagement with clear protocols and expectations to the benefit of all involved parties.

The condition included in this decision is also fundamentally consistent with key principles underlying the various programs that regulatory decisions should provide opportunities for participation, and be appropriately informed, by the affected communities and neighboring states, which can include Indian Tribes. The State noted in its comments on the December 2021 Proposal that it already conducts meaningful engagement with Tribal partners. The condition included in this decision is therefore consistent with existing efforts by the State and will serve to formalize such opportunities for Tribal engagement within the context of the State's approved program authority in the covered areas of Indian country. The condition does not disturb the State's fundamental authority and approval by EPA to administer environmental regulatory programs in the requested areas of Indian country. It merely adds an appropriate process to the State's program administration to support the State's existing efforts to engage with affected Tribes and to substitute for Tribal consultation that would have occurred where EPA is the front-line regulator in Indian country.

B.  Required Tribal Engagement Protocols

As part of this approval, the State is required to follow the Tribal engagement protocols set forth in Appendix A to this decision ("Tribal Engagement Protocols"). As described above, this process blends and, as appropriate, adjusts procedures recommended by certain Tribes in their consultation comments to EPA. Notably, the Tribal Engagement Protocols expressly provide an opportunity for the State and Tribes to tailor the engagement procedures to their specific interests and needs through separate agreement(s). As stated in the Tribal Engagement Protocols, and as described in Section VI.D below:

These procedures will not apply with regard to any Tribe(s) where the State and such Tribe(s) enter into a written agreement establishing separate procedures for coordination between the State and such Tribe(s) regarding the State's administration of the regulatory program(s) covered by the SAFETEA decision.

Accordingly, the State has the ability to modify the procedures contained in the Tribal Engagement Protocols upon agreement with one or more of the covered Tribes.

While the State has informed EPA through its comments on the December 2021 Proposal that it already conducts meaningful engagement with its Tribal partners, EPA recognizes that additional time may be needed for the State to incorporate the specific procedures of the Tribal Engagement Protocols into the ordinary administration of its environmental regulatory programs as approved under this

13

AR0000935

SAFETEA decision. The condition requiring the Tribal Engagement Protocols will thus not take effect until 120 days from the date of this SAFETEA decision. EPA believes a 120-day window will provide sufficient time for the State to supplement its existing Tribal outreach procedures to account for the Tribal Engagement Protocols and will also provide an opportunity for the State and Tribe(s) to develop separate coordination agreements, if they so choose. EPA notes that the 120-day window is not a deadline for development of any such separate agreements, and encourages the State and Tribes to develop their own tailored coordination agreements to replace the Tribal Engagement Protocols at any time.

C.  Covered Tribes

This approval decision directly applies to certain Indian country lands of those Tribes whose reservations remain intact under the holding and (as applied in later cases) the reasoning of *McGirt*.[9] As noted above, Tribes whose reservations have been adjudicated to remain intact currently include Cherokee Nation, The Chickasaw Nation, The Choctaw Nation of Oklahoma, Miami Tribe of Oklahoma, The Muscogee (Creek) Nation, Ottawa Tribe of Oklahoma, Peoria Tribe of Indians of Oklahoma, Quapaw Nation, The Seminole Nation of Oklahoma, and Wyandotte Nation. The Tribal Engagement Protocols in Appendix A apply to these Tribes, as well as to the Pawnee Nation. It is also possible that the reservations of additional Tribes remain intact. Such reservations could, for instance, be the subject of future adjudications or other proceedings or findings establishing their current status as intact reservations. In that event, the relevant categories of such Tribes' lands would automatically fall within the scope of the State's program authority consistent with the State's request and today's decision. The Tribal Engagement Protocols in Appendix A will also apply to such Tribes. Together, the Tribes described in this section constitute the Tribes covered by the condition set forth above on the State's program approval under SAFETEA ("Covered Tribes").

D.  Separate State-Tribal Coordination Agreements

As previously stated, the condition included in this decision is intended to ensure a general baseline of opportunity for the Covered Tribes to provide meaningful input into the State's regulatory activity in their areas. EPA recognizes, however, that the most effective means for State and Tribal sovereigns to interact would generally be through their own coordination agreements and protocols tailored to their specific interests and priorities. Therefore, as noted in the Tribal Engagement Protocols, in lieu of the condition set forth above, the State and one or more of the Covered Tribes may enter into their own State-Tribal agreement addressing how they will communicate and coordinate on the State's actions

---

[9] As described above (see Section IV), the State's request under SAFETEA generally covers geographic areas that were not understood by the State and EPA to be Indian country prior to the Supreme Court's decision in *McGirt* and generally excludes areas that had previously been understood to constitute Indian country.

14

under this approval. The details of such agreements would be for the State and Tribe(s) to negotiate.[10] Once the agreement is signed, the State would be relieved of compliance with the condition set forth above with regard to the signatory Tribe(s) for as long as the agreement is in effect. EPA strongly supports the development of such State-Tribal agreements and stands ready to assist the parties as appropriate.

## VII. EPA Oversight

To further promote strong partnerships among the State, Tribes, and EPA as programs are administered by the State in Indian country, EPA also intends to bring a Tribal focus to its oversight of Oklahoma's programs as administered in Indian country to help ensure consideration of Tribal input and ongoing transparent dialogue among the parties. EPA oversight of state programs generally involves a number of interactions, including scheduled reviews of state programs, reviews of specific regulatory actions such as draft state permits, and consideration of compliance and enforcement issues.

EPA will continue to conduct reviews of the State's environmental regulatory programs. EPA also plans, in the ordinary course of permit reviews: 1) to review comments submitted by Tribes on draft or proposed State permits as well as State responses, and/or 2) where requested by Tribes, to review draft State permits or other actions, consult with Tribes as appropriate regarding their concerns, and work with the State to help ensure Tribal concerns are considered and appropriately addressed. For concerns identified by Tribes related to enforcement of the State's programs or to a specific facility or event, EPA plans to engage with Tribes and work with the State to help ensure that Tribal concerns are considered and appropriately addressed. Further, where EPA is conducting facility inspections in Indian country, and upon request of a Tribe, EPA may permit Tribal representatives to accompany EPA inspectors if the representative has appropriate federal credentials or, if uncredentialed, with the facility's permission. Consistent with EPA practice, EPA will also endeavor to provide notifications to Tribes of planned EPA inspections in Indian country. Finally, EPA will engage with Tribes on a regular recurring basis to assess the State's administration of programs under the SAFETEA authority and to identify Tribal priorities and concerns relating to program implementation or enforcement.[11] Each of these oversight activities will be conducted consistent with EPA's established oversight authorities under the various federal environmental laws administered by the Agency.

---

[10] SAFETEA Section 10211(b) includes separate requirements relating to Tribal environmental regulation under EPA's statutes in Indian country in Oklahoma, and calls for State/Tribal cooperative agreements. The State and Covered Tribes may also benefit by establishing procedures regarding negotiation of such SAFETEA cooperative agreements.

[11] EPA also recognizes that some Tribes in Oklahoma may be interested in seeking eligibility to administer approved regulatory programs of their own under EPA's statutes. EPA intends to work with interested Tribes to help them develop complete TAS applications and to assist, as appropriate, with development of cooperative agreements required by SAFETEA Section 10211(b).

15

**PETITIONER'S ADDENDUM 000017**

## VIII.    Conclusion

Consistent with the authority and requirements of Section 10211(a) of SAFETEA, EPA withdraws the October 2020 Decision and approves, subject to the consultation condition set forth herein, the State of Oklahoma's July 22, 2020, request to administer the environmental regulatory programs described in this decision in the specified areas of Indian country. EPA looks forward to working cooperatively with the State and Tribes to promote ongoing, transparent dialogue and appropriate consideration of all parties' interests as the State administers programs in the covered areas of Indian country.

Thank you again for your letter. If you have further questions, you are welcome to contact me, or your staff may contact Jack Bowles, Director of the Office of Intergovernmental Relations, at bowles.jack@epa.gov or 202-564-3657.

Sincerely,

Jane Nishida
Acting Administrator

ENCLOSURES:
1. Appendix A – Tribal Engagement Protocols
2. Appendix B – List of Covered Programs

16

**PETITIONER'S ADDENDUM 000018**

**Appendix A – Tribal Engagement Protocols**

The State shall implement the following procedures in connection with all regulatory programs covered by the decision under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005 ("SAFETEA") to which these procedures are appended. These procedures are designed to help formalize and establish a minimum set of procedures and expectations for the State's approach to engagement with Covered Tribes to ensure that the Tribes' input and environmental priorities are considered in the State's decision-making processes.

These procedures will not apply with regard to any Tribe(s) where the State and such Tribe(s) enter into a written agreement establishing separate procedures for coordination between the State and such Tribe(s) regarding the State's administration of the regulatory program(s) covered by the SAFETEA decision.

**Section I - Final Agency Actions**

The procedures in Sections I.A, I.B, I.C, and III shall apply to all final agency actions by the State under the program(s) covered by the SAFETEA decision - including promulgation of regulations, issuance of permits, licenses or other approvals, establishment of standards, or other final agency action.

A. Notice to Affected Tribe(s)

1) As early as practicable in the action development process, the State must send a written notice to any Covered Tribe(s) (see Section III.A below) whose Indian country will be subject to, is the site of, or is within 50 miles of the site of the final agency action, inviting the affected Tribe(s) to confer with the State regarding the action. Any Covered Tribe(s) entitled to notice under these procedures are referred to as "affected Tribe(s)."

2) The notice must be provided early enough so that conferral under Section I.B can reasonably be expected to be completed while meeting any statutory or regulatory timing requirements or deadlines applicable to the final agency action in question. The notice must identify any such statutory or regulatory deadlines so that the affected Tribe(s) can seek to structure their conferral to comport with those deadlines.

3) The notice must be sent to the tribal leader and head of the environmental department of each affected Tribe.

4) The notice must provide a full, clear, accurate and non-technical description of the action with relevant maps and timelines, a summary description of the agency's process for making a decision (including any statutory or regulatory timing requirements or deadlines),

17

**PETITIONER'S ADDENDUM 000019**

and a contact at the State agency responsible for the action.

5) The notice must expressly request a response from the affected Tribe(s) indicating if they wish to confer and/or provide written views or objections to the action and provide at least 30 days for tribal response.

B. <u>Conferral with Affected Tribe(s)</u>

1) If an affected Tribe responds to the State notice within 30 days or any longer period set forth in the State notice and indicates that the Tribe wishes to confer with the State regarding the action, the State shall offer to meet with the Tribe to discuss the action.

   a) The State shall ensure that official(s) with sufficient knowledge of the action are present at all meeting(s) to provide meaningful information to the Tribe and address the Tribe's questions. Such meeting(s) may be in-person, virtual or by phone, as appropriate.

   b) In addition to meeting with the affected Tribe(s), the State shall provide sufficient documentary information for the Tribe(s) to make an informed decision about the action, including maps, technical data, and other explanatory or supporting information as requested by the Tribe. If such data is provided after the first conferral meeting, the State will hold additional meeting(s) no later than 15 days after receipt of such data by the Tribe or as mutually agreed upon by the State and Tribe, if requested by the Tribe.

   c) Within 30 days of the later of 1) the initial State/Tribal meeting, 2) the receipt by the Tribe of any information requested under Section I.B.1.b, or 3) any subsequent meeting under Section I.B.1.b, the Tribe will provide any information and views it wishes the State to consider regarding the action. Such information and views must be submitted in writing, at which point the conferral process under Section I.B shall be complete.

2) Meaningful conferral under Section 1.B shall require that efforts are aimed at achieving consensus between the State and the affected Tribe(s).

3) The State shall make reasonable efforts to ensure that applicable statutory and regulatory deadlines do not limit meaningful conferral efforts.

4) Subject to Sections III.C and III.D (General Provisions), if affected Tribe(s) respond to the notice in Section I.A by indicating that they wish to confer, no final action will be taken by the State until conferral with affected Tribe(s) under Section I.B is complete.

C. <u>Reporting</u>

18

AR0000940

1) Within 10 business days of finalizing an action subject to the procedures in Section I.A above, the State must provide a written description of the tribal engagement process to the affected Tribe(s).

2) The description must include:

    a) A signed statement(s) of non-opposition to the action obtained from the affected Tribe(s);

    b) A description of any concerns raised by affected Tribe(s) and how the State addressed those concerns; or

    c) A signed certification that notice was provided pursuant to Section I.A and that no response was provided by any affected Tribe.

3) The State will provide a yearly report to the EPA, Region 6 Regional Administrator that will include information indicating the number of notifications provided to affected Tribes under Section I.A and the number of conferrals conducted with affected Tribes under Section I.B. The State will also identify any final agency actions where the State provided a written description of the engagement process to affected Tribe(s) under Section I.C.2.b. The State will provide a copy of the report to all Covered Tribes at the same time the State provides a copy to EPA.

## Section II - Civil Compliance Assurance and Enforcement

The procedures in Section II shall apply to civil compliance assurance and enforcement activities undertaken by the State under each of the programs covered by the SAFETEA decision. The procedures in this Section must be implemented consistent with, and do not alter, limit, or supersede, any applicable laws, regulations, or any limitations on sharing enforcement sensitive or confidential information, or any restrictions on communications with outside parties.

A. Civil Inspection Planning and Priority Setting

    1) Notice to Covered Tribes

        a) As early as practicable in the annual civil inspection planning and priority setting process undertaken consistent with applicable EPA Compliance Monitoring Strategies, the State must send a notice letter to the tribal leaders and heads of the environmental departments of all Covered Tribes informing them of the commencement of the planning process and inviting each Covered Tribe to provide views on the State's planning and priority setting as relevant to areas of, or within 50 miles of, their Indian country.

**PETITIONER'S ADDENDUM 000021**

b) Such notice must identify the program(s) under consideration in the State's inspection planning and priority setting process and a contact at the State agency(ies) responsible for each program.

c) Such notice must expressly request a response from the Covered Tribes indicating if they wish to confer and/or provide written views and must provide at least 30 days for tribal response.

2) Conferral with Covered Tribes

a) If a Covered Tribe responds to the State notice within 30 days or any longer period set forth in the State notice and indicates that the Tribe wishes to confer with the State regarding the State's inspection planning and priority setting, the State shall offer to meet with the Tribe.

   i) The State shall ensure that official(s) with sufficient knowledge of the State's enforcement programs and the inspection planning and priority setting process are present at the meeting to provide meaningful information to the Tribe, address the Tribe's questions, and receive tribal input. Such meeting may be in-person, virtual or by phone, as appropriate.

   ii) Within 30 days of the State/Tribal meeting, the Tribe will provide any information and views it wishes the State to consider regarding State's inspection planning and priority setting for the program(s) at issue. Such information and views must be submitted in writing, at which point the conferral process under Section II.A.2 shall be complete.

3) Reporting

Within 30 days of completing its annual inspection planning process and priority setting subject to procedures in Section II.A, the State must provide to any Covered Tribe that participated in the conferral process and/or provided written views a written description of how the State incorporated tribal views into the State's annual inspection plan.

B. Civil Compliance Assurance and Enforcement Activities

1) Notice to Covered Tribe(s)

a) Where the State conducts an on-site civil inspection at a facility located on, or within 50 miles of, the Indian country of a Covered Tribe, the State must, within 15 days of finalizing the inspection report, send a copy of the final inspection report to the tribal leader and

20

**PETITIONER'S ADDENDUM 000022**

head of the environmental department of such Tribe, and invite the Tribe to confer with the State on its findings.

b) Such notice must expressly request a response from the Tribe indicating if the Tribe wishes to confer and/or provide written views and must provide at least 15 days for tribal response.

2) Conferral with Covered Tribe(s)

a) If a Covered Tribe responds to the State notice within 15 days or any longer period set forth in the State notice and indicates that the Tribe wishes to confer with the State regarding the final inspection report, the State shall offer to meet with the Tribe.

 i) The State shall ensure that official(s) with sufficient knowledge of the inspection report's findings are present at the meeting to provide meaningful information to the Tribe and address the Tribe's questions. Such meeting may be in-person, virtual or by phone, as appropriate.

 ii) Within 30 days of the State/Tribal meeting, the Tribe will provide any information and views it wishes the State to consider regarding the final inspection report. Such information and views must be submitted in writing, at which point the conferral process under Section II.B.2 shall be complete.

3) Post-Inspection Communication

Where the State conducts a civil enforcement response at a facility for which a final inspection report was provided to a Covered Tribe under Section II.B.1 and conferral occurred under Section II.B.2 and/or the Tribe provided written views, at a Tribe's request and subject to applicable limitations on sharing enforcement sensitive or confidential information and to any limitations on communications with third parties as described above in Section II, the State will provide the Tribe with timely publicly available information about the State's response. This could include, for example, inspection sampling results, final orders, filed complaints, or final settlement agreements or consent decrees.

C. Civil Enforcement Referrals by Covered Tribes

1) Conferral with Covered Tribes

a) Where a tribal leader or head of the environmental department of a Covered Tribe provides to the director of a State program a written notice identifying with specificity a potential civil violation of a requirement under a program covered by this SAFETEA decision

21

**PETITIONER'S ADDENDUM 000023**

occurring on, or within 50 miles of, such Tribe's Indian country, the State must, within 15 days of receipt, respond to signatory of such notice in writing by offering to meet with the Tribe to discuss the Tribe's concerns regarding the potential violation.

   b) The State shall ensure that official(s) with sufficient knowledge of the program(s) under which the potential violations occurred are present at any meeting with the Covered Tribe. Such meeting may be in-person, virtual or by phone, as appropriate.

2) If the State conducts a civil inspection or civil enforcement response at the subject facility, the State shall follow the procedures of Section II.B.

3) If the State resolves the matter at the subject facility in a manner that does not result in a civil inspection or civil enforcement response that would trigger the procedures of Section II.B, then the State must provide timely publicly available information to the Covered Tribe explaining how the matter is being, or was, addressed subject to applicable limitations on sharing enforcement sensitive or confidential information and to any limitations on communications with third parties as described above in Section II.

**Section III - General Provisions**

A. For purposes of these conditions, "Covered Tribes" or "Covered Indian Tribes" currently refers to: Cherokee Nation, The Chickasaw Nation, The Choctaw Nation of Oklahoma, Miami Tribe of Oklahoma, The Muscogee (Creek) Nation, Ottawa Tribe of Oklahoma, Pawnee Nation of Oklahoma, Peoria Tribe of Indians of Oklahoma, Quapaw Nation, The Seminole Nation of Oklahoma, and Wyandotte Nation. Covered Tribes shall also include any additional Tribes whose reservations are, in the future, adjudicated to remain intact.

B. For purposes of these conditions, "Indian Country" has the same meaning as under 18 U.S.C. § 1151.

C. These conditions must be implemented consistent with, and do not alter, limit, or supersede any statutory or regulatory requirements (including any timing requirements or deadlines) applicable to the final agency action taken by the State.

D. These conditions do not alter, limit, or supersede the State's authority to proceed expeditiously in emergency circumstances. Where the State does not fully comply with these conditions due to an emergency circumstance, the State must, as soon as practicable, provide written notice to any affected Tribe(s) stating that emergency circumstances required action, stating under what legal authority the action was taken, describing the action taken by the State, and explaining why the situation prevented full compliance with tribal notification and conferral procedures. For purposes of this condition, an "emergency circumstance" is one presenting an imminent threat of

22

**PETITIONER'S ADDENDUM 000024**

AR0000944

significant harm to human health, safety or the environment that necessitates action within the time period that would otherwise be needed to conduct the tribal notification and conferral procedures of these conditions.

E. Nothing in these procedures shall be interpreted to affect or alter existing regulatory, enforcement, or other legal authorities of the Covered Tribes.

## Appendix B – List of Covered Programs[12]

Resource Conservation Recovery Act:

- Subtitle C hazardous waste program (42 U.S.C. § 6921, *et seq.*; 40 C.F.R. Part 272, Subpart LL)
- Subtitle D permit program (42 U.S.C. § 6941, *et seq.*; 40 C.F.R. Parts 239 and 258)
- Coal Combustion Residual State Program (42 U.S.C. § 6945(d); 40 C.F.R. Part 257, Subpart D)
- Subtitle I Underground Storage Tank Program (42 U.S.C. § 6991, *et seq.*; 40 C.F.R. § 282.86)

Clean Air Act:

- State Implementation Plan (42 U.S.C. § 7410; 40 C.F.R. Part 52, Subpart LL - 40 C.F.R. § 52.1920 - 52.1960)
- Standards of Performance for New Stationary Sources (42 U.S.C. § 7411(b) and (c), 7429; 40 C.F.R. Part 60)
- National Emission Standards for Hazardous Air Pollutants (42 U.S.C. § 7412; 40 C.F.R. Part 61, Subpart A-40 C.F.R. § 61.04(b)(38) and § 61.04(c)(6)(iv))
- Approval and Promulgation of State Plans for Designated Facilities and Pollutants (42 U.S.C. § 7411(d) and 7429; 40 C.F.R. Part 62, Subpart LL - 40 C.F.R. § 62.9100 - 62.9191)
- National Emission Standards for Hazardous Air Pollutants, Delegation Status for Part 63 Standards-State of Oklahoma (42 U.S.C. § 7412; 40 C.F.R. Part 63, Subpart A – 40 C.F.R. § 63.99(a)(37))

---

[12] As stated in the October 2020 Decision, EPA has reorganized the list of regulatory programs included in Oklahoma's July 2020 letter to track the statutes administered by EPA, avoid unnecessary references and duplication, and reference relevant statutory and regulatory provisions that reflect the requested programs. Consistent with the State's request to include all regulatory programs approved by EPA outside of Indian country (and the statement that the list of programs included in the July 2020 letter was non-exclusive), EPA has included certain regulatory programs that were not separately identified in the State's July 2020 letter. Because Section 10211(a) of SAFETEA applies only to regulatory programs, EPA has not included any references to environmental grant authorities under EPA statutes or regulations that were included in the State's July 2020 letter.

23

**PETITIONER'S ADDENDUM 000025**

- State Operating Permits Program (42 U.S.C. § 7661a(d) - 7661f; 40 C.F.R. Part 70, Appendix A, Oklahoma)
- Ambient Air Monitoring Reference and Equivalent Methods and Ambient Air Quality Surveillance, 42 U.S.C. § 7601(a), 7619 (40 C.F.R. Parts 53 and 58)

Clean Water Act:

- Pretreatment (33 U.S.C. § 1317; 40 C.F.R. Parts 129 and 403)
- National Pollutant Discharge Elimination System Programs authorized for Oklahoma Department of Environmental Quality and Oklahoma Department of Agriculture, Food, and Forestry (33 U.S.C. § 1342; 40 C.F.R. Parts 122-125)
- Disposal of Biosolids and Sewage Sludge (33 U.S.C. § 1345; 40 C.F.R. Part 503)
- Water Quality Standards and Implementation plans (33 U.S.C. § 1313; 40 C.F.R. Parts 130 and 131)

Safe Drinking Water Act:

- Underground Injection Control (UIC) Program (excluding Osage County, Oklahoma) for Classes I, II, III, IV and V wells, (42 U.S.C. § 300h-300h-8; 40 C.F.R. § 147.1850 and 1851)
- Public Drinking Water System Program (42 U.S.C. § 300f, *et seq.*; 40 C.F.R. Part 143-149)

Federal Insecticide, Fungicide, and Rodenticide Act:

- State Pesticides Certification and Training Plan (7 U.S.C. § 136i; 40 C.F.R. Part 171)
- Experimental Use Permits (7 U.S.C. § 136c; 40 C.F.R. Part 172)
- Delegated State Enforcement and Training (7 U.S.C. § 136u)
- Enforcement Primacy (7 U.S.C. § 136w-i)
- Public Health, Quarantine, and Crisis Exemptions (7 U.S.C. § 136p; 40 C.F.R. Part 166)
- Special Local Needs Registrations (7 U.S.C. § 136v; 40 C.F.R. Part 162)

Toxic Substances Control Act:

- Lead-Based Paint Activities in Target Housing and Child-Occupied Facilities ("Lead-Based Paint Program") (15 U.S.C. § 2682; 40 C.F.R. Part 745)
- Lead-Based Paint Renovation, Repair and Painting, and Pre-Renovation Education Activities in Target Housing and Child Occupied Facilities (15 U.S.C. § 2684; 40 C.F.R. Part 745)
- Asbestos in Schools (15 U.S.C. § 2643; 40 C.F.R. Part 763)

24

**PETITIONER'S ADDENDUM 000026**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

May 12, 2025

THE ADMINISTRATOR

The Honorable J. Kevin Stitt
Governor of the State of Oklahoma
Oklahoma State Capitol
2300 North Lincoln Boulevard
Oklahoma City, Oklahoma 73105

**Re:     State of Oklahoma Request Under Section 10211(a) of the Safe, Accountable,
Flexible, Efficient Transportation Equity Act of 2005**

Dear Governor Stitt:

This letter and the attached appendices constitute the United States Environmental
Protection Agency's final decision, after reconsideration, approving the State of Oklahoma's July
22, 2020, request to administer the State's EPA-approved environmental regulatory programs in
certain areas of Indian country under Section 10211(a) of the Safe, Accountable, Flexible,
Efficient Transportation Equity Act of 2005. As required by SAFETEA, EPA's then-
Administrator Andrew Wheeler approved the State's request in a decision dated October 1, 2020.
However, following a lengthy period of review and reconsideration, EPA's then-Acting
Administrator Jane Nishida withdrew the 2020 decision and replaced it with a new decision
dated January 13, 2025, approving the State's request, but making two significant changes.

First, the 2025 decision included a condition requiring the State to implement specified
procedures to coordinate with affected Indian Tribes and seek Tribal views as the State
administers its EPA-approved regulatory programs within and around the affected Tribes' areas
of Indian country. That condition exceeded EPA's authority under the clear and mandatory terms
of SAFETEA, and EPA has no discretion but to withdraw it.

Second, the 2025 decision corrected a mistake in the 2020 decision regarding the scope
of the State's Underground Injection Control permitting program under the Safe Drinking Water
Act as applied in Osage County. EPA appreciates the State's clarification (provided in your letter
to EPA dated December 4, 2024) that the State had intended to exclude the entire UIC program
as applied in Osage County from its 2020 SAFETEA request. Based on this clarification, the
2025 decision corrected EPA's prior error and excluded all classes of UIC wells in Osage County
from EPA's approval of the State's program authority. Today's decision will, as SAFETEA
requires, continue to honor the State's request and effectuate that exclusion in accordance with
the law.

As required by the express language of Section 10211(a) of SAFETEA, EPA hereby
withdraws both the October 2020 and January 2025 decisions and replaces them with a full
approval of the State's requested program authority without any additional requirements that
would exceed the clear mandate and restrictions of SAFETEA. With today's final decision, it is
EPA's intent to steady the shifting landscape of EPA's SAFETEA decision making and provide

**PETITIONER'S ADDENDUM 000027**

AR0001132

certainty to the State, Tribes, regulated community, and people of Oklahoma by providing a clear and final framework for environmental regulation under the federal statutes administered by EPA. We look forward to working with the State and our Tribal partners to promote ongoing, transparent dialogue and appropriate consideration of all parties' interests as we work toward achieving this shared goal.

Sincerely,

Lee Zeldin
Administrator


Appendix A:  Information Supporting Approval of State of Oklahoma's Request Under SAFETEA Section 10211(a)

Appendix B:  List of Covered Programs

2

**PETITIONER'S ADDENDUM 000028**

AR0001133

## Appendix A
## Information Supporting Approval of
## State of Oklahoma's Request Under SAFETEA Section 10211(a)

### I.    Introduction

This Appendix provides information supporting the U.S. Environmental Protection Agency's ("EPA" or "Agency") approval of the State of Oklahoma's ("State") July 22, 2020, request to administer the State's EPA-approved environmental regulatory programs in certain areas of Indian country under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users. Pub. Law. 109-59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA").

### II.    Background

On July 22, 2020, the State submitted a letter to EPA requesting approval under Section 10211(a) of SAFETEA to administer in certain areas of Indian country the State's environmental regulatory programs that were previously approved by EPA outside of Indian country. Section 10211(a) of SAFETEA applies only to Oklahoma and provides:

SEC. 10211. ENVIRONMENTAL PROGRAMS.

(a) OKLAHOMA.–Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency (referred to in this section as the "Administrator") determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.

Pub. Law 109-59, 119 Stat. 1144, 1937.

The State's request followed closely after announcement of the U.S. Supreme Court's decision in *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020). In that decision, the Supreme Court held that the Muscogee (Creek) Nation's reservation in eastern Oklahoma had not been disestablished by Congress and remained Indian country under federal law. Prior to the *McGirt* decision, neither EPA nor the State had understood the Muscogee (Creek) Nation's original reservation boundaries to remain intact, and based on that misunderstanding the State had, as a practical matter, implemented environmental regulatory programs in much of the area that was held by the Supreme Court to be Indian country. However, because the State's programs were generally not approved to apply in Indian country, the State's program implementation was no longer appropriate following the Supreme Court's clarification regarding the Indian reservation status of the subject lands. Subsequent to the ruling in *McGirt*, several Oklahoma State court decisions have held that the reservations of other Tribes in Oklahoma had also never been disestablished

1

and remained Indian country under federal law,[1] and additional areas may subsequently be adjudicated to retain reservation status under federal law.

As reflected in the State's request – and as further clarified by the State's letter to EPA dated December 4, 2024 – the State's intent in invoking the SAFETEA authority was essentially to reestablish the status quo regarding the scope of the State's programs as they had been administered prior to the *McGirt* decision. The request was not, therefore, limited to any specific Tribe(s). Instead, the State's request included areas of Indian country within the formal reservations of all Tribes in Oklahoma – *i.e.*, all Tribes with formal reservations that, pursuant or subsequent to the ruling in *McGirt*, have been or will be adjudicated to remain intact. However, to prevent any expansion of the State's programs beyond their pre-*McGirt* extent, the State also expressly excluded from its request certain categories of lands that had been understood to qualify as Indian country – and thus to generally fall outside the geographic extent of the State's EPA-approved regulatory programs – prior to the Supreme Court's decision. The precise geographic contours of the State's request and this approval are described in greater detail below.

EPA first approved the State's request by letter from then-Administrator Wheeler to Oklahoma Governor Stitt dated October 1, 2020 ("October 2020 Decision"). That decision adhered to the express mandate of SAFETEA by providing a full approval of the State's request without adding any unauthorized collateral requirements that would exceed SAFETEA's clear directive as passed by Congress.

Following review and reconsideration, EPA withdrew the October 2020 Decision and replaced it with a decision by then-Acting Administrator Nishida dated January 13, 2025 ("January 2025 Decision"). Importantly, and as required by SAFETEA, the January 2025 Decision also provided a full approval of the State's request and included a correction regarding UIC permitting in Osage County to ensure that the approval matched the State's intent. However, the new decision also added a condition imposing extensive and prescriptive Tribal engagement requirements on the State's administration of its regulatory programs under the SAFETEA approval. Those requirements exceeded EPA's authority under the statute and, as described herein, are no longer in effect as a result of EPA's withdrawal of the January 2025 Decision.

## III.    Withdrawal of the January 2025 Decision

Where a request by Oklahoma meets the basic requirements of SAFETEA Section 10211(a), the statute mandates EPA approval "[n]otwithstanding any other provision of law" and "without any further demonstration of authority by the State." This clear congressional direction imposes a nondiscretionary duty for EPA to approve a proper request and reserves no authority for EPA to impose additional requirements or otherwise constrain the State's administration of the subject environmental regulatory programs. Although the January 2025 Decision did, as required by SAFETEA, include a full approval of the State's request, it also included a condition requiring the State to follow extensive and prescriptive procedures to coordinate with Indian

---

[1] In addition to the Muscogee (Creek) Nation, such Tribes currently include the Cherokee Nation, the Chickasaw Nation, the Choctaw Nation of Oklahoma, Miami Tribe of Oklahoma, Ottawa Tribe of Oklahoma, Peoria Tribe of Indians of Oklahoma, Quapaw Nation, the Seminole Nation of Oklahoma, and Wyandotte Nation.

2

**PETITIONER'S ADDENDUM 000030**

Tribes as the State carries out its approved environmental regulatory programs in and around the Tribes' reservations. These Tribal coordination requirements are inconsistent with the strict limits placed by Congress on EPA's decision making and were, therefore, *ultra vires*. Notably, the January 2025 Decision cited no language of SAFETEA or of any statute administered by, or regulation promulgated by, EPA to support the detailed coordination procedures it imposed on the State. The January 2025 Decision simply included a statement asserting that SAFETEA does not preclude such a condition. That statement is incorrect. Section 10211(a) expresses a clear Congressional mandate for EPA to approve, *without more*, a request by Oklahoma that satisfies the stated terms contained in the statutory provision and expressly constrains EPA to do so notwithstanding any other provision of law and without any further demonstration of authority by the State. The statute does, therefore, squarely prohibit precisely the type of additional requirements imposed by the condition contained in the January 2025 Decision. In these circumstances, EPA has no discretion but to withdraw the January 2025 Decision and replace it with a new approval that is legally compliant with the strictures of SAFETEA. EPA is thus withdrawing the January 2025 Decision.[2]

EPA greatly appreciates the interests expressed by Tribes throughout the Agency's SAFETEA decision making in developing stronger coordinating and consultative relationships with the State. EPA supports efforts to develop such relationships and stands ready to assist, as appropriate, such efforts at the request of the State and any interested Tribes. EPA also intends to honor the Agency's longstanding relationships with the Tribes in Oklahoma and to continue to consult with Tribes in Oklahoma consistent with existing Agency policy and practices.

## IV. Approval of the State's Request Under Section 10211(a) of SAFETEA

While State regulatory programs under federal environmental laws typically don't extend to Indian country, Congress has, in uncommon circumstances, provided for State program administration in such areas. Section 10211(a) of SAFETEA provides for such program administration by Oklahoma and requires that EPA approve a request from the State where the statute's elements are met – *i.e.*, where the request addresses (1) any regulatory program, (2) submitted by Oklahoma for approval by EPA under a law administered by EPA, where EPA has (3) determined that the program meets applicable requirements of the law, and (4) approved the program with respect to areas in the State that are not Indian country, and (5) the State requests to administer the program in areas of the State that are in Indian country. Each of these

---

[2] In the January 2025 Decision, EPA also stated that the Agency should have engaged in additional consultation with Tribes prior to rendering the October 2020 Decision. EPA notes, however, that the Agency did engage with Tribes and receive and consider Tribal input prior to issuing that decision. Further, as acknowledged in the January 2025 Decision, Section 10211(a) of SAFETEA includes no procedural requirement to consult with Tribes or to conduct any other process – *e.g.*, public notice and comment – in connection with EPA's decision on a request by Oklahoma. Rather, the statute expressly provides for, and mandates, EPA approval of a proper request notwithstanding any other provision of law, which includes any provisions of law establishing procedural (or substantive) requirements – *e.g.*, the Administrative Procedure Act, the National Environmental Policy Act, the National Historic Preservation Act, the Endangered Species Act. Because the January 2025 Decision exceeded EPA's legal authority, the Agency is required to rescind the decision and is doing so expeditiously.

3

**PETITIONER'S ADDENDUM 000031**

circumstances is present here.[3] EPA thus has no discretion but to follow the express mandate of SAFETEA and approve the State's request in full notwithstanding any other provision of law and without any further demonstration of authority by the State.[4] Therefore, EPA is approving the State's July 22, 2020 request, as clarified by the State's December 2024 letter, in full for the geographic areas of Indian country in the request and the regulatory programs identified in Appendix B.

## V.  Geographic Scope of Approval

EPA is approving Oklahoma's SAFETEA request over all areas of Indian country requested by the State.[5] The State's request applies to Indian country throughout the State, but

---

[3] Section 10211(a) requires approval of a request by Oklahoma where EPA previously has determined that a regulatory program submitted by the State meets applicable requirements of federal environmental law, and EPA has approved the program to apply outside of Indian country. Consistent with the clear language of Section 10211(a), EPA reads the required determination that the State's program meets applicable requirements of federal environmental law as applying at the time the program was previously approved outside of Indian country. This is consistent with Congress's expressed intent to mandate approval of the State's request under SAFETEA "[n]otwithstanding any other provision of law," which includes the provisions of the statutes administered by EPA. EPA was not, therefore, required to engage in a program-by-program review of the State's environmental regulatory programs prior to approving the State's request. Such a review would be contrary to the express mandate of Section 10211(a). Although SAFETEA mandates approval in the first instance, EPA notes that the Agency's ordinary statutory and regulatory authorities to oversee and review state programs will continue to apply as the programs are implemented going forward.

[4] Consistent with Congress's plenary authority over Indian affairs, Congress may – as it has in Section 10211(a) – expressly provide authority for a state to regulate in Indian country and may override any prior potentially inconsistent legal requirement or limitation of law, including any potential jurisdictional impediment to the State's regulation in Indian country or any requirement under federal environmental laws administered by EPA. EPA is aware that many Tribes, including Tribes in Oklahoma, entered into treaties with the United States and that many of these treaties retain their vitality with the same legal force as federal statutes under the U.S. Constitution. In some cases, these treaties may address limitations on, or exclusions of, state jurisdiction over Tribes or areas of Indian country and may include provisions referencing, among other things, Tribal rights to self-govern. EPA is also mindful of the general trust relationship that the federal government has with all federally recognized Tribes, which is a key component of the unique relationship between the federal government and Tribes. For EPA, the trust responsibility informs how we exercise our discretion, when it is legally available, to protect Tribal health and environments. EPA recognizes and has considered the importance of Tribal treaties and the federal/Tribal trust relationship during the Agency's decision making under SAFETEA. Ultimately, EPA is bound to apply the clear and express mandate of Section 10211(a) of SAFETEA, a duly enacted Act of Congress, that specifically allows environmental regulation under EPA-administered statutes by the State in areas of Indian country, and that requires EPA to approve a request of the State to so regulate notwithstanding any other provision of law and without any further demonstration of authority by the State. The statute provides EPA no discretion to incorporate additional factors or requirements in rendering its approval.

[5] EPA notes that Section 10211(a) of SAFETEA does not specify any required minimum geographic area of Indian country to be included in a request from Oklahoma. EPA interprets the provision as providing

4

AR0001137

expressly excludes three categories of land over which the State had not administered regulatory programs prior to *McGirt.* As stated in the request:

> This request does not seek approval to administer any programs in Indian country on lands, including rights-of-way running through the same, that –
>
> (A) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. § 1151(c);
>
> (B) Are held in trust by the United States on behalf of an individual Indian or Tribe; or
>
> (C) Are owned in fee by a Tribe, if the Tribe –
>
> > (i) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party; and
> >
> > (ii) never allotted the land to a member or citizen of the Tribe.

The State's July 2020 request also expressly excluded the SDWA Class II UIC program in Osage County, Oklahoma. However, in its December 2024 letter the State clarified that – consistent with the status of UIC program administration prior to *McGirt* – it did not intend to request any UIC program authority in Osage County. This decision thus excludes all UIC permitting in Osage County.

This decision thus approves the State to administer its approved environmental regulatory programs over all of the geographic areas of Indian country requested in the State's July 2020 letter as clarified by the State's December 2024 letter.[6] As described above, EPA recognizes that the precise geographic areas covered by this decision may evolve to the extent additional reservations located within Oklahoma are adjudicated to remain intact. Because this approval applies to categories of Indian country, as opposed to specified Tribes or parcels, the approval will automatically cover any areas of Indian country – other than the categories of Indian country excluded by the State – subsequently determined to exist in Oklahoma. EPA will retain authority to directly implement environmental regulatory programs in all Indian country areas excluded by

---

sufficient flexibility for the State to exclude certain areas of Indian country from its request and to mandate EPA approval of such a limited request so long as the basic criteria of the statute are met.

[6] There remains one minor instance where the State's request deviates from the geographic scope of the State's programs as implemented prior to *McGirt.* Consistent with the D.C. Circuit's *ODEQ* decision, the State's Clean Air Act State Implementation Plan ("SIP") applies on non-reservation areas of Indian country – most notably, Indian allotments – in the State. Prior to *McGirt,* the State had thus implemented its SIP on Indian allotments, including allotments that are now understood (per the Supreme Court's *McGirt* decision) to be located within the exterior boundaries of an Indian reservation. To the extent an allotment is located on an Indian reservation, it would be excluded from the D.C. Circuit's holding that SIPs apply on non-reservation areas of Indian country. The State's July 2020 request excludes Indian allotments, and thus does not request extension of Oklahoma's SIP onto such reservation allotments.

5

**PETITIONER'S ADDENDUM 000033**

the State's request and this decision. Nothing in this decision is intended to change or address Tribal authority under Tribal law in the covered areas where Tribes are acting outside the scope of a program under a statute administered by EPA.

## VI.    Programmatic Scope of Approval

EPA is approving Oklahoma to administer all of its approved environmental regulatory programs which the State has requested to administer in areas of Indian country. The State's July 2020 letter, as further clarified by the State's December 2024 letter,[7] requested approval under SAFETEA with regard to all of the State's existing EPA-approved environmental regulatory programs[8] that are administered by the Oklahoma Department of Environmental Quality, the Oklahoma Department of Agriculture, Food and Forestry, the Oklahoma Water Resources Board,[9] the Oklahoma Corporation Commission, and the Oklahoma Department of Labor.

Consistent with the State's July 2020 request, as clarified by the State's December 2024 letter, EPA is approving the State under SAFETEA to administer all environmental regulatory programs previously approved by EPA to apply outside of Indian country, including, but not limited to, the environmental regulatory programs identified in Appendix B to today's decision. Each of the programs covered by this approval has been submitted to EPA – *i.e.*, they involve a submission by the State for EPA's consideration under a law administered by EPA – and approved by EPA as meeting applicable requirements of federal environmental law with respect to areas of the State that are outside of Indian country. These programs thus satisfy the necessary criteria of SAFETEA Section 10211(a). To the extent EPA's prior approvals of these State programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by this approval under SAFETEA. Because each of the programs identified in Appendix B is now approved to include the requested areas of Indian country, any future revisions or amendments to these identified programs will similarly extend to the covered areas of Indian country without any further need for additional requests under SAFETEA.[10]

---

[7] As explained above, the State has clarified that it did not intend to request SDWA UIC program authority in Osage County. As reflected in Appendix B to this decision, EPA is thus excluding all classes of wells in Osage County, Oklahoma from this approval.

[8] Section 10211(a) of SAFETEA addresses only "regulatory program[s]" administered under federal environmental laws. The provision does not address funding provided under EPA grant programs. The provision also does not address any exercise of State regulatory authority outside the scope of a program approved by EPA under a federal environmental statute administered by EPA.

[9] EPA notes that as of November 2022, the State transferred administration of Clean Water Act Water Quality Standards from the Oklahoma Water Resources Board to the Oklahoma Department of Environmental Quality.

[10] However, should the State apply to EPA in the future for approval of any program that has not been previously approved outside of Indian country, the State would also need to submit a request under SAFETEA to the extent the State wishes to administer that program in any area of Indian country. This is consistent with the language of Section 10211(a), which contemplates that a request from Oklahoma to administer a program in Indian country will relate to a regulatory program that has already been submitted to EPA and approved by EPA to apply outside of Indian country.

6

AR0001139

**Appendix B**
**List of Covered Programs[11]**

## Resource Conservation Recovery Act

- Subtitle C hazardous waste program (42 U.S.C. § 6921, *et seq.;* 40 C.F.R. Part 272, Subpart LL)
- Subtitle D permit program (42 U.S.C. § 6941, *et seq.;* 40 C.F.R. Parts 239 and 258)
- Coal Combustion Residual State Program (42 U.S.C. § 6945(d); 40 C.F.R. Part 257, Subpart D)
- Subtitle I Underground Storage Tank Program (42 U.S.C. § 6991, *et seq.;* 40 C.F.R. § 282.86)

## Clean Air Act

- State Implementation Plan (42 U.S.C. § 7410; 40 C.F.R. Part 52, Subpart LL - 40 C.F.R. §§ 52.1920 - 52.1960)
- Standards of Performance for New Stationary Sources (42 U.S.C. §§ 7411(b) and (c), 7429; 40 C.F.R. Part 60)
- National Emission Standards for Hazardous Air Pollutants (42 U.S.C. § 7412; 40 C.F.R. Part 61, Subpart A - 40 C.F.R. § 61.04(b)(38) and § 61.04(c)(6)(iv))
- Approval and Promulgation of State Plans for Designated Facilities and Pollutants (42 U.S.C. §§ 7411(d) and 7429; 40 C.F.R. Part 62, Subpart LL - 40 C.F.R. §§ 62.9100 - 62.9191)
- National Emission Standards for Hazardous Air Pollutants, Delegation Status for Part 63 Standards-State of Oklahoma (42 U.S.C. § 7412; 40 C.F.R. Part 63, Subpart A - 40 C.F.R. § 63.99(a)(37))
- State Operating Permits Program (42 U.S.C. §§ 7661a(d) - 7661f; 40 C.F.R. Part 70, Appendix A, Oklahoma)
- Ambient Air Monitoring Reference and Equivalent Methods and Ambient Air Quality Surveillance, 42 U.S.C. §§ 7601(a), 7619 (40 C.F.R. Parts 53 and 58)

## Clean Water Act

- Pretreatment (33 U.S.C. § 1317; 40 C.F.R. Parts 129 and 403)
- National Pollutant Discharge Elimination System Programs authorized for Oklahoma Department of Environmental Quality and Oklahoma Department of Agriculture, Food, and Forestry (33 U.S.C. § 1342; 40 C.F.R. Parts 122-125)

---

[11] EPA has reorganized the list of regulatory programs included in Oklahoma's July 2020 letter to track the statutes administered by EPA, avoid unnecessary references and duplication, and reference relevant statutory and regulatory provisions that reflect the requested programs. Consistent with the State's request to include all regulatory programs approved by EPA outside of Indian country (and the statement that the list of programs included in the State's July 2020 letter was non-exclusive), EPA has included certain regulatory programs that were not separately identified in the State's July 2020 letter. Because Section 10211(a) of SAFETEA applies only to regulatory programs, EPA has not included any references to environmental grant authorities under EPA statutes or regulations that were included in the State's July 2020 letter.

1

**PETITIONER'S ADDENDUM 000035**

- Disposal of Biosolids and Sewage Sludge (33 U.S.C. § 1345; 40 C.F.R. Part 503)
- Water Quality Standards and Implementation Plans (33 U.S.C. § 1313; 40 C.F.R. Parts 130 and 131)

**Safe Drinking Water Act**

- Underground Injection Control (UIC) Program (excluding Osage County, Oklahoma) for Classes I, II, III, IV and V wells, (42 U.S.C. §§ 300h-300h-8; 40 C.F.R. §§ 147.1850 and 1851)
- Public Drinking Water System Program (42 U.S.C. § 3001, *et seq.;* 40 C.F.R. Parts 143-149)

**Federal Insecticide, Fungicide, and Rodenticide Act**

- State Pesticides Certification and Training Plan (7 U.S.C. § 136i; 40 C.F.R. Part 171)
- Experimental Use Permits (7 U.S.C. § 136c; 40 C.F.R. Part 172)
- Delegated State Enforcement and Training (7 U.S.C. § 136u)
- Enforcement Primacy (7 U.S.C. § 136w-i)
- Public Health, Quarantine, and Crisis Exemptions (7 U.S.C. § 136p; 40 C.F.R. Part 166)
- Special Local Needs Registrations (7 U.S.C. § 136v; 40 C.F.R. Part 162)

**Toxic Substances Control Act**

- Lead-Based Paint Activities in Target Housing and Child-Occupied Facilities (Lead-Based Paint Program) (15 U.S.C. § 2682; 40 C.F.R. Part 745)
- Lead-Based Paint Renovation, Repair and Painting, and Pre-Renovation Education Activities in Target Housing and Child Occupied Facilities (15 U.S.C. § 2684; 40 C.F.R. Part 745)
- Asbestos in Schools (15 U.S.C. § 2643; 40 C.F.R. Part 763)

**PETITIONER'S ADDENDUM 000036**

AR0001141

# Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs

July 16, 2025  |  Report No. 25-E-0042



PETITIONER'S ADDENDUM 000037

## Abbreviations

| | |
|---|---|
| C.F.R. | Code of Federal Regulations |
| EPA | U.S. Environmental Protection Agency |
| LBP | Lead-Based Paint |
| OCSPP | Office of Chemical Safety and Pollution Prevention |
| OECA | Office of Enforcement and Compliance Assurance |
| OIG | Office of Inspector General |
| RRP | Renovation, Repair, and Painting |
| TSCA | Toxic Substances Control Act |
| U.S.C. | United States Code |

## Cover Image

A windowsill with chipping paint. (EPA image)

**Are you aware of fraud, waste, or abuse in an EPA program?**

**EPA Inspector General Hotline**
1200 Pennsylvania Avenue, NW (2431T)
Washington, D.C. 20460
(888) 546-8740
OIG.Hotline@epa.gov

Learn more about our OIG Hotline.

**EPA Office of Inspector General**
1200 Pennsylvania Avenue, NW (2410T)
Washington, D.C. 20460
(202) 566-2391
www.epaoig.gov

Subscribe to our Email Updates.
Follow us on X @EPAoig.
Send us your Project Suggestions.

**PETITIONER'S ADDENDUM 000038**

25-E-0042
July 16, 2025

# At a Glance

## Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs

### Why We Did This Evaluation

**To accomplish this objective:**

The U.S. Environmental Protection Agency Office of Inspector General conducted this evaluation to determine whether the EPA verifies that EPA-authorized state lead-based paint programs continue to meet regulatory requirements after initial authorization. We initiated this evaluation in response to an anonymous OIG Hotline complaint.

Lead was commonly used in paint until the U.S. government banned such paint for residential use in 1978. Consequently, people may be exposed to lead in residential dwellings and child-occupied facilities constructed prior to that date. The EPA's lead-based paint programs aim to protect public health by reducing or eliminating lead-based paint hazards. With EPA authorization, states may administer these programs on behalf of the EPA.

**To support these EPA mission-related efforts:**

- *Compliance with the law.*
- *Partnering with states and other stakeholders.*
- *Operating efficiently and effectively.*

Address inquiries to our public affairs office at (202) 566-2391 or OIG.PublicAffairs@epa.gov.

List of OIG reports.

### What We Found

The EPA is not verifying that authorized state lead-based paint programs remain at least as protective of human health and the environment as the federal programs and that the programs provide adequate enforcement after initial program authorization. Specifically, the EPA does not conduct periodic adequacy evaluations that meet regulatory requirements. After initial authorization, the EPA relies on the information that authorized state lead-based paint programs submit through grant reports and other required reports. However, the reports do not provide the information that the EPA needs to determine the overall adequacy of the state lead-based paint programs.

In addition, the EPA Office of Chemical Safety and Pollution Prevention and the EPA Office of Enforcement and Compliance Assurance have not developed policies for the EPA regional offices to verify that authorized state lead-based paint programs continue to meet regulatory requirements after initial program authorization. Staff from both offices asserted that their offices were not responsible for developing these policies. However, the EPA headquarters offices are responsible for developing national policy. Regarding the authorized state lead-based paint programs, the Office of Chemical Safety and Pollution Prevention is responsible for leading policy development for the programmatic elements for periodic adequacy evaluations and authorization withdrawals, while the Office of Enforcement and Compliance Assurance is responsible for leading policy development for the enforcement and compliance elements. Because those offices have not led the development of these policies, the regional offices do not have the necessary tools to consistently conduct oversight of authorized state lead-based paint programs.

> Without changes to the EPA's oversight procedures, authorized state lead-based paint programs may not adequately protect public health, and children may suffer adverse and irreversible health effects.

### Recommendations and Planned Agency Corrective Actions

We recommend that the assistant administrators for Chemical Safety and Pollution Prevention and Enforcement and Compliance Assurance coordinate to develop guidance that directs regional offices to conduct periodic adequacy evaluations, provides examples of what might constitute a "significant change" in an authorized program's implementation or enforcement, and provides examples of when the withdrawal process may be warranted. We also recommend that the assistant administrators clarify the headquarters and regional offices' oversight roles and responsibilities regarding state implementation of authorized lead-based paint programs. The EPA agreed with the spirit of our draft recommendations but disagreed with the specific language used in Recommendations 1 and 3. The Agency suggested revisions and provided acceptable corrective actions that met the intent of all four recommendations. The EPA agreed with our final recommendations, and all four recommendations are resolved with corrective actions pending.

**PETITIONER'S ADDENDUM 000039**



**OFFICE OF INSPECTOR GENERAL**
U.S. ENVIRONMENTAL PROTECTION AGENCY

July 16, 2025

**MEMORANDUM**

**SUBJECT:**   Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs
Report No. 25-E-0042

**FROM:**   Nicole N. Murley, Acting Inspector General

**TO:**   Nancy Beck, Principal Deputy Assistant Administrator
Office of Chemical Safety and Pollution Prevention

Jeffery Hall, Assistant Administrator
Office of Enforcement and Compliance Assurance

This is our report on the subject evaluation conducted by the U.S. Environmental Protection Agency Office of Inspector General. The project number for this evaluation was OSRE-FY24-0089. This report contains findings that describe the problems the OIG has identified and corrective actions the OIG recommends. Final determinations on matters in this report will be made by EPA managers in accordance with established audit resolution procedures.

In accordance with EPA Manual 2750, your offices provided acceptable planned corrective actions and estimated milestone dates in response to OIG recommendations. All recommendations are resolved, and no final response to this report is required. If you submit a response, however, it will be posted on the OIG's website, along with our memorandum commenting on your response. Your response should be provided as an Adobe PDF file that complies with the requirements of section 508 of the Rehabilitation Act of 1973, as amended. The final response should not contain data that you do not want to be released to the public; if your response contains such data, you should identify the data for redaction or removal along with corresponding justification.

We will post this report to our website at www.epaoig.gov.

**PETITIONER'S ADDENDUM 000040**

# *Table of Contents*

**Purpose** ................................................................................................................................. **1**

**Background** ............................................................................................................................. **1**

     Health Risks from Lead-Based Paint ................................................................................ 1

     The EPA's Lead-Based Paint Programs ........................................................................... 1

     EPA Authorization of State Lead-Based Paint Programs ............................................... 3

     State and Tribal Assistance Grants for State Lead-Based Paint Programs ................... 4

     EPA Oversight of State Lead-Based Paint Programs ..................................................... 4

**Responsible Offices** .............................................................................................................. **6**

**Scope and Methodology** ....................................................................................................... **7**

**Prior Report** .......................................................................................................................... **7**

**Results** .................................................................................................................................. **7**

     The EPA Does Not Have Procedures to Verify that Authorized State Lead-Based Paint
          Programs Remain Adequately Protective and Provide Adequate Enforcement ............... 8

     The Offices of Chemical Safety and Pollution Prevention and Enforcement and
          Compliance Assurance Are Not Meeting Their Leadership and Policy Development
          Responsibilities Related to Authorized State Lead-Based Paint Programs ....................... 11

**Conclusions** ......................................................................................................................... **12**

**Recommendations** .............................................................................................................. **12**

**Agency Response and OIG Assessment** ............................................................................. **13**

**Status of Recommendations** .............................................................................................. **15**

## Appendixes

  A   Agency Response to the Draft Report ......................................................................... 16

  B   Distribution ................................................................................................................... 19

**PETITIONER'S ADDENDUM 000041**

## Purpose

The U.S. Environmental Protection Agency Office of Inspector General initiated this evaluation to determine whether the EPA verifies that EPA-authorized state lead-based paint, or LBP, programs continue to meet regulatory requirements after initial authorization. We initiated this evaluation in response to an anonymous February 2024 OIG Hotline complaint.

## Background

### Health Risks from Lead-Based Paint

Over the last 50 years, the EPA, other federal regulators, and state regulators took actions that have significantly reduced the use of lead in products like gasoline and paint. The EPA reported that these actions, along with other public health initiatives, have contributed to a more than 90 percent reduction in blood lead levels since the mid-1970s. Despite this success, lead remains a public health issue because it was commonly used in paint until the U.S. government banned LBP for residential use in 1978, meaning residents who reside in homes constructed prior to that may be exposed to lead. [1]

Lead-contaminated paint dust, which is created when LBP deteriorates or is disturbed, is the most common source of childhood lead exposure. [2] According to the EPA, young children occupy approximately 3.8 million homes that contain LBP hazards across the United States. [3] According to the EPA's website, the EPA and the U.S. Centers for Disease Control and Prevention affirm that "[t]here is no known safe level of lead in a child's blood," and lead causes a wide range of health effects, from behavioral problems and learning disabilities to increased blood pressure, seizures, and death. Children six years old and under are most at risk from exposure to lead because their developing bodies more readily absorb lead, their brains are particularly sensitive to the effects of lead, and they often put their hands and other lead-contaminated objects into their mouths. [4]

### The EPA's Lead-Based Paint Programs

Title IV of the Toxic Substances Control Act, or TSCA, requires the EPA to implement and enforce LBP programs to reduce or eliminate LBP hazards and provides states and Indian tribes the opportunity to seek authorization to implement some of the LBP programs. [5] The EPA issued regulations at 40 C.F.R. part 745, subparts E and L, to implement those statutory requirements and issued regulations at subpart Q to provide the process for EPA authorization of state implementation. After receiving

---

[1] U.S. Ctrs. For Disease Control & Prevention, *About Lead in Paint*, https://www.cdc.gov/lead-prevention/prevention/paint.html (last visited May 30, 2025).

[2] EPA, *What is the most significant source of childhood lead exposure in a residence?*, https://www.epa.gov/lead/what-most-significant-source-childhood-lead-exposure-residence (last visited May 30, 2025).

[3] EPA, *EPA Strengthens Standards to Protect Children from Exposure to Lead Paint Dust,* https://www.epa.gov/newsreleases/epa-strengthens-standards-protect-children-exposure-lead-paint-dust (last visited May 30, 2025).

[4] EPA, *Learn about Lead*, https://www.epa.gov/lead/learn-about-lead (last visited May 30, 2025).

[5] While recognized Indian tribes may apply for authorization, the scope of our information collection and analysis was limited to authorized state LBP programs.

**PETITIONER'S ADDENDUM 000042**

authorization, states assume the day-to-day implementation and enforcement responsibilities for the LBP programs. Figure 1 below describes the three LBP programs that states may administer on behalf of the EPA: (1) the Lead-Based Paint Activities program, which implements subpart L of 40 C.F.R. part 745, "Lead-Based Paint Activities"; (2) the Lead Renovation, Repair, and Painting, or RRP, program; and (3) the Pre-Renovation Education program. The RRP and Pre-Renovation Education programs together implement subpart E of 40 C.F.R. part 745, "Residential Property Renovation."

**Figure 1: EPA LBP programs available for state authorization**



**40 C.F.R. part 745, subpart L, "Lead-Based Paint Activities"**

| Lead-Based Paint Activities Program | Implements the Lead-Based Paint Activities, Certification, and Training Rule, which requires that LBP activities be performed by certified individuals and firms, and establishes requirements for certification, accreditation of training programs, and work standards for individuals and firms engaged in LBP activities in target housing and child-occupied facilities. |

**40 C.F.R. part 745, subpart E, "Residential Property Renovation"**

| Renovation, Repair, and Painting Program | Implements the Lead Renovation, Repair, and Painting Rule, which requires that individuals performing renovations are properly trained, renovators and firms performing renovations are certified, and work practice standards are followed for renovations performed in target housing and child-occupied facilities. |

| Pre-Renovation Education Program | Implements the pre-renovation education requirement, which requires that individuals performing a renovation for compensation in target housing or a child-occupied facility distribute a lead hazard information pamphlet to the property owner and occupant no more than 60 days prior to beginning the renovation. |

*Notes*: Target housing means "any housing constructed prior to 1978, except housing for the elderly or persons with disabilities or any 0-bedroom dwelling (unless any child who is less than 6 years of age resides or is expected to reside in such housing)."[6] A child-occupied facility is "a building, or a portion of a building, constructed prior to 1978, visited regularly by the same child, under 6 years of age, on at least two different days within any week … provided that each day's visit lasts at least 3 hours and the combined weekly visits last at least 6 hours, and the combined annual visits last at least 60 hours."[7] Child-occupied facilities include daycare centers, preschools, and kindergarten classrooms.
Source: OIG summary of the LBP-related regulations published at 40 C.F.R. part 745. (EPA OIG image)

These LBP regulatory programs require the establishment of accredited training programs, certification of individuals and firms, and work practice standards for the conduct of renovation projects and LBP

---

[6] 40 C.F.R. § 745.223.
[7] 40 C.F.R. § 745.83.

**PETITIONER'S ADDENDUM 000043**

activities in target housing and child-occupied facilities built prior to 1978. LBP activities include inspections, risk assessments, and abatements.

## EPA Authorization of State Lead-Based Paint Programs

To obtain EPA authorization to implement an LBP program, both TSCA and the EPA's implementing regulations provide that a state must submit an application that demonstrates that the state program is "at least as protective of human health and the environment" as the EPA's RRP, Pre-Renovation Education, and Lead-Based Paint Activities programs.[8] The application must also demonstrate that the state program provides "adequate enforcement."[9] Specifically, a state must exhibit programmatic elements to be considered "at least as protective" and must exhibit enforcement elements as evidence of providing "adequate enforcement," as shown in Figure 2.

**Figure 2: Required elements of an authorized state LBP program**



| Programmatic elements defined by 40 C.F.R. §§ 745.325 and 745.326 | Enforcement elements defined by 40 C.F.R. § 745.327 |
|---|---|
| 1. Procedures and requirements for the accreditation of training programs that educate individuals conducting renovations and LBP activities. For the RRP program only, training requirements must include refresher trainings and on-the-job training for some individuals. | 1. The legal authority, standards, and regulations necessary to address any significant risks posed by noncompliance and a plan with a statement of resources that will be devoted to the program. |
| 2. Procedures and requirements for the certification of individuals and firms conducting renovations and LBP activities. | 2. Required performance elements, including training for enforcement and inspection personnel, and compliance assistance to the public and regulated community. |
| 3. Work practice standards for LBP activities and renovations. | 3. Regularly submit summary on progress and performance report in accordance with requirements at 40 C.F.R. § 745.324(h). |
| 4. Requirements that all activities are conducted by certified individuals and firms with properly trained individuals. | |
| 5. Appropriate infrastructure and government capacity to effectively implement a program. | |
| 6. For the Pre-Renovation Education program only, requirements for the distribution of lead hazard information pursuant to 40 C.F.R. § 745.84. | |

Source: OIG analysis of 40 C.F.R. §§ 745.325–327. (EPA OIG image)

The EPA developed the Lead-Based Paint Activities program in 1996 and has authorized 39 states; four tribes; Puerto Rico; and Washington, D.C., to implement that program. The Agency developed the RRP program in 2008 and has authorized 15 states and one tribe to implement that program. The EPA developed the Pre-Renovation Education program in 1998 and has authorized 17 states and one tribe to

---

[8] 15 U.S.C. § 2684(b)(1); 40 C.F.R. § 745.324(e)(2)(i).
[9] 15 U.S.C. § 2684(b)(2); 40 C.F.R. § 745.324(e)(2)(ii).

PETITIONER'S ADDENDUM 000044

implement that program. The authorization information for these three programs is current as of May 2025. [10]

## *State and Tribal Assistance Grants for State Lead-Based Paint Programs*

As authorized by section 404(g) of TSCA, the EPA Office of Chemical Safety and Pollution Prevention, or the OCSPP, provides State and Tribal Assistance Grants for authorized state LBP programs. EPA regional offices administer the TSCA 404(g) LBP grants on behalf of the OCSPP to support the development and implementation of authorized state LBP programs. EPA regional offices administer part of the EPA's Toxic Substances Compliance Monitoring grant on behalf of the EPA Office of Enforcement and Compliance Assurance, or OECA, to support the enforcement and compliance assurance components of authorized state LBP programs.

As part of the grant application process, authorized states must develop workplans that identify activities, goals, and timelines that the state will use to develop or implement its LBP program. Additionally, states must provide the appropriate EPA regional offices with reports on activities for LBP grants. States must submit quarterly TSCA 404(g) LBP performance reports and mid-year and end-of-year Toxic Substances Compliance Monitoring grant reports. Further, the EPA regional offices must provide OECA with end-of-year reports for each program funded by a Toxic Substances Compliance Monitoring grant.

## *EPA Oversight of State Lead-Based Paint Programs*

While states are responsible for the day-to-day implementation and enforcement of an authorized LBP program, the EPA's primary role is to conduct oversight. As part of that oversight, the EPA must verify that authorized state LBP programs remain at least as protective of human health and the environment as the federal LBP programs. The EPA must also verify that authorized state programs provide adequate enforcement. Table 1 further details the EPA's oversight requirements.

**Table 1: Requirements for EPA oversight of state LBP programs**

| Regulatory language | OIG summary of oversight requirements |
|---|---|
| Per 40 C.F.R. § 745.324(g), the "EPA shall periodically evaluate the adequacy of a State's or Indian Tribe's implementation and enforcement of its authorized programs." | Verify that authorized program implementation continues to meet all the programmatic and enforcement elements set by 40 C.F.R. part 745, subpart Q, outlined in Figure 2 above. |
| Per 40 C.F.R. § 745.324(h), every year or every two years, as applicable, authorized states shall submit reports to the EPA that include:<br>1. "Any significant changes in the content or administration of the State … program implemented since the previous reporting period; and | Review state reports to determine whether the states are successfully implementing their programs. |

---

[10] The EPA authorized some of these programs decades ago.

**PETITIONER'S ADDENDUM 000045**

| Regulatory language | OIG summary of oversight requirements |
|---|---|
| 2. All information regarding the lead-based paint enforcement and compliance activities listed at. § 745.327(d) 'Summary on Progress and Performance.'" | |
| Per 40 C.F.R. § 745.324(i)(1), "[i]f EPA concludes that a State … is not administering and enforcing an authorized program in compliance with the standards, regulations, and other requirements of sections 401 through 412 of the Toxic Substances Control Act and this subpart, the Administrator shall notify the primary agency for the State … in writing and indicate EPA's intent to withdraw authorization of the program." | If the Agency determines that the state is not meeting the required programmatic and enforcement elements, the Agency shall issue a notice of intent to withdraw authorization and provide the state an opportunity to respond to its findings and complete a corrective action. |

Source: OIG analysis of 40 C.F.R. § 745.324(g–i). (EPA OIG table)

The EPA uses the term "adequate" throughout 40 C.F.R. part 745, subpart Q, to indicate that an authorized state LBP program meets the required programmatic and enforcement elements. For simplicity, we use the term "periodic adequacy evaluation" in this report to refer to the regulatory requirement found at 40 C.F.R. § 745.324(g). The periodic adequacy evaluation is the EPA's primary regulatory oversight mechanism for verifying that authorized state LBP programs remain at least as protective as the federal LBP programs and that the programs provide adequate enforcement after initial authorization. As shown in Figure 3, the periodic adequacy evaluation also informs whether the state programs should remain authorized. If the EPA finds a state program to be inadequate, the Agency must issue a notice of intent to withdraw authorization of that program. If the state does not respond within 60 days of the notice of intent to withdraw or fails to reach an agreement correcting the identified deficiencies within 180 days, the EPA must withdraw its authorization after meeting all withdrawal requirements set forth in 40 C.F.R. § 745.324(i).

**Figure 3: The LBP programs' implementation, authorization, and oversight process**



Source: OIG analysis of 40 C.F.R. § 745.324. (EPA OIG image)

**PETITIONER'S ADDENDUM 000046**

The EPA headquarters offices—in this case, the OCSPP and OECA—and the EPA regional offices play distinct but complementary roles in that oversight process. The EPA outlines the roles of headquarters and regional offices in regulation at 40 C.F.R. § 1.5(a), as well as in two policy memorandums: the 1984 *EPA Policy on Oversight of Delegated Environmental Programs* and the 2023 *Principles and Best Practices for Oversight of State Implementation and Enforcement of Environmental Laws*. As shown in Figure 4, these oversight documents describe the EPA headquarters offices as responsible for developing national goals and policy and the EPA regions as responsible for directly overseeing authorized programs and adapting national policy to meet state needs. Specifically, the OCSPP and OECA are responsible for developing national guidance and reviewing reports from states and regional offices. The regional offices are responsible for implementing national guidance and directly overseeing authorized state programs funded under the EPA state grants.

**Figure 4: EPA authorities relevant to headquarters and regional office oversight of EPA programs**

| 40 C.F.R. § 1.5(a) | EPA Policy on Oversight of Delegated Environmental Programs memorandum (1984) | Principles and Best Practices for Oversight of State Implementation and Enforcement of Environmental Laws memorandum (2023) |
|---|---|---|
| EPA **headquarters offices** "maintain overall planning, coordination and control of EPA programs." <br><br> "**Regional Administrators** … are responsible directly to the Administrator for the execution of the Agency's programs within the boundaries of their Regions." (emphasis added) | EPA **headquarters offices** are responsible for developing national goals, standards, regulations, and policies and for ensuring their collective and effective implementation. <br><br> **Regional offices** are responsible for direct oversight of delegated state programs and adapting national program objectives and requirements to the needs of individual states. | Reaffirms **headquarters** and **regional office** oversight positions laid out in the 1984 memorandum and clarifies that development of oversight guidance is a collective responsibility shared by **headquarters** and **regional offices**. |

*Note*: According to *EPA Policy on Oversight of Delegated Environmental Programs*, delegation is the "review and 'approval' or 'authorization' process by which EPA assigns to competent and willing states the responsibility to operate a program mandated by federal statute."

Source: OIG summary of EPA authorities relevant to headquarters and regional office oversight of EPA programs. (EPA OIG image)

## Responsible Offices

To summarize the details provided above, the OCSPP is responsible for directing authorized state LBP program implementation through the development of national policies and procedures, including grant program guidance. The Land, Chemicals, and Redevelopment Divisions in each EPA region are responsible for overseeing the day-to-day implementation of authorized state LBP programs. In fiscal

**PETITIONER'S ADDENDUM 000047**

year 2023, the OCSPP allocated $12.20 million to its TSCA 404(g) LBP grant program. OECA is responsible for directing authorized state LBP program enforcement and compliance through the development of national policies and procedures, including its Toxic Substances Compliance Monitoring grant program. The Enforcement and Compliance Assurance Divisions in each EPA region are responsible for overseeing the day-to-day enforcement and compliance of authorized state LBP programs. In fiscal year 2023, OECA allocated $3.03 million to its Toxic Substances Compliance Monitoring State and Tribal Assistance grant for LBP programs.

## Scope and Methodology

We conducted this evaluation from May 2024 to March 2025 in accordance with the *Quality Standards for Inspection and Evaluation* published in December 2020 by the Council of the Inspectors General on Integrity and Efficiency. Those standards require that we perform the evaluation to obtain sufficient and appropriate evidence to support our findings. We initiated this evaluation in response to an anonymous February 2024 OIG Hotline complaint. That complaint alleged that an authorized state's LBP programs lacked the administrative and infrastructure capacity to successfully implement all required programmatic and enforcement elements. We designed our evaluation to identify the root cause of the issues alleged in the hotline complaint.

To identify the EPA's LBP program oversight requirements, we reviewed applicable laws and regulations, including relevant portions of TSCA. After considering the amount of housing built prior to 1978 and the number of authorized state LBP programs in each region, we selected four regional offices for review: EPA Regions 2, 3, 5, and 10. We reviewed policy and procedure documents provided by OECA, the OCSPP, and Regions 3 and 5. We interviewed staff from OECA, the OCSPP, and selected regional offices to distinguish roles and responsibilities and to identify policies and procedures for complying with state oversight requirements.

## Prior Report

In EPA OIG Report No. 19-P-0302, *EPA Not Effectively Implementing the Lead-Based Paint Renovation, Repair and Painting Rule*, issued September 9, 2019, we found that the EPA lacked internal controls, coordinated strategies, objectives, and goals for implementing the RRP Rule. We recommended that the Agency identify the regulated universe for the RRP program; update current program guidance; establish management oversight controls as well as objectives, goals, and measurable outcomes; and establish a forum to share best practices and innovations. The Agency certified that it completed each of these corrective actions.

## Results

The EPA is not verifying that authorized state LBP programs remain adequately protective and provide adequate enforcement after initial program authorization. Specifically, the Agency does not collect sufficient information to satisfy the requirement for a periodic adequacy evaluation. In addition, the OCSPP and OECA have not met their responsibilities to develop national program guidance, which would

**PETITIONER'S ADDENDUM 000048**

include the development of policies and procedures for periodic adequacy evaluations or required authorization withdrawals. Without changes to the EPA's oversight procedures, the authorized state LBP programs may not adequately protect public health. Further, children may suffer adverse and irreversible health effects.

### *The EPA Does Not Have Procedures to Verify that Authorized State Lead-Based Paint Programs Remain Adequately Protective and Provide Adequate Enforcement*

The EPA does not have procedures to verify that authorized state LBP programs remain adequately protective of human health and the environment and that the programs provide adequate enforcement after initial approval. Consequently, the EPA does not conduct periodic adequacy evaluations that meet the requirements of 40 C.F.R. § 745.324(g). Instead of having specific procedures for conducting adequacy evaluations, the EPA relies on the information that authorized state LBP programs must submit through TSCA 404(g) LBP grant reports, Toxic Substances Compliance Monitoring grant reports, and the reports required pursuant to 40 C.F.R. § 745.324(h) on any significant changes and program performance. Although OECA has issued compliance monitoring grant guidance and the OSCPP has issued TSCA 404(g) LBP grant guidance, [11] neither guidance document instructs the states to provide reports that include the information required for the EPA to determine the overall adequacy of the state LBP programs after initial authorization. Collectively, the information gathered through grant reporting requirements and reports required pursuant to 40 C.F.R. § 745.324(h) is insufficient to demonstrate whether the programs meet all the required programmatic and enforcement elements to remain adequately protective of human health and the environment and provide adequate enforcement. Table 2 summarizes the information that authorized state LBP programs must submit to the EPA.

**Table 2: Summary of the information that authorized state LBP programs must submit to the EPA**

| TSCA 404(g) LBP grant reports | Toxic Substances Compliance Monitoring grant reports | 40 C.F.R. § 745.324(h) reports |
| --- | --- | --- |
| Comparison of accomplishments to workplan objectives and the number of certified individuals and firms, certifications issued, training course accreditations issued, and training courses. | Outputs and outcomes, problems encountered and actions to address unresolved problems, evaluation of a state's performance under the grant, and the projected and actual number of inspections for each funded program. | Any significant change in the administration or content of an authorized program and a summary on progress and performance.* The summary must include the scope of the regulated community, inspections conducted, enforcement actions taken, compliance assistance provided, and the level of resources that the state committed to these activities. |

*Note:* A summary on progress and performance, as part of the 40 C.F.R. § 745.324(h) reporting requirements, assesses enforcement and compliance outputs and only pertains to enforcement elements.

Source: OIG summary of OECA and OCSPP guidance documents and 40 C.F.R. § 745.324(h). (EPA OIG table)

   * "Significant change" is not defined at 40 C.F.R. § 745.324(h)(1).

---

[11] EPA OECA, Toxic Substances Compliance Monitoring Grant Guidance (2024). EPA OSCPP, FY 2024 TSCA Section 404(g) Lead-Based Paint Grant Program Guidance.

Although the EPA is required to "periodically evaluate the adequacy of a State's … implementation and enforcement of its authorized programs," [12] the Agency has not defined "periodic." To determine whether an authorized program is "adequate," the periodic adequacy evaluation must assess whether the authorized program is maintaining the required programmatic and enforcement elements. During interviews, when asked about conducting periodic adequacy evaluations, regional staff referred us to the grant and regulatory reporting requirements. However, as shown in Tables 3 and 4, these reporting requirements do not address all the programmatic and enforcement elements required to verify that authorized state LBP programs remain at least as protective as the federal LBP programs and provide adequate enforcement. In fact, collectively, the information fulfills only one of the required elements— the requirement for regular summary on progress and performance reports. The EPA does not collect sufficient information to verify the remaining programmatic and enforcement elements. Further, although 40 C.F.R. § 745.324(h)(1) requires authorized states to report any "significant changes" in the content or administration of a program since the prior reporting period, none of the headquarters or regional office staff in our interviews indicated that they had policies that defined a significant change.

**Table 3: OIG assessment of whether the information that the EPA collects from authorized state LBP programs is sufficient to verify that a program meets each required programmatic element**

| Programmatic elements | TSCA 404(g) LBP grant reports | 40 C.F.R. § 745.324(h) reports |
|---|---|---|
| Procedures and requirements for the accreditation of training programs that educate individuals conducting renovations and LBP activities. For the RRP program only, training requirements must include refresher trainings and on-the-job training for some individuals. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| Procedures and requirements for the certification of individuals and firms conducting renovations or LBP activities. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| Work practice standards for the conduct of LBP activities and renovations. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| Requirements that all activities are conducted by certified individuals and firms with properly trained individuals. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |

---

[12] 40 C.F.R. § 745.324(g).

**PETITIONER'S ADDENDUM 000050**

| Programmatic elements | TSCA 404(g) LBP grant reports | 40 C.F.R. § 745.324(h) reports |
|---|---|---|
| Appropriate infrastructure and government capacity. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| For the Pre-Renovation Education program only, procedures and requirements for the distribution of lead hazard information pursuant to 40 C.F.R. § 745.84. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |

Source: OIG analysis of 40 C.F.R. §§ 745.325–326, the OCSPP TSCA 404(g) LBP grant guidance, and the 40 C.F.R. § 745.324(h) reporting requirements. (EPA OIG table)

**Table 4: OIG assessment of whether the information that the EPA collects from authorized state LBP programs is sufficient to verify that a program meets each required enforcement element**

| Enforcement elements | Toxic Substances Compliance Monitoring grant reports | 40 C.F.R. § 745.324(h) reports |
|---|---|---|
| The legal authority, standards, and regulations necessary to address any significant risks posed by noncompliance and a plan with a statement of resources that will be devoted to the program. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| Required performance elements, including training for enforcement and inspection personnel, compliance assistance to the public, and the ability to implement a compliance monitoring and enforcement program. | ✗ Does not provide sufficient information. | ✗ Does not provide sufficient information. |
| Regularly submit summary on progress and performance reports in accordance with requirements at 40 C.F.R. § 745.324(h). | ✗ Does not provide sufficient information. | ✓ Meets the requirement to regularly submit such a report. |

Source: OIG analysis of 40 C.F.R. § 745.327, the OECA Toxic Substances Compliance Monitoring grant guidance, and the 40 C.F.R. § 745.324(h) reporting requirements. (EPA OIG table)

The EPA is also required to initiate the withdrawal process if the EPA "concludes that a State or Indian Tribe is not administering and enforcing an authorized program in compliance with standards, regulations, and other requirements." [13] Despite this requirement, the EPA does not have policies and procedures that identify the evidence necessary to initiate the withdrawal of its program authorization. According to the OCSPP, the EPA has never withdrawn a state LBP program authorization. Headquarters staff rely on the EPA regions to identify programmatic and enforcement issues through formal and

---

[13] 40 C.F.R. § 745.324(i)(1).

**PETITIONER'S ADDENDUM 000051**

informal communications with their state counterparts. However, none of the regions we spoke with had policies or procedures that established criteria for escalating state program issues to headquarters or that identified the evidence needed to initiate and support a withdrawal of authorization. The OCSPP, OECA, and most of the regions we interviewed said that they refer to regulatory language to guide withdrawal. However, the regulation only includes processes that the EPA must follow once the Agency has concluded that a state or Indian tribe is not administering and enforcing an authorized program in compliance with the standards, regulations, and other program requirements.

Without policies or procedures for conducting periodic adequacy evaluations and definitions for "periodic" and "significant change," regional oversight of authorized state LBP programs may be inconsistent or insufficient. Furthermore, without policies and procedures that provide examples of when initiation of the withdrawal process under 40 C.F.R. 734.324(i) may be warranted, state programs that do not maintain the required programmatic and enforcement elements may retain authorization.

### *The Offices of Chemical Safety and Pollution Prevention and Enforcement and Compliance Assurance Are Not Meeting Their Leadership and Policy Development Responsibilities Related to Authorized State Lead-Based Paint Programs*

The OCSPP and OECA have not led the development of national program guidance for the regional offices to verify that authorized state LBP programs continue to meet regulatory requirements after initial program authorization. Staff from the OCSPP and OECA each asserted that their offices were not responsible for developing the policies for the required periodic adequacy evaluations. In our initial interview with the OCSPP, a manager stated that it is the responsibility of regions to carry out the regulation at 40 C.F.R. § 745.324 and that the OCSPP has not supplemented the regulation with additional guidance. That manager referred to the EPA delegation of authority, *Authorization of State and Tribal Programs under Section 404,* dated November 24, 2009, to support the OCSPP's assertion that developing these policies was not within its responsibility and authority. While this document delegates some decision-making power to the regional administrators, such as decision-making for processing applications, the delegation does not prevent or limit the headquarters offices from developing policies and procedures for periodic adequacy evaluations or for recommending the initiation of the withdrawal process.

Consistent with the oversight roles described in 40 C.F.R. § 1.5(a) and in the 1984 and 2023 oversight memorandums, the EPA headquarters offices are responsible for developing national policy. In the context of authorized state LBP programs, the OCSPP is responsible for leading policy development for the programmatic elements for periodic adequacy evaluations and withdrawals, while OECA is responsible for leading policy development for the enforcement and compliance elements. Because the OCSPP and OECA have not led the development of these policies, the regional offices do not have the necessary tools to consistently conduct oversight of authorized state LBP programs.

**PETITIONER'S ADDENDUM 000052**

## Conclusions

Without conducting comprehensive periodic adequacy evaluations, the EPA does not have sufficient information to verify that authorized state LBP programs remain protective of human health and the environment or to verify that the programs continue to provide adequate enforcement after initial authorization. Additionally, without a periodic adequacy evaluation process in place, the EPA may not have sufficient evidence to determine when withdrawal of a program is warranted. Since several LBP programs have been authorized for decades and the EPA has not conducted periodic adequacy evaluations, there is a risk that authorized state LBP programs are no longer able to demonstrate that all the programmatic and enforcement elements remain adequate. Inadequate LBP programs may increase the risk of lead exposure to children. Additionally, if the EPA cannot verify that authorized state programs remain protective, the Agency risks wasting or inefficiently expending annual grant funding for authorized state LBP programs—such as the $12.20 million from the OCSPP and $3.03 million from OECA in fiscal year 2023.

## Recommendations

To promote effective EPA oversight of authorized state implementation of LBP programs, we recommend that the assistant administrator for Chemical Safety and Pollution Prevention, in coordination with the assistant administrator for Enforcement and Compliance Assurance:

1.  Develop guidance that:

    a.  Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 745.324(g) for lead-based paint programs and specifies the expected frequency of the periodic evaluations and the programmatic elements required to evaluate the adequacy of an authorized lead-based paint program. Doing so will help verify that authorized state programs remain at least as protective of human health and the environment as the federal programs after initial authorization.

    b.  Provides examples of what might constitute a "significant change" in the content or administration of an authorized lead-based paint program as it relates to 40 C.F.R. § 745.324(h)(1). This will help the EPA to specify the types of program changes that authorized states must report to their EPA regional offices.

    c.  Provides examples of when the withdrawal process under 40 C.F.R. § 745.324(i) may be warranted for an authorized lead-based paint program. Doing so will help EPA staff communicate the circumstances that could result in a recommendation for authorized state program withdrawal to the delegated EPA official.

2.  Clarify the headquarters and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Paint Activities; Lead Renovation, Repair, and Painting; and Pre-Renovation Education programs consistent with 40 C.F.R. § 1.5 and EPA

**PETITIONER'S ADDENDUM 000053**

policy memorandums. With a clear understanding of roles and responsibilities, the EPA can more effectively implement its oversight functions.

To promote effective EPA oversight of authorized state LBP compliance and enforcement program requirements, we recommend that the assistant administrator for Enforcement and Compliance Assurance, in coordination with the assistant administrator for Chemical Safety and Pollution Prevention:

3. Develop guidance that:

    a. Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 745.324(g) and specifies the expected frequency of the periodic evaluations and the enforcement elements required to evaluate the adequacy of an authorized program. Doing so will help verify that authorized state programs continue to provide adequate enforcement after initial authorization.

    b. Provides examples of what might constitute a "significant change" in the content or administration of an authorized lead-based paint program as it relates to 40 C.F.R. § 745.324(h)(1). This will help the EPA to specify the types of program changes that authorized states must report to their EPA regional offices.

    c. Provides examples of when the withdrawal process under 40 C.F.R. § 745.324(i) may be warranted for an authorized lead-based paint program. Doing so will help EPA staff communicate the circumstances that could result in a recommendation for authorized state program withdrawal to the delegated EPA official.

4. Clarify the headquarters and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Paint Activities and Lead Renovation, Repair, and Painting, and Pre-Renovation Education programs consistent with 40 C.F.R. § 1.5 and EPA policy memorandums. With a clear understanding of roles and responsibilities, the EPA can more effectively implement its oversight functions.

## Agency Response and OIG Assessment

The EPA's response to our draft report is in Appendix A. The EPA also provided technical comments, which we considered and applied as appropriate.

In its response to our draft report, the EPA stated that it agreed with the spirit of all four of our recommendations but disagreed with the specific language used in Recommendations 1 and 3. The Agency suggested revisions that met the intent of our recommendations. The Agency also suggested that we consolidate our report recommendations from four to two and address them jointly to OECA and OCSPP action officials. However, we believe that the distinction between the programmatic and enforcement requirements calls for separate recommendations to each action official. We accepted the Agency's proposed revisions but maintained the separate recommendations. The EPA agreed with our

**PETITIONER'S ADDENDUM 000054**

revised recommendations. The Agency provided acceptable corrective actions that meet the intent of our recommendations, including developing the relevant guidance and clarifying oversight roles. According to the Agency, its two-year timeline to implement the corrective actions appropriately allows for OECA and the OCSPP to collaborate with the EPA Office of General Counsel and the regional staff that will be required to implement the guidance. All four recommendations are resolved with corrective actions pending.

14

# Status of Recommendations

| Rec. No. | Page No. | Recommendation | Status* | Action Official | Planned Completion Date |
|---|---|---|---|---|---|
| 1 | 12 | In coordination with the assistant administrator for Enforcement and Compliance Assurance, develop guidance that:<br><br>a. Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 745.324(g) for lead-based paint programs and specifies the expected frequency of the periodic evaluations and the programmatic elements required to evaluate the adequacy of an authorized lead-based paint program. Doing so will help verify that authorized state programs remain at least as protective of human health and the environment as the federal programs after initial authorization.<br><br>b. Provides examples of what might constitute a "significant change" in the content or administration of an authorized lead-based paint program as it relates to 40 C.F.R. § 745.324(h)(1). This will help the EPA to specify the types of program changes that authorized states must report to their EPA regional offices.<br><br>c. Provides examples of when the withdrawal process under 40 C.F.R. § 745.324(i) may be warranted for an authorized lead-based paint program. Doing so will help EPA staff communicate the circumstances that could result in a recommendation for authorized state program withdrawal to the delegated EPA official. | R | Assistant Administrator for Chemical Safety and Pollution Prevention | 3/15/27 |
| 2 | 12 | In coordination with the assistant administrator for Enforcement and Compliance Assurance, clarify the headquarters and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Paint Activities; Lead Renovation, Repair, and Painting; and Pre-Renovation Education programs consistent with 40 C.F.R. § 1.5 and EPA policy memorandums. With a clear understanding of roles and responsibilities, the EPA can more effectively implement its oversight functions. | R | Assistant Administrator for Chemical Safety and Pollution Prevention | 3/15/27 |
| 3 | 13 | In coordination with the assistant administrator for Chemical Safety and Pollution Prevention, develop guidance that:<br><br>a. Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 745.324(g) and specifies the expected frequency of the periodic evaluations and the enforcement elements required to evaluate the adequacy of an authorized program. Doing so will help verify that authorized state programs continue to provide adequate enforcement after initial authorization.<br><br>b. Provides examples of what might constitute a "significant change" in the content or administration of an authorized lead-based paint program as it relates to 40 C.F.R. § 745.324(h)(1). This will help the EPA to specify the types of program changes that authorized states must report to their EPA regional offices.<br><br>c. Provides examples of when the withdrawal process under 40 C.F.R. § 745.324(i) may be warranted for an authorized lead-based paint program. Doing so will help EPA staff communicate the circumstances that could result in a recommendation for authorized state program withdrawal to the delegated EPA official. | R | Assistant Administrator for Enforcement and Compliance Assurance | 3/15/27 |
| 4 | 13 | In coordination with the assistant administrator for Chemical Safety and Pollution Prevention, clarify the headquarters and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Paint Activities and Lead Renovation, Repair, and Painting, and Pre-Renovation Education programs consistent with 40 C.F.R. § 1.5 and EPA policy memorandums. With a clear understanding of roles and responsibilities, the EPA can more effectively implement its oversight functions. | R | Assistant Administrator for Enforcement and Compliance Assurance | 3/15/27 |

\* C = Corrective action completed.
  R = Recommendation resolved with corrective action pending.
  U = Recommendation unresolved with resolution efforts in progress.

**PETITIONER'S ADDENDUM 000056**

**Appendix A**

# *Agency Response to the Draft Report*



WASHINGTON, D.C. 20460

April 24, 2025

<u>MEMORANDUM</u>

**SUBJECT:** Response to Draft Report entitled "Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs," Project No. OSRE-FY24-0089

**FROM:** Nancy B. Beck, PhD
Principal Deputy Assistant Administrator
Office of Chemical Safety and Pollution Prevention

NANCY BECK
Digitally signed by NANCY BECK
Date: 2025.04.24 17:03:34 -04'00'

Jeffery A. Hall
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance

**TO:** Nicole N. Murley
Acting Inspector General

EPA's Office of Chemical Safety and Pollution Prevention (OCSPP) and Office of Enforcement and Compliance Assurance (OECA) appreciate the opportunity to respond to the findings and recommendations presented in the Office of Inspector General's (OIG's) draft report, "Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs" (the "Draft Report"). Attached to this memorandum are OCSPP's and OECA's Technical Comments, which we respectfully request remain internal to EPA.

**I.    General Comments:**

OCSPP and OECA appreciate the OIG's effort in evaluating Agency verification that EPA-authorized state lead-based paint (LBP) programs continue to meet regulatory requirements after their initial authorization. We agree that Agency oversight of authorized state LBP programs is critical to ensure that

these programs continue to meet regulatory requirements and protect human health and the environment for all residents of the United States.

The OIG offers four recommendations to strengthen Agency oversight of authorized state LBP programs. While we agree with the spirit of all four recommendations, we disagree with OIG recommendations 1 and 3 because, as written, they seemingly require OCSPP and OECA to develop guidance that goes beyond clarifying existing regulatory obligations to implementing new requirements.

Accordingly, we have proposed revisions to these recommendations to reflect what we are able to do in a guidance document. We have also proposed two corrective actions that in our view fully implement the revised recommendations. OCSPP and OECA will jointly develop a guidance document that includes the specific information discussed by the OIG in the Draft Report, such as clarifying the Headquarters (HQ) and regional offices' oversight roles and responsibilities regarding state implementation of authorized lead-based programs. We have set a two-year timeframe for developing this guidance, which will enable OCSPP and OECA to collaborate with the Regions and EPA's Office of General Counsel to determine the best course of action to make the planned changes.

## II.    Recommendations and Agency Response

**Recommendations 1 (and 3)** [1]: Develop guidance that:

a)  Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 734.324(g) and, as part of that guidance, specify the expected frequency of the periodic evaluations and the programmatic (and enforcement elements) [2] required to evaluate the adequacy of an authorized program.

b)  Defines the scope of a "significant change" as it relates to 40 C.F.R. § 734.324(h)(1).

c)  Describes the evidence necessary to implement the withdrawal process under 40 C.F.R. § 734.324(i).

**EPA Response – Disagree**

- **Proposed Combined Revised Recommendation 1:** Develop guidance that:

a)  Directs regional offices to conduct the periodic adequacy evaluations required by 40 C.F.R. § 734.324(g) and, as part of that guidance, specify the expected frequency of the periodic evaluations and the programmatic and enforcement elements required to evaluate the adequacy of an authorized program.

---

[1] The OIG's Draft Report contains nearly identical recommendations directed at OCSPP and OECA, which we propose combining as described below.
[2] This parenthetical language appears in the OIG's Recommendation 3, directed at OECA.

**PETITIONER'S ADDENDUM 000058**

b) Provides examples of what might constitute a "significant change" as it relates to 40 C.F.R. § 734.324(h)(1).

c) Provides examples of facts or circumstances where implementation of the withdrawal process under 40 C.F.R. § 734.324(i) may be warranted.

- **Proposed Corrective Action 1:** OCSPP and OECA, with regional input, will develop regional guidance that aligns with the requirements of Recommendations 1 and 3, as described in sections (a) through (c) of these recommendations.

  - **Target Completion Date:** March 15, 2027

**Recommendations 2 and 4:** Clarify the HQ and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Pa int Activities and Lead Renovation, Repair and Painting programs as it relates to 40 C.F.R. § 1.5 and EPA policy memorandums.

**EPA Response – Agree**

- **Proposed Corrective Action 2:** The guidance OCSPP and OECA will develop under Corrective Action 1 will clarify the HQ's and regional offices' oversight roles and responsibilities regarding state implementation of authorized Lead-Based Paint Activities and Lead Renovation, Repair and Painting programs.

  - **Target Completion Date:** March 15, 2027

**PETITIONER'S ADDENDUM 000059**

# *Distribution*

The Administrator
Deputy Administrator
Associate Deputy Administrator
Assistant Deputy Administrator
Chief of Staff, Office of the Administrator
Deputy Chief of Staff for Management, Office of the Administrator
Agency Follow-Up Official (the CFO)
Assistant Administrator for Chemical Safety and Pollution Prevention
Assistant Administrator for Enforcement and Compliance Assurance
Regional Administrators for Regions 1–10
Principal Deputy Assistant Administrator for Chemical Safety and Pollution Prevention
Principal Deputy Assistant Administrator for Enforcement and Compliance Assurance
Agency Follow-Up Coordinator
General Counsel
Associate Administrator for Congressional and Intergovernmental Relations
Associate Administrator for Public Affairs
Principal Deputy Associate Administrator for Public Affairs
Deputy Assistant Administrator for Chemical Safety and Pollution Prevention
Deputy Assistant Administrator for Enforcement and Compliance Assurance
Deputy Assistant Administrator for Management, Office of Chemical Safety and Pollution Prevention
Deputy Assistant Administrator for Management, Office of Enforcement and Compliance Assurance
Deputy Regional Administrators for Regions 1–10
Senior Advisor, Office of Chemical Safety and Pollution Prevention
Director, Office of Continuous Improvement, Office of the Chief Financial Officer
Director, Office of Regional Operations
OIG Liaison, Office of Policy, Office of the Administrator
GAO Liaison, Office of Policy, Office of the Administrator
Audit Follow-Up Coordinator, Office of the Administrator
Senior Audit Advisor, Office of Chemical Safety and Pollution Prevention
Audit Follow-Up Coordinator, Office of Enforcement and Compliance Assurance
Audit Follow-Up Coordinators, Regions 1–10

**PETITIONER'S ADDENDUM 000060**



## Whistleblower Protection

U.S. Environmental Protection Agency

*The whistleblower protection coordinator's role is to educate Agency employees about prohibitions against retaliation for protected disclosures and the rights and remedies against retaliation. For more information, please visit the OIG's whistleblower protection webpage.*

## Contact us:



**Congressional & Media Inquiries:** OIG.PublicAffairs@epa.gov



**EPA OIG Hotline:** OIG.Hotline@epa.gov



**Web:** epaoig.gov

## Follow us:

𝕏    **X:** @epaoig

**in**    **LinkedIn:** linkedin.com/company/epa-oig

**You Tube**    **YouTube:** youtube.com/epaoig

**Instagram:** @epa.ig.on.ig



**www.epaoig.gov**

PETITIONER'S ADDENDUM 000061

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

PAWNEE NATION OF
OKLAHOMA,

               Petitioner,

v.

LEE ZELDIN, in his official capacity
as U.S. Environmental Protection
Agency Administrator, and U.S.
ENVIRONMENTAL PROTECTION
AGENCY,

               Respondents.

Case No. 25-9548

---

## DECLARATION OF MONTY MATLOCK

---

I, Monty Matlock, declare as follows:

1. I am Director of the Pawnee Nation Division of Natural Resources and Safety (DNRS). My office address is 301 Agency Rd., Pawnee, OK 74058.

2. I have worked for the DNRS for 29 years.

3. The facts set forth in this declaration are based on my own personal knowledge and experience. If called as a witness, I could and would testify competently to these facts.

1

**PETITIONER'S ADDENDUM 000062**

4. DNRS's mission is the conservation, protection, management, and use of the Pawnee Nation's natural resources; as well as promoting public education to help further understand and appreciate our natural resources. The well-being, quality of life, and safety of the Nation's citizens and the public is also a priority for DNRS. DNRS strives to enhance the lives of tribal and non-tribal citizens by interacting with the surrounding communities frequently to promote conservation and safety, and by collaborating with outside agencies to expand and improve services available to all citizens living within the Pawnee Nation jurisdictional boundaries.

5. The Pawnee Nation has adopted its own Natural Resource Protection Act, administered by DNRS, which includes protections for surface and groundwater quality, drinking water supplies, and provisions to address solid waste, wastewater, underground storage tanks, pollution from oil and gas development, timber resources, and other matters.  https://pawneenation.org/wp-content/uploads/2020/12/Title-XII.pdf .

6. My understanding is that EPA's January 2025 and May 2025 SAFETEA Decisions did not immediately change the regulatory agency administering federal environmental programs on the Pawnee Nation. Because the Pawnee Nation's reservation has not yet been formally adjudicated, it is my understanding that Oklahoma would have continued to administer those programs following the

2

**PETITIONER'S ADDENDUM 000063**

Supreme Court's *McGirt* decision even in the absence of EPA's SAFETEA

approvals.

7. Nevertheless, EPA's May 2025 SAFETEA decision has a significant

impact on the Pawnee Nation. It impairs DRNS's ability to carry out its mission by

eliminating the engagement process required by EPA in its January 2025

SAFETEA Order for many environmental decisions. The January 2025 SAFETEA

decision required Oklahoma to engage with the Pawnee Nation in a manner similar

to what EPA does through government-to-government consultation. The

engagement process required notice to the Pawnee Nation and other affected tribes

of proposed permits, enforcement efforts, and regulatory actions within 50 miles of

their jurisdictional lands, specific steps to confer with and attempt to reach

consensus with the affected tribes, and reporting requirements that ensure

Oklahoma carries out this engagement process. Yet, after the May 2025 decision,

Oklahoma will not be required to engage with affected tribes in this way.

8. The May 2025 Decision impacts the Nation because it negates our ability

to be at the table where regulatory decisions by the State of Oklahoma affecting

our natural resources and the environment are made. Communication between

environmental program administrators (whether at EPA or the State of Oklahoma)

and DRNS is paramount to protecting both human health and environment within

the Pawnee Nation.

**PETITIONER'S ADDENDUM 000064**

9. Communication between the Pawnee Nation and program administrators helps to fulfill Article II, Section 2, Part ii of the Pawnee Nation's Constitution, which empowers the Pawnee Nation to "protect the peace, safety, health and welfare of the members of the Pawnee Nation." The consultation process has been used to establish open dialogue between the Pawnee Nation and EPA (as with other regulatory entities) to assure the most positive outcome for the protection of both its members and resources in line with the Pawnee Nation's Constitution. Such dialogue is imperative to carefully vet any action having impact upon the Pawnee Nation and/or its members.

10. The impacts of the May 2025 Decision on the Nation involve not only Oklahoma environmental decisions occurring within the Pawnee Nation reservation itself, but also Oklahoma regulatory actions occurring on lands under the jurisdiction of other tribes. The 50-mile radius where Oklahoma would have been required to engage with the Pawnee Nation on any permitting or regulatory activities includes an area that covers much of the western half of the Muscogee (Creek) Nation reservation and part of the Cherokee Nation reservation, as well as jurisdictional lands of several other tribes, as shown in the map in Paragraph 11 below. The Pawnee Nation is unlikely to engage with every environmental regulatory action by the State of Oklahoma within that 50-mile radius, but many of those actions have the potential to affect the Nation's air, water and health.

4

**PETITIONER'S ADDENDUM 000065**

11. For example, the May 2025 decision grants Oklahoma authority over Clean Air Act programs on Muscogee (Creek) Nation lands that are adjacent to Pawnee Nation lands. This map depicts tribal jurisdictions in Oklahoma, and the cropped image below shows the Pawnee Nation and Muscogee (Creek) Nation border:



12. There are numerous facilities with air permits issued by the Oklahoma Department of Environmental Quality (ODEQ) on Muscogee (Creek) Nation lands within 50 miles of the Pawnee Nation (that distance extends as far east as the Tulsa area). For example, there are a number of permitted facilities close to the Pawnee Nation border, including in the areas around Oilton and Drumright. This map

**PETITIONER'S ADDENDUM 000066**

depicts ODEQ air monitoring sites (of point source emissions as of 2019), with the

border of Pawnee Nation's jurisdictional lands delineated in red:



13. Given its proximity to the Pawnee Nation, ODEQ Clean Air Act permits

on Muscogee (Creek) Nation lands impact air quality for the Pawnee Nation. Air

pollution does not stop at jurisdictional lines, and emissions permitted by

Oklahoma inevitably will reach the Pawnee Nation. The May 2025 decision

eliminates numerous opportunities for the Nation to engage with Oklahoma on

Clean Air Act permits (both within and outside the Pawnee Nation) and is likely to

make it more difficult and more costly for the Nation to successfully administer its

own environmental programs and protect tribal citizens.

6

**PETITIONER'S ADDENDUM 000067**

14. The May 2025 decision also grants Oklahoma regulatory authority over a variety of Clean Water Act (CWA) programs, where the loss of the engagement process will adversely affect the Pawnee Nation. For example, there are a number of streams flowing through the Pawnee Nation's jurisdictional lands that are listed under CWA Section 303(d) as impaired waters, meaning that they don't comply with applicable water quality standards for protection of human health and other uses such as aquatic life. These CWA 303(d) listed stream segments, and their impairments, include:

- Arkansas River – Enterococci

- Pawnee Lake - Chlorophyll-a, Turbidity

- Black Bear Creek - Enterococci, Turbidity

- Council Creek - Enterococci, Dissolved Oxygen, Turbidity

- Salt Creek - Enterococci, E-coli, Dissolved Oxygen, Turbidity

- Lagoon Creek – Enterococci

- Cimarron River - Enterococci, Lead, pH, Fish Biology, Turbidity

- Little Stillwater Creek – Nitrates

- Stillwater Creek - Enterococci, Dissolved Oxygen, E-coli, Turbidity

- Dugout Creek - Enterococci, E-coli

- Skull Creek - Lead

7

15. Most of these streams originate outside the Pawnee Nation and are impaired (at least in part) because of pollutant discharges occurring upstream of the Nation. The engagement requirement of the January 2025 Decision would have allowed DRNS to better address the sources of pollution (both within and upstream of the Nation) impacting these streams. I expect the loss of that engagement will adversely impact these impaired waters and DRNS's ability to clean them up.

16. In addition, the Vamoosa-Ada aquifer—which provides drinking water for members of the Pawnee Nation—underlies both Pawnee County and other Oklahoma counties, including Osage County, and is the primary source of fresh groundwater in parts of our region. Several towns rely entirely or in part on this groundwater for municipal supply. For that reason, DRNS has concerns about any approvals of activities by Oklahoma that may impact the aquifer. For example, waste from past oilfield operations has already impacted parts of the aquifer. In 1997, an oil and gas company reached a settlement with the Sac and Fox Nation for historic contamination of the Vamoosa-Ada aquifer to the south (downgradient) of Pawnee County. That contamination left the Sac and Fox Nation (whose lands overlie the aquifer) without any natural source of fresh drinking water.

17. In addition, the May 2025 decision eliminates the January 2025 requirement for Oklahoma to engage with the Pawnee Nation on a variety of other environmental programs like the Safe Drinking Water Act (SDWA), the Federal

8

Insecticide, Fungicide, and Rodenticide Act (FIFRA), the Resource Conservation and Recovery Act (RCRA), and the Toxic Substances Control Act (TSCA). Communication and engagement is paramount to continuing to work with and coordinate with Oklahoma, especially to ensure continuity for programs and ability to protect the health and safety of Pawnee Nation.

18. Improved engagement and coordination with Oklahoma is a high priority for the Pawnee Nation because we have long-standing concerns about the State's administration of federal environmental programs and the extent to which Oklahoma agencies coordinate with DRNS. For example, under Oklahoma's administration of the SDWA underground injection control (UIC) Class II program, a rash of earthquakes linked to underground injection wells occurred in recent years. This occurred because Oklahoma allowed companies to dispose of enormous volumes of oil and gas wastewater by pumping it into underground injection wells at high pressures that destabilized the subsurface formations and caused a wave of disposal-induced earthquakes in Oklahoma. On September 3, 2016, the largest earthquake recorded in Oklahoma history (magnitude 5.8) hit the Pawnee Nation, causing significant damage to the Nation's administrative buildings, several of which were unusable for a period of time in late 2016 until repairs were completed. Many Pawnee members' homes were also damaged by the earthquake.

9

19. Another example occurred in June 2016, when saltwater spilled from a disposal facility located on Oklahoma school land. The spill resulted in the discharge of 1,000 barrels of saltwater into an unnamed creek that flows through Pawnee Nation trust land. The Pawnee Nation responded to the incident, along with EPA, which was present and managed the incident and the clean-up. Oklahoma was not present at the incident, even though the spill occurred from a facility located on Oklahoma school land.

20. Additionally, Oklahoma has in the past failed to examine its own relevant records before attempting to permit UIC activities of concern to the Pawnee Nation. For example, in June 2015, an oil and gas operator attempted to acquire a permit from Oklahoma for a UIC saltwater disposal (SWD) well near the Pawnee Nation's water supply wells. The Pawnee Nation challenged the permit on the basis that at least two existing abandoned oil and gas wells were within the "zone of endangerment according to its records. Yet the state's own records database, as well as site documentation, demonstrated that two such wells were within the zone of endangerment.

21. As another example, under Oklahoma's administration of the UIC program, there has been ongoing chloride contamination of Black Bear Creek in northern Oklahoma. Black Bear Creek drains in Pawnee County, and it provides numerous beneficial uses to the Pawnee Nation, such as groundwater recharge,

10

public and private water supplies, fish and wildlife propagation, agriculture, recreation and cultural uses, and more. In December 2010, the Pawnee Nation identified high chloride levels within the Black Bear Creek and initiated an investigation upstream to identify the source(s) of the chloride. The investigation pointed to an oil field and UIC site in Garfield County, located approximately 45 miles west of the Pawnee Nation boundary. The Pawnee Nation determined that, at this location, the subsurface flow was leaching into Black Bear Creek. Through a search of Oklahoma records, the Pawnee Nation was able to identify a cluster of approximately 11 abandoned or otherwise improperly closed wells within the area of origin. At least some of these wells were not closed by acceptable standards. While the Pawnee Nation alerted Oklahoma of this issue, the contamination is still ongoing with no known action from Oklahoma to address it. To this date (15 years later), no known action by the State of Oklahoma or EPA has addressed the ongoing pollution problems.

22. If the court in this case rules that the SAFETEA Rider has expired, that ruling would also benefit the Pawnee Nation. For example, my understanding is that if SAFETEA were no longer in effect, EPA would then retain administration of the various federal environmental programs that were transferred to Oklahoma by the May 2025 Decision. Unlike Oklahoma, EPA has a well-developed practice of government-to-government consultation with tribes affected by its decisions. If

**PETITIONER'S ADDENDUM 000072**

EPA retains authority of those programs, that federal consultation would substitute for the Oklahoma engagement requirement in the January 2025 Decision.

23. A ruling that the SAFETEA Rider has expired would yield another major benefit for the Pawnee Nation's ability to protect our air, water, health and other natural resources: it would allow the Nation to obtain Treatment as State authority (TAS) authority over federal environmental programs on Pawnee jurisdictional lands. The 2005 SAFETEA Rider, which gave Oklahoma an effective veto over any TAS requests in the state, was enacted shortly after the Pawnee Nation obtained TAS approval from EPA in 2004 to administer certain CWA programs. My understanding is that since the 2005 Rider was enacted, no Oklahoma tribes have succeeded in getting TAS approval. If the court rules that the veto authority is no longer in effect, the Nation would not just be limited to engaging with Oklahoma on environmental programs as provided in the January 2025 Decision—we could administer those programs ourselves.

24. The Pawnee Nation has already identified a number of environmental programs where we are interested in expanding TAS authority. The Nation's Five-Year Tribal Environmental Plan for fiscal years 2025-2029 listed several goals in this regard, including:

   a. Expanding the Pawnee Nation's existing TAS CWA Sections 303(c) and 401 authority to cover all (a) Indian allotments held in Trust, (b)

12

fee lands owned by the Pawnee Nation, and (c) fee lands which meet the "Montana Test" within the Pawnee Nation's reservation boundaries.

b. Seeking TAS authority for certain Clean Air Act (CAA) programs. The Pawnee Nation's 5-year Plan notes that the Nation may use EPA funding to build its CAA capacity. The Pawnee Nation would like to build its CAA programs in the near future such that it is TAS eligible, and can develop an air quality program and assume EPA-approved permitting authority.

c. Seeking TAS authority for certain SDWA programs, including the Public Water System Supervision program and the UIC program.

d. Seeking TAS authority for lead abatement programs under TSCA. The Plan states that EPA funding may be used to build TSCA capacity.

e. The Pawnee Nation would like to build its TSCA programs such that it is TAS eligible for the lead-based paint programs.

If Oklahoma no longer holds a veto over TAS approvals, it would clear a major hurdle blocking the Pawnee Nation's ability to achieve these goals.

13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:

10/08/2025

_____

Monty Matlock

14