**No. 25-9548**

---

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

PAWNEE NATION OF OKLAHOMA,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY et al.,
*Respondents*.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT STANDER
*Deputy Assistant Attorney General*
CAMERON HINOJOS
LAURA BROWN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 305-5884
cameron.hinojos@usdoj.gov

**Oral argument is requested.**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ....................iv

PRIOR OR RELATED APPEALS ....................v

GLOSSARY ....................vi

JURISDICTIONAL STATEMENT ....................1

INTRODUCTION ....................3

STATEMENT OF THE ISSUES ....................4

PERTINENT STATUTES AND REGULATIONS ....................5

STATEMENT OF THE CASE ....................5

A. Enactment of SAFETEA's Environmental Programs provision ....................5

B. Factual and procedural background ....................6

SUMMARY OF ARGUMENT ....................13

STANDARD OF REVIEW ....................14

ARGUMENT ....................15

I. The Environmental Programs provision of SAFETEA did not expire ....................15

A. The plain language of the SAFETEA environmental provision demonstrates the provision does not expire ....................15

B. SAFETEA is not an appropriation act and thus is not subject to any presumption of temporary effect ....................17

II. EPA properly approved Oklahoma's request after determining that the provision's sole criterion had been met ....... 25

III. EPA properly granted Oklahoma's SAFETEA request without imposing conditions because Congress afforded no discretion for EPA to condition its approval ....... 35

IV. Indian-related interpretive canon does not save Pawnee's arguments because the statutory provision is not ambiguous ....... 43

CONCLUSION ....... 44

STATEMENT REGARDING ORAL ARGUMENT ....... 46

CERTIFICATE OF COMPLIANCE ....... 47

CERTIFICATE OF DIGITAL SUBMISSION ....... 48

CERTIFICATE OF SERVICE ....... 49

ADDENDUM

# FEDERAL RULE OF APPELLATE PROCEDURE 28(f) ADDENDUM OF SELECTED STATUTES AND REGULATIONS

**Statutes**

1 U.S.C. § 105 ........................................................................ ADD001

5 U.S.C. § 706 ........................................................................ ADD003

15 U.S.C. 2618 ........................................................................ ADD004

31 U.S.C. § 1301 ........................................................................ ADD006

33 U.S.C. § 1342 ........................................................................ ADD008

33 U.S.C. § 1369 ........................................................................ ADD016

42 U.S.C. § 300g-2 ........................................................................ ADD018

42 U.S.C. § 300h-1 ........................................................................ ADD020

42 U.S.C. § 300j-7 ........................................................................ ADD022

42 U.S.C. § 6926 ........................................................................ ADD024

42 U.S.C. § 7601 ........................................................................ ADD027

42 U.S.C. § 7607 ........................................................................ ADD030

42 U.S.C. § 7661a ........................................................................ ADD036

**Code of Federal Regulations**

40 C.F.R. § 123.62(b) ........................................................................ ADD040

## TABLE OF AUTHORITIES

### Cases

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ....................................................................37

*Arizona v. Navajo Nation*,
599 U.S. 555 (2023).........................................................................42, 43

*Atl. Fish Spotters Ass'n v. Evans*,
321 F.3d 220 (1st Cir. 2003) .......................................................................24

*Auburn Housing Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002)........................................................................24

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023).......................................................................................29

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*,
961 F.2d 269 (D.C. Cir. 1992) .....................................................................24

*Brogan v. United States*,
522 U.S. 398 (1998).....................................................................................17

*Carcieri v. Salazar*,
555 U.S. 379 (2009).....................................................................................18

*Chickasaw Nation v. United States*,
534 U.S. 84 (2001)..................................................................................43, 44

*Clinton v. City of New York*,
524 U.S. 417 (1998).....................................................................................34

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ..................................................................... 2

*Dubin v. United States*,
599 U.S. 110 (2023).................................................................................26, 28

*Groff v. DeJoy*,
600 U.S. 447 (2023) .......... 16, 26, 35

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 29

*Jake's Fireworks Inc. v. Acosta*,
893 F.3d 1248 (10th Cir. 2018) .......... 43

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 38

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 14, 15, 35, 40

*Lopez v. Davis*,
531 U.S. 230 (2001) .......... 37

*Luna Perez v. Sturgis Pub. Sch.,*
598 U.S. 142 (2023) .......... 38

*Marathon Oil Co. v. Lujan*,
937 F.2d 498 (10th Cir. 1991) .......... 36

*McGirt v. Oklahoma*,
591 U.S. 894 (2020) .......... 7

*Minis v. United States*,
40 U.S. (15 Pet.) 423 (1841) .......... 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 15

*Nevada v. DOE*,
400 F.3d 9 (D.C. Cir. 2005) .......... 20

*NLRB v. SW General, Inc.*,
580 U.S. 288 (2017) .......... 36

*Okla. Dep't of Env't Quality v. EPA*,
740 F.3d 185 (D.C. Cir. 2014) .......... 11, 38, 39

*Polselli v. Internal Revenue Serv.*,
598 U.S. 432 (2023) .......... 17

*Rotkiske v. Klemm*,
589 U.S. 8 (2019) .......... 38

*Smithfork Grazing Ass'n v. Salazar*,
564 F.3d 1210 (10th Cir. 2009) .......... 18, 24

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) .......... 20, 22

*Territory of Guam v. United States*,
141 S. Ct. 1608 (2021) .......... 26

*Tin Cup, LLC v. U.S. Army Corps of Eng'rs*
904 F.3d 1068 (9th Cir. 2018) .......... 18, 24

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011) .......... 42, 43

*United States v. Rios-Montano*,
438 F.Supp.3d 1149 (S.D. Cal. 2020) .......... 19, 23

*Utah Shared Access All. v. Carpenter*,
463 F.3d 1125 (10th Cir. 2006) .......... 23

*Va. Uranium Inc. v. Warren*,
587 U.S. 761 (2019) .......... 16

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006) .......... 27

**Statutes**

1 U.S.C. § 105 .......... 21

5 U.S.C. § 706(2)(A) ....................14, 15

15 U.S.C. § 2618(a)(1).................... 1

31 U.S.C. § 1301....................18

33 U.S.C. § 1342(b) ....................27

33 U.S.C. § 1342(c)(1)....................31

33 U.S.C. § 1342(c)(3)....................30

33 U.S.C. § 1369.................... 1

42 U.S.C. § 300g-2 ....................27

42 U.S.C. § 300h-1 ....................27

42 U.S.C. § 300j-7(a)....................1, 2

42 U.S.C. § 300j-7(a)(2) .................... 1

42 U.S.C. § 6926....................27

42 U.S.C. § 6926(e) ....................31

42 U.S.C. § 7601(d) .................... 7

42 U.S.C. § 7607(b) ....................1, 2

42 U.S.C. § 7661a(d) ....................27

42 U.S.C. § 7661a(i) ....................34

42 U.S.C. § 7607(b) .................... 1

Pub. L. 96-126, 93 Stat. 954 (Nov. 27, 1979)....................24

Pub. L. 109-59, 119 Stat. 1144 (Aug. 10, 2025).................... 1, 5, 6, 16, 23,
....................24, 25, 26, 28, 29, 35, 37

**Code of Federal Regulations**

40 C.F.R. § 123.62(b) ....................41

**Legislative Materials**

H.R. Doc. No. 107-284 (2003)....................22

H.R. Rep. No. 109-12, pt. 1 (2005) .................... 5

**Other Materials**

Antonin Scalia & Byran A. Gardner, *Reading Law: The Interpretation of Legal Texts* 112 (2012) ....................37

*Principles of Federal Appropriations Law* (4th ed. 2016)....................20, 22, 23

## PRIOR OR RELATED APPEALS

*Pawnee Nation of Oklahoma v. EPA et al.*, United States Court of Appeals for the Tenth Circuit, Case No. 20-9635.

## GLOSSARY

| | |
|---|---|
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| SAFETEA | Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005 |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under the substantive environmental laws establishing the programs that EPA approved Oklahoma to administer in Indian country under § 10211(a) of SAFETEA, Pub. Law 109-59, 119 Stat. 1144, 1937 (Aug. 10, 2025). *See, e.g.*, 42 U.S.C. §§ 7607(b) (affording judicial review in regional circuit courts of regionally or locally applicable agency actions under the Clean Air Act), 300j-7(a)(2) (affording judicial review in regional circuit courts of agency actions under the Safe Drinking Water Act other than National Primary Drinking Water Regulations); 15 U.S.C. § 2618(a)(1) (affording judicial review in either the D.C. Circuit or regional circuit courts for actions under the Toxic Substances Control Act); 33 U.S.C. § 1369 (affording judicial review of state program determinations under the Clean Water Act in regional circuit courts).

The agency action at issue in this petition is an action taken under SAFETEA, which does not provide its own judicial review provision. § 10211(a), Pub. Law 109-59, 119 Stat. 1144, 1937. Nevertheless, that Act merely requires EPA, on request from Oklahoma, to extend the State's authority to administer its EPA-approved environmental programs from areas outside Indian country to areas inside Indian country within the State's boundaries. *Id*. Because a challenge to Oklahoma's authority to administer many of those programs outside of Indian country would be judicially reviewable in this Court, *see, e.g.*, 42 U.S.C. §§

7607(b), 300j-7(a), extension of that authority to Indian country should similarly be reviewable here. And, because EPA's extension of Oklahoma's authority to administer some of the programs in the SAFETEA decision is reviewable in this Court, the entire agency action is reviewable in this Court. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 179 (D.C. Cir. 2017).

Pawnee Nation agrees this Court has jurisdiction under the substantive environmental laws establishing the programs that EPA's SAFETEA approval authorized Oklahoma to administer in Indian country. Pet. Br. 1. But Petitioner's basis for that argument incorrectly rests on its erroneous belief that SAFETEA has expired. *Id*. As detailed in Section I, *infra*, SAFETEA has not expired. This Court has jurisdiction to review EPA's SAFETEA decision because the Act created parity within Oklahoma between Indian country and non-Indian country, and this Court has jurisdiction to review approvals of Oklahoma's authority to administer environmental programs in non-Indian country. *See, e.g.*, 42 U.S.C. §§ 7607(b), 300j-7(a).

## INTRODUCTION

On May 12, 2025, the Environmental Protection Agency issued a decision approving Oklahoma's request to extend its administration of federal environmental protection programs in non-Indian country to Indian country within the State under the Environmental Programs provision of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005 (SAFETEA). That statutory provision is an Oklahoma-specific provision that *mandates* that EPA approve a request by Oklahoma—without discretion—so long as EPA has already approved the program to apply outside of Indian country. Because all of the programs included in Oklahoma's request were already approved for the rest of the State, EPA was required to approve Oklahoma's request.

Pawnee Nation challenges EPA's decision on three grounds, none of which are availing. First, contrary to Pawnee Nation's assertion, the Environmental Programs provision of SAFETEA mandating EPA's approval of Oklahoma's request has not expired. The statute contains no expiration language, and this Court cannot imply an expiration date where none exists.

Second, EPA properly approved Oklahoma's request without requiring the State to resubmit, and EPA to *re*-approve, every single environmental program the State administers. The Environmental Programs provision supplies one criterion for approval: the program submitted for approval must be approved for

administration outside of Indian country. The State's programs met that criterion. Pawnee Nation misreads the plain language and argues that the statute creates a requirement of independent review of the State's programs.

Finally, EPA properly determined that it had no authority under the Environmental Programs provision of SAFETEA to manufacture and include additional conditions on Oklahoma's approval. Given its lack of authority, EPA acted lawfully when it declined to impose a State-tribal consultation requirement.

## STATEMENT OF THE ISSUES

1. Whether the Environmental Programs provision of SAFETEA expired prior to EPA's issuance of the challenged decision, despite no expiration date or other demonstrative Congressional intent that the provision would expire.

2. Whether EPA properly interpreted SAFETEA to require its approval of Oklahoma's request to administer environmental programs in Indian country where EPA had already approved the State to administer the programs in non-Indian country, without requiring Oklahoma to resubmit and EPA to reconsider every environmental program for *re*-approval.

3. Whether EPA properly declined to attach conditions to Oklahoma's approval for administration of environmental programs in Indian country where SAFETEA does not authorize any such conditions.

## PERTINENT STATUTES AND REGULATIONS

Statutes and regulations have been included in the addendum filed with this brief.

## STATEMENT OF THE CASE

On May 12, 2025, EPA issued a decision approving Oklahoma's request under the "Environmental Programs" provision of SAFETEA, Pub. L. No. 109-59, § 10211(a), 119 Stat. 1144, 1937 (2005), to administer its EPA-approved environmental regulatory programs within certain areas of Indian country inside of the state borders. AR1132-1141. That decision is challenged here.

### A. Enactment of SAFETEA's Environmental Programs provision

SAFETEA is a conglomeration of multiple types of legislation that includes authorizations for programs, budget authority for various infrastructure and transit projects, and substantive provisions of law, including the Environmental Programs provision at issue here.

On March 7, 2005, the United States House of Representatives Committee on Transportation and Infrastructure reported to the whole House a bill titled "Transportation Equity Act: A Legacy For Users." H.R. Rep. No. 109-12, pt. 1 (2005). That bill, titled "An Act To authorize funds for Federal-aid highways, highway safety programs, and transit programs, and for other purposes," eventually became SAFETEA. Pub. L. No. 109-59, 119 Stat. 1144 (Aug. 10, 2005). In

addition to creating certain infrastructure programs nationwide, SAFETEA also included an Oklahoma-specific statutory provision titled "Environmental Programs." That provision provides:

> (a) OKLAHOMA.—Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency (referred to in this section as the "Administrator") determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.
>
> (b) TREATMENT AS STATE. —Notwithstanding any other provision of law, the administrator may treat an Indian tribe in the State of Oklahoma as a State under a law administered by the Administrator only if—
>
> (1) the Indian tribe meets requirements under the law to be treated as a State; and
>
> (2) the Indian tribe and the agency of the State of Oklahoma with federally delegated program authority enter into a cooperative agreement, subject to review and approval of the Administrator after notice and opportunity for public hearing, under which the Indian tribe at that State agency agree to treatment of the Indian tribe as a State and to jointly plan administer program requirements.

SAFETEA § 10211(a), 119 Stat. at 1937.

**B. Factual and procedural background**

In July 2020, the United States Supreme Court held that a large swath of land within Oklahoma state borders that had previously been understood to have

lost its reservation status had in fact remained a reservation for the Muscogee (Creek) Nation that had never been disestablished.[1] *McGirt v. Oklahoma*, 591 U.S. 894, 924, 937 (2020). Prior to *McGirt*, both Oklahoma and EPA operated under the assumption that any lands within what they understood to be a former reservation that did not otherwise qualify as Indian country were subject to the State's EPA-approved environmental programs authority.[2]

The *McGirt* holding immediately displaced that understanding. Effectively, the holding meant Oklahoma could no longer administer its EPA approved programs, which were generally not approved to cover Indian country, in those areas. Thus, EPA, rather than the State, suddenly became the appropriate frontline environmental regulator under federal law in those areas affected by the *McGirt* decision, at least until a tribe, or the State under SAFETEA, received approval from EPA to administer the programs. *See, e.g.*, 42 U.S.C. § 7601(d) (establishing that EPA may treat tribes as states for purposes of Clean Air Act programs, and addressing direct administration by EPA in lieu of tribes).

---

[1] To "disestablish" a reservation is to divest a tribal reservation of its land or diminish the reservation's boundaries. *See McGirt*, 591 U.S. at 903-904.

[2] Even prior to *McGirt*, there were some lands within the affected area that were understood to be Indian country (*e.g.*, tribal trust lands and Indian allotments) and thus generally outside the scope of the State's EPA-approved environmental regulatory programs. However, *McGirt* clarified that the original reservation boundaries remained intact; thus, all land (including non-Indian-owned land) within the reservation remained Indian country.

Shortly after the Supreme Court's decision, and with the purpose of returning the environmental regulatory regime in those areas to a pre-*McGirt* landscape, Oklahoma submitted a letter to EPA in July 2020 requesting approval under SAFETEA to administer all of its EPA-approved environmental programs in certain areas of the State that are Indian country. Because Oklahoma's stated intent was to reestablish the pre-*McGirt* scope of their programs, but not to expand that scope, the State expressly excluded from its request categories of land (*e.g.*, Indian allotments and tribal trust lands) that had been understood to constitute Indian country—and thus to generally fall outside the geographic area of the State's approved programs—prior to the Supreme Court's ruling.

Muscogee (Creek) Nation then requested tribal consultation with EPA regarding Oklahoma's SAFETEA request. AR152. EPA held its first consultation meeting with the Muscogee (Creek) Nation on August 25, 2020. *Id.* That same day, EPA invited thirty-eight federally recognized Oklahoma tribal nations to consult regarding the request. *Id.* EPA consulted with thirteen tribal nations a few weeks after the invitation (on September 8, 2020). *Id.* Additionally, EPA individually consulted with six tribal nations after the multi-tribe consultation for about a week (from September 9 to September 14, 2020). *Id.* EPA further met with Muscogee Nation for a second consultation in that timeframe (on September 10, 2020).

Starting in late August 2020, EPA also received written comments from several tribal nations regarding Oklahoma's request.[3] After a month of receiving comments, on September 29, 2020, EPA issued a summary report of its tribal consultation and engagement related to the SAFETEA decision, which included EPA's responses to the tribal comments. AR150–163 (EPA's summary report of tribal consultation and response to comments). On September 30, 2020, EPA responded individually to each tribe that provided comments.[4]

---

[3] AR63-65 (comments submitted by Muscogee Nation on August 24, 2020); AR66 (Choctaw Nation, August 24, 2020); AR76 (Sac and Fox Nation, September 3, 2020); AR80-87 (Cherokee Nation, September 8, 2020); AR92-93 (Pawnee Nation, September 10, 2020); AR99-102 (Pawnee Nation, September 14, 2020); AR104-111 (Choctaw Nation, September 16, 2020) AR112–14 (Ponca Tribe, September 19, 2020); AR115-16 (Absentee Shawnee Tribe, September 25, 2020); AR117-18 (Delaware Nation, September 25, 2020); AR119-120 (Fort Sill Apache Tribe, September 25, 2020); AR121-124 (Kaw Nation, September 25, 2020); AR125-26 (Muscogee Nation, September 25, 2020); AR127-130 (Sac and Fox Nation, September 25, 2020); AR131-32 (Seminole Nation, September 25, 2020); AR133-35 (Tonkawa Tribe, September 25, 2020); AR136-38 (Wichita and Affiliated Tribes, September 25, 2020); AR139-140 (Iowa Tribe, September 28, 2020).

[4] AR164-65 (response from EPA to Absentee Shawntee Tribe); AR166-67 (Cherokee Nation); AR168-69 (Chickasaw Nation); AR170-171 (Choctaw Nation); AR172-73 (Citizen Potawatomi Nation); AR174-75 (Delaware Nation); AR176-77 (Eastern Shawnee Tribe); AR178-79 (Fort Sill Apache Tribe); AR180-181 (Iowa Tribe); AR182-83 (Muscogee Nation); AR184-85 (Osage Nation); AR186-87 (Ottawa Tribe); AR188-89 (Pawnee Nation); AR190-191 (Peoria Tribe); AR192-93 (Ponca Tribe); AR194-95 (Quapaw Nation); AR196-97 (Sac and Fox Nation); AR198-99 (Seminole Nation); AR200-201 (Seneca-Cayuga Nation); AR202-203 (Wichita and Affiliated Tribes); AR204-205 (Wyandotte Nation); AR206-207 (Kaw Nation).

EPA sent its decision letter approving Oklahoma's request to the governor of Oklahoma on October 1, 2020. AR208. EPA explained that the Environmental Programs provision applies when the State has an already-approved program with respect to areas in the State that are not Indian country. AR209. EPA determined that Oklahoma's request satisfied SAFETEA's elements because Oklahoma sought approval to administer regulatory programs in Indian country that EPA had already approved Oklahoma to administer in the State outside of Indian country. AR210.

About a month after EPA's decision, on November 27, 2020, Pawnee Nation filed a petition for review in this Court. *Pawnee Nation of Oklahoma v. EPA*, Case No. 20-9635, 10th Cir., Doc. No. 10789217. After a series of motions, first filed on December 23, 2020, *Id.*, Doc. No. 10795361, this Court placed that case in abeyance. *Id.*, Doc. No. 10825273. On August 26, 2025, that petition was voluntarily dismissed. *Id.*, Doc. No. 11208759.

After receiving additional feedback from affected tribes and a change in Presidential Administrations, EPA began a second consultation process with the affected tribes on June 30, 2021, to review the October 2020 decision. AR259-264. EPA apprised Oklahoma of its second consultation. AR265. After the second consultation was completed, EPA issued a notice of proposed withdrawal and reconsideration of the October 2020 decision on December 22, 2021. AR551–53. EPA explained that one of the motivations for providing additional consultation

and reconsidering the October 2020 decision was that the abbreviated consultation period that had been provided prior to the 2020 decision had not afforded sufficient time for the tribes to express their concerns. AR539-40.

For the next three years, EPA received comments from stakeholders and considered its options. And at the end of this consideration, on January 13, 2025, EPA withdrew the 2020 decision and issued a new decision approving Oklahoma's request (the January 2025 decision). AR923.

In the January 2025 decision, EPA again interpreted the Environmental Programs provision of SAFETEA to mandate approval of Oklahoma's request to administer environmental programs in Indian country if its express sole criterion—that Oklahoma had EPA approval to administer the programs at issue in areas outside of Indian country—is met. AR928. For a second time, EPA determined that the elements of the Environmental Programs provision were met, mandating approval. AR931. However, unlike in the October 2020 decision, in the January 2025 decision, EPA interpreted the provision as allowing it to impose additional conditions on its approval. AR931. It reasoned that nothing in the statute foreclosed it from including conditions on its approval. AR931. Thus, relying on out-of-circuit dicta, EPA added a "State-Tribal Engagement Condition" to its approval. AR928, 931 (citing *Okla. Dep't of Env't Quality v. EPA (ODEQ)*, 740 F.3d 185, 190 (D.C. Cir. 2014)). That condition contained mandatory procedures

for State coordination with affected tribes while the State administered its environmental regulatory programs. AR939-45 (stating the procedures to meet the State-Tribal Engagement Condition).

On April 9, 2025, shortly after another change in Presidential Administrations, EPA notified the affected tribes that the Agency had erred in its interpretation of the statute in the January 2025 decision. AR963. On this third review of Oklahoma's request, EPA returned to its original interpretation of the statute as providing no discretion to impose conditions to an approval and explained that it intended to withdraw the January 2025 decision and issue a new decision approving the request without conditions. AR963. A couple of weeks later, on April 28, 2025, EPA held a meeting with the tribes to hear from them on EPA's path forward. AR1122. EPA also received two comments from Pawnee Nation regarding the Agency's stated plans. AR968–1121, AR1127–1131.

About a month after meeting with the tribes, on May 12, 2025, EPA issued a new decision (the May 2025 decision) approving Oklahoma's request, but without the State-Tribal Engagement Condition. AR1132-1141. EPA explained that imposing that condition had exceeded its authority under SAFETEA. AR1136.

On June 18, 2025, Pawnee Nation petitioned for review of the May 2025 decision. Doc. No. 11190427.

## SUMMARY OF ARGUMENT

1. The SAFETEA Environmental Programs provision was law at the time EPA issued the final decision at issue in this case and remains law to this day. The statutory language contains no expiration date. Moreover, Pawnee Nation's argument that the Court can infer an expiration date where none exists because courts can do so for appropriation acts fails. SAFETEA is not an appropriation act. And the mere fact that some of the provisions of SAFETEA *other than* the Environmental Programs provision contain certain discrete funding provisions does not transform SAFETEA into an appropriation act, under the principles of federal appropriations law. Appropriation acts generally must adhere to very specific congressional procedures, and the fact that SAFETEA was passed through an entirely different process demonstrates that the act is not an appropriation act subject to any presumption of expiration.

2. The SAFETEA Environmental Programs provision requires EPA to approve a request by Oklahoma to administer environmental programs in Indian country if a single criterion is met: the program that is the subject of Oklahoma's request must be one EPA has approved Oklahoma to administer outside of Indian country. Because EPA's approval of Oklahoma's administration of the program *outside* of Indian country is the only necessary prerequisite to Oklahoma requesting approval to administer that program *in* Indian country, nothing in the

plain language of the statute authorizes, much less requires, EPA to reconsider that program's approval before granting Oklahoma's SAFETEA request.

3. EPA properly approved Oklahoma's SAFETEA request without conditioning its approval on State-tribal consultation. EPA had no authority or discretion to create and add conditions to its approval. The statute commands EPA to approve a request that meets the provision's express criteria. Congress did not grant any discretion to EPA here. In fact, Congress expressly restricted EPA's discretion by the provision's language. And even if EPA possessed discretion, nothing required it to impose conditions. The Agency acted lawfully and in accordance with the strict mandate of SAFETEA when EPA withdrew the January 2025 decision with the State-Tribal Engagement Condition and omitted that condition from the May 2025 final decision.

## STANDARD OF REVIEW

When interpreting statutes, the Court is tasked with finding the best interpretation of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)).

This Court reviews final agency actions that are not subject to a more specific standard of review under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Under this standard, the Court determines whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (quoting 5 U.S.C. § 706(2)(A)). The Court determines whether the agency considered the relevant information and articulated an explanation that rationally connects the facts to the choices made. *Id.* at 43 (citations omitted).

## ARGUMENT

EPA properly approved Oklahoma's SAFETEA request. SAFETEA has no expiration date or presumption of expiration and thus remains in effect. Moreover, EPA properly approved Oklahoma's SAFETEA request after determining that the sole criterion was met. Congress commanded EPA to approve any request by Oklahoma to administer regulatory programs in Indian country that EPA approved for non-Indian country within the State. It gave EPA no discretion to create and add conditions as the Agency saw fit. Because Oklahoma's request met the statute's sole criterion, EPA was required to approve the request.

### I. The Environmental Programs provision of SAFETEA did not expire

#### A. The plain language of the SAFETEA environmental provision demonstrates the provision does not expire.

Because the SAFETEA Environmental Programs provision does not contain any sunset or express expiration, the provision remains in effect today. When interpreting a statute, this Court is tasked with exercising its judgement to determine the meaning of the statute. *Loper Bright*, 603 U.S. at 394. As with all

such questions, "statutory interpretation must begin with, and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (internal quotations omitted).

The statutory provision states:

> Notwithstanding any other provision of law, if the Administrator of the Environmental Protection Agency . . . determines that a regulatory program submitted by the State of Oklahoma for approval by the Administrator under a law administered by the Administrator meets applicable requirements of the law, and the Administrator approves the State to administer the State program under the law with respect to areas in the State that are not Indian country, on request of the State, the Administrator shall approve the State to administer the State program in the areas of the State that are in Indian country, without any further demonstration of authority by the State.

SAFETEA § 10211(a), 119 Stat. at 1937. The provision includes no expiration date, nor does it even suggest it was intended to be temporary. *Id*.

It is the Court's "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019). Here, Congress elected not to include any sunset date for SAFETEA's Environmental Programs provision, and this Court should reject Pawnee Nation's attempt to amend the statute through litigation.

Notably, Congress plainly knows how to sunset a provision where it deems appropriate, and Pawnee Nation expressly admits that it did so in provisions *other than* the Environmental Programs provision throughout the Act. *See* Pet. Br. 10-11 (detailing provisions other than the Environmental Programs provision of

SAFETEA that expired in 2009). And Courts "assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act." *Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) (internal quotations omitted). The fact that Congress expressly chose to sunset *some* provisions of SAFETEA and chose *not* to include the same language in the Environmental Programs provision exhibits that Congress chose not to sunset it.

And, although Pawnee Nation asserts policy reasons for why they believe the Court should disregard the plain language of the Environmental Programs provision and graft an expiration date into it, Pet. Br. 35-37, these arguments are irrelevant. "Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so . . . ." *Brogan v. United States*, 522 U.S. 398, 408 (1998).

In short, the Environmental Programs provision's statutory language does not contain any expiration date, and this Court is not at liberty to amend the statutory language to add one.

**B. SAFETEA is not an appropriation act and thus is not subject to any presumption of temporary effect.**

Cognizant that nothing in the plain language of the statute supports their argument Pawnee Nation resorts to federal common law and urges the Court to create an expiration date itself. Focusing on the fact that other provisions of

SAFETEA include funding for certain programs, Pawnee Nation argues this Court should extend the presumption that *appropriation* acts expire to presume the Environmental Programs provision of SAFETEA expires as well. But the presumption that provisions in appropriation acts are temporary *only* applies to appropriation acts. *Smithfork Grazing Ass'n v. Salazar*, 564 F.3d 1210, 1216 (10th Cir. 2009). Because SAFETEA is not an appropriation act, it presumptively does *not* expire, and Congress would have needed to include an expiration date for one to apply.

The presumption that appropriation acts expire comes from caselaw and has two roots. First, there is a semi-statutory basis. Second, courts have relied on dicta from a 19th Century Supreme Court decision. One of the statutes governing appropriation acts, mandates that "an *appropriation* in a regular, annual appropriation law *may be construed to be permanent* or available continuously only if the appropriation . . . expressly provides that it is available after the fiscal year covered by the law in which it appears," 31 U.S.C. § 1301 (emphasis added). Courts have extended this statute, which only applies to funding provisions, to also apply to substantive provisions contained within appropriation acts. *See Salazar*, 564 F.3d at 1216. Other Courts have traced this rule back to an 1841 United States Supreme Court decision. *Tin Cup*, *LLC v. U.S. Army Corps of Eng'rs* 904 F.3d 1068, 1073 (9th Cir. 2018) (citing *Minis v. United States*, 40 U.S. (15 Pet.) 423,

445 (1841)). Regardless of the rule's origin, caselaw in this circuit, and others, have applied this presumption of temporary effect to substantive provisions of appropriation acts.

Pawnee Nation claims that SAFETEA is a "spending act." Pet. Br. 23. Thus, they argue, all SAFETEA's provisions are temporary. To start, "spending act" is not a term with any significance in appropriations law. Putting that aside, Pawnee Nation's argument is incorrect for one simple reason: SAFETEA is not an "appropriation act," which is a term that does carry legal significance here. And either SAFETEA is an appropriation law, subject to a presumption of temporary effect, or it is not. *See United States v. Rios-Montano*, 438 F.Supp.3d 1149, 1153 (S.D. Cal. 2020) (holding that a bill with some appropriation provisions is not an appropriation law subject to the presumption). Because SAFETEA is not an appropriation law, the Court should refrain from extending the presumption of temporary effect to SAFETEA.

Federal appropriations law and application of the presumption of temporary effect to appropriation acts involves a much more exacting inquiry than the one Pawnee Nation proposes. And for good reason, duly enacted laws should not be presumed expired except in very specific and easily determined circumstances. *See Rios-Montano*, 438 F.Supp.3d. at 1152 (stating that absent an express sunset provision, courts should hesitate to infer one).

Generally, acts can be sorted into two buckets: authorizations and appropriations. An authorization is generally a substantive enactment that creates or modifies programs run by federal agencies. U.S. Gov't Accountability Off.,[5] GAO-05-734SP, *Budget Glossary* 13 (defining authorizing legislation). And an appropriation is authorization for payment of funds from the Treasury. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (distinguishing "substantive enactments" from "appropriations measures"). And an "appropriation act" is, in relevant part, "[a] statute, under the jurisdiction of the House and Senate Committees on Appropriations, that generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." U.S. Gov't Accountability Off., GAO-05-734SP, *Budget Glossary* 13 (defining appropriation act).

---

[5] To assist agencies with difficult questions of appropriations law, Congress created the Comptroller General within the United States Government Accountability Office (an agency in the Legislative Branch). It tasked the Comptroller General with resolving appropriations issues raised by agencies by issuing legal decisions concerning the availability and appropriate use of funds, which are binding on agencies. U.S. Gov't Accountability Off., GAO-16-463SP, *Principles of Federal Appropriations Law*, ch. 1, 1-12 (4th ed. 2016). These decisions are not binding on private parties or the Courts, and private litigants can seek legal remedies for any disputed amounts due. *Id.* at 1-12. However, as the expert agency on federal appropriations law and issues, these decisions will be cited here and should carry some weight. *See Nevada v. DOE*, 400 F.3d 9, 16 (D.C. Cir. 2005) (Courts "give special weight to [GAO's] opinions" due to its "accumulated experience and expertise in the field of government appropriations.").

For context, usually programs or Agency activities must be authorized through an authorizing act before appropriations can be made for those activities or programs. While atypical, an appropriation act could contain substantive provisions, and substantive acts could contain appropriations provisions. *See generally,* U.S. Gov't Accountability Off., GAO-16-464SP, *Principles of Federal Appropriations Law*, ch.2, at 2-54–56 (explaining that nothing actually prohibits Congress from using these atypical arrangements).

Appropriation acts are easily identifiable because since July 30, 1947, Congress requires these acts to bear a specific form of title. Pub. L. 80-278, §105, 61 Stat. 634 (the original enactment of 1 U.S.C. § 105). The "Title of appropriation Acts" states, "[t]he style and title of all Acts making appropriations for the support of Government shall be as follows: 'An Act making appropriations (here insert the object) for the year ending September 30 (here insert the calendar year).'" 1 U.S.C. § 105. If an act does not follow that formula, it is not an appropriation act. *Id.*; *see also Principles of Federal Appropriations Law*, ch. 2, at 2-23.

Here, Congress titled SAFETEA "An Act To authorize funds for Federal-aid highways, highway safety programs, and transit programs, and for other purposes." This title does not use the phrase "making appropriations for (purpose)" or "for the year ending in September 30 (year)." Thus, it is not an appropriation act. *See* 1 U.S.C. § 105.

Further demonstrating that SAFETEA is not an appropriation act is the fact that it did not originate in the House of Representatives Committee on Appropriations. Appropriation acts are special kinds of acts. *See Tenn. Valley Auth.*, 437 U.S. at 190 (contrasting substantive enactments from appropriations measures). One of their unique features is that appropriation bills must generally begin in the Committee on Appropriations in the United States House of Representatives. *Principles of Federal Appropriations Law*, ch. 2, at 2-18. That committee alone considers, modifies, and reports draft appropriation bills to the whole House for consideration before sending the bill to the Senate. *Id.* In fact, House Rule X grants exclusive jurisdiction over appropriation bills to the Committee on Appropriations. Rules of the House of Representatives 107th Congress 2d Session, H.R. Doc. No. 107-284, at 423, 427–28 (2003). Thus, if an enacted law does not reach the House by report from the Committee on Appropriations, it should not be considered an appropriation act. SAFETEA did not reach the House by report from the Committee on Appropriations; it reached it by report from the House Committee on Transportation and Infrastructure. H.R. 3, 109th Cong. 1 (Feb. 9, 2005) ("Mr. Young of Alaska . . . introduced the following bill; which was referred to the Committee on Transportation and Infrastructure"). Thus, for this reason too, SAFETEA is not an appropriation act.

Notably, although SAFETEA contains certain funding provisions, this does not transform the Act into an appropriation act. *See Principles of Federal Appropriations Law*, ch.2, at 2-56 (noting that acts that contain funding provisions are not necessarily appropriation acts). Another court's analysis and conclusion that the National Defense Authorization Act—which also contains certain funding provisions comingled with various substantive provisions—was not an appropriation act is particularly instructive. *Rios-Montano*, 438 F.Supp.3d at 1153. The *Rios-Montano* court considered that, although the National Defense Authorization Act "is enacted each fiscal year to specify the budget needs for the Department of Defense," it also "made substantive changes to the law and enacted new, longstanding programs through other NDAAs." *Id*. The court thus concluded that the Act was not an appropriation act subject to any presumed expiration date. *Id*.

SAFETEA is even *less* like an appropriation act than the National Defense Authorization Act. SAFETEA was *not* "enacted each fiscal year to specify the budget needs for [a federal agency]." *Rios-Montano*, 438 F. Supp. 3d at 1153 (quoting *Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1131 (10th Cir. 2006)). Rather, SAFETEA was enacted in 2005 and contained, among program authorizations, provisions that generally funded programs from 2005 to 2009. *See, e.g.,* SAFETEA § 1101, 119 Stat. at 1153 (2005). And, like the National Defense

Authorization Act, SAFETEA included various substantive provisions. *See, e.g.,* SAFETEA § 4143, 119 Stat. at 1747 (2005) (giving the Department of Transportation the authority to stop commercial vehicles for inspection).

All of the cases Pawnee Nation cites in which a court presumes an expiration date not in the text of the statute, Pet. Br. 23-29, involve appropriation acts. For example, when speaking of provisions at issue in another case, this Court in *Salazar* noted that the provisions were contained in a series of annual appropriation acts from 1972 to 1992. 564 F.3d at 1215. The example act it cited was "H.R. 4930, 96th Cong. (1979)," *id.*, which ultimately became "An Act Making appropriations for the Department of the Interior and related agencies for the fiscal year ending in September 30, 1980, and for other purposes." Pub. L. 96-126, 93 Stat. 954. Thus, those series of acts were clearly appropriation acts.[6]

Thus, because SAFETEA is not an appropriation act, the Court cannot simply presume the Environmental Programs provision within that Act expires.

---

[6] *See also Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir. 1992) ("Congress attached a rider to an emergency supplemental appropriations bill . . . "); *Atl. Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 223 (1st Cir. 2003) ("The question before us concerns the proper interpretation of a rider attached to an appropriations bill."); *Tin Cup,*, 904 F.3d at 1071 ("In response to complaints from business groups and legislators, Congress limited the use of the 1989 Manual in the Energy and Water Development Appropriations act of 1992 . . ."); *Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) ("we are called upon to determine whether Congress intended section 226 of the 1999 Appropriations Act to nullify section 519(n) . . .").

And because there is no expiration in the text itself, the Act remains in effect today.

## II. EPA properly approved Oklahoma's request after determining that the provision's sole criterion had been met

Because Oklahoma simply sought to extend its already-approved environmental programs from non-Indian country to Indian country, the State met the sole requirement of the Act and EPA was mandated to approve its request. As described in EPA's, the Environmental Programs provision is meant to provide a straightforward path for Oklahoma to extend the same EPA-approved regulatory programs that the State administers in non-Indian country into areas of the State that are Indian country. *See, e.g.,* AR1137 n.3. Here, Oklahoma's request sought exactly that.

The statute requires EPA to approve a request from Oklahoma to administer in Indian country "a regulatory program submitted by the State of Oklahoma for approval by [EPA] under a law administered by [EPA]" that "meets applicable requirements of the law, and [EPA] approves the State to administer the State program under the law with respect to areas in the State that are not Indian country . . . ." SAFETEA § 10211(a), 119 Stat. at 1937. Here, Oklahoma sought approval to administer in Indian country programs that (1) had been "submitted by the State of Oklahoma for approval by [EPA] under . . . law[s] administered by [EPA]" and (2) had already been determined to "meet[] the requirements of the law" and are

subject to currently effective approvals for the State to administer "with respect to areas in the State that are not Indian country . . . ." *Id*. Based on the plain language of the Act, the provision applies to programs EPA has approved the State to administer in non-Indian country, regardless of when EPA approved those programs, so long as that approval remains current (*i.e.*, has not been withdrawn). *See Groff v. DeJoy*, 600 U.S. at 468 ("statutory interpretation must begin with, and ultimately heed, what a statute actually says"); AR1137 n.3.

The structure of the provision similarly demonstrates the appropriateness of EPA's reading. *Territory of Guam v. United States*, 141 S. Ct. 1608, 1613 (2021) ("statutes must be read as a whole" (internal quotations omitted)). To set the table, there are two different "approvals" referred to in the SAFETEA Environmental Programs provision. The first approval refers to a program approved under a substantive environmental law (*e.g.*, EPA's approval of Oklahoma's authority to administer the State's drinking water program under the Safe Drinking Water Act) in non-Indian country. The second approval refers to EPA approving of Oklahoma's request to administer that already-existing regulatory program in Indian country under SAFETEA. This reading is clear from the text surrounding the two terms within the provision and when considering the text in context with the organic federal environmental protection statutes that created these programs. *See Dubin v. United States*, 599 U.S. 110, 118 (2023) (stating that the Court should

construe terms that draw meaning from context in light of the terms surrounding it); *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) (stating that usually laws addressing the same subject matter should be read as if they are one law).

Many of the regulatory programs established under the statutes administered by EPA—and all of Oklahoma's programs at issue in this case—are exercises in cooperative federalism. That is, EPA often sets minimum requirements for the program, and then states may (and in some cases are required to) seek EPA's approval to administer the program as the frontline regulator, with EPA retaining authority to oversee a state's administration of the program. *See, e.g.*, 42 U.S.C. § 6926 (Resource Conservation and Recovery Act – hazardous waste program); 33 U.S.C. § 1342(b) (Clean Water Act – National Pollutant Discharge Elimination System); 42 U.S.C. § 7661a(d) (Clean Air Act – Title V operating permits); 42 U.S.C. § 300g-2 and 300h-1 (Safe Drinking Water Act – public water systems and underground injection control).

The initial approvals under these statutes for Oklahoma's programs generally excluded Indian country. Read in its entirety and in context, the Environmental Programs provision makes a clear distinction between the original substantive program approval outside of Indian country and a subsequent approval of a request to extend a program into Indian country under SAFETEA.

Starting with the first use of "approval," the term "regulatory program submitted . . . for approval by the [EPA]" is contextualized by the next phrase. That is, it is a regulatory program submitted for approval "under a law administered by the [EPA]." Consistent with the cooperative federalism model described above, this is a clear reference to the various federal environmental statutes administered by EPA, and this phrase can only mean that the "approval" refers to the initial authorization of the State to administer an environmental program under federal law within the State outside of Indian country. *See Dubin*, 599 U.S. at 118 (stating that terms should be read in context with the surrounding text).

Further reinforcing this understanding is the next clause stating, "and the [EPA] approves the State to administer the State program under the law with respect to areas in the State that are not Indian country." SAFETEA § 10211, 119 Stat. 1937 (2005). As shown by the prior paragraph, this refers to the conclusion of the process for review of the State's submitted program outside of Indian country and the determination that EPA makes (*i.e.*, approval outside of Indian country) before the State may seek approval under SAFETEA. Thus, the State must have received approval to administer the programs outside of Indian country before it can receive SAFETEA approval to administer the programs in Indian country. Put differently, the statute requires the existence of an approved substantive program

administered in non-Indian country as a necessary prerequisite for approval of the request to administer that program in Indian country under SAFETEA. Because the substantive program approval is a prerequisite to the SAFETEA request, it necessarily must be final before the SAFETEA request is decided.

The grammar of the statute further supports this position. *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023) (stating that the basic tenets of grammar should guide interpretations). Given that the two clauses mentioned are adjacent and separated by a comma, the terms must logically be related to each other. The most logical connection is that the State program referred to in the second clause, ". . . and the [EPA] approves the State to administer the State program," is the same regulatory program referred to in the first clause, "a regulatory program submitted . . . for approval . . . under a law administered by [EPA]," *i.e.*, the program initially submitted for approval outside of Indian country under one of the statutes administered by EPA. *See* SAFETEA § 10211, 119 Stat. 1937 (2005).

Finally, the "regulatory program submitted . . . for approval" must be the original request under substantive law to administer the program in the State outside of Indian country because of the tense of the verb submit. *See Gundy v. United States*, 588 U.S. 128, 142 (2019) (stating that verb tense can be a useful guide in interpretation). The term "submitted" is the only use of past-tense in the entire provision. Thus, the regulatory program referred to must already have been

submitted for and received approval prior to any "request of the State," under SAFETEA § 10211, to administer the environmental program within Indian country. And as explained in the foregoing arguments, that program must already be authorized to operate in non-Indian country. The only submittal and approval that could have occurred prior to a SAFETEA request is the original request by Oklahoma to administer its programs within the State outside of Indian country.

With that understanding in mind, the term "meets applicable requirements of the law" must refer to EPA's original review of Oklahoma's programs for administration within the State outside of Indian country. Because the term "meets applicable requirements" directly follows "regulatory program submitted . . . for approval" the "applicable requirements" term must apply to the original program submitted for approval under substantive law. In that context, it is referring to the standards for the original approval of the substantive program, *i.e.*, Oklahoma's approvals to administer each program outside of Indian country.

Additionally, under the federal-state cooperative arrangement established in statutes administered by EPA, states are often the frontline regulators, and EPA is generally tasked with oversight of the states' program administration. *See, e.g.,* Clean Water Act § 402, 33 U.S.C. § 1342(c)(3) (generally defining EPA's oversight role for state water discharge permit programs). When Oklahoma originally submitted its programs covered by the SAFETEA decision, EPA

reviewed those programs and determined that the programs met the applicable requirements. *See, e.g.,* 33 U.S.C. § 1342(c)(1) (requiring EPA to determine that the program met applicable requirements before approval).

With some variety across the various programs, if EPA determines that a State is not administering the approved program in accordance with applicable requirements, EPA has various oversight authorities, which can include withdrawing approval of the program. *See, e.g*., Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6926(e) ("Whenever the Administrator determines . . . that a State is not administering and enforcing a program authorized under this section in accordance with requirements of this section, he shall so notify the State, and if appropriate corrective action is not taken within a reasonable time . . . the Administrator shall withdraw authorization of such program . . . ."). Unless and until EPA has withdrawn its approval of the program, EPA's determination that the program "meets applicable requirements" continues and does not expire. Since none of the programs that Oklahoma submitted to EPA for approval have ever had their authorization withdrawn, the determination that they "meet[] applicable requirements" is still effective.

With this correct understanding, the statute describes a coherent sequence of events. EPA is required to determine that (1) the State submitted a program for review under one of EPA's organic environmental statutes and (2) the State

program met the applicable requirements and was approved for administration within the State outside of Indian country. Where EPA has made these determinations, it must approve a request by Oklahoma to administer the environmental program within Indian country as well.

EPA's reading of the statute does not render language of the statute superfluous, as Pawnee Nation argues. Pet. Br. 45. Again, the statute describes the two-step process that is necessarily sequential, involving *first* review and approval of a substantive regulatory program outside of Indian country, and only then a request and approval to extend that program into Indian country.

Indeed, far from rendering this language surplusage, EPA's reading gives that language effect. Under EPA's reading, the use of the present tense when referring to Oklahoma's request to extend a program to Indian country that "meets applicable requirements of the law," and that EPA approves the State to administer the State program under the law with respect to areas in the State that are not Indian country," *id*., requires there to be a *currently* approved program in place. In other words, Oklahoma could not seek to administer a program in Indian country if EPA had either not *yet* approved that program for administration outside of Indian country or if EPA had *withdrawn* its approval outside of Indian country.

The statute's best reading is also entirely consistent with EPA's existing statutory and regulatory authorities. EPA has extensive authorities across its

programs to oversee an existing approved state program, including, in relevant cases, the authority to pull back its approval if there are significant failings. Pawnee Nation cites some of these authorities in its brief, and there are others. These authorities continue to apply to the State's programs as administered in Indian country, just as they have applied all along to the State's programs outside of Indian country. And they provide the appropriate avenue for potentially interested entities such as Pawnee Nation to raise programmatic concerns to EPA.[7] There is no indication from the text that Congress disturbed these authorities in the Environmental Programs provision.

Nor is there any indication that Congress intended to create an entirely separate requirement for program reconsideration in SAFETEA. In fact, the structure of the Environmental Programs provision suggests that—in the event Oklahoma opted to make a request under the provision—Congress intended parity in the administration of programs in Indian country and outside Indian country within the State of Oklahoma. *See* SAFETEA § 10211, 119 Stat. 1937 (2005) (requiring that the program already have been authorized for operation outside Indian country). Further, interpreting SAFETEA to require EPA to perform a full

[7] In an apparent attempt to illustrate the importance of a program review by EPA, Pawnee makes several assertions of alleged failings in Oklahoma's prior implementation of environmental programs. Pet. Br. 47-51. EPA takes these issues seriously; but for purposes of interpreting SAFETEA, they are beside the point.

secondary review of each of Oklahoma's already existing programs, regardless of the fact that the programs had been previously approved and that nothing had disturbed those approvals, in order to extend them into portions of the State that are in Indian country would "produce an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (internal quotations omitted). That would be a monumental undertaking for EPA and the State to undergo. And given that there are other authorities with which EPA oversees the State's implementation of its authorized environmental programs,[8] which do not include any sort of secondary review of the initial approval, it would make no sense to include such a costly requirement in the Environmental Programs provision, and Congress did not.

It would be an especially absurd result in this situation given that before *McGirt*, Oklahoma was already operating its programs in the areas of Indian country subject to its SAFETEA request. As explained above, EPA's approval of Oklahoma's SAFETEA request continued the status quo and avoided any unnecessary regulatory upheavals. *See* AR1135.

---

[8] *See, e.g.,* 42 U.S.C. § 7661a(i) (providing EPA oversight of state air permit programs).

For those reasons, EPA properly determined that it only needed to find that it had approved Oklahoma to administer the same programs outside of Indian country that Oklahoma sought to administer in Indian country.

## III. EPA properly granted Oklahoma's SAFETEA request without imposing conditions because Congress afforded no discretion for EPA to condition its approval

The SAFETEA Environmental Programs provision imposes a mandatory duty on EPA to grant requests from Oklahoma to administer in Indian country the same programs EPA has approved for non-Indian country within the State. Nothing in the plain language of the statute suggests EPA has any discretion to attach any conditions to its approval of those requests.

This Court is tasked with "determin[ing] the best reading of the statute." *Loper Bright*, 603 U.S. at 373. Interpretation of the Environmental Programs provision must begin with the plain language of the text. *Groff v. DeJoy*, 600 U.S. at 468 ("[S]tatutory interpretation must begin with, and ultimately heed, what a statute actually says." (internal quotations omitted)). Here the plain language of the text is clear: EPA "shall approve" any request by Oklahoma to administer any environmental program in Indian country that meets the statute's sole criterion. SAFETEA § 10211, 119 Stat. at 1937. The provision does not authorize EPA to only partially grant a request with respect to any program, or to grant the request with conditions attached to it.

Further, the statute expressly overrides any potentially conflicting provision of law and requires nothing more from the State than a request to extend a program that was already approved outside of Indian country. *Id.* (stating the provision applies "[n]otwithstanding any other provision of law" and requiring no "further demonstration of authority by the State"); *see also NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (stating that "notwithstanding" in a statute confirms which provisions prevail in the event of a conflict).

Although, in its January 2025 decision EPA conditioned its approval on State-tribal consultation, EPA has reconsidered and rescinded that decision specifically because it exceeded EPA's statutory authority. As EPA explained in the May 2025 decision, based on the language of the provision, the Agency had no authority to reach beyond Congress' express mandate and add conditions to its approval. AR1135-36. And as this Court has observed, for such ministerial duties, "agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991).

Here, Congress clearly spoke to EPA's authority in the statute. The Environmental Programs provision is prescriptive by its express terms, directing EPA to approve a request by Oklahoma that meets the sole criterion, *i.e.*, that the relevant State program had been submitted to and reviewed by EPA and approved

for operation outside of Indian country. Requiring nothing more, the provision commands that EPA "shall approve" the request "[n]otwithstanding any other provision of law" and "without any further demonstration of authority by [Oklahoma]." SAFETEA § 10211, 119 Stat. at 1937. The traditional rule is that while the term "may" is permissive, Congress' use of "shall" is mandatory. *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (citing Antonin Scalia & Byran A. Gardner, *Reading Law: The Interpretation of Legal Texts* 112 (2012)); *see also Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting the use of "may" with "shall"). Here, Congress used "shall," and Pawnee Nation makes no argument that this "shall" was not meant to be mandatory. *See* Pet. Br. 37-38.

Pawnee Nation attempts to circumvent this plain reading and cites to four sources it claims supports its view that Congress provided EPA discretion to condition an approval under SAFETEA. First, Pawnee Nation cites the Environmental Programs provision itself and argues that the statute does not, on its face, preclude additional conditions. Next, Pawnee Nation points to dicta in a D.C. Circuit opinion speculating that EPA could attempt to condition an approval under SAFETEA. Pawnee Nation also references various program oversight authorities established in the environmental statutes administered by EPA as potential authorities to require Oklahoma to engage with tribes. And finally, Pawnee Nation

cites the federal trust responsibility. None of these sources, however, provides any avenue for EPA to avoid Congress' express direction.

First, as shown above, the Environmental Programs provision clearly does not provide discretion by its express language. Pawnee Nation's argument that the statute does not expressly preclude imposition of additional conditions provides little support for their position. It is a "fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (internal quotations omitted). And it is "not for [the Court] to rewrite the statute so that it covers only what [the Court] thinks is necessary to achieve what [the Court] think[s] Congress really intended." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 678 (2020). This is especially true when the plain language so forecloses any discretion. *Luna Perez v. Sturgis Pub. Sch.,* 598 U.S. 142, 150 (2023) (stating that the Court must apply the text as actually written, not to rely on other considerations to discount the plain text).

Second, the D.C. Circuit decision on which Pawnee Nation relies does not support its argument. Pawnee Nation cites certain dicta in a 2014 decision addressing a Clean Air Act permitting rule that EPA had promulgated for Indian country. *Okla. Dep't of Env't Quality v. EPA*, (*ODEQ*) 740 F.3d 185 (D.C. Cir. 2014). While not relevant to this case, the simplified thrust of Oklahoma's

challenge to EPA's rule in that case was that EPA was attempting to operate the relevant permitting program over certain types of Indian country that the State believed it had been authorized to regulate. *See generally id.*

The case had no substantive overlap with SAFETEA. The Environmental Programs provision was not at issue, nor did the court's holding rest on any application or interpretation of that provision. *Id.* at 192-95. However, EPA had argued that because SAFETEA provided Oklahoma an alternative option to obtain full relief, any injury suffered by Oklahoma was essentially self-inflicted. *Id.* at 189-90. EPA argued Oklahoma lacked standing because Oklahoma's purported injury was self-inflicted since the State could obtain authority to operate the program in Indian country under SAFETEA, which would include operation in the areas at issue in that case. *Id.*

In addressing the State's standing, the court observed: "[w]e do not think relief under the SAFETEA is so certain or complete as to render Oklahoma's injury self-inflicted." *ODEQ*, 740 F.3d at 190. The court speculated that "the EPA might attach a condition to its approval of [the State's program] as applied to Indian country…[a]nd if the EPA does interpret the SAFETEA as authorizing it to attach conditions, then the agency might well be entitled to judicial deference under *Chevron*." *Id.* The court thus found that Oklahoma had sufficient standing to sue as the alternative relief was not complete or certain. *Id.*

The D.C. Circuit's mere consideration of the *possibility* that EPA may one day advance an interpretation to which a court might have been required to defer under the now-overturned *Chevron* doctrine provides no support for *any* interpretation of the statute, much less the interpretation Pawnee Nation advances here. *See id*. Indeed, the hypothetical scenario the D.C. Circuit noted now could never occur. Agency interpretations are no longer entitled to *Chevron* deference. *Loper Bright*, 603 U.S. at 396. And, as fully explained *supra*, the now-determinative "best" interpretation of the statute precludes EPA imposing conditions on a SAFETEA approval.

Third, Pawnee Nation's references to various program oversight authorities established in the substantive environmental statutes administered by EPA, Pet. Br. 40-44, are equally unavailing. These authorities are designed to ensure that states are appropriately administering its EPA-approved programs. And these authorities will, as clearly expressed in EPA's May 2025 decision, continue to operate in their ordinary course as EPA oversees Oklahoma's administration of programs, both within and outside of Indian country. AR1137 n.3. They do not, however, override the express language in SAFETEA or authorize EPA to create entirely new requirements. Notably, the statute requires EPA to approve administration in Indian country of the *same* program Oklahoma administers in non-Indian County; it does not authorize EPA to reconsider programs administered in non-Indian

country or to approve deviations from those approved programs in Indian country. *See* Section II, *infra*.

Assuming for argument that EPA has authority to modify the State's already-approved programs to include some kind of *new* tribal consultation requirement, that modification would necessarily be separate from a SAFETEA decision since SAFETEA does not provide that authority. Further, any modifications to the programs would likely need to go through their own administrative processes under their enabling statutes, which could include a requirement for notice and comment. [9]

Attempting to use EPA's authority under the various acts it administers to include a general condition pursuant to its SAFETEA decision is particularly problematic when SAFETEA provides that "[n]otwithstanding any other provision

---

[9] EPA also notes that the program approval and oversight authorities established in EPA's statutes and regulations have their own varied administrative procedures for implementation, which in some cases include a requirement for notice and comment. For example, the Clean Water Act authority that Pawnee cites includes mandatory administrative processes. *See* 40 C.F.R. § 123.62(b) (describing the processes that a state and EPA must perform in order to modify a state's Clean Water Act program, which include submission of new plan documents and a notice and comment period). Even if any of these provisions could be read to authorize the type of tribal engagement condition Pawnee Nation requests, its argument that EPA can, by the stroke of a pen, apply such requirements in a SAFETEA decision would entirely circumvent these critical, mandatory procedures. The procedural, as well as the substantive, incongruence of Pawnee Nation's interpretation is thus manifest.

of law," the EPA must approve Oklahoma's request if the statutes criterion is met. Due to that language, EPA cannot condition its approval based on authority granted in other provisions, *i.e.*, the various environmental statutes themselves.

Fourth, Pawnee Nation also points to the federal government's general trust relationship with tribes as a source of authority to condition a SAFETEA approval. EPA is very mindful of the general trust relationship and honors that relationship by administering its statutes and regulations in Indian country and consulting with tribes—as the Agency did here—about EPA actions that affect them. The general trust may inform EPA's exercise of discretion in programs EPA administers. It does not, however, create any duty, or provide EPA any authority, to add conditions under SAFETEA.

It is true that the United States has a general trust relationship with Indian tribes. *Arizona v. Navajo Nation*, 599 U.S. 555, 565 (2023). However, because the United States is a sovereign rather than a private trustee, "Congress may style its relations with the Indians a trust without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is limited or bare compared to a trust relationship between private parties at common law." *Id.* (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011)). Accordingly, "unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, [courts] will not 'apply common-law trust principles' to infer duties not

found in the text of a treaty, statute, or regulation." *Id.* at 566 (quoting *Jicarilla Apache Nation*, 564 U.S. at 178). Pawnee Nation has identified no such conventional trust relationship with the tribe as to particular trust assets that could possibly override Congress's express statements in SAFETEA.

Nor does EPA's 1984 Indian Policy, cited by Petitioner, Pet Br. 43, require EPA to impose conditions on Oklahoma. EPA's 1984 Indian Policy remains a bedrock of EPA's working relationship with tribes; nowhere, however, does it mandate that EPA impose requirements on states in any particular case. *See generally,* AR5-14 (including no mandates that would require EPA to include a condition to its SAFETEA approval). To the extent any aspect of the policy's guidance points in a particular direction, EPA notes that such guidance is just that: guidance. It is not a regulation, is not mandatory, and does not carry the force of law. *See Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1262 (10th Cir. 2018) (stating that policy statements do not have the force and effect of law).

## IV. Indian-related interpretive canon does not save Pawnee's arguments because the statutory provision is not ambiguous

Pawnee Nation's reliance on the Indian Law Canon of construction does not save its interpretations of SAFETEA. Pet. Br. 29-32, 38-39, 46. As Pawnee says, statutes are to be construed liberally in favor of tribes with "ambiguous provisions interpreted to their benefit," based on the Indian-related interpretive canon. *Chickasaw Nation v. United States*, 534 U.S. 84, 88 (2001). However, that canon

only applies if the statute is *ambiguous*. *Id.* The canon is not a blank check for the Court to "bend" the language of sufficiently clear statutes to favor tribes. *See id.*

For the foregoing reasons, there is no ambiguity regarding these issues. First, there is no plain text reading that would supply an expiration date on the Environmental Programs provision. *See* Section I, *supra*. Second, the meaning of the sole criterion EPA can consider when approving a SAFETEA request is clear and unambiguous as outlined above. *See* Section II, *supra*. And finally, the statute clearly removes all discretion from the EPA to add conditions to its SAFETEA approval. *See* Section III, *supra*. Pawnee Nation has not shown that any of the issues involve ambiguous language, and thus the canon is inapplicable here. *See generally Carcieri v. Salazar*, 555 U.S. 379 (2009) (refusing to apply the Indian-related interpretive canon to a statute that was sufficiently clear).

## CONCLUSION

For the foregoing reasons, the Court should uphold the EPA's May 2025 decision as in accordance with the law.

Respectfully submitted,

*s/ Cameron Hinojos*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
CAMERON HINOJOS
LAURA J. S. BROWN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 305-5884
cameron.hinojos@usdoj.gov

February 13, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Though deferring to the Court's judgment on the matter, the U.S. Environmental Protection Agency believes that oral argument would be useful to the Court.

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 10,682 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ Cameron Hinojos
CAMERON HINOJOS

Counsel for Respondents

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus Version 1.435.539.0 (updated September 2, 2025), and according to the program are free of viruses.

*s/ Cameron Hinojos*
CAMERON HINOJOS

Counsel for Respondents

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2026, I served the foregoing with the with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Cameron Hinojos*
CAMERON HINOJOS

Counsel for Respondents

# ADDENDUM

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



zation, shall not be required to provide services, accommodations, advantages, facilities, goods, or privileges for the solemnization or celebration of a marriage. Any refusal under this subsection to provide such services, accommodations, advantages, facilities, goods, or privileges shall not create any civil claim or cause of action.''

STATUTORY PROHIBITION

Pub. L. 117–228, §7, Dec. 13, 2022, 136 Stat. 2306, provided that:

''(a) NO IMPACT ON STATUS AND BENEFITS NOT ARISING FROM A MARRIAGE.—Nothing in this Act [see Short Title of 2022 Amendment note set out under section 1 of this title], or any amendment made by this Act, shall be construed to deny or alter any benefit, status, or right of an otherwise eligible entity or person which does not arise from a marriage, including tax-exempt status, tax treatment, educational funding, or a grant, contract, agreement, guarantee, loan, scholarship, license, certification, accreditation, claim, or defense.

''(b) NO FEDERAL RECOGNITION OF POLYGAMOUS MARRIAGES.—Nothing in this Act, or any amendment made by this Act, shall be construed to require or authorize Federal recognition of marriages between more than 2 individuals.''

## § 8. "Person", "human being", "child", and "individual" as including born-alive infant

(a) In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the words ''person'', ''human being'', ''child'', and ''individual'', shall include every infant member of the species homo sapiens who is born alive at any stage of development.

(b) As used in this section, the term ''born alive'', with respect to a member of the species homo sapiens, means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

(c) Nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being ''born alive'' as defined in this section.

(Added Pub. L. 107–207, §2(a), Aug. 5, 2002, 116 Stat. 926.)

# CHAPTER 2—ACTS AND RESOLUTIONS; FORMALITIES OF ENACTMENT; REPEALS; SEALING OF INSTRUMENTS

Sec.
101. Enacting clause.
102. Resolving clause.
103. Enacting or resolving words after first section.
104. Numbering of sections; single proposition.
105. Title of appropriation Acts.
106. Printing bills and joint resolutions.
106a. Promulgation of laws.
106b. Amendments to Constitution.
107. Parchment or paper for printing enrolled bills or resolutions.
108. Repeal of repealing act.
109. Repeal of statutes as affecting existing liabilities.
Sec.
110. Saving clause of Revised Statutes.
111. Repeals as evidence of prior effectiveness.
112. Statutes at Large; contents; admissibility in evidence.
112a. United States Treaties and Other International Agreements; contents; admissibility in evidence.
112b. United States international agreements and non-binding instruments; transparency provisions.
113. ''Little and Brown's'' edition of laws and treaties; slip laws; Treaties and Other International Act[1] Series; admissibility in evidence.
114. Sealing of instruments.

**Editorial Notes**

AMENDMENTS

2022—Pub. L. 117–263, div. E, title LIX, §5947(a)(2), Dec. 23, 2022, 136 Stat. 3481, added item 112b and struck out former item 112b ''United States international agreements; transmission to Congress''.

1972—Pub. L. 92–403, §2, Aug. 22, 1972, 86 Stat. 619, added item 112b.

1966—Pub. L. 89–497, §2, July 8, 1966, 80 Stat. 271, inserted ''slip laws; Treaties and Other International Acts Series;'' in item 113.

1951—Act Oct. 31, 1951, ch. 655, §2(a), 65 Stat. 710, added items 106a and 106b.

1950—Act Sept. 23, 1950, ch. 1001, §3, 64 Stat. 980, added item 112a.

## § 101. Enacting clause

The enacting clause of all Acts of Congress shall be in the following form: ''Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.''

(July 30, 1947, ch. 388, 61 Stat. 634.)

## § 102. Resolving clause

The resolving clause of all joint resolutions shall be in the following form: ''Resolved by the Senate and House of Representatives of the United States of America in Congress assembled.''

(July 30, 1947, ch. 388, 61 Stat. 634.)

## § 103. Enacting or resolving words after first section

No enacting or resolving words shall be used in any section of an Act or resolution of Congress except in the first.

(July 30, 1947, ch. 388, 61 Stat. 634.)

## § 104. Numbering of sections; single proposition

Each section shall be numbered, and shall contain, as nearly as may be, a single proposition of enactment.

(July 30, 1947, ch. 388, 61 Stat. 634.)

## § 105. Title of appropriation Acts

The style and title of all Acts making appropriations for the support of Government shall be as follows: ''An Act making appropriations (here insert the object) for the year ending September 30 (here insert the calendar year).''

[1] So in original. Does not conform to section catchline.

(July 30, 1947, ch. 388, 61 Stat. 634; Pub. L. 93–344, title V, § 506(a), July 12, 1974, 88 Stat. 322.)

**Editorial Notes**

AMENDMENTS

1974—Pub. L. 93–344 substituted ''September 30'' for ''June 30''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1974 AMENDMENT

Pub. L. 93–344, title V, § 506(b), July 12, 1974, 88 Stat. 322, which provided that the amendment of this section by Pub. L. 93–344 was effective with respect to Acts making appropriations for the support of the Government for any fiscal year commencing on or after Oct. 1, 1976, was omitted in the complete revision of title V of Pub. L. 93–344 by Pub. L. 101–508, title XIII, § 13201(a), Nov. 5, 1990, 104 Stat. 1388–609.

## § 106. Printing bills and joint resolutions

Every bill or joint resolution in each House of Congress shall, when such bill or resolution passes either House, be printed, and such printed copy shall be called the engrossed bill or resolution as the case may be. Said engrossed bill or resolution shall be signed by the Clerk of the House or the Secretary of the Senate, and shall be sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk or Secretary. When such bill, or joint resolution shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution, as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States. During the last six days of a session such engrossing and enrolling of bills and joint resolutions may be done otherwise than as above prescribed, upon the order of Congress by concurrent resolution.

(July 30, 1947, ch. 388, 61 Stat. 634.)

**Statutory Notes and Related Subsidiaries**

REFERENCE TO OBRA; EFFECTIVE DATE; RATIFICATION OF ENROLLMENT CORRECTIONS AND PRINTED ENROLLMENT

Pub. L. 100–360, title IV, § 411(a), July 1, 1988, 102 Stat. 768, provided that:

''(1) REFERENCE.—In this section, the term 'OBRA' refers to the Omnibus Budget Reconciliation Act of 1987 (Public Law 100–203) [Pub. L. 100–203, Dec. 22, 1987, 101 Stat. 1330, see Tables for classification].

''(2) EFFECTIVE DATE.—Except as specifically provided in this section, the amendments made by this section [amending sections 254*o*, 294f, 300aa–12, 300aa–15, 300aa–21, 426, 704, 912, 1320a–7, 1320a–7a, 1320a–7b, 1320b–5, 1320b–7, 1320b–8, 1320c–3, 1320c–5, 1320c–9, 1395e, 1395h, 1395i–2, 1395i–3, 1395k, 1395*l*, 1395m, 1395u, 1395w–1, 1395w–2, 1395x, 1395y, 1395aa, 1395bb, 1395cc, 1395dd, 1395gg, 1395mm, 1395ss, 1395tt, 1395ww, 1395aaa, 1395bbb, 1395ccc, 1396a, 1396b, 1396d, 1396j, 1396n, 1396*o*, 1396p, 1396r, 1396r–1, 1396r–3, 1396r–4, 1396s, and 1397d of Title 42, The Public Health and Welfare, amending provisions set out as notes under sections 426, 1320a–7a, 1320c–2, 1320c–3, 1395b–1, 1395h, 1395i–3, 1395*l*, 1395m, 1395n, 1395u, 1395w–1, 1395x, 1395aa, 1395dd, 1395mm, 1395ss, 1395ww, 1395bbb, 1396a, 1396b, and 1396r of Title 42, and repealing provisions set out as notes under section 1395*l* of Title 42], as they relate to a provision in OBRA, shall be effective as if they were included in the enactment of that provision in OBRA.

''(3) RATIFICATION OF ENROLLMENT CORRECTIONS AND PRINTED ENROLLMENT.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), the enrollment corrections noted in footnotes numbered 9 through 72 of OBRA are hereby ratified and shall be considered to have been enacted as part of OBRA. The printed enrollment of title IV of OBRA [Pub. L. 100–203, title IV, Dec. 22, 1987, 101 Stat. 1330–39], as prepared and printed under section 8004 of OBRA [section 8004 of Pub. L. 100–203, set out below] (including the footnote corrections described in subparagraph (B) and as incorporating the clarifications described in subparagraph (C)), shall be deemed to constitute title IV of OBRA as enacted.

''(B) FOOTNOTE CORRECTIONS.—(i) With respect to the reference to which footnote 28 relates (101 Stat. 1330–81), the reference shall be deemed to have read '1320a–7b)'.

''(ii) With respect to the word to which footnote 30 relates (101 Stat. 1330–91), the word shall be deemed to have read 'the'.

''(iii) With respect to the designation to which footnote 52 relates (101 Stat. 1330–151), the designation shall be deemed to have read '(F)'.

''(C) CLARIFICATIONS OF ILLEGIBLE MATTER.—(i) Section 1842(n)(1)(A) of the Social Security Act, as added by section 4051(a) of OBRA (101 Stat. 1330–93) [42 U.S.C. 1395m(n)(1)(A)], is deemed to have the phrase 'the supplier's reasonable charge to individuals enrolled under this part for the test' immediately after 'or, if lower, the'.

''(ii) Section 1834(a)(7)(B)(i) of the Social Security Act, as inserted by section 4062(b) of OBRA (101 Stat. 1330–103) [42 U.S.C. 1395m(a)(7)(B)(i)], is deemed to have a reference to '1987' immediately after 'December'.''

PRINTED ENROLLMENTS PREPARED AFTER ENACTMENT

Pub. L. 106–93, Nov. 10, 1999, 113 Stat. 1310, provided: ''That the provisions of sections 106 and 107 of title 1, United States Code, are waived for the remainder of the first session of the One Hundred Sixth Congress with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations or continuing appropriations for the fiscal year ending September 30, 2000. The enrollment of any such bill or joint resolution shall be in such form as the Committee on House Administration of the House of Representatives certifies to be a true enrollment.''

Pub. L. 105–253, Oct. 12, 1998, 112 Stat. 1887, provided: ''That the provisions of sections 106 and 107 of title 1, United States Code, are waived for the remainder of the One Hundred Fifth Congress with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations or continuing appropriations for the fiscal year ending September 30, 1999. The enrollment of any such bill or joint resolution shall be in such form as the Committee on House Oversight of the House of Representatives certifies to be a true enrollment.''

Pub. L. 105–120, Nov. 26, 1997, 111 Stat. 2527, provided: ''That the provisions of sections 106 and 107 of title 1, United States Code, are waived for the balance of the first session of the One Hundred Fifth Congress with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations for the fiscal year ending on September 30, 1998, or continuing appropriations for the fiscal year ending on September 30, 1998. The enrollment of any such bill or joint resolution shall be in such form as the Committee on House Oversight of the House of Representatives certifies to be a true enrollment.''

Pub. L. 105–32, Aug. 1, 1997, 111 Stat. 250, provided: ''That the provisions of sections 106 and 107 of title 1, United States Code, are waived with respect to the printing (on parchment or otherwise) of the enrollment of H.R. 2014 [Pub. L. 105–34, Aug. 5, 1997, 111 Stat. 788] and of H.R. 2015 [Pub. L. 105–33, Aug. 5, 1997, 111 Stat.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**Editorial Notes**

REFERENCES IN TEXT

Section 2605(b)(4)(D) of this title, referred to in subsec. (a)(1)(B)(i), (ii), was in the original "section (6)(b)(4)(D)", and was translated as meaning section 6(b)(4)(D) of title I of Pub. L. 94–469 to reflect the probable intent of Congress.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act, referred to in subsecs. (d)(1)(A), (2) and (g)(1), (2)(A), is Pub. L. 114–182, June 22, 2016, 130 Stat. 492. The effective date of the Frank R. Lautenberg Chemical Safety for the 21st Century Act probably means the date of the enactment of the Act, which was approved June 22, 2016. For complete classification of this Act to the Code, see Short Title of 2016 Amendment note set out under section 2601 of this title and Tables.

AMENDMENTS

2016—Subsec. (a). Pub. L. 114–182, §13(1), amended subsec. (a) generally. Prior to amendment, subsec. (a) related to effect of chapter on State law.

Subsec. (b). Pub. L. 114–182, §13(2), amended subsec. (b) generally. Prior to amendment, subsec. (b) related to exemption from required testing of chemical substances or mixtures.

Subsecs. (c) to (g). Pub. L. 114–182, §13(3), added subsecs. (c) to (g).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

## § 2618. Judicial review

### (a) In general

(1)(A) Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,,[1] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(B) Except as otherwise provided in this subchapter, courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

(C)(i) Not later than 60 days after the publication of a designation under section 2605(b)(1)(B)(ii) of this title, any person may commence a civil action to challenge the designation.

(ii) The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

(2) Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of title 28 shall apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

### (b) Additional submissions and presentations; modifications

If in an action under this section to review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

### (c) Standard of review

(1)(A) Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of title 5, and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of title 5.

(B) Section 706 of title 5 shall apply to review of a rule or order under this section, except that—

(i) in the case of review of—

(I) a rule under section 2603(a), 2604(b)(4), 2605(a) (including review of the associated determination under section 2605(b)(4)(A)), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

(II) an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and

(ii) the court may not review the contents and adequacy of any statement of basis and

[1] So in original.

purpose required by section 553(c) of title 5 to be incorporated in the rule or order, except as part of the record, taken as a whole.

(2) The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28.

**(d) Fees and costs**

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

**(e) Other remedies**

The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

(Pub. L. 94–469, title I, § 19, Oct. 11, 1976, 90 Stat. 2039; renumbered title I and amended Pub. L. 99–519, § 3(b)(2), (c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub. L. 102–550, title X, § 1021(b)(8), Oct. 28, 1992, 106 Stat. 3923; Pub. L. 114–182, title I, §§ 14, 19(m), June 22, 2016, 130 Stat. 498, 508.)

**Editorial Notes**

AMENDMENTS

2016—Subsec. (a)(1)(A). Pub. L. 114–182, § 19(m)(1)(A), substituted ''Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''Not later than 60 days after the date of the promulgation of a rule under section 2603(a), 2604(a)(2), 2604(b)(4), 2605(a), 2605(e), or 2607 of this title, or under subchapter II or IV'', ''such rule or order'' for ''such rule'', and ''such a rule or order'' for ''such a rule''.

Subsec. (a)(1)(B). Pub. L. 114–182, § 19(m)(1)(B), substituted ''Except as otherwise provided in this subchapter, courts'' for ''Courts'' and ''this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''subparagraph (A) or (B) of section 2605(b)(1) of this title''.

Subsec. (a)(1)(C). Pub. L. 114–182, § 14(1), added subpar. (C).

Subsec. (a)(2). Pub. L. 114–182, § 19(m)(1)(C), substituted ''record'' for ''rulemaking record'' and ''based the rule or order'' for ''based the rule''.

Subsec. (a)(3). Pub. L. 114–182, § 14(2), struck out par. (3) which defined ''rulemaking record''.

Subsec. (b). Pub. L. 114–182, § 19(m)(2), substituted ''review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,'' for ''review a rule'', ''such rule or order'' for ''such rule'', ''the rule or order'' for ''the rule'', ''new rule or order'' for ''new rule'' in two places, and ''modified rule or order'' for ''modified rule''.

Subsec. (c)(1)(A). Pub. L. 114–182, § 19(m)(3)(A)(i), substituted ''a rule or order'' for ''a rule'' and ''such rule or order'' for ''such rule''.

Subsec. (c)(1)(B). Pub. L. 114–182, § 19(m)(3)(A)(ii)(I), substituted ''a rule or order'' for ''a rule'' in introductory provisions.

Pub. L. 114–182, § 19(m)(3)(A)(ii)(III), struck out concluding provisions which read as follows: ''The term 'evidence' as used in clause (i) means any matter in the rulemaking record.''

Subsec. (c)(1)(B)(i). Pub. L. 114–182, § 19(m)(3)(A)(ii)(II), amended cl. (i) generally. Prior to amendment, cl. (i) read as follows: ''in the case of review of a rule under section 2603(a), 2604(b)(4), 2605(a), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record (as defined in subsection (a)(3)) taken as a whole;''.

Subsec. (c)(1)(B)(ii), (iii). Pub. L. 114–182, § 19(m)(3)(A)(ii)(III), added cl. (ii) and struck out former cls. (ii) and (iii) which related to review of rules under section 2605(a) of this title and statements not subject to court review, respectively.

Subsec. (c)(1)(C). Pub. L. 114–182, § 19(m)(3)(A)(iii), struck out subpar. (C) which read as follows: ''A determination, rule, or ruling of the Administrator described in subparagraph (B)(ii) may be reviewed only in an action under this section and only in accordance with such subparagraph.''

Subsec. (c)(2). Pub. L. 114–182, § 19(m)(3)(B), substituted ''any rule or order'' for ''any rule''.

1992—Subsec. (a)(1)(A). Pub. L. 102–550, § 1021(b)(8)(A), substituted ''subchapter II or IV'' for ''subchapter II''.

Subsec. (a)(3)(B). Pub. L. 102–550, § 1021(b)(8)(B), inserted before semicolon at end ''and in the case of a rule under subchapter IV, the finding required for the issuance of such a rule''.

1986—Subsec. (a)(1)(A). Pub. L. 99–519 inserted reference to subchapter II of this chapter.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective Jan. 1, 1977, see section 31 of Pub. L. 94–469, set out as a note under section 2601 of this title.

### § 2619. Citizens' civil actions

**(a) In general**

Except as provided in subsection (b), any person may commence a civil action—

(1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV, or order issued under section 2603 or 2604 of this title or subchapter II or IV to restrain such violation, or

(2) against the Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary.

Any civil action under paragraph (1) shall be brought in the United States district court for the district in which the alleged violation occurred or in which the defendant resides or in which the defendant's principal place of business is located. Any action brought under paragraph (2) shall be brought in the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the plaintiff is domiciled. The district courts of the United States shall have jurisdiction over suits brought under this section, without regard to the amount in controversy or the citizenship of the parties. In any civil action under this subsection process may be served on a defendant in any judicial district in which the defendant resides or may be found and subpoenas for witnesses may be served in any judicial district.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



Sec.
1310. Appropriations for private organizations.

SUBCHAPTER II—TRUST FUNDS AND REFUNDS

1321. Trust funds.
1322. Payments of unclaimed trust fund amounts and refund of amounts erroneously deposited.
1323. Trust funds for certain fees, donations, quasi-public amounts, and unearned amounts.
1324. Refund of internal revenue collections.

SUBCHAPTER III—LIMITATIONS, EXCEPTIONS, AND PENALTIES

1341. Limitations on expending and obligating amounts.
1342. Limitation on voluntary services.
1343. Buying and leasing passenger motor vehicles and aircraft.
1344. Passenger carrier use.
1345. Expenses of meetings.
1346. Commissions, councils, boards, and interagency and similar groups.
1347. Appropriations or authorizations required for agencies in existence for more than one year.
1348. Telephone installation and charges.
1349. Adverse personnel actions.
1350. Criminal penalty.
1351. Reports on violations.
1352. Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions.
1353. Acceptance of travel and related expenses from non-Federal sources.
1354. Limitation on use of appropriated funds for contracts with entities not meeting veterans' employment reporting requirements.
1355. Prohibition on use of funds for portraits.

**Editorial Notes**

AMENDMENTS

2018—Pub. L. 115–158, §2(b), Mar. 27, 2018, 132 Stat. 1242, added item 1355. Item was added to the analysis for this chapter to reflect the probable intent of Congress, notwithstanding directory language amending the analysis for subchapter III of this chapter.

1998—Pub. L. 105–339, §7(b)(2), Oct. 31, 1998, 112 Stat. 3189, added item 1354.

1990—Pub. L. 101–280, §4(b)(2), May 4, 1990, 104 Stat. 157, redesignated item 1352 ''Acceptance of travel and related expenses from non-Federal sources'' as 1353.

1989—Pub. L. 101–194, title III, §302(b), Nov. 30, 1989, 103 Stat. 1746, added item 1352 ''Acceptance of travel and related expenses from non-Federal sources''.

Pub. L. 101–121, title III, §319(a)(2), Oct. 23, 1989, 103 Stat. 756, added item 1352 ''Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions''.

1986—Pub. L. 99–550, §1(b), Oct. 27, 1986, 100 Stat. 3070, substituted ''Passenger carrier use'' for ''Passenger motor vehicle and aircraft use'' in item 1344.

## SUBCHAPTER I—GENERAL

### § 1301. Application

(a) Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.

(b) The reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which the appropriation originally was made shall be construed and accounted for as a new appropriation. The unexpended balance shall be reduced by the amount to be diverted.

(c) An appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously only if the appropriation—

(1) is for rivers and harbors, lighthouses, public buildings, or the pay of the Navy and Marine Corps; or

(2) expressly provides that it is available after the fiscal year covered by the law in which it appears.

(d) A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made.

(Pub. L. 97–258, Sept. 13, 1982, 96 Stat. 917.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1301(a) ..... | 31:628. | R.S. §3678. |
| 1301(b) ..... | 31:717. | Mar. 4, 1915, ch. 147, §4, 38 Stat. 1161. |
| 1301(c) ..... | 31:718. | Aug. 24, 1912, ch. 355, §7, 37 Stat. 487; Mar. 3, 1919, ch. 99, §6(last sentence), 40 Stat. 1309. |
| 1301(d) ..... | 31:627. | June 30, 1906, ch. 3914, §9, 34 Stat. 764. |

In subsection (a), the word ''Appropriations'' is substituted for ''sums appropriated for the various branches of expenditure in the public service'' to eliminate unnecessary words. The words ''they are respectively'' and ''and for no others'' are omitted as surplus. The words ''except as otherwise provided by law'' are substituted for ''All'' in section 3678 of the Revised Statutes to inform the reader that there are exceptions to the source provisions restated in the subsection.

In subsection (c), before clause (1), the words ''specific or indefinite'' are omitted as surplus. The words ''made subsequent to August 24, 1912'' are omitted as executed. The words ''without reference to a fiscal year'' are omitted as surplus. In clause (1), the words ''is for'' are substituted for ''belongs to one of the following four classes'' to eliminate unnecessary words. The words ''last specifically named in and excepted from the operation of the provisions of section 713 of this title'' and the words related to section 5 of the Act of June 20, 1874 (31:713), in section 6(last sentence) of the Act of March 3, 1919 (ch. 99, 40 Stat. 1309), are omitted because section 5 was repealed by section 3 of the Act of July 6, 1949 (ch. 299, 63 Stat. 407).

In subsection (d), the words ''passed after June 30, 1906'' are omitted as executed.

**Statutory Notes and Related Subsidiaries**

SHORT TITLE OF 2019 AMENDMENT

Pub. L. 116–1, §1, Jan. 16, 2019, 133 Stat. 3, provided that: ''This Act [amending section 1341 of this title] may be cited as the 'Government Employee Fair Treatment Act of 2019'.''

SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115–158, §1, Mar. 27, 2018, 132 Stat. 1242, provided that: ''This Act [enacting section 1355 of this title] may be cited as the 'Eliminating Government-funded Oil-painting Act' or the 'EGO Act'.''

SHORT TITLE OF 1984 AMENDMENT

Pub. L. 98–359, §1, July 13, 1984, 98 Stat. 402, provided: ''That this Act [amending section 1322 of this title] may be cited as the 'Postal Savings System Statute of Limitations Act'.''

TRANSFERS FROM APPROPRIATION ACCOUNTS; SALARIES OF TEMPORARILY REASSIGNED EMPLOYEES

Pub. L. 105–277, div. A, §101(f) [title V, §510], Oct. 21, 1998, 112 Stat. 2681–337, 2681–385, as amended by Pub. L.

106–31, title V, § 5005(*l*), May 21, 1999, 113 Stat. 111, provided that: ''Notwithstanding any other provision of law, hereafter—

''(1) no amount may be transferred from an appropriation account for the Departments of Labor, Health and Human Services, and Education except as authorized in this or any subsequent appropriation Act, or in the Act establishing the program or activity for which funds are contained in this Act [see Tables for classification];

''(2) no department, agency, or other entity, other than the one responsible for administering the program or activity for which an appropriation is made in this Act, may exercise authority for the timing of the obligation and expenditure of such appropriation, or for the purpose for which it is obligated and expended, except to the extent and in the manner otherwise provided in sections 1512 and 1513 of title 31, United States Code; and

''(3) no funds provided under this Act or subsequent Departments of Labor, Health and Human Services, Education, and Related Agencies Appropriations Acts shall be available for the salary (or any part thereof) of an employee who is reassigned on a temporary detail basis to another position in the employing agency or department or in any other agency or department, unless the detail is independently approved by the head of the employing department or agency.''

Similar provisions were contained in the following prior appropriation acts:

Pub. L. 105–78, title V, § 511, Nov. 13, 1997, 111 Stat. 1516.

Pub. L. 104–208, div. A, title I, § 101(e) [title V, § 509], Sept. 30, 1996, 110 Stat. 3009–233, 3009–269.

Pub. L. 104–134, title I, § 101(d) [title V, § 509], Apr. 26, 1996, 110 Stat. 1321–211, 1321–244; renumbered title I, Pub. L. 104–140, § 1(a), May 2, 1996, 110 Stat. 1327.

Pub. L. 103–333, title V, § 515, Sept. 30, 1994, 108 Stat. 2574.

### Executive Documents

EX. ORD. NO. 13457. PROTECTING AMERICAN TAXPAYERS FROM GOVERNMENT SPENDING ON WASTEFUL EARMARKS

Ex. Ord. No. 13457, Jan. 29, 2008, 73 F.R. 6417, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Policy*. It is the policy of the Federal Government to be judicious in the expenditure of taxpayer dollars. To ensure the proper use of taxpayer funds that are appropriated for Government programs and purposes, it is necessary that the number and cost of earmarks be reduced, that their origin and purposes be transparent, and that they be included in the text of the bills voted upon by the Congress and presented to the President. For appropriations laws and other legislation enacted after the date of this order, executive agencies should not commit, obligate, or expend funds on the basis of earmarks included in any non-statutory source, including requests in reports of committees of the Congress or other congressional documents, or communications from or on behalf of Members of Congress, or any other non-statutory source, except when required by law or when an agency has itself determined a project, program, activity, grant, or other transaction to have merit under statutory criteria or other merit-based decisionmaking.

SEC. 2. *Duties of Agency Heads*. (a) With respect to all appropriations laws and other legislation enacted after the date of this order, the head of each agency shall take all necessary steps to ensure that:

(i) agency decisions to commit, obligate, or expend funds for any earmark are based on the text of laws, and in particular, are not based on language in any report of a committee of Congress, joint explanatory statement of a committee of conference of the Congress, statement of managers concerning a bill in the Congress, or any other non-statutory statement or indication of views of the Congress, or a House, committee, Member, officer, or staff thereof;

(ii) agency decisions to commit, obligate, or expend funds for any earmark are based on authorized, transparent, statutory criteria and merit-based decision making, in the manner set forth in section II of OMB Memorandum M–07–10, dated February 15, 2007, to the extent consistent with applicable law; and

(iii) no oral or written communications concerning earmarks shall supersede statutory criteria, competitive awards, or merit-based decisionmaking.

(b) An agency shall not consider the views of a House, committee, Member, officer, or staff of the Congress with respect to commitments, obligations, or expenditures to carry out any earmark unless such views are in writing, to facilitate consideration in accordance with section 2(a)(ii) above. All written communications from the Congress, or a House, committee, Member, officer, or staff thereof, recommending that funds be committed, obligated, or expended on any earmark shall be made publicly available on the Internet by the receiving agency, not later than 30 days after receipt of such communication, unless otherwise specifically directed by the head of the agency, without delegation, after consultation with the Director of the Office of Management and Budget, to preserve appropriate confidentiality between the executive and legislative branches.

(c) Heads of agencies shall otherwise implement within their respective agencies the policy set forth in section 1 of this order, consistent with such instructions as the Director of the Office of Management and Budget may prescribe.

(d) The head of each agency shall upon request provide to the Director of the Office of Management and Budget information about earmarks and compliance with this order.

SEC. 3. *Definitions*. For purposes of this order:

(a) The term ''agency'' means an executive agency as defined in section 105 of title 5, United States Code, and the United States Postal Service and the Postal Regulatory Commission, but shall exclude the Government Accountability Office; and

(b) the term ''earmark'' means funds provided by the Congress for projects, programs, or grants where the purported congressional direction (whether in statutory text, report language, or other communication) circumvents otherwise applicable merit-based or competitive allocation processes, or specifies the location or recipient, or otherwise curtails the ability of the executive branch to manage its statutory and constitutional responsibilities pertaining to the funds allocation process.

SEC. 4. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to an agency or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its agencies, instrumentalities, or entities, its officers, employees, or agents, or any other person.

GEORGE W. BUSH.

## § 1302. Determining amounts appropriated

Except as specifically provided by law, the total amount appropriated in an appropriation law is determined by adding up the specific amounts or rates appropriated in each paragraph of the law.

(Pub. L. 97–258, Sept. 13, 1982, 96 Stat. 917.)

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

(June 30, 1948, ch. 758, title IV, § 401, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub. L. 95–217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–217 inserted reference to section 1313 of this title in pars. (1), (3), (4), and (5), struck out par. (6) which provided that no Federal agency be deemed an applicant for purposes of this subsection, and redesignated par. (7) as (6).

### § 1342. National pollutant discharge elimination system

**(a) Permits for discharge of pollutants**

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objec-

tives of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which—

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

(D) control the disposal of pollutants into wells;

(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator**

(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

(2) Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

(3) Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

(4) LIMITATIONS ON PARTIAL PERMIT PROGRAM RETURNS AND WITHDRAWALS.—A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of—

(A) a State partial permit program approved under subsection (n)(3) of this section only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

(B) a State partial permit program approved under subsection (n)(4) of this section only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

**(d) Notification of Administrator**

(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

(3) The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

(4) In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

**(e) Waiver of notification requirement**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

**(f) Point source categories**

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

**(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants**

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

**(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works**

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

**(i) Federal enforcement not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(j) Public information**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

**(k) Compliance with permits**

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section

Appellate Case: 25-9548 Document: 26 Date Filed: 02/13/2026 Page: 72


1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

**(*l*) Limitation on permit requirement**

**(1) Agricultural return flows**

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

**(2) Stormwater runoff from oil, gas, and mining operations**

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

**(m) Additional pretreatment of conventional pollutants not required**

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

**(n) Partial permit program**

**(1) State submission**

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

**(2) Minimum coverage**

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b) of this section.

**(3) Approval of major category partial permit programs**

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if—

(A) such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

(B) the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section.

**(4) Approval of major component partial permit programs**

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) of this section if—

(A) the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section; and

(B) the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) of this section by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

**(*o*) Anti-backsliding**

**(1) General prohibition**

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C)

or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

**(2) Exceptions**

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if—

(A) material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

(B)(i) information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

(ii) the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B) of this section;

(C) a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

(D) the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

(E) the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

**(3) Limitations**

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

**(p) Municipal and industrial stormwater discharges**

**(1) General rule**

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

**(2) Exceptions**

Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

**(3) Permit requirements**

**(A) Industrial discharges**

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

**(B) Municipal discharge**

Permits for discharges from municipal storm sewers—

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

**(4) Permit application requirements**

**(A) Industrial and large municipal discharges**

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as

the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(B) Other municipal discharges**

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(5) Studies**

The Administrator, in consultation with the States, shall conduct a study for the purposes of—

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

**(6) Regulations**

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

**(q) Combined sewer overflows**

**(1) Requirement for permits, orders, and decrees**

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000, for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the ''CSO control policy'').

**(2) Water quality and designated use review guidance**

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

**(3) Report**

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

**(r) Discharges incidental to the normal operation of recreational vessels**

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

(June 30, 1948, ch. 758, title IV, § 402, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub. L. 95–217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub. L. 100–4, title IV, §§ 401–404(a), 404(c), formerly 404(d), 405, Feb. 4, 1987, 101 Stat. 65–67, 69, renumbered § 404(c), Pub. L. 104–66, title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub. L. 102–580, title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub. L. 106–554, § 1(a)(4) [div. B, title I, § 112(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A–224; Pub. L. 110–288, § 2, July 29, 2008, 122 Stat. 2650.)

AMENDMENTS

2008—Subsec. (r). Pub. L. 110–288 added subsec. (r).

2000—Subsec. (q). Pub. L. 106–554 added subsec. (q).

1992—Subsec. (p)(1), (6). Pub. L. 102–580 substituted ''October 1, 1994'' for ''October 1, 1992'' in par. (1) and ''October 1, 1993'' for ''October 1, 1992'' in par. (6).

1987—Subsec. (a)(1). Pub. L. 100–4, § 404(c), inserted cl. (A) and (B) designations.

Subsec. (c)(1). Pub. L. 100–4, § 403(b)(2), substituted ''as to those discharges'' for ''as to those navigable waters''.

Subsec. (c)(4). Pub. L. 100–4, § 403(b)(1), added par. (4).

Subsec. (*l*). Pub. L. 100–4, § 401, inserted ''Limitation on permit requirement'' as subsec. heading designated existing provisions as par. (1) and inserted par. heading, added par. (2), and aligned pars. (1) and (2).

Subsecs. (m) to (p). Pub. L. 100–4, §§ 402, 403(a), 404(a), 405, added subsecs. (m) to (p).

1977—Subsec. (a)(5). Pub. L. 95–217, § 50, substituted ''section 1314(i)(2)'' for ''section 1314(h)(2)''.

Subsec. (b). Pub. L. 95–217, § 50, substituted in provisions preceding par. (1) ''subsection (i)(2) of section 1314'' for ''subsection (h)(2) of section 1314''.

Subsec. (b)(8). Pub. L. 95–217, § 54(c)(1), inserted reference to identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into treatment works and programs to assure compliance with pretreatment standards by each source.

Appellate Case: 25-9548 Document: 26 Date Filed: 02/13/2026 Page: 75


Subsec. (c)(1), (2). Pub. L. 95–217, § 50, substituted ''section 1314(i)(2)'' for ''section 1314(h)(2)''.

Subsec. (d)(2). Pub. L. 95–217, § 65(b), inserted provision requiring that, whenever the Administrator objects to the issuance of a permit under subsec. (d)(2) of this section, the written objection contain a statement of the reasons for the objection and the effluent limitations and conditions which the permit would include if it were issued by the Administrator.

Subsec. (d)(4). Pub. L. 95–217, § 65(a), added par. (4).

Subsec. (e). Pub. L. 95–217, § 50, substituted ''subsection (i)(2) of section 1314'' for ''subsection (h)(2) of section 1314''.

Subsec. (h). Pub. L. 95–217, § 66, substituted ''where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit,'' for ''where no State program is approved,''.

Subsec. (*l*). Pub. L. 95–217, § 33(c), added subsec. (*l*).

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

Enforcement functions of Administrator or other official of the Environmental Protection Agency under this section relating to compliance with national pollutant discharge elimination system permits with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas were transferred to the Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until the first anniversary of the date of initial operation of the Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(a), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

PERMIT REQUIREMENTS FOR DISCHARGES FROM CERTAIN VESSELS

Pub. L. 110–299, §§ 1, 2, July 31, 2008, 122 Stat. 2995, as amended by Pub. L. 111–215, § 1, July 30, 2010, 124 Stat. 2347, provided that:

''SECTION 1. DEFINITIONS.

''In this Act:

''(1) ADMINISTRATOR.—The term 'Administrator' means the Administrator of the Environmental Protection Agency.

''(2) COVERED VESSEL.—The term 'covered vessel' means a vessel that is—

''(A) less than 79 feet in length; or

''(B) a fishing vessel (as defined in section 2101 of title 46, United States Code), regardless of the length of the vessel.

''(3) OTHER TERMS.—The terms 'contiguous zone', 'discharge', 'ocean', and 'State' have the meanings given the terms in section 502 of the Federal Water Pollution Control Act (33 U.S.C. 1362).

''SEC. 2. DISCHARGES INCIDENTAL TO NORMAL OPERATION OF VESSELS.

''(a) NO PERMIT REQUIREMENT.—Except as provided in subsection (b), during the period beginning on the date of the enactment of this Act [July 31, 2008] and ending on December 18, 2013, the Administrator, or a State in the case of a permit program approved under section 402 of the Federal Water Pollution Control Act (33 U.S.C. 1342), shall not require a permit under that section for a covered vessel for—

''(1) any discharge of effluent from properly functioning marine engines;

''(2) any discharge of laundry, shower, and galley sink wastes; or

''(3) any other discharge incidental to the normal operation of a covered vessel.

''(b) EXCEPTIONS.—Subsection (a) shall not apply with respect to—

''(1) rubbish, trash, garbage, or other such materials discharged overboard;

''(2) other discharges when the vessel is operating in a capacity other than as a means of transportation, such as when—

''(A) used as an energy or mining facility;

''(B) used as a storage facility or a seafood processing facility;

''(C) secured to a storage facility or a seafood processing facility; or

''(D) secured to the bed of the ocean, the contiguous zone, or waters of the United States for the purpose of mineral or oil exploration or development;

''(3) any discharge of ballast water; or

''(4) any discharge in a case in which the Administrator or State, as appropriate, determines that the discharge—

''(A) contributes to a violation of a water quality standard; or

''(B) poses an unacceptable risk to human health or the environment.''

STORMWATER PERMIT REQUIREMENTS

Pub. L. 102–240, title I, § 1068, Dec. 18, 1991, 105 Stat. 2007, provided that:

''(a) GENERAL RULE.—Notwithstanding the requirements of sections 402(p)(2)(B), (C), and (D) of the Federal Water Pollution Control Act [33 U.S.C. 1342(p)(2)(B), (C), (D)], permit application deadlines for stormwater discharges associated with industrial activities from facilities that are owned or operated by a municipality shall be established by the Administrator of the Environmental Protection Agency (hereinafter in this section referred to as the 'Administrator') pursuant to the requirements of this section.

''(b) PERMIT APPLICATIONS.—

''(1) INDIVIDUAL APPLICATIONS.—The Administrator shall require individual permit applications for discharges described in subsection (a) on or before October 1, 1992; except that any municipality that has participated in a timely part I group application for an industrial activity discharging stormwater that is denied such participation in a group application or for which a group application is denied shall not be required to submit an individual application until the 180th day following the date on which the denial is made.

''(2) GROUP APPLICATIONS.—With respect to group applications for permits for discharges described in subsection (a), the Administrator shall require—

''(A) part I applications on or before September 30, 1991, except that any municipality with a population of less than 250,000 shall not be required to submit a part I application before May 18, 1992; and

''(B) part II applications on or before October 1, 1992, except that any municipality with a population of less than 250,000 shall not be required to submit a part II application before May 17, 1993.

''(c) MUNICIPALITIES WITH LESS THAN 100,000 POPULATION.—The Administrator shall not require any municipality with a population of less than 100,000 to apply for or obtain a permit for any stormwater discharge associated with an industrial activity other than an airport, powerplant, or uncontrolled sanitary landfill owned or operated by such municipality before

October 1, 1992, unless such permit is required by section 402(p)(2)(A) or (E) of the Federal Water Pollution Control Act [33 U.S.C. 1342(p)(2)(A), (E)].

''(d) UNCONTROLLED SANITARY LANDFILL DEFINED.—For the purposes of this section, the term 'uncontrolled sanitary landfill' means a landfill or open dump, whether in operation or closed, that does not meet the requirements for run-on and run-off controls established pursuant to subtitle D of the Solid Waste Disposal Act [42 U.S.C. 6941 et seq.].

''(e) LIMITATION ON STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to affect any application or permit requirement, including any deadline, to apply for or obtain a permit for stormwater discharges subject to section 402(p)(2)(A) or (E) of the Federal Water Pollution Control Act [33 U.S.C. 1342(p)(2)(A), (E)].

''(f) REGULATIONS.—The Administrator shall issue final regulations with respect to general permits for stormwater discharges associated with industrial activity on or before February 1, 1992.''

PHOSPHATE FERTILIZER EFFLUENT LIMITATION

Section 306(c) of Pub. L. 100–4 provided that:

''(1) ISSUANCE OF PERMIT.—As soon as possible after the date of the enactment of this Act [Feb. 4, 1987], but not later than 180 days after such date of enactment, the Administrator shall issue permits under section 402(a)(1)(B) of the Federal Water Pollution Control Act [33 U.S.C. 1342(a)(1)(B)] with respect to facilities—

''(A) which were under construction on or before April 8, 1974, and

''(B) for which the Administrator is proposing to revise the applicability of the effluent limitation established under section 301(b) of such Act [33 U.S.C. 1311(b)] for phosphate subcategory of the fertilizer manufacturing point source category to exclude such facilities.

''(2) LIMITATIONS ON STATUTORY CONSTRUCTION.—Nothing in this section [amending section 1311 of this title and enacting this note] shall be construed—

''(A) to require the Administrator to permit the discharge of gypsum or gypsum waste into the navigable waters,

''(B) to affect the procedures and standards applicable to the Administrator in issuing permits under section 402(a)(1)(B) of the Federal Water Pollution Control Act [33 U.S.C. 1342(a)(1)(B)], and

''(C) to affect the authority of any State to deny or condition certification under section 401 of such Act [33 U.S.C. 1341] with respect to the issuance of permits under section 402(a)(1)(B) of such Act.''

LOG TRANSFER FACILITIES

Section 407 of Pub. L. 100–4 provided that:

''(a) AGREEMENT.—The Administrator and Secretary of the Army shall enter into an agreement regarding coordination of permitting for log transfer facilities to designate a lead agency and to process permits required under sections 402 and 404 of the Federal Water Pollution Control Act [33 U.S.C. 1342, 1344], where both such sections apply, for discharges associated with the construction and operation of log transfer facilities. The Administrator and Secretary are authorized to act in accordance with the terms of such agreement to assure that, to the maximum extent practicable, duplication, needless paperwork and delay in the issuance of permits, and inequitable enforcement between and among facilities in different States, shall be eliminated.

''(b) APPLICATIONS AND PERMITS BEFORE OCTOBER 22, 1985.—Where both of sections 402 and 404 of the Federal Water Pollution Control Act [33 U.S.C. 1342, 1344] apply, log transfer facilities which have received a permit under section 404 of such Act before October 22, 1985, shall not be required to submit a new application for a permit under section 402 of such Act. If the Administrator determines that the terms of a permit issued on or before October 22, 1985, under section 404 of such Act satisfies the applicable requirements of sections 301, 302, 306, 307, 308, and 403 of such Act [33 U.S.C. 1311, 1312, 1316, 1317, 1318, and 1343], a separate application for a permit under section 402 of such Act shall not thereafter be required. In any case where the Administrator demonstrates, after an opportunity for a hearing, that the terms of a permit issued on or before October 22, 1985, under section 404 of such Act do not satisfy the applicable requirements of sections 301, 302, 306, 307, 308, and 403 of such Act, modifications to the existing permit under section 404 of such Act to incorporate such applicable requirements shall be issued by the Administrator as an alternative to issuance of a separate new permit under section 402 of such Act.

''(c) LOG TRANSFER FACILITY DEFINED.—For the purposes of this section, the term 'log transfer facility' means a facility which is constructed in whole or in part in waters of the United States and which is utilized for the purpose of transferring commercially harvested logs to or from a vessel or log raft, including the formation of a log raft.''

ALLOWABLE DELAY IN MODIFYING EXISTING APPROVED STATE PERMIT PROGRAMS TO CONFORM TO 1977 AMENDMENT

Section 54(c)(2) of Pub. L. 95–217 provided that any State permit program approved under this section before Dec. 27, 1977, which required modification to conform to the amendment made by section 54(c)(1) of Pub. L. 95–217, which amended subsec. (b)(8) of this section, not be required to be modified before the end of the one year period which began on Dec. 27, 1977, unless in order to make the required modification a State must amend or enact a law in which case such modification not be required for such State before the end of the two year period which began on Dec. 27, 1977.

## § 1343. Ocean discharge criteria

### (a) Issuance of permits

No permit under section 1342 of this title for a discharge into the territorial sea, the waters of the contiguous zone, or the oceans shall be issued, after promulgation of guidelines established under subsection (c) of this section, except in compliance with such guidelines. Prior to the promulgation of such guidelines, a permit may be issued under such section 1342 of this title if the Administrator determines it to be in the public interest.

### (b) Waiver

The requirements of subsection (d) of section 1342 of this title may not be waived in the case of permits for discharges into the territorial sea.

### (c) Guidelines for determining degradation of waters

(1) The Administrator shall, within one hundred and eighty days after October 18, 1972 (and from time to time thereafter), promulgate guidelines for determining the degradation of the waters of the territorial seas, the contiguous zone, and the oceans, which shall include:

(A) the effect of disposal of pollutants on human health or welfare, including but not limited to plankton, fish, shellfish, wildlife, shorelines, and beaches;

(B) the effect of disposal of pollutants on marine life including the transfer, concentration, and dispersal of pollutants or their byproducts through biological, physical, and chemical processes; changes in marine ecosystem diversity, productivity, and stability; and species and community population changes;

(C) the effect of disposal, of pollutants on esthetic, recreation, and economic values;

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



### § 1368. Federal procurement

#### (a) Contracts with violators prohibited

No Federal agency may enter into any contract with any person, who has been convicted of any offense under section 1319(c) of this title, for the procurement of goods, materials, and services if such contract is to be performed at any facility at which the violation which gave rise to such conviction occurred, and if such facility is owned, leased, or supervised by such person. The prohibition in the preceding sentence shall continue until the Administrator certifies that the condition giving rise to such conviction has been corrected.

#### (b) Notification of agencies

The Administrator shall establish procedures to provide all Federal agencies with the notification necessary for the purposes of subsection (a) of this section.

#### (c) Omitted

#### (d) Exemptions

The President may exempt any contract, loan, or grant from all or part of the provisions of this section where he determines such exemption is necessary in the paramount interest of the United States and he shall notify the Congress of such exemption.

#### (e) Annual report to Congress

The President shall annually report to the Congress on measures taken in compliance with the purpose and intent of this section, including, but not limited to, the progress and problems associated with such compliance.

#### (f) Contractor certification or contract clause in acquisition of commercial products or commercial services

(1) No certification by a contractor, and no contract clause, may be required in the case of a contract for the acquisition of commercial products or commercial services in order to implement a prohibition or requirement of this section or a prohibition or requirement issued in the implementation of this section.

(2) In paragraph (1), the terms ''commercial product'' and ''commercial service'' have the meanings given those terms in sections 103 and 103a, respectively, of title 41.

(June 30, 1948, ch. 758, title V, § 508, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 891; amended Pub. L. 103–355, title VIII, § 8301(a), Oct. 13, 1994, 108 Stat. 3396; Pub. L. 115–232, div. A, title VIII, § 836(g)(5), Aug. 13, 2018, 132 Stat. 1873.)

**Editorial Notes**

CODIFICATION

Subsec. (c) of this section authorized the President to cause to be issued, not more than 180 days after October 18, 1972, an order (1) requiring each Federal agency authorized to enter into contracts or to extend Federal assistance by way of grant, loan, or contract, to effectuate the purpose and policy of this chapter, and (2) setting forth procedures, sanctions and penalties as the President determines necessary to carry out such requirement.

AMENDMENTS

2018—Subsec. (f)(1). Pub. L. 115–232, § 836(g)(5)(A), substituted ''commercial products or commercial services'' for ''commercial items''.

Subsec. (f)(2). Pub. L. 115–232, § 836(g)(5)(B), substituted ''the terms 'commercial product' and 'commercial service' have the meanings given those terms in sections 103 and 103a, respectively, of title 41.'' for ''the term 'commercial item' has the meaning given such term in section 103 of title 41.''

1994—Subsec. (f). Pub. L. 103–355 added subsec. (f).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2018 AMENDMENT

Amendment by Pub. L. 115–232 effective Jan. 1, 2020, subject to a savings provision, see section 836(h) of Pub. L. 115–232, set out as an Effective Date of 2018 Amendment; Savings Provision note under section 453b of Title 6, Domestic Security.

EFFECTIVE DATE OF 1994 AMENDMENT

For effective date and applicability of amendment by Pub. L. 103–355, see section 10001 of Pub. L. 103–355, set out as a note under section 8752 of Title 10, Armed Forces.

**Executive Documents**

ADMINISTRATION OF CHAPTER WITH RESPECT TO FEDERAL CONTRACTS, GRANTS, OR LOANS

For provisions concerning the administration of this chapter with respect to Federal contracts, grants, or loans, see Ex. Ord. No. 11738, Sept. 10, 1973, 38 F.R. 25161, set out as a note under section 7606 of Title 42, The Public Health and Welfare.

### § 1369. Administrative procedure and judicial review

#### (a) Subpenas

(1) For purposes of obtaining information under section 1315 of this title, or carrying out section 1367(e) of this title, the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for effluent data, upon a showing satisfactory to the Administrator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subsection, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator, to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(2) The district courts of the United States are authorized, upon application by the Adminis-

trator, to issue subpenas for attendance and testimony of witnesses and the production of relevant papers, books, and documents, for purposes of obtaining information under sections 1314(b) and (c) of this title. Any papers, books, documents, or other information or part thereof, obtained by reason of such a subpena shall be subject to the same requirements as are provided in paragraph (1) of this subsection.

**(b) Review of Administrator's actions; selection of court; fees**

(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(*l*) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement.

(3) AWARD OF FEES.—In any judicial proceeding under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party whenever it determines that such award is appropriate.

(4) DISCHARGES INCIDENTAL TO NORMAL OPERATION OF VESSELS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), any interested person may file a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating in accordance with the requirements of this subsection.

(B) VENUE EXCEPTION.—Subject to section 1322(p)(7)(C)(v) of this title, a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

**(c) Additional evidence**

In any judicial proceeding brought under subsection (b) of this section in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(June 30, 1948, ch. 758, title V, § 509, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 891; amended Pub. L. 93–207, § 1(6), Dec. 28, 1973, 87 Stat. 906; Pub. L. 100–4, title III, § 308(b), title IV, § 406(d)(3), title V, § 505(a), (b), Feb. 4, 1987, 101 Stat. 39, 73, 75; Pub. L. 100–236, § 2, Jan. 8, 1988, 101 Stat. 1732; Pub. L. 115–282, title IX, § 903(c)(4), Dec. 4, 2018, 132 Stat. 4356.)

**Editorial Notes**

AMENDMENTS

2018—Subsec. (b)(4). Pub. L. 115–282 added par. (4).

1988—Subsec. (b)(3), (4). Pub. L. 100–236 redesignated par. (4) as (3) and struck out former par. (3) relating to venue, which provided for selection procedure in subpar. (A), administrative provisions in subpar. (B), and transfers in subpar. (C).

1987—Subsec. (b)(1). Pub. L. 100–4, §§ 308(b), 406(d)(3), 505(a), substituted "transacts business which is directly affected by such action" for "transacts such business", "120" for "ninety", and "120th" for "ninetieth", substituted "1316, or 1345 of this title" for "or 1316 of this title" in cl. (E), and added cl. (G).

Subsec. (b)(3), (4). Pub. L. 100–4, § 505(b), added pars. (3) and (4).

1973—Subsec. (b)(1)(C). Pub. L. 93–207 substituted "pretreatment" for "treatment".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–236 effective 180 days after Jan. 8, 1988, see section 3 of Pub. L. 100–236, set out as a note under section 2112 of Title 28, Judiciary and Judicial Procedure.

## § 1370. State authority

Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



the request by the Administrator of comments by the Science Advisory Board prior to proposal of a maximum contaminant level goal and national primary drinking water regulation for provisions which related to study by the National Academy of Sciences to determine the maximum contaminant levels, report to Congress, and funding therefor.

1977—Subsec. (e)(2). Pub. L. 95–190 inserted provisions relating to revisions of the required report and cl. (G).

NATIONAL PRIMARY DRINKING WATER REGULATION FOR ARSENIC

Pub. L. 106–377, §1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–41, provided in part: ''That notwithstanding section 1412(b)(12)(A)(v) of the Safe Drinking Water Act, as amended [42 U.S.C. 300g–1(b)(12)(A)(v)], the Administrator shall promulgate a national primary drinking water regulation for arsenic not later than June 22, 2001.''

APPLICABILITY OF PRIOR REQUIREMENTS

Pub. L. 104–182, title I, §102(b), Aug. 6, 1996, 110 Stat. 1620, provided that: ''The requirements of subparagraphs (C) and (D) of section 1412(b)(3) of the Safe Drinking Water Act [42 U.S.C. 300g–1(b)(3)(C), (D)] as in effect before the date of enactment of this Act [Aug. 6, 1996], and any obligation to promulgate regulations pursuant to such subparagraphs not promulgated as of the date of enactment of this Act, are superseded by the amendments made by subsection (a) [amending this section].''

DISINFECTANTS AND DISINFECTION BYPRODUCTS

Pub. L. 104–182, title I, §104(b), Aug. 6, 1996, 110 Stat. 1625, provided that: ''The Administrator of the Environmental Protection Agency may use the authority of section 1412(b)(5) of the Safe Drinking Water Act [42 U.S.C. 300g–1(b)(5)] (as amended by this Act) to promulgate the Stage I and Stage II Disinfectants and Disinfection Byproducts Rules as proposed in volume 59, Federal Register, page 38668 (July 29, 1994). The considerations used in the development of the July 29, 1994, proposed national primary drinking water regulation on disinfectants and disinfection byproducts shall be treated as consistent with such section 1412(b)(5) for purposes of such Stage I and Stage II rules.''

## § 300g–2. State primary enforcement responsibility

**(a) In general**

For purposes of this subchapter, a State has primary enforcement responsibility for public water systems during any period for which the Administrator determines (pursuant to regulations prescribed under subsection (b) of this section) that such State—

(1) has adopted drinking water regulations that are no less stringent than the national primary drinking water regulations promulgated by the Administrator under subsections (a) and (b) of section 300g–1 of this title not later than 2 years after the date on which the regulations are promulgated by the Administrator, except that the Administrator may provide for an extension of not more than 2 years if, after submission and review of appropriate, adequate documentation from the State, the Administrator determines that the extension is necessary and justified;

(2) has adopted and is implementing adequate procedures for the enforcement of such State regulations, including conducting such monitoring and making such inspections as the Administrator may require by regulation;

(3) will keep such records and make such reports with respect to its activities under paragraphs (1) and (2) as the Administrator may require by regulation;

(4) if it permits variances or exemptions, or both, from the requirements of its drinking water regulations which meet the requirements of paragraph (1), permits such variances and exemptions under conditions and in a manner which is not less stringent than the conditions under, and the manner in which variances and exemptions may be granted under sections 300g–4 and 300g–5 of this title;

(5) has adopted and can implement an adequate plan for the provision of safe drinking water under emergency circumstances including earthquakes, floods, hurricanes, and other natural disasters, as appropriate; and

(6) has adopted authority for administrative penalties (unless the constitution of the State prohibits the adoption of the authority) in a maximum amount—

(A) in the case of a system serving a population of more than 10,000, that is not less than $1,000 per day per violation; and

(B) in the case of any other system, that is adequate to ensure compliance (as determined by the State);

except that a State may establish a maximum limitation on the total amount of administrative penalties that may be imposed on a public water system per violation.

**(b) Regulations**

(1) The Administrator shall, by regulation (proposed within 180 days of December 16, 1974), prescribe the manner in which a State may apply to the Administrator for a determination that the requirements of paragraphs (1), (2), (3), and (4) of subsection (a) of this section are satisfied with respect to the State, the manner in which the determination is made, the period for which the determination will be effective, and the manner in which the Administrator may determine that such requirements are no longer met. Such regulations shall require that before a determination of the Administrator that such requirements are met or are no longer met with respect to a State may become effective, the Administrator shall notify such State of the determination and the reasons therefor and shall provide an opportunity for public hearing on the determination. Such regulations shall be promulgated (with such modifications as the Administrator deems appropriate) within 90 days of the publication of the proposed regulations in the Federal Register. The Administrator shall promptly notify in writing the chief executive officer of each State of the promulgation of regulations under this paragraph. Such notice shall contain a copy of the regulations and shall specify a State's authority under this subchapter when it is determined to have primary enforcement responsibility for public water systems.

(2) When an application is submitted in accordance with the Administrator's regulations under paragraph (1), the Administrator shall within 90 days of the date on which such application is submitted (A) make the determination applied for, or (B) deny the application and notify the applicant in writing of the reasons for his denial.

**(c) Interim primary enforcement authority**

A State that has primary enforcement authority under this section with respect to each existing national primary drinking water regulation shall be considered to have primary enforcement authority with respect to each new or revised national primary drinking water regulation during the period beginning on the effective date of a regulation adopted and submitted by the State with respect to the new or revised national primary drinking water regulation in accordance with subsection (b)(1) of this section and ending at such time as the Administrator makes a determination under subsection (b)(2)(B) of this section with respect to the regulation.

(July 1, 1944, ch. 373, title XIV, § 1413, as added Pub. L. 93–523, § 2(a), Dec. 16, 1974, 88 Stat. 1665; amended Pub. L. 99–339, title I, § 101(c)(2), June 19, 1986, 100 Stat. 646; Pub. L. 104–182, title I, §§ 112, 113(b), Aug. 6, 1996, 110 Stat. 1633, 1635.)

AMENDMENTS

1996—Subsec. (a)(1). Pub. L. 104–182, § 112(a)(1), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "has adopted drinking water regulations which are no less stringent than the national primary drinking water regulations in effect under sections 300g–1(a) and 300g–1(b) of this title;".

Subsec. (a)(5). Pub. L. 104–182, § 112(b), inserted "including earthquakes, floods, hurricanes, and other natural disasters, as appropriate" after "emergency circumstances".

Subsec. (a)(6). Pub. L. 104–182, § 113(b), added par. (6).

Subsec. (c). Pub. L. 104–182, § 112(a)(2), added subsec. (c).

1986—Subsec. (a)(1). Pub. L. 99–339 substituted "are no less stringent than the national primary drinking water regulations in effect under sections 300g–1(a) and 300g–1(b) of this title" for subpars. (A) and (B) which related to stringency of State drinking water regulations between period of promulgation and effective date of national interim drinking water regulations and during the period after such effective date.

### § 300g–3. Enforcement of drinking water regulations

**(a) Notice to State and public water system; issuance of administrative order; civil action**

(1)(A) Whenever the Administrator finds during a period during which a State has primary enforcement responsibility for public water systems (within the meaning of section 300g–2(a) of this title) that any public water system—

(i) for which a variance under section 300g–4 or an exemption under section 300g–5 of this title is not in effect, does not comply with any applicable requirement, or

(ii) for which a variance under section 300g–4 or an exemption under section 300g–5 of this title is in effect, does not comply with any schedule or other requirement imposed pursuant thereto,

he shall so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time.

(B) If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action, the Administrator shall issue an order under subsection (g) of this section requiring the public water system to comply with such applicable requirement or the Administrator shall commence a civil action under subsection (b) of this section.

(2) ENFORCEMENT IN NONPRIMACY STATES.—

(A) IN GENERAL.—If, on the basis of information available to the Administrator, the Administrator finds, with respect to a period in which a State does not have primary enforcement responsibility for public water systems, that a public water system in the State—

(i) for which a variance under section 300g–4 of this title or an exemption under section 300g–5 of this title is not in effect, does not comply with any applicable requirement; or

(ii) for which a variance under section 300g–4 of this title or an exemption under section 300g–5 of this title is in effect, does not comply with any schedule or other requirement imposed pursuant to the variance or exemption;

the Administrator shall issue an order under subsection (g) of this section requiring the public water system to comply with the requirement, or commence a civil action under subsection (b) of this section.

(B) NOTICE.—If the Administrator takes any action pursuant to this paragraph, the Administrator shall notify an appropriate local elected official, if any, with jurisdiction over the public water system of the action prior to the time that the action is taken.

**(b) Judicial determinations in appropriate Federal district courts; civil penalties, separate violations**

The Administrator may bring a civil action in the appropriate United States district court to require compliance with any applicable requirement, with an order issued under subsection (g) of this section, or with any schedule or other requirement imposed pursuant to a variance or exemption granted under section 300g–4 or 300g–5 of this title if—

(1) authorized under paragraph (1) or (2) of subsection (a) of this section, or

(2) if requested by (A) the chief executive officer of the State in which is located the public water system which is not in compliance with such regulation or requirement, or (B) the agency of such State which has jurisdiction over compliance by public water systems in the State with national primary drinking water regulations or State drinking water regulations.

The court may enter, in an action brought under this subsection, such judgement as protection of public health may require, taking into consideration the time necessary to comply and the availability of alternative water supplies; and, if the court determines that there has been a violation of the regulation or schedule or other requirement with respect to which the action was brought, the court may, taking into account the seriousness of the violation, the population at risk, and other appropriate factors, impose on the violator a civil penalty of not to exceed

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



**§ 300h–1. State primary enforcement responsibility**

**(a) List of States in need of a control program; amendment of list**

Within 180 days after December 16, 1974, the Administrator shall list in the Federal Register each State for which in his judgment a State underground injection control program may be necessary to assure that underground injection will not endanger drinking water sources. Such list may be amended from time to time.

**(b) State applications; notice to Administrator of compliance with revised or added requirements; approval or disapproval by Administrator; duration of State primary enforcement responsibility; public hearing**

(1)(A) Each State listed under subsection (a) shall within 270 days after the date of promulgation of any regulation under section 300h of this title (or, if later, within 270 days after such State is first listed under subsection (a)) submit to the Administrator an application which contains a showing satisfactory to the Administrator that the State—

(i) has adopted after reasonable notice and public hearings, and will implement, an underground injection control program which meets the requirements of regulations in effect under section 300h of this title; and

(ii) will keep such records and make such reports with respect to its activities under its underground injection control program as the Administrator may require by regulation.

The Administrator may, for good cause, extend the date for submission of an application by any State under this subparagraph for a period not to exceed an additional 270 days.

(B) Within 270 days of any amendment of a regulation under section 300h of this title revising or adding any requirement respecting State underground injection control programs, each State listed under subsection (a) shall submit (in such form and manner as the Administrator may require) a notice to the Administrator containing a showing satisfactory to him that the State underground injection control program meets the revised or added requirement.

(2) Within ninety days after the State's application under paragraph (1)(A) or notice under paragraph (1)(B) and after reasonable opportunity for presentation of views, the Administrator shall by rule either approve, disapprove, or approve in part and disapprove in part, the State's underground injection control program.

(3) If the Administrator approves the State's program under paragraph (2), the State shall have primary enforcement responsibility for underground water sources until such time as the Administrator determines, by rule, that such State no longer meets the requirements of clause (i) or (ii) of paragraph (1)(A) of this subsection.

(4) Before promulgating any rule under paragraph (2) or (3) of this subsection, the Administrator shall provide opportunity for public hearing respecting such rule.

**(c) Program by Administrator for State without primary enforcement responsibility; restrictions**

If the Administrator disapproves a State's program (or part thereof) under subsection (b)(2), if the Administrator determines under subsection (b)(3) that a State no longer meets the requirements of clause (i) or (ii) of subsection (b)(1)(A), or if a State fails to submit an application or notice before the date of expiration of the period specified in subsection (b)(1), the Administrator shall by regulation within 90 days after the date of such disapproval, determination, or expiration (as the case may be) prescribe (and may from time to time by regulation revise) a program applicable to such State meeting the requirements of section 300h(b) of this title. Such program may not include requirements which interfere with or impede—

(1) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production or natural gas storage operations, or

(2) any underground injection for the secondary or tertiary recovery of oil or natural gas,

unless such requirements are essential to assure that underground sources of drinking water will not be endangered by such injection. Such program shall apply in such State to the extent that a program adopted by such State which the Administrator determines meets such requirements is not in effect. Before promulgating any regulation under this section, the Administrator shall provide opportunity for public hearing respecting such regulation.

**(d) "Applicable underground injection control program" defined**

For purposes of this subchapter, the term "applicable underground injection control program" with respect to a State means the program (or most recent amendment thereof) (1) which has been adopted by the State and which has been approved under subsection (b), or (2) which has been prescribed by the Administrator under subsection (c).

**(e) Primary enforcement responsibility by Indian Tribe**

An Indian Tribe may assume primary enforcement responsibility for underground injection control under this section consistent with such regulations as the Administrator has prescribed pursuant to this part and section 300j–11 of this title. The area over which such Indian Tribe exercises governmental jurisdiction need not have been listed under subsection (a) of this section, and such Tribe need not submit an application to assume primary enforcement responsibility within the 270-day deadline noted in subsection (b)(1)(A) of this section. Until an Indian Tribe assumes primary enforcement responsibility, the currently applicable underground injection control program shall continue to apply. If an applicable underground injection control program does not exist for an Indian Tribe, the Administrator shall prescribe such a program pursuant to subsection (c) of this section, and consistent with section 300h(b) of this title, within 270 days after June 19, 1986, unless an Indian

Tribe first obtains approval to assume primary enforcement responsibility for underground injection control.

(July 1, 1944, ch. 373, title XIV, § 1422, as added Pub. L. 93–523, § 2(a), Dec. 16, 1974, 88 Stat. 1676; amended Pub. L. 95–190, § 6(a), Nov. 16, 1977, 91 Stat. 1396; Pub. L. 99–339, title II, § 201(a), title III, § 302(c), June 19, 1986, 100 Stat. 653, 666.)

**Editorial Notes**

AMENDMENTS

1986—Subsec. (c)(1). Pub. L. 99–339, § 201(a), inserted "or natural gas storage operations, or" after "production".

Subsec. (e). Pub. L. 99–339, § 302(c), added subsec. (e).

1977—Subsec. (b)(1)(A). Pub. L. 95–190 inserted provisions relating to extension of date for submission of applications by any State.

### § 300h–2. Enforcement of program

#### (a) Notice to State and violator; issuance of administrative order; civil action

(1) Whenever the Administrator finds during a period during which a State has primary enforcement responsibility for underground water sources (within the meaning of section 300h–1(b)(3) of this title or section 300h–4(c) of this title) that any person who is subject to a requirement of an applicable underground injection control program in such State is violating such requirement, he shall so notify the State and the person violating such requirement. If beyond the thirtieth day after the Administrator's notification the State has not commenced appropriate enforcement action, the Administrator shall issue an order under subsection (c) requiring the person to comply with such requirement or the Administrator shall commence a civil action under subsection (b).

(2) Whenever the Administrator finds during a period during which a State does not have primary enforcement responsibility for underground water sources that any person subject to any requirement of any applicable underground injection control program in such State is violating such requirement, the Administrator shall issue an order under subsection (c) requiring the person to comply with such requirement or the Administrator shall commence a civil action under subsection (b).

#### (b) Civil and criminal actions

Civil actions referred to in paragraphs (1) and (2) of subsection (a) shall be brought in the appropriate United States district court. Such court shall have jurisdiction to require compliance with any requirement of an applicable underground injection program or with an order issued under subsection (c). The court may enter such judgment as protection of public health may require. Any person who violates any requirement of an applicable underground injection control program or an order requiring compliance under subsection (c)—

(1) shall be subject to a civil penalty of not more than $25,000 for each day of such violation, and

(2) if such violation is willful, such person may, in addition to or in lieu of the civil penalty authorized by paragraph (1), be imprisoned for not more than 3 years, or fined in accordance with title 18, or both.

#### (c) Administrative orders

(1) In any case in which the Administrator is authorized to bring a civil action under this section with respect to any regulation or other requirement of this part other than those relating to—

(A) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production, or

(B) any underground injection for the secondary or tertiary recovery of oil or natural gas,

the Administrator may also issue an order under this subsection either assessing a civil penalty of not more than $10,000 for each day of violation for any past or current violation, up to a maximum administrative penalty of $125,000, or requiring compliance with such regulation or other requirement, or both.

(2) In any case in which the Administrator is authorized to bring a civil action under this section with respect to any regulation, or other requirement of this part relating to—

(A) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production, or

(B) any underground injection for the secondary or tertiary recovery of oil or natural gas,

the Administrator may also issue an order under this subsection either assessing a civil penalty of not more than $5,000 for each day of violation for any past or current violation, up to a maximum administrative penalty of $125,000, or requiring compliance with such regulation or other requirement, or both.

(3)(A) An order under this subsection shall be issued by the Administrator after opportunity (provided in accordance with this subparagraph) for a hearing. Before issuing the order, the Administrator shall give to the person to whom it is directed written notice of the Administrator's proposal to issue such order and the opportunity to request, within 30 days of the date the notice is received by such person, a hearing on the order. Such hearing shall not be subject to section 554 or 556 of title 5, but shall provide a reasonable opportunity to be heard and to present evidence.

(B) The Administrator shall provide public notice of, and reasonable opportunity to comment on, any proposed order.

(C) Any citizen who comments on any proposed order under subparagraph (B) shall be given notice of any hearing under this subsection and of any order. In any hearing held under subparagraph (A), such citizen shall have a reasonable opportunity to be heard and to present evidence.

(D) Any order issued under this subsection shall become effective 30 days following its issuance unless an appeal is taken pursuant to paragraph (6).

(4)(A) Any order issued under this subsection shall state with reasonable specificity the na-

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



portunity to confer with the Administrator and shall provide the agency notice and an opportunity for a hearing on the record in accordance with chapters 5 and 7 of title 5.

**(4) Public review**

**(A) In general**

Any interested person may obtain review of an administrative penalty order issued under this subsection. The review may be obtained in the United States District Court for the District of Columbia or in the United States District Court for the district in which the violation is alleged to have occurred by the filing of a complaint with the court within the 30-day period beginning on the date the penalty order becomes final. The person filing the complaint shall simultaneously send a copy of the complaint by certified mail to the Administrator and the Attorney General.

**(B) Record**

The Administrator shall promptly file in the court a certified copy of the record on which the order was issued.

**(C) Standard of review**

The court shall not set aside or remand the order unless the court finds that there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or that the assessment of the penalty by the Administrator constitutes an abuse of discretion.

**(D) Prohibition on additional penalties**

The court may not impose an additional civil penalty for a violation that is subject to the order unless the court finds that the assessment constitutes an abuse of discretion by the Administrator.

**(c) Limitation on State use of funds collected from Federal Government**

Unless a State law in effect on August 6, 1996, or a State constitution requires the funds to be used in a different manner, all funds collected by a State from the Federal Government from penalties and fines imposed for violation of any substantive or procedural requirement referred to in subsection (a) shall be used by the State only for projects designed to improve or protect the environment or to defray the costs of environmental protection or enforcement.

**(d) Indian rights and sovereignty as unaffected; "Federal agency" defined**

(1) Nothing in the Safe Drinking Water Amendments of 1977 shall be construed to alter or affect the status of American Indian lands or water rights nor to waive any sovereignty over Indian lands guaranteed by treaty or statute.

(2) For the purposes of this chapter, the term ''Federal agency'' shall not be construed to refer to or include any American Indian tribe, nor to the Secretary of the Interior in his capacity as trustee of Indian lands.

**(e) Washington Aqueduct**

The Secretary of the Army shall not pass the cost of any penalty assessed under this subchapter on to any customer, user, or other purchaser of drinking water from the Washington Aqueduct system, including finished water from the Dalecarlia or McMillan treatment plant.

(July 1, 1944, ch. 373, title XIV, § 1447, as added Pub. L. 93–523, § 2(a), Dec. 16, 1974, 88 Stat. 1688; amended Pub. L. 95–190, § 8(a), (d), Nov. 16, 1977, 91 Stat. 1396, 1397; Pub. L. 104–182, title I, § 129(a), (c), Aug. 6, 1996, 110 Stat. 1660, 1662.)

**Editorial Notes**

REFERENCES IN TEXT

The Safe Drinking Water Amendments of 1977, referred to in subsec. (d)(1), is Pub. L. 95–190, Nov. 16, 1977, 91 Stat. 1393. For complete classification of this Act to the Code, see Short Title of 1977 Amendment note set out under section 201 of this title and Tables.

AMENDMENTS

1996—Subsecs. (a) to (d). Pub. L. 104–182, § 129(a), added subsecs. (a) to (c), redesignated former subsec. (c) as (d), and struck out former subsecs. (a) and (b) which related to compliance by Federal agencies with Federal, State, and local requirements respecting provision of safe drinking water and respecting underground injection programs, liability for civil penalties, and waiver of compliance requirements when necessary in interest of national security.

Subsec. (e). Pub. L. 104–182, § 129(c), added subsec. (e).

1977—Subsec. (a). Pub. L. 95–190, § 8(a), substituted provisions relating to compliance by Federal agencies having jurisdiction over federally owned or maintained public water systems, or engaged in underground injection activities with Federal, State, and local requirements, etc., for provisions relating to compliance by Federal agencies having jurisdiction over federally owned or maintained public water systems with national primary drinking water regulations.

Subsec. (c). Pub. L. 95–190, § 8(d), added subsec. (c).

## § 300j–7. Judicial review

**(a) Courts of appeals; petition for review: actions respecting regulations; filing period; grounds arising after expiration of filing period; exclusiveness of remedy**

A petition for review of—

(1) actions pertaining to the establishment of national primary drinking water regulations (including maximum contaminant level goals) may be filed only in the United States Court of Appeals for the District of Columbia circuit; and

(2) any other final action of the Administrator under this chapter may be filed in the circuit in which the petitioner resides or transacts business which is directly affected by the action.

Any such petition shall be filed within the 45-day period beginning on the date of the promulgation of the regulation or any other final Agency action with respect to which review is sought or on the date of the determination with respect to which review is sought, and may be filed after the expiration of such 45-day period if the petition is based solely on grounds arising after the expiration of such period. Action of the Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or in any civil action to enjoin enforcement. In any petition concerning the assessment of a civil penalty

pursuant to section 300g–3(g)(3)(B) of this title, the petitioner shall simultaneously send a copy of the complaint by certified mail to the Administrator and the Attorney General. The court shall set aside and remand the penalty order if the court finds that there is not substantial evidence in the record to support the finding of a violation or that the assessment of the penalty by the Administrator constitutes an abuse of discretion.

**(b) District courts; petition for review: actions respecting variances or exemptions; filing period; grounds arising after expiration of filing period; exclusiveness of remedy**

The United States district courts shall have jurisdiction of actions brought to review (1) the granting of, or the refusing to grant, a variance or exemption under section 300g–4 or 300g–5 of this title or (2) the requirements of any schedule prescribed for a variance or exemption under such section or the failure to prescribe such a schedule. Such an action may only be brought upon a petition for review filed with the court within the 45-day period beginning on the date the action sought to be reviewed is taken or, in the case of a petition to review the refusal to grant a variance or exemption or the failure to prescribe a schedule, within the 45-day period beginning on the date action is required to be taken on the variance, exemption, or schedule, as the case may be. A petition for such review may be filed after the expiration of such period if the petition is based solely on grounds arising after the expiration of such period. Action with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or in any civil action to enjoin enforcement.

**(c) Judicial order for additional evidence before Administrator; modified or new findings; recommendation for modification or setting aside of original determination**

In any judicial proceeding in which review is sought of a determination under this subchapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such term and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken, and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(July 1, 1944, ch. 373, title XIV, § 1448, as added Pub. L. 93–523, § 2(a), Dec. 16, 1974, 88 Stat. 1689; amended Pub. L. 99–339, title III, § 303, June 19, 1986, 100 Stat. 667; Pub. L. 104–182, title I, § 113(c), Aug. 6, 1996, 110 Stat. 1636.)

**Editorial Notes**

AMENDMENTS

1996—Subsec. (a). Pub. L. 104–182, § 113(c)(2), (3), in concluding provisions, substituted ''or any other final Agency action'' for ''or issuance of the order'' and inserted at end ''In any petition concerning the assessment of a civil penalty pursuant to section 300g–3(g)(3)(B) of this title, the petitioner shall simultaneously send a copy of the complaint by certified mail to the Administrator and the Attorney General. The court shall set aside and remand the penalty order if the court finds that there is not substantial evidence in the record to support the finding of a violation or that the assessment of the penalty by the Administrator constitutes an abuse of discretion.''

Subsec. (a)(2). Pub. L. 104–182, § 113(c)(1), substituted ''any other final action'' for ''any other action''.

1986—Subsec. (a)(1). Pub. L. 99–339, § 303(1), amended par. (1) generally. Prior to amendment, par. (1) read as follows: ''action of the Administrator in promulgating any national primary drinking water regulation under section 300g–1 of this title, any regulation under section 300g–2(b)(1) of this title, any regulation under section 300g–3(c) of this title, any regulation for State underground injection control programs under section 300h of this title, or any general regulation for the administration of this subchapter may be filed only in the United States Court of Appeals for the District of Columbia Circuit; and''.

Subsec. (a)(2). Pub. L. 99–339, § 303(2), amended par. (2) generally. Prior to amendment, par. (2) read as follows: ''action of the Administrator in promulgating any other regulation under this subchapter, issuing any order under this subchapter, or making any determination under this subchapter may be filed only in the United States court of appeals for the appropriate circuit.''

**§ 300j–8. Citizen's civil action**

**(a) Persons subject to civil action; jurisdiction of enforcement proceedings**

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

(1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any requirement prescribed by or under this subchapter;

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this subchapter which is not discretionary with the Administrator; or

(3) for the collection of a penalty by the United States Government (and associated costs and interest) against any Federal agency that fails, by the date that is 18 months after the effective date of a final order to pay a penalty assessed by the Administrator under section 300h–8(b)[1] of this title, to pay the penalty.

No action may be brought under paragraph (1) against a public water system for a violation of a requirement prescribed by or under this subchapter which occurred within the 27-month period beginning on the first day of the month in which this subchapter is enacted. The United States district courts shall have jurisdiction, without regard to the amount in controversy or

[1] So in original. Probably should be section ''300j–6(b)''.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





under normal operating conditions, on an annual average basis;

(ii) the hydraulic retention time in such initial impoundment is no longer than thirty days under normal operating conditions, on an annual average basis: *Provided*, That the sludge in such impoundment does not constitute a hazardous waste as identified by the extraction procedure toxicity characteristic in effect on November 8, 1984; or

(iii) such system utilizes activated sludge treatment in the first portion of secondary treatment.

(C) For the purposes of this subsection, the term ''underground source or[3] drinking water'' has the same meaning as provided in regulations under the Safe Drinking Water Act (title XIV of the Public Health Service Act [42 U.S.C. 300f et seq.]).

(13) The Administrator may modify the requirements of paragraph (1) in the case of a surface impoundment for which the owner or operator, prior to October 1, 1984, has entered into, and is in compliance with, a consent order, decree, or agreement with the Administrator or a State with an authorized program mandating corrective action with respect to such surface impoundment that provides a degree of protection of human health and the environment which is at a minimum equivalent to that provided by paragraph (1).

(Pub. L. 89–272, title II, § 3005, as added Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2808; amended Pub. L. 95–609, § 7(h), Nov. 8, 1978, 92 Stat. 3082; Pub. L. 96–482, §§ 10, 11, Oct. 21, 1980, 94 Stat. 2338; Pub. L. 98–616, title II, §§ 211–213(a), (c), 214(a), 215, 224(b), 243(c), Nov. 8, 1984, 98 Stat. 3240–3243, 3253, 3261; Pub. L. 104–119, § 4(6), (7), Mar. 26, 1996, 110 Stat. 833.)

**Editorial Notes**

REFERENCES IN TEXT

The Surface Mining Control and Reclamation Act of 1977, referred to in subsec. (f), is Pub. L. 95–87, Aug. 3, 1977, 91 Stat. 445, which is classified generally to chapter 25 (§ 1201 et seq.) of Title 30, Mineral Lands and Mining. For complete classification of this Act to the Code, see Short Title note set out under section 1201 of Title 30 and Tables.

The Safe Drinking Water Act, referred to in subsec. (j)(12)(C), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, § 2(a), 88 Stat. 1660, which is classified generally to subchapter XII (§ 300f et seq.) of chapter 6A of this title. For complete classification of this Act to the Code see Short Title note set out under section 201 of this title and Tables.

AMENDMENTS

1996—Subsec. (a). Pub. L. 104–119, § 4(6), substituted ''polychlorinated'' for ''polycholorinated''.

Subsec. (e)(1)(C). Pub. L. 104–119, § 4(7), inserted comma at end of subpar. (C).

1984—Subsec. (a). Pub. L. 98–616, § 211, substituted ''an existing facility or planning to construct a new'' for ''a'', inserted ''and the construction of any new facility for the treatment, storage, or disposal of any such hazardous waste'', and inserted at end ''No permit shall be required under this section in order to construct a facility if such facility is constructed pursuant to an approval issued by the Administrator under section 2605(e) of title 15 for the incineration of polycholorinated [sic] biphenyls and any person owning or operating such a facility may, at any time after operation or construction of such facility has begun, file an application for a permit pursuant to this section authorizing such facility to incinerate hazardous waste identified or listed under this subchapter.''

Subsec. (c)(1), (2). Pub. L. 98–616, § 213(c), designated existing provisions as par. (1) and added par. (2).

Subsec. (c)(3). Pub. L. 98–616, § 212, added par. (3).

Subsec. (e). Pub. L. 98–616, § 213(a), designated existing provisions as par. (1), redesignated former pars. (1), (2), and (3) thereof as subpars. (A), (B), and (C), respectively, designated existing provisions of previously redesignated subpar. (A) as cl. (i) and added cl. (ii), inserted ''This paragraph shall not apply to any facility which has been previously denied a permit under this section or if authority to operate the facility under this section has been previously terminated.'' to closing provisions of par. (1), and added pars. (2) and (3).

Subsec. (g). Pub. L. 98–616, § 214(a), added subsec. (g).

Subsec. (h). Pub. L. 98–616, § 224(b), added subsec. (h).

Subsec. (i). Pub. L. 98–616, § 243(c), added subsec. (i).

Subsec. (j). Pub. L. 98–616, § 215, added subsec. (j).

1980—Subsec. (e)(1). Pub. L. 96–482, § 10, substituted ''November 19, 1980'' for ''October 21, 1976''.

Subsec. (f). Pub. L. 96–482, § 11, added subsec. (f).

1978—Subsec (a). Pub. L. 95–609 inserted ''treatment, storage, or'' after ''and after such date the''.

**Executive Documents**

TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Administrator or other official of Environmental Protection Agency under this chapter to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 6903 of this title.

## § 6926. Authorized State hazardous waste programs

### (a) Federal guidelines

Not later than eighteen months after October 21, 1976, the Administrator, after consultation with State authorities, shall promulgate guidelines to assist States in the Development of State hazardous waste programs.

### (b) Authorization of State program

Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and, after notice and opportunity for public hearing, submit to the Administrator an application, in such form as he shall require, for authorization of such program. Within ninety days following submission of an application under this subsection, the Administrator shall issue a notice as to whether or not he expects such program to be authorized, and within ninety days following such notice (and after opportunity for public hearing) he shall publish his findings as to whether or not the conditions listed in items (1), (2), and (3) below have been met. Such State is authorized to carry out such program in lieu of the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste (and to enforce permits deemed to have been issued under section 6935(d)(1)[1] of this title) unless,

[3] So in original. Probably should be ''of''.

[1] See References in Text note below.

within ninety days following submission of the application the Administrator notifies such State that such program may not be authorized and, within ninety days following such notice and after opportunity for public hearing, he finds that (1) such State program is not equivalent to the Federal program under this subchapter, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter. In authorizing a State program, the Administrator may base his findings on the Federal program in effect one year prior to submission of a State's application or in effect on January 26, 1983, whichever is later.

**(c) Interim authorization**

(1) Any State which has in existence a hazardous waste program pursuant to State law before the date ninety days after the date of promulgation of regulations under sections 6922, 6923, 6924, and 6925 of this title, may submit to the Administrator evidence of such existing program and may request a temporary authorization to carry out such program under this subchapter. The Administrator shall, if the evidence submitted shows the existing State program to be substantially equivalent to the Federal program under this subchapter, grant an interim authorization to the State to carry out such program in lieu of the Federal program pursuant to this subchapter for a period ending no later than January 31, 1986.

(2) The Administrator shall, by rule, establish a date for the expiration of interim authorization under this subsection.

(3) Pending interim or final authorization of a State program for any State which reflects the amendments made by the Hazardous and Solid Waste Amendments of 1984, the State may enter into an agreement with the Administrator under which the State may assist in the administration of the requirements and prohibitions which take effect pursuant to such Amendments.

(4) In the case of a State permit program for any State which is authorized under subsection (b) or under this subsection, until such program is amended to reflect the amendments made by the Hazardous and Solid Waste Amendments of 1984 and such program amendments receive interim or final authorization, the Administrator shall have the authority in such State to issue or deny permits or those portions of permits affected by the requirements and prohibitions established by the Hazardous and Solid Waste Amendments of 1984. The Administrator shall coordinate with States the procedures for issuing such permits.

**(d) Effect of State permit**

Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter.

**(e) Withdrawal of authorization**

Whenever the Administrator determines after public hearing that a State is not administering and enforcing a program authorized under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw authorization of such program and establish a Federal program pursuant to this subchapter. The Administrator shall not withdraw authorization of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

**(f) Availability of information**

No State program may be authorized by the Administrator under this section unless—

(1) such program provides for the public availability of information obtained by the State regarding facilities and sites for the treatment, storage, and disposal of hazardous waste; and

(2) such information is available to the public in substantially the same manner, and to the same degree, as would be the case if the Administrator was carrying out the provisions of this subchapter in such State.

**(g) Amendments made by 1984 act**

(1) Any requirement or prohibition which is applicable to the generation, transportation, treatment, storage, or disposal of hazardous waste and which is imposed under this subchapter pursuant to the amendments made by the Hazardous and Solid Waste Amendments of 1984 shall take effect in each State having an interim or finally authorized State program on the same date as such requirement takes effect in other States. The Administrator shall carry out such requirement directly in each such State unless the State program is finally authorized (or is granted interim authorization as provided in paragraph (2)) with respect to such requirement.

(2) Any State which, before November 8, 1984, has an existing hazardous waste program which has been granted interim or final authorization under this section may submit to the Administrator evidence that such existing program contains (or has been amended to include) any requirement which is substantially equivalent to a requirement referred to in paragraph (1) and may request interim authorization to carry out that requirement under this subchapter. The Administrator shall, if the evidence submitted shows the State requirement to be substantially equivalent to the requirement referred to in paragraph (1), grant an interim authorization to the State to carry out such requirement in lieu of direct administration in the State by the Administrator of such requirement.

**(h) State programs for used oil**

In the case of used oil which is not listed or identified under this subchapter as a hazardous waste but which is regulated under section 6935 of this title, the provisions of this section regarding State programs shall apply in the same manner and to the same extent as such provisions apply to hazardous waste identified or listed under this subchapter.

(Pub. L. 89–272, title II, §3006, as added Pub. L. 94–580, §2, Oct. 21, 1976, 90 Stat. 2809; amended Pub. L. 95–609, §7(i), Nov. 8, 1978, 92 Stat. 3082;

Pub. L. 98–616, title II, §§ 225, 226(a), 227, 228, 241(b)(2), Nov. 8, 1984, 98 Stat. 3254, 3255, 3260; Pub. L. 99–499, title II, § 205(j), Oct. 17, 1986, 100 Stat. 1703.)

**Editorial Notes**

References in Text

Section 6935(d)(1) of this title, referred to in subsec. (b), was in the original a reference to section 3012(d)(1) of Pub. L. 89–272, which was renumbered section 3014(d)(1) of Pub. L. 89–272 by Pub. L. 98–616 and is classified to section 6935(d)(1) of this title.

The Hazardous and Solid Waste Amendments of 1984, referred to in subsecs. (c)(3), (4), and (g), is Pub. L. 98–616, Nov. 8, 1984, 98 Stat. 3221, which amended this chapter. For complete classification of this Act to the Code, see Short Title of 1984 Amendment note set out under section 6901 of this title and Tables.

Amendments

1986—Subsec. (h). Pub. L. 99–499 added subsec. (h).

1984—Subsec. (b). Pub. L. 98–616, §§ 225, 241(b)(2), inserted "(and to enforce permits deemed to have been issued under section 6935(d)(1) of this title)", and inserted provision at end that in authorizing a State program, the Administrator may base his findings on the Federal program in effect one year prior to submission of a State's application or in effect on January 26, 1983, whichever is later.

Subsec. (c)(1). Pub. L. 98–616, § 227(1), (2), designated existing provisions as par. (1) and substituted "period ending no later than January 31, 1986" for "twenty-four month period beginning on the date six months after the date of promulgation of regulations under sections 6922 through 6925 of this title".

Subsec. (c)(2) to (4). Pub. L. 98–616, § 227(3), added pars. (2) to (4).

Subsec. (f). Pub. L. 98–616, § 226(a), added subsec. (f).

Subsec. (g). Pub. L. 98–616, § 228, added subsec. (g).

1978—Subsec. (c). Pub. L. 95–609 substituted "of" for "required for" wherever appearing and "may submit" for "submit".

**Statutory Notes and Related Subsidiaries**

Effective Date of 1984 Amendment

Pub. L. 98–616, title II, § 226(b), Nov. 8, 1984, 98 Stat. 3254, provided that: "The amendment made by subsection (a) [enacting subsec. (f) of this section] shall apply with respect to State programs authorized under section 3006 [this section] before, on, or after the date of enactment of the Hazardous and Solid Waste Amendments of 1984 [Nov. 8, 1984]."

**Executive Documents**

Transfer of Functions

For transfer of certain enforcement functions of Administrator or other official of Environmental Protection Agency under this chapter to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 6903 of this title.

## § 6927. Inspections

### (a) Access entry

For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes. For the purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, such officers, employees or representatives are authorized—

(1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

(2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge.

### (b) Availability to public

(1) Any records, reports, or information (including records, reports, or information obtained by representatives of the Environmental Protection Agency) obtained from any person under this section shall be available to the public, except that upon a showing satisfactory to the Administrator (or the State, as the case may be) by any person that records, reports, or information, or particular part thereof, to which the Administrator (or the State, as the case may be) or any officer, employee or representative thereof has access under this section if made public, would divulge information entitled to protection under section 1905 of title 18, such information or particular portion thereof shall be considered confidential in accordance with the purposes of that section, except that such record, report, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, or when relevant in any proceeding under this chapter.

(2) Any person not subject to the provisions of section 1905 of title 18 who knowingly and willfully divulges or discloses any information entitled to protection under this subsection shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

(3) In submitting data under this chapter, a person required to provide such data may—

(A) designate the data which such person believes is entitled to protection under this subsection, and

(B) submit such designated data separately from other data submitted under this chapter.

A designation under this paragraph shall be made in writing and in such manner as the Administrator may prescribe.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



(A) A State registration fee on new motor vehicles registered in the State which are not clean-fuel vehicles in the amount of at least 1 percent of the cost of the vehicle. The proceeds of such fee shall be used to provide financial incentives to purchasers of clean-fuel vehicles and to vehicle dealers who sell high volumes or high percentages of clean-fuel vehicles and to defray the administrative costs of the incentive program.

(B) Provisions to exempt clean-fuel vehicles from high occupancy vehicle or trip reduction requirements.

(C) Provisions to provide preference in the use of existing parking spaces for clean-fuel vehicles.

The incentives under this paragraph shall not apply in the case of covered fleet vehicles.

**(4) No sales or production mandate**

The regulations and plan revisions under paragraphs (1) and (2) shall not include any production or sales mandate for clean-fuel vehicles or clean alternative fuels. Such regulations and plan revisions shall also provide that vehicle manufacturers and fuel suppliers may not be subject to penalties or sanctions for failing to produce or sell clean-fuel vehicles or clean alternative fuels.

(July 14, 1955, ch. 360, title II, § 249, as added Pub. L. 101–549, title II, § 229(a), Nov. 15, 1990, 104 Stat. 2525.)

REFERENCES IN TEXT

The Solid Waste Disposal Act, referred to in subsec. (c)(2)(D), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795. Subtitle I of the Act is classified generally to subchapter IX (§ 6991 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

November 15, 1990, referred to in subsec. (e)(3), was in the original ''the date of the Clean Air Act Amendments of 1990'', which was translated as meaning the date of enactment of Pub. L. 101–549, which enacted this section, to reflect the probable intent of Congress.

### § 7590. General provisions

**(a) State refueling facilities**

If any State adopts enforceable provisions in an implementation plan applicable to a nonattainment area which provides that existing State refueling facilities will be made available to the public for the purchase of clean alternative fuels or that State-operated refueling facilities for such fuels will be constructed and operated by the State and made available to the public at reasonable times, taking into consideration safety, costs, and other relevant factors, in approving such plan under section 7410 of this title and part D,[1] the Administrator may credit a State with the emission reductions for purposes of part D[1] attributable to such actions.

**(b) No production mandate**

The Administrator shall have no authority under this part to mandate the production of clean-fuel vehicles except as provided in the California pilot test program or to specify as applicable the models, lines, or types of, or marketing or price practices, policies, or strategies for, vehicles subject to this part. Nothing in this part shall be construed to give the Administrator authority to mandate marketing or pricing practices, policies, or strategies for fuels.

**(c) Tank and fuel system safety**

The Secretary of Transportation shall, in accordance with chapter 301 of title 49, promulgate applicable regulations regarding the safety and use of fuel storage cylinders and fuel systems, including appropriate testing and retesting, in conversions of motor vehicles.

**(d) Consultation with Department of Energy and Department of Transportation**

The Administrator shall coordinate with the Secretaries of the Department of Energy and the Department of Transportation in carrying out the Administrator's duties under this part.

(July 14, 1955, ch. 360, title II, § 250, as added Pub. L. 101–549, title II, § 229(a), Nov. 15, 1990, 104 Stat. 2528.)

CODIFICATION

In subsec. (c), ''chapter 301 of title 49'' substituted for ''the National Motor Vehicle Traffic Safety Act of 1966 [15 U.S.C. 1381 et seq.]'', meaning ''the National Traffic and Motor Vehicle Safety Act of 1966 [15 U.S.C. 1381 et seq.]'', on authority of Pub. L. 103–272, § 6(b), July 5, 1994, 108 Stat. 1378, the first section of which enacted subtitles II, III, and V to X of Title 49, Transportation.

## SUBCHAPTER III—GENERAL PROVISIONS

### § 7601. Administration

**(a) Regulations; delegation of powers and duties; regional officers and employees**

(1) The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter. The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of his powers and duties under this chapter, except the making of regulations subject to section 7607(d) of this title, as he may deem necessary or expedient.

(2) Not later than one year after August 7, 1977, the Administrator shall promulgate regulations establishing general applicable procedures and policies for regional officers and employees (including the Regional Administrator) to follow in carrying out a delegation under paragraph (1), if any. Such regulations shall be designed—

(A) to assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the chapter;

(B) to assure at least an adequate quality audit of each State's performance and adherence to the requirements of this chapter in implementing and enforcing the chapter, particularly in the review of new sources and in enforcement of the chapter; and

(C) to provide a mechanism for identifying and standardizing inconsistent or varying criteria, procedures, and policies being employed by such officers and employees in implementing and enforcing the chapter.

[1] So in original. Probably should be ''part D of subchapter I of this chapter''.

**(b) Detail of Environmental Protection Agency personnel to air pollution control agencies**

Upon the request of an air pollution control agency, personnel of the Environmental Protection Agency may be detailed to such agency for the purpose of carrying out the provisions of this chapter.

**(c) Payments under grants; installments; advances or reimbursements**

Payments under grants made under this chapter may be made in installments, and in advance or by way of reimbursement, as may be determined by the Administrator.

**(d) Tribal authority**

(1) Subject to the provisions of paragraph (2), the Administrator—

(A) is authorized to treat Indian tribes as States under this chapter, except for purposes of the requirement that makes available for application by each State no less than one-half of 1 percent of annual appropriations under section 7405 of this title; and

(B) may provide any such Indian tribe grant and contract assistance to carry out functions provided by this chapter.

(2) The Administrator shall promulgate regulations within 18 months after November 15, 1990, specifying those provisions of this chapter for which it is appropriate to treat Indian tribes as States. Such treatment shall be authorized only if—

(A) the Indian tribe has a governing body carrying out substantial governmental duties and powers;

(B) the functions to be exercised by the Indian tribe pertain to the management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction; and

(C) the Indian tribe is reasonably expected to be capable, in the judgment of the Administrator, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this chapter and all applicable regulations.

(3) The Administrator may promulgate regulations which establish the elements of tribal implementation plans and procedures for approval or disapproval of tribal implementation plans and portions thereof.

(4) In any case in which the Administrator determines that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible, the Administrator may provide, by regulation, other means by which the Administrator will directly administer such provisions so as to achieve the appropriate purpose.

(5) Until such time as the Administrator promulgates regulations pursuant to this subsection, the Administrator may continue to provide financial assistance to eligible Indian tribes under section 7405 of this title.

(July 14, 1955, ch. 360, title III, §301, formerly §8, as added Pub. L. 88–206, §1, Dec. 17, 1963, 77 Stat. 400, renumbered Pub. L. 89–272, title I, §101(4), Oct. 20, 1965, 79 Stat. 992; amended Pub. L. 90–148, §2, Nov. 21, 1967, 81 Stat. 504; Pub. L. 91–604, §§3(b)(2), 15(c)(2), Dec. 31, 1970, 84 Stat. 1677, 1713; Pub. L. 95–95, title III, §305(e), Aug. 7, 1977, 91 Stat. 776; Pub. L. 101–549, title I, §§107(d), 108(i), Nov. 15, 1990, 104 Stat. 2464, 2467.)

CODIFICATION

Section was formerly classified to section 1857g of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §108(i), inserted "subject to section 7607(d) of this title" after "regulations".

Subsec. (d). Pub. L. 101–549, §107(d), added subsec. (d).

1977—Subsec. (a). Pub. L. 95–95 designated existing provisions as par. (1) and added par. (2).

1970—Subsec. (a). Pub. L. 91–604, §15(c)(2), substituted "Administrator" for "Secretary" and "Environmental Protection Agency" for "Department of Health, Education, and Welfare".

Subsec. (b). Pub. L. 91–604, §3(b)(2), substituted "Environmental Protection Agency" for "Public Health Service" and struck out provisions covering the payment of salaries and allowances.

Subsec. (c). Pub. L. 91–604, §15(c)(2), substituted "Administrator" for "Secretary".

1967—Pub. L. 90–148 reenacted section without change.

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

DISADVANTAGED BUSINESS CONCERNS; USE OF QUOTAS PROHIBITED

Title X of Pub. L. 101–549 provided that:

"SEC. 1001. DISADVANTAGED BUSINESS CONCERNS.

"(a) IN GENERAL.—In providing for any research relating to the requirements of the amendments made by the Clean Air Act Amendments of 1990 [Pub. L. 101–549, see Tables for classification] which uses funds of the Environmental Protection Agency, the Administrator of the Environmental Protection Agency shall, to the extent practicable, require that not less than 10 percent of total Federal funding for such research will be made available to disadvantaged business concerns.

"(b) DEFINITION.—

"(1)(A) For purposes of subsection (a), the term 'disadvantaged business concern' means a concern—

"(i) which is at least 51 percent owned by one or more socially and economically disadvantaged individuals or, in the case of a publicly traded company, at least 51 percent of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

"(ii) the management and daily business operations of which are controlled by such individuals.

"(B)(i) A for-profit business concern is presumed to be a disadvantaged business concern for purposes of subsection (a) if it is at least 51 percent owned by, or in the case of a concern which is a publicly traded

company at least 51 percent of the stock of the company is owned by, one or more individuals who are members of the following groups:

''(I) Black Americans.
''(II) Hispanic Americans.
''(III) Native Americans.
''(IV) Asian Americans.
''(V) Women.
''(VI) Disabled Americans.

''(ii) The presumption established by clause (i) may be rebutted with respect to a particular business concern if it is reasonably established that the individual or individuals referred to in that clause with respect to that business concern are not experiencing impediments to establishing or developing such concern as a result of the individual's identification as a member of a group specified in that clause.

''(C) The following institutions are presumed to be disadvantaged business concerns for purposes of subsection (a):

''(i) Historically black colleges and universities, and colleges and universities having a student body in which 40 percent of the students are Hispanic.

''(ii) Minority institutions (as that term is defined by the Secretary of Education pursuant to the General Education Provision Act (20 U.S.C. 1221 et seq.)).

''(iii) Private and voluntary organizations controlled by individuals who are socially and economically disadvantaged.

''(D) A joint venture may be considered to be a disadvantaged business concern under subsection (a), notwithstanding the size of such joint venture, if—

''(i) a party to the joint venture is a disadvantaged business concern; and

''(ii) that party owns at least 51 percent of the joint venture.

A person who is not an economically disadvantaged individual or a disadvantaged business concern, as a party to a joint venture, may not be a party to more than 2 awarded contracts in a fiscal year solely by reason of this subparagraph.

''(E) Nothing in this paragraph shall prohibit any member of a racial or ethnic group that is not listed in subparagraph (B)(i) from establishing that they have been impeded in establishing or developing a business concern as a result of racial or ethnic discrimination.

''SEC. 1002. USE OF QUOTAS PROHIBITED.—Nothing in this title shall permit or require the use of quotas or a requirement that has the effect of a quota in determining eligibility under section 1001.''

**§ 7602. Definitions**

When used in this chapter—

(a) The term ''Administrator'' means the Administrator of the Environmental Protection Agency.

(b) The term ''air pollution control agency'' means any of the following:

(1) A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

(2) An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(3) A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

(4) An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(5) An agency of an Indian tribe.

(c) The term ''interstate air pollution control agency'' means—

(1) an air pollution control agency established by two or more States, or

(2) an air pollution control agency of two or more municipalities located in different States.

(d) The term ''State'' means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

(e) The term ''person'' includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

(f) The term ''municipality'' means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

(g) The term ''air pollutant'' means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term ''air pollutant'' is used.

(h) All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

(i) The term ''Federal land manager'' means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(j) Except as otherwise expressly provided, the terms ''major stationary source'' and ''major emitting facility'' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

(k) The terms ''emission limitation'' and ''emission standard'' mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design,

emption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions*. The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability*. This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity*. Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded*. Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),,[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and pub-

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.
[4] So in original. Probably should be "subsection,".

lishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

[5] So in original. The word "to" probably should not appear.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a ''rule''). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the ''comment period''). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section[6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original ''section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)'', meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I of this chapter, referred to in subsec. (d)(1)(J), was in the original ''subtitle C of title I'', and was translated as reading ''part C of title I'' to reflect the probable intent of Congress, because title I does not contain subtitles.

CODIFICATION

In subsec. (h), ''subchapter II of chapter 5 of title 5'' was substituted for ''the Administrative Procedures Act'' on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

[6] So in original. Probably should be ''sections''.

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out ''or section 7521(b)(5)'' after ''section 7410(f)''.

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking ''under section 7413(d) of this title'' immediately before ''under section 7419 of this title'', was executed by striking ''under section 7413(d) of this title,'' before ''under section 7419 of this title'', to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: ''The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.''

Pub. L. 101–549, §702(c), inserted ''or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title,'' before ''or any other final action of the Administrator''.

Pub. L. 101–549, §302(g), substituted ''section 7412'' for ''section 7412(c)''.

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: ''the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,''.

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: ''promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),''.

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting ''subchapter VI of this chapter'' for ''part B of subchapter I of this chapter'', was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section ''7545(c)(3)'' for ''7545(c)(4)'' of this title.

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other

officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, § 308, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1708.)

CODIFICATION

Section was formerly classified to section 1857h–6 of this title.

PRIOR PROVISIONS

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7609. Policy review

#### (a) Environmental impact

The Administrator shall review and comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter or other provisions of the authority of the Administrator, contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal agency action (other than a project for construction) to which section 4332(2)(C) of this title applies, and (3) proposed regulations published by any department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review.

#### (b) Unsatisfactory legislation, action, or regulation

In the event the Administrator determines that any such legislation, action, or regulation is unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality.

(July 14, 1955, ch. 360, title III, § 309, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1709.)

CODIFICATION

Section was formerly classified to section 1857h–7 of this title.

PRIOR PROVISIONS

A prior section 309 of act July 14, 1955, ch. 360, title III, formerly § 13, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401; renumbered § 306, Oct. 20, 1965, Pub. L. 89–272, title I, § 101(4), 79 Stat. 992; renumbered § 309, Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 506; renumbered § 316, Dec. 31, 1970, Pub. L. 91–604, § 12(a), 84 Stat. 1705, related to appropriations and was classified to section 1857*l* of this title, prior to repeal by section 306 of Pub. L. 95–95. See section 7626 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7610. Other authority

#### (a) Authority and responsibilities under other laws not affected

Except as provided in subsection (b) of this section, this chapter shall not be construed as

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



carry out a permit program under this subchapter.

(July 14, 1955, ch. 360, title V, § 501, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2635.)

### § 7661a. Permit programs

#### (a) Violations

After the effective date of any permit program approved or promulgated under this subchapter, it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate an affected source (as provided in subchapter IV–A of this chapter), a major source, any other source (including an area source) subject to standards or regulations under section 7411 or 7412 of this title, any other source required to have a permit under parts[1] C or D of subchapter I of this chapter, or any other stationary source in a category designated (in whole or in part) by regulations promulgated by the Administrator (after notice and public comment) which shall include a finding setting forth the basis for such designation, except in compliance with a permit issued by a permitting authority under this subchapter. (Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.) The Administrator may, in the Administrator's discretion and consistent with the applicable provisions of this chapter, promulgate regulations to exempt one or more source categories (in whole or in part) from the requirements of this subsection if the Administrator finds that compliance with such requirements is impracticable, infeasible, or unnecessarily burdensome on such categories, except that the Administrator may not exempt any major source from such requirements.

#### (b) Regulations

The Administrator shall promulgate within 12 months after November 15, 1990, regulations establishing the minimum elements of a permit program to be administered by any air pollution control agency. These elements shall include each of the following:

(1) Requirements for permit applications, including a standard application form and criteria for determining in a timely fashion the completeness of applications.

(2) Monitoring and reporting requirements.

(3)(A) A requirement under State or local law or interstate compact that the owner or operator of all sources subject to the requirement to obtain a permit under this subchapter pay an annual fee, or the equivalent over some other period, sufficient to cover all reasonable (direct and indirect) costs required to develop and administer the permit program requirements of this subchapter, including section 7661f of this title, including the reasonable costs of—

(i) reviewing and acting upon any application for such a permit,

(ii) if the owner or operator receives a permit for such source, whether before or after November 15, 1990, implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

(iii) emissions and ambient monitoring,

(iv) preparing generally applicable regulations, or guidance,

(v) modeling, analyses, and demonstrations, and

(vi) preparing inventories and tracking emissions.

(B) The total amount of fees collected by the permitting authority shall conform to the following requirements:

(i) The Administrator shall not approve a program as meeting the requirements of this paragraph unless the State demonstrates that, except as otherwise provided in subparagraphs[2] (ii) through (v) of this subparagraph, the program will result in the collection, in the aggregate, from all sources subject to subparagraph (A), of an amount not less than $25 per ton of each regulated pollutant, or such other amount as the Administrator may determine adequately reflects the reasonable costs of the permit program.

(ii) As used in this subparagraph, the term ''regulated pollutant'' shall mean (I) a volatile organic compound; (II) each pollutant regulated under section 7411 or 7412 of this title; and (III) each pollutant for which a national primary ambient air quality standard has been promulgated (except that carbon monoxide shall be excluded from this reference).

(iii) In determining the amount under clause (i), the permitting authority is not required to include any amount of regulated pollutant emitted by any source in excess of 4,000 tons per year of that regulated pollutant.

(iv) The requirements of clause (i) shall not apply if the permitting authority demonstrates that collecting an amount less than the amount specified under clause (i) will meet the requirements of subparagraph (A).

(v) The fee calculated under clause (i) shall be increased (consistent with the need to cover the reasonable costs authorized by subparagraph (A)) in each year beginning after 1990, by the percentage, if any, by which the Consumer Price Index for the most recent calendar year ending before the beginning of such year exceeds the Consumer Price Index for the calendar year 1989. For purposes of this clause—

(I) the Consumer Price Index for any calendar year is the average of the Consumer Price Index for all-urban consumers published by the Department of Labor, as of the close of the 12-month period ending on August 31 of each calendar year, and

(II) the revision of the Consumer Price Index which is most consistent with the Consumer Price Index for calendar year 1989 shall be used.

[1] So in original. Probably should be ''part''.

[2] So in original. Probably should be ''clauses''.

(C)(i) If the Administrator determines, under subsection (d) of this section, that the fee provisions of the operating permit program do not meet the requirements of this paragraph, or if the Administrator makes a determination, under subsection (i) of this section, that the permitting authority is not adequately administering or enforcing an approved fee program, the Administrator may, in addition to taking any other action authorized under this subchapter, collect reasonable fees from the sources identified under subparagraph (A). Such fees shall be designed solely to cover the Administrator's costs of administering the provisions of the permit program promulgated by the Administrator.

(ii) Any source that fails to pay fees lawfully imposed by the Administrator under this subparagraph shall pay a penalty of 50 percent of the fee amount, plus interest on the fee amount computed in accordance with section 6621(a)(2) of title 26 (relating to computation of interest on underpayment of Federal taxes).

(iii) Any fees, penalties, and interest collected under this subparagraph shall be deposited in a special fund in the United States Treasury for licensing and other services, which thereafter shall be available for appropriation, to remain available until expended, subject to appropriation, to carry out the Agency's activities for which the fees were collected. Any fee required to be collected by a State, local, or interstate agency under this subsection shall be utilized solely to cover all reasonable (direct and indirect) costs required to support the permit program as set forth in subparagraph (A).

(4) Requirements for adequate personnel and funding to administer the program.

(5) A requirement that the permitting authority have adequate authority to:

(A) issue permits and assure compliance by all sources required to have a permit under this subchapter with each applicable standard, regulation or requirement under this chapter;

(B) issue permits for a fixed term, not to exceed 5 years;

(C) assure that upon issuance or renewal permits incorporate emission limitations and other requirements in an applicable implementation plan;

(D) terminate, modify, or revoke and reissue permits for cause;

(E) enforce permits, permit fee requirements, and the requirement to obtain a permit, including authority to recover civil penalties in a maximum amount of not less than $10,000 per day for each violation, and provide appropriate criminal penalties; and

(F) assure that no permit will be issued if the Administrator objects to its issuance in a timely manner under this subchapter.

(6) Adequate, streamlined, and reasonable procedures for expeditiously determining when applications are complete, for processing such applications, for public notice, including offering an opportunity for public comment and a hearing, and for expeditious review of permit actions, including applications, renewals, or revisions, and including an opportunity for judicial review in State court of the final permit action by the applicant, any person who participated in the public comment process, and any other person who could obtain judicial review of that action under applicable law.

(7) To ensure against unreasonable delay by the permitting authority, adequate authority and procedures to provide that a failure of such permitting authority to act on a permit application or permit renewal application (in accordance with the time periods specified in section 7661b of this title or, as appropriate, subchapter IV–A of this chapter) shall be treated as a final permit action solely for purposes of obtaining judicial review in State court of an action brought by any person referred to in paragraph (6) to require that action be taken by the permitting authority on such application without additional delay.

(8) Authority, and reasonable procedures consistent with the need for expeditious action by the permitting authority on permit applications and related matters, to make available to the public any permit application, compliance plan, permit, and monitoring or compliance report under section 7661b(e) of this title, subject to the provisions of section 7414(c) of this title.

(9) A requirement that the permitting authority, in the case of permits with a term of 3 or more years for major sources, shall require revisions to the permit to incorporate applicable standards and regulations promulgated under this chapter after the issuance of such permit. Such revisions shall occur as expeditiously as practicable and consistent with the procedures established under paragraph (6) but not later than 18 months after the promulgation of such standards and regulations. No such revision shall be required if the effective date of the standards or regulations is a date after the expiration of the permit term. Such permit revision shall be treated as a permit renewal if it complies with the requirements of this subchapter regarding renewals.

(10) Provisions to allow changes within a permitted facility (or one operating pursuant to section 7661b(d) of this title) without requiring a permit revision, if the changes are not modifications under any provision of subchapter I of this chapter and the changes do not exceed the emissions allowable under the permit (whether expressed therein as a rate of emissions or in terms of total emissions:[3] *Provided*, That the facility provides the Administrator and the permitting authority with written notification in advance of the proposed changes which shall be a minimum of 7 days, unless the permitting authority provides in its regulations a different timeframe for emergencies.

**(c) Single permit**

A single permit may be issued for a facility with multiple sources.

**(d) Submission and approval**

(1) Not later than 3 years after November 15, 1990, the Governor of each State shall develop

[3] So in original. A closing parenthesis probably should precede the colon.

and submit to the Administrator a permit program under State or local law or under an interstate compact meeting the requirements of this subchapter. In addition, the Governor shall submit a legal opinion from the attorney general (or the attorney for those State air pollution control agencies that have independent legal counsel), or from the chief legal officer of an interstate agency, that the laws of the State, locality, or the interstate compact provide adequate authority to carry out the program. Not later than 1 year after receiving a program, and after notice and opportunity for public comment, the Administrator shall approve or disapprove such program, in whole or in part. The Administrator may approve a program to the extent that the program meets the requirements of this chapter, including the regulations issued under subsection (b) of this section. If the program is disapproved, in whole or in part, the Administrator shall notify the Governor of any revisions or modifications necessary to obtain approval. The Governor shall revise and resubmit the program for review under this section within 180 days after receiving notification.

(2)(A) If the Governor does not submit a program as required under paragraph (1) or if the Administrator disapproves a program submitted by the Governor under paragraph (1), in whole or in part, the Administrator may, prior to the expiration of the 18-month period referred to in subparagraph (B), in the Administrator's discretion, apply any of the sanctions specified in section 7509(b) of this title.

(B) If the Governor does not submit a program as required under paragraph (1), or if the Administrator disapproves any such program submitted by the Governor under paragraph (1), in whole or in part, 18 months after the date required for such submittal or the date of such disapproval, as the case may be, the Administrator shall apply sanctions under section 7509(b) of this title in the same manner and subject to the same deadlines and other conditions as are applicable in the case of a determination, disapproval, or finding under section 7509(a) of this title.

(C) The sanctions under section 7509(b)(2) of this title shall not apply pursuant to this paragraph in any area unless the failure to submit or the disapproval referred to in subparagraph (A) or (B) relates to an air pollutant for which such area has been designated a nonattainment area (as defined in part D of subchapter I of this chapter).

(3) If a program meeting the requirements of this subchapter has not been approved in whole for any State, the Administrator shall, 2 years after the date required for submission of such a program under paragraph (1), promulgate, administer, and enforce a program under this subchapter for that State.

**(e) Suspension**

The Administrator shall suspend the issuance of permits promptly upon publication of notice of approval of a permit program under this section, but may, in such notice, retain jurisdiction over permits that have been federally issued, but for which the administrative or judicial review process is not complete. The Administrator shall continue to administer and enforce federally issued permits under this subchapter until they are replaced by a permit issued by a permitting program. Nothing in this subsection should be construed to limit the Administrator's ability to enforce permits issued by a State.

**(f) Prohibition**

No partial permit program shall be approved unless, at a minimum, it applies, and ensures compliance with, this subchapter and each of the following:

(1) All requirements established under subchapter IV–A of this chapter applicable to ''affected sources''.

(2) All requirements established under section 7412 of this title applicable to ''major sources'', ''area sources,'' and ''new sources''.

(3) All requirements of subchapter I of this chapter (other than section 7412 of this title) applicable to sources required to have a permit under this subchapter.

Approval of a partial program shall not relieve the State of its obligation to submit a complete program, nor from the application of any sanctions under this chapter for failure to submit an approvable permit program.

**(g) Interim approval**

If a program (including a partial permit program) submitted under this subchapter substantially meets the requirements of this subchapter, but is not fully approvable, the Administrator may by rule grant the program interim approval. In the notice of final rulemaking, the Administrator shall specify the changes that must be made before the program can receive full approval. An interim approval under this subsection shall expire on a date set by the Administrator not later than 2 years after such approval, and may not be renewed. For the period of any such interim approval, the provisions of subsection (d)(2) of this section, and the obligation of the Administrator to promulgate a program under this subchapter for the State pursuant to subsection (d)(3) of this section, shall be suspended. Such provisions and such obligation of the Administrator shall apply after the expiration of such interim approval.

**(h) Effective date**

The effective date of a permit program, or partial or interim program, approved under this subchapter, shall be the effective date of approval by the Administrator. The effective date of a permit program, or partial permit program, promulgated by the Administrator shall be the date of promulgation.

**(i) Administration and enforcement**

(1) Whenever the Administrator makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, the Administrator shall provide notice to the State and may, prior to the expiration of the 18-month period referred to in paragraph (2), in the Administrator's discretion, apply any of the sanctions specified in section 7509(b) of this title.

(2) Whenever the Administrator makes a determination that a permitting authority is not

Appellate Case: 25-9548 Document: 26 Date Filed: 02/13/2026 Page: 100


adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, 18 months after the date of the notice under paragraph (1), the Administrator shall apply the sanctions under section 7509(b) of this title in the same manner and subject to the same deadlines and other conditions as are applicable in the case of a determination, disapproval, or finding under section 7509(a) of this title.

(3) The sanctions under section 7509(b)(2) of this title shall not apply pursuant to this subsection in any area unless the failure to adequately enforce and administer the program relates to an air pollutant for which such area has been designated a nonattainment area.

(4) Whenever the Administrator has made a finding under paragraph (1) with respect to any State, unless the State has corrected such deficiency within 18 months after the date of such finding, the Administrator shall, 2 years after the date of such finding, promulgate, administer, and enforce a program under this subchapter for that State. Nothing in this paragraph shall be construed to affect the validity of a program which has been approved under this subchapter or the authority of any permitting authority acting under such program until such time as such program is promulgated by the Administrator under this paragraph.

(July 14, 1955, ch. 360, title V, § 502, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2635.)

### § 7661b. Permit applications

#### (a) Applicable date

Any source specified in section 7661a(a) of this title shall become subject to a permit program, and required to have a permit, on the later of the following dates—

(1) the effective date of a permit program or partial or interim permit program applicable to the source; or

(2) the date such source becomes subject to section 7661a(a) of this title.

#### (b) Compliance plan

(1) The regulations required by section 7661a(b) of this title shall include a requirement that the applicant submit with the permit application a compliance plan describing how the source will comply with all applicable requirements under this chapter. The compliance plan shall include a schedule of compliance, and a schedule under which the permittee will submit progress reports to the permitting authority no less frequently than every 6 months.

(2) The regulations shall further require the permittee to periodically (but no less frequently than annually) certify that the facility is in compliance with any applicable requirements of the permit, and to promptly report any deviations from permit requirements to the permitting authority.

#### (c) Deadline

Any person required to have a permit shall, not later than 12 months after the date on which the source becomes subject to a permit program approved or promulgated under this subchapter, or such earlier date as the permitting authority may establish, submit to the permitting authority a compliance plan and an application for a permit signed by a responsible official, who shall certify the accuracy of the information submitted. The permitting authority shall approve or disapprove a completed application (consistent with the procedures established under this subchapter for consideration of such applications), and shall issue or deny the permit, within 18 months after the date of receipt thereof, except that the permitting authority shall establish a phased schedule for acting on permit applications submitted within the first full year after the effective date of a permit program (or a partial or interim program). Any such schedule shall assure that at least one-third of such permits will be acted on by such authority annually over a period of not to exceed 3 years after such effective date. Such authority shall establish reasonable procedures to prioritize such approval or disapproval actions in the case of applications for construction or modification under the applicable requirements of this chapter.

#### (d) Timely and complete applications

Except for sources required to have a permit before construction or modification under the applicable requirements of this chapter, if an applicant has submitted a timely and complete application for a permit required by this subchapter (including renewals), but final action has not been taken on such application, the source's failure to have a permit shall not be a violation of this chapter, unless the delay in final action was due to the failure of the applicant timely to submit information required or requested to process the application. No source required to have a permit under this subchapter shall be in violation of section 7661a(a) of this title before the date on which the source is required to submit an application under subsection (c) of this section.

#### (e) Copies; availability

A copy of each permit application, compliance plan (including the schedule of compliance), emissions or compliance monitoring report, certification, and each permit issued under this subchapter, shall be available to the public. If an applicant or permittee is required to submit information entitled to protection from disclosure under section 7414(c) of this title, the applicant or permittee may submit such information separately. The requirements of section 7414(c) of this title shall apply to such information. The contents of a permit shall not be entitled to protection under section 7414(c) of this title.

(July 14, 1955, ch. 360, title V, § 503, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2641.)

### § 7661c. Permit requirements and conditions

#### (a) Conditions

Each permit issued under this subchapter shall include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and such other conditions as are necessary to as-

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO




(d) If the Administrator disapproves the State program he or she shall notify the State of the reasons for disapproval and of any revisions or modifications to the State program which are necessary to obtain approval.

[48 FR 14178, Apr. 1, 1983; 50 FR 6941, Feb. 19, 1985]

**§ 123.62 Procedures for revision of State programs.**

(a) Either EPA or the approved State may initiate program revision. Program revision may be necessary when the controlling Federal or State statutory or regulatory authority is modified or supplemented. The State shall keep EPA fully informed of any proposed modifications to its basic statutory or regulatory authority, its forms, procedures, or priorities. Grounds for program revision include cases where a State's existing approved program includes authority to issue NPDES permits for activities on a Federal Indian reservation and an Indian Tribe has subsequently been approved for assumption of the NPDES program under 40 CFR part 123 extending to those lands.

(b) Revision of a State program shall be accomplished as follows:

(1) The State shall submit a modified program description, Attorney General's statement, Memorandum of Agreement, or such other documents as EPA determines to be necessary under the circumstances.

(2) Whenever EPA determines that the proposed program revision is substantial, EPA shall issue public notice and provide an opportunity to comment for a period of at least 30 days. The public notice shall be mailed to interested persons and shall be published in the FEDERAL REGISTER and in enough of the largest newspapers in the State to provide Statewide coverage. The public notice shall summarize the proposed revisions and provide for the opportunity to request a public hearing. Such a hearing will be held if there is significant public interest based on requests received.

(3) The Administrator will approve or disapprove program revisions based on the requirements of this part (or, in the case of a sewage sludge management program, 40 CFR part 501) and of the CWA.

(4) A program revision shall become effective upon the approval of the Administrator. Notice of approval of any substantial revision shall be published in the FEDERAL REGISTER. Notice of approval of non-substantial program revisions may be given by a letter from the Administrator to the State Governor or his designee.

(c) States with approved programs must notify EPA whenever they propose to transfer all or part of any program from the approved State agency to any other State agency, and must identify any new division of responsibilities among the agencies involved. The new agency is not authorized to administer the program until approved by the Administrator under paragraph (b) of this section. Organizational charts required under §123.22(b) (or, in the case of a sewage sludge management program, §501.12(b) of this chapter) must be revised and resubmitted.

(d) Whenever the Administrator has reason to believe that circumstances have changed with respect to a State program, he may request, and the State shall provide, a supplemental Attorney General's statement, program description, or such other documents or information as are necessary.

(e) *State NPDES programs only.* All new programs must comply with these regulations immediately upon approval. Any approved State section 402 permit program which requires revision to conform to this part shall be so revised within one year of the date of promulgation of these regulations, unless a State must amend or enact a statute in order to make the required revision in which case such revision shall take place within 2 years, except that revision of State programs to implement the requirements of 40 CFR part 403 (pretreatment) shall be accomplished as provided in 40 CFR 403.10. In addition, approved States shall submit, within 6 months, copies of their permit forms for EPA review and approval. Approved States shall also assure that permit applicants, other than POTWs, submit, as part of their application, the information required under §§124.4(d) and 122.21 (g) or (h), as appropriate.

(f) Revision of a State program by a Great Lakes State or Tribe (as defined in 40 CFR 132.2) to conform to section 118 of the CWA and 40 CFR part 132 shall be accomplished pursuant to 40 CFR part 132.

[48 FR 14178, Apr. 1, 1983, as amended at 49 FR 31842, Aug. 8, 1984; 50 FR 6941, Feb. 19, 1985; 53 FR 33007, Sept. 6, 1988; 58 FR 67983, Dec. 22, 1993; 60 FR 15386, Mar. 23, 1995; 63 FR 45123, Aug. 24, 1998]

**§ 123.63 Criteria for withdrawal of State programs.**

(a) In the case of a sewage sludge management program, references in this section to ''this part'' will be deemed to refer to 40 CFR part 501. The Administrator may withdraw program approval when a State program no longer complies with the requirements of this part, and the State fails to take corrective action. Such circumstances include the following:

(1) Where the State's legal authority no longer meets the requirements of this part, including:

(i) Failure of the State to promulgate or enact new authorities when necessary; or

(ii) Action by a State legislature or court striking down or limiting State authorities.

(2) Where the operation of the State program fails to comply with the requirements of this part, including:

(i) Failure to exercise control over activities required to be regulated under this part, including failure to issue permits;

(ii) Repeated issuance of permits which do not conform to the requirements of this part; or

(iii) Failure to comply with the public participation requirements of this part.

(3) Where the State's enforcement program fails to comply with the requirements of this part, including:

(i) Failure to act on violations of permits or other program requirements;

(ii) Failure to seek adequate enforcement penalties or to collect administrative fines when imposed; or

(iii) Failure to inspect and monitor activities subject to regulation.

(4) Where the State program fails to comply with the terms of the Memorandum of Agreement required under §123.24 (or, in the case of a sewage sludge management program, §501.14 of this chapter).

(5) Where the State fails to develop an adequate regulatory program for developing water quality-based effluent limits in NPDES permits.

(6) Where a Great Lakes State or Tribe (as defined in 40 CFR 132.2) fails to adequately incorporate the NPDES permitting implementation procedures promulgated by the State, Tribe, or EPA pursuant to 40 CFR part 132 into individual permits.

(b) [Reserved]

[48 FR 14178, Apr. 1, 1983; 50 FR 6941, Feb. 19, 1985, as amended at 54 FR 23897, June 2, 1989; 60 FR 15386, Mar. 23, 1995; 63 FR 45123, Aug. 24, 1998]

**§ 123.64 Procedures for withdrawal of State programs.**

(a) A State with a program approved under this part (or, in the case of a sewage sludge management program, 40 CFR part 501) may voluntarily transfer program responsibilities required by Federal law to EPA by taking the following actions, or in such other manner as may be agreed upon with the Administrator.

(1) The State shall give the Administrator 180 days notice of the proposed transfer and shall submit a plan for the orderly transfer of all relevant program information not in the possession of EPA (such as permits, permit files, compliance files, reports, permit applications) which are necessary for EPA to administer the program.

(2) Within 60 days of receiving the notice and transfer plan, the Administrator shall evaluate the State's transfer plan and shall identify any additional information needed by the Federal government for program administration and/or identify any other deficiencies in the plan.

(3) At least 30 days before the transfer is to occur the Administrator shall publish notice of the transfer in the FEDERAL REGISTER and in enough of the largest newspapers in the State to provide Statewide coverage, and shall mail notice to all permit holders, permit applicants, other regulated persons and other interested persons on appropriate EPA and State mailing lists.